# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, et al.,

         Plaintiffs,

   v.

SOCIAL SECURITY
ADMINISTRATION, et al.,

         Defendants.

Case No. 1:25-cv-00596-ELH

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR 5 U.S.C. § 705 STAY**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 1

I.    The United States DOGE Service ............................................................................ 1

II.   The DOGE Team at the Social Security Administration ......................................... 2

III.  This Litigation ......................................................................................................... 4

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT .................................................................................................................. 6

I.    The Court Lacks Jurisdiction over Plaintiffs' Claims. ............................................ 6

      A.    Plaintiffs Lack Standing. ................................................................................ 6

            1.    *Plaintiffs Do Not Have Members with Standing to Sue in Their Own Right.* ......... 8

            2.    *Individual Participation Is Necessary as to the Privacy Act Claims
                  (Counts I, II).* ...................................................................................... 11

      B.    Plaintiffs Fail to Establish Reviewable Final Agency Action. ...................... 13

            1.    *Plaintiffs Have Failed to Clearly Identify the Agency Action They Challenge.* ... 13

            2.    *Access Decisions Are Not Reviewable "Agency Action."* ................... 14

            3.    *Plaintiffs Have Failed to Identify "Final" Agency Action.* ................. 16

II.   Even if There Were Jurisdiction, Plaintiffs Are Not Likely to Succeed on the Merits of Their
      Claims. .................................................................................................................... 19

      A.    Plaintiffs Cannot Use the APA to Avoid the Privacy Act's Narrow Cause of Action. 19

      B.    There Is No Privacy Act Violation. .............................................................. 20

      C.    There Is No Violation of Section 6013/SSA Regulations. ............................ 23

      D.    Defendants' Conduct Is Not Arbitrary and Capricious. ............................... 26

      E.    Plaintiffs' Ultra Vires Claim Also Fails. ..................................................... 27

III.  Plaintiffs Cannot Show Irreparable Harm. ............................................................ 28

IV.  The Public Interest and Balance of Equities Counsel Against an Injunction......................... 29

CONCLUSION......................................................................................................................... 30

## INTRODUCTION

This Court should deny Plaintiffs' request for emergency injunctive relief because none of the necessary factors weighs in favor of granting their motion. First, Plaintiffs are unlikely to succeed on the merits—their claims fail both at the threshold and in substance. Plaintiffs lack standing because they have not suffered any cognizable Article III injury; their claims are not cognizable under the APA; and they have not alleged a Privacy Act violation because only authorized federal employees have accessed protected data. Second, Plaintiffs' speculation has not shown that they likely face imminent irreparable harm. And finally, both the equities and the public interest support permitting the government to exercise its lawful authority to hire employees and give those employees access to systems as required for their job duties. In sum, the entirety of Plaintiffs' Motion relies on one claim: that it's unlawful for one employee of a federal agency to share information with another authorized federal employee specifically for the purpose of carrying out an Executive Order of the President. That claim cannot be correct, so their Motion fails.

## BACKGROUND

## I.    The United States DOGE Service

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established United States Digital Service, an agency that was designed to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." 90 Fed. Reg. 8441, § 4 (the "EO"). The EO redesignated the United States Digital Service as the Department of Governmental Efficiency Service, or U.S. DOGE Service (the "USDS"). *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within the Executive

Office of the President pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. *Id.* § 3(b). Agency heads are required under the EO to establish within their respective agencies a DOGE Team of at least four employees, which may include Special Government Employees. *Id.* § 3(c).

The EO also directs DOGE to collaborate with Executive agencies to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity as well as ensure data integrity. EO § 4. To accomplish these objectives, the EO directs DOGE to work with relevant agency heads, and vice versa, to ensure that DOGE has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the EO instructs, DOGE must "adhere to rigorous data protection standards." *Id.*

## II. The DOGE Team at the Social Security Administration

Ten individuals at the Social Security Administration ("SSA"), all federal employees, are assisting with implementing the President's directives from the EO as part of the SSA's DOGE Team. Felix-Lawson Decl. ¶ 4. Four of those employees are on detail, subject to written, signed agreements, from other government agencies to the SSA; one employee is in the process of being detailed from National Aeronautics and Space Administration ("NASA") to the SSA; one employee is in the process of being onboarded to SSA as a detailee from the Department of Labor; and four employees were appointed as expert, special government employees under 5 U.S.C. § 3109 and C.F.R. Part 304. Felix-Lawson Decl. ¶¶ 4–12. All ten of the employees have attended a Privacy Training (either in person or via Microsoft Teams) that covered privacy laws applicable to SSA data and the penalties for improper use of that data, as well as an Ethics Training (either in person or via Microsoft Teams) that covered ethics laws applicable to SSA

employees.[1]  *Id.* ¶¶ 13(a)–(b).  These nine employees each also signed an Acknowledgement of

SSA Information Security and Privacy Awareness Training, which covers requirements for

compliance with information security and privacy policies of the SSA.  *Id.* ¶ 13(c).  In addition,

the detailee agreements for the employees detailed to SSA specify that the detailee must not

make unauthorized disclosures of SSA information and that the detailee must follow all SSA

rules and policies while working for SSA.  *Id.* ¶ 14.  Background checks for eight of the

employees were completed with favorable determinations, while the remaining background

checks are still pending.  *Id.* ¶ 15.

Only seven of the ten DOGE Team members at SSA have been granted access to SSA

data or personally identifiable information, or access to systems containing such information.

Russo Decl. ¶¶ 7–16.  These six individuals all received SSA training on topics including ethics,

the Privacy Act, and information security, and acknowledged and signed the Systems Sanctions

Access Policy and Annual Reminders on Safeguarding PII.  *Id.* ¶ 21.  This is the same level of

training provided to other SSA employees.  *Id.*

In each case of data access being granted, the SSA provided read-only access to

production data, which does not allow modification or deletion of the underlying data.  *Id.*  This

level of access provides no access to SSA production automation, code, or configuration files,

and provides no avenues to alter the function of SSA production systems.  *Id.*  In other words,

DOGE Team members can review records needed to detect fraud without being able to change

beneficiary data or payment files.  *Id.*  The specific data sets provided were obtained from SSA's

Enterprise Data Warehouse ("EDW").  *Id.* ¶ 20.  The EDW is an integrated source of data

---

[1] As noted, the tenth DOGE Team member is still in the process of being onboarded from
the Department of Labor.

created to service Management Information ("MI"), Business Intelligence ("BI"), and predictive analytics across SSA. *Id.* EDW data sets, like those provided to the seven DOGE Team members working with SSA, are routinely used for analytics purposes by employees performing analysis on agency data within job duties, such as anti-fraud analysis or research. *Id.* SSA's Office of Financial Policy and Program Integrity confirmed the level of access granted to the DOGE team to perform analysis has similarly been granted to 30–40 employees in their component. *Id.*

### III.    This Litigation

Plaintiffs, two national labor unions and a "grassroots advocacy organization," filed this lawsuit on February 21, 2025. Compl. (ECF 1) ¶¶ 17–19. The Complaint named as defendants the SSA; Leland Dudek, in his official capacity as Acting Commissioner of the SSA; the U.S. DOGE Service; and U.S. DOGE Service Temporary Organization. Though the Complaint requested a variety of injunctive relief (*see, e.g.*, Compl. at 28–29), Plaintiffs did not file their Motion for Temporary Restraining and Preliminary Injunction ("Motion," ECF 21)—accompanied by an Amended Complaint (ECF 17)—until late at night on Friday, March 7, 2025.

In the March 7, 2025, Amended Complaint, Plaintiffs added additional defendants Elon Musk, in his official capacity as Senior Advisor to the President and "de facto Head of DOGE"; Mike Russo, in his official capacity as Chief Information Officer of the SSA; and Amy Gleason, in her official capacity as DOGE Acting Administrator. Am. Compl. ¶¶ 21, 23, 26 (hereinafter, all named defendants referred to collectively as "Defendants"). Broadly speaking, Plaintiffs aver that the granting of access to SSA information and information systems to DOGE Team members was unlawful under the Administrative Procedure Act ("APA") and the Privacy Act (Counts I–V). Plaintiffs also challenge—under the Appointments Clause of the U.S.

Constitution—Mr. Dudek's appointment as Acting Commissioner of the SSA and his ability to provide DOGE Team members access to SSA information (Count VII). Finally, Plaintiffs assert a catchall claim for *ultra vires* that is essentially duplicative of their other claims.

Plaintiffs seek, *inter alia*, injunctive relief that (i) restricts further access to SSA information by DOGE Team members, Mr. Musk, and Ms. Gleason; (ii) requires the deletion of "all unlawfully obtained, disclosed, or accessed data"; and (iii) prohibits Defendants "from installing any software on SSA devices, information systems, or systems of record" or "accessing, altering, or disclosing any SSA computer or software code." ECF 21 ¶¶ 1–7.

## LEGAL STANDARD

Whether to grant interim injunctive relief is within the Court's "sound discretion." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). However, granting such relief "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. The danger of a mistake in this setting is substantial." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) (cleaned up). Accordingly, "[f]ederal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1992) (quotations omitted); *Robinson v. Wexford Health*, 2018 WL 4961658, at *2 (D. Md. Oct. 15, 2018).

"[W]hen the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary injunction." Wright and Miller, 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed.); *see also Robinson*, 2018 WL 4961658, at *2. Namely, a party seeking a preliminary injunction or

5

TRO must establish: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction serves the public interest. *Pevia v. Hogan*, 443 F. Supp. 3d 612, 643 (D. Md. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[A]ll four requirements must be satisfied." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010). The movant's burden is "exceedingly high." *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024), *cert. granted sub. nom Mahmoud v. Taylor*, -- S. Ct. --, 2025 WL 226842 (Jan. 17, 2025) (Mem.). Further, "[w]henever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Consol. Coal Co. v. Disabled Miners*, 442 F.2d 1261, 1267 (4th Cir. 1971).

## ARGUMENT

### I. The Court Lacks Jurisdiction over Plaintiffs' Claims.

#### A. Plaintiffs Lack Standing.

"The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing." *Barton v. District of Columbia*, 131 F. Supp. 2d 236, 243 n.6 (D.D.C. 2001); *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (court has "an independent obligation to assure that standing exists"). "The burden of establishing standing to sue lies squarely on the party claiming subject-matter jurisdiction." *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005). Because Plaintiffs fail to carry their burden, the Court should deny Plaintiffs' Motion without further inquiry.

Article III of the Constitution extends the "judicial Power" of the federal courts only to "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1; *see TransUnion LLC v. Ramirez*, 594

6

U.S. 413, 423 (2021).  There is a case or controversy only if the plaintiff has standing to assert their claim.  *TransUnion*, 594 U.S. at 423.  At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024).  This requirement assures that there is a "real need to exercise the power of judicial review in order to protect the interests of the complaining party."  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).  The standing inquiry is especially rigorous when a plaintiff seeks to enjoin the executive branch, to prevent the Court from exercising "general legal oversight of the other branches of Government."  *Murthy v. Missouri*, 66 U.S. 43, 76 (2024) (cleaned up).

An organization can assert standing "either in its own right or as a representative of its members."  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).  An organization establishes "representational standing" by demonstrating that: "'(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.'"  *Id.* at 184 (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)).  To satisfy the first prong, organizational plaintiffs must offer specific facts "establishing that at least one *identified member* had suffered or would suffer harm."  *Summers*, 555 U.S. at 498 (emphasis added); *Defs. of Wildlife*, 504 U.S. at 563.

Plaintiffs are three organizations: AFSCME (the "largest trade union of public employees in the United States, with around 1.4 million members"); ARA (a "grassroots advocacy organization with 4.4 million members"); and AFT (a national labor organization "representing over 1.8 million members"). Am. Compl. ¶¶ 16–18. Plaintiffs' standing argument resides in one footnote in their 27-page brief. Mot. at 13 n.32. Therein, Plaintiffs do not argue that they have standing "in [their] own right." *S. Walk at Broadlands*, 713 F.3d at 182; *see* Mot. at 13 n.32; *see also, e.g.*, Am. Compl. ¶¶ 88–97 (describing "Harms to Plaintiffs"). Plaintiffs appear to raise only a representational standing argument, but they fail to satisfy at least prongs one and three of the representational-standing inquiry.

      *1.   Plaintiffs Do Not Have Members with Standing to Sue in Their Own Right.*

<u>Plaintiffs' Members Do Not Demonstrate Injury-in-Fact.</u> To establish representational standing, Plaintiffs must show that their individual members have suffered injury-in-fact— "actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "certainly impending"; "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And it must be "concrete—that is, real, and not abstract." *TransUnion*, 594 U.S. at 424.

Plaintiffs summarily assert that their members "have been and continue to be harmed by the disclosure of their highly sensitive information to DOGE personnel," Mot. at 13 n.32, but do not explain how. Plaintiffs' Amended Complaint alleges only that an unknown number of unnamed members either participate in an SSA program or receive SSA benefits, Am. Compl. ¶ 88, and that Defendants' alleged conduct has harmed this subset of Plaintiffs' members by "depriving them of privacy protections guaranteed by federal law and by making their

information available for, and subject to, investigation by DOGE and scammers," *id.* ¶ 97.[2]  The

Declarations accompanying Plaintiffs' Motion similarly assert that Plaintiffs' members were

injured "by the release of their data to DOGE personnel as soon as those personnel gained access

to it."  *See, e.g.*, Wigler Decl. (Ex. A, ECF 22-1) ¶¶ 14, 34 (AFSCME Director); Conrad Decl.

(Ex. B, ECF 22-2) ¶ 7 (AFSCME Member).  In other words, Plaintiffs' theory of injury-in-fact is

that their members have provided various forms of information to SSA with the expectation of

confidentiality and privacy, and that Defendants' actions in allowing certain USDS employees to

access those records violates the members' reasonable expectations.

That theory fails.  As a threshold matter, Plaintiffs may not predicate standing on the

existence of their statutory claims.  Even if Plaintiffs were likely to succeed on the merits of their

claims (they are not), a statutory violation, by itself, is not a cognizable Article III injury.

*TransUnion*, 594 U.S. at 426–27.  Rather, "[o]nly those plaintiffs who have been *concretely*

*harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in

federal court."  *Id.*; *see also O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 243 (4th Cir. 2023) ("The

intangible harm of enduring a statutory violation, standing alone, typically won't suffice under

Article III[.]"); *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 347 (4th Cir. 2017) (alleged

informational injury from the violation of a Fair Credit Reporting Act provision was not a

concrete injury when the plaintiff did not allege how the violation adversely affected him).  To

demonstrate concrete harm, Plaintiffs' members must have sustained "physical, monetary, or

---

[2] Again, to satisfy prong one, Plaintiffs must prove that at least one identified member
has suffered or will suffer harm.  *Summers*, 555 U.S. at 498.  There is a "limited exception" to
this identification requirement that applies in cases where "all members of an organization are
harmed."  *S. Walk at Broadlands*, 713 F.3d at 184.  Here, though, Plaintiffs do not allege—much
less provide evidence—showing that every single one of their millions of members have been
harmed by Defendants' alleged conduct.  *See generally* Am. Compl. ¶¶ 88–97.

cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts" arising from USDS's access to SSA data. *Id.* at 427. Access to information— if unaccompanied by disclosure of that information—is not a cognizable intangible harm. *See O'Leary*, 60 F.4th at 246 (rejecting the plaintiffs' proposed analogy to the traditional tort of intrusion upon seclusion because there was no "unwanted intrusion into the home"); *Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245–50 (11th Cir. 2022) (en banc) (no cognizable injury from disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public); *id.* at 1246 (collecting cases); *Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 231–32 (M.D. Pa. 2023) (discussing the tort); Rest. 2d of Torts § 652D ("Publicity given to private life"); *see also TransUnion*, 594 U.S. at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation.").[3]

Plaintiffs do not contend that their members were victims of any disclosure of their SSA information to non-government actors. Were it enough for a plaintiff to establish standing simply by alleging that the holder of her personal information used it in a manner contrary to her subjective expectations, the limits the Supreme Court has carefully established to govern when disclosure of information constitutes injury-in-fact, including the requirement to identify a historical analogue, would be obliterated. *TransUnion*, 594 U.S. 413. Because USDS's mere

---

[3] Defendants recognize that Judge Boardman recently found concrete injury in a similar case brought by AFT against other federal agencies, by analogy to the common-law tort of intrusion upon seclusion. *See Am. Fed'n of Teachers v. Bessent*, -- F.Supp.3d --, 2025 WL 582063, at *6, *7 (D. Md. Feb. 24, 2025). The court's holding in that case—that a government worker's access to information stored by another government worker is "disclosure" sufficient to establish concrete injury—is inconsistent with *TransUnion* and the Fourth Circuit's holding in *TrustedID*. Even if Plaintiffs were not required to show that their private information was disseminated to the public, the absence of any evidence that the information has been seen outside of SSA and a handful of USDS employees is fatal to their claim of Article III injury.

access to SSA data is not a physical, monetary, or cognizable harm, it cannot establish injury-in-fact for Article III standing.

    <u>Plaintiffs' Members Do Not Demonstrate Causation.</u>  Plaintiffs also fail to establish the crucial element of causation for their members.  For example, some of Plaintiffs' claims amount to an allegation that third-party bad actors will gain access to the members' sensitive information and abuse it.  *See, e.g.*, Conrad Decl. ¶ 8.  For Plaintiffs' theory to hold water, they would have to demonstrate that: (1) access by the DOGE individuals will—by some unknown mechanism—materially increase the risk of hacking, notwithstanding SSA's existing internal controls; (2) there will be a cybersecurity incident that will compromise SSA's information; (3) the Plaintiffs' members' information specifically will be compromised; and (4) compromise will cause the Plaintiffs' members cognizable harm.  Relying on this "speculative chain of possibilities . . . does not establish that injury based on potential future [action] is certainly impending or is fairly traceable[.]"  *Clapper*, 568 U.S. at 414; *O'Leary*, 60 F.4th at 244 ("[B]eing subjected to a data breach isn't in and of itself sufficient to establish Article III standing without a nonspeculative, increased risk of identity theft.").

    "Article III excludes plaintiffs who rely on an abstract statutory privacy injury unless it came with a nonspeculative increased risk of identity theft."  *O'Leary*, 60 F.4th at 244.  There being no such increased risk here, Plaintiffs have failed to show injury-in-fact.

    2.  *Individual Participation Is Necessary as to the Privacy Act Claims (Counts I, II).*

    Regarding prong three of the representational-standing inquiry, Plaintiffs assert that "the participation of individuals is unnecessary here, as the relief sought is equitable."  Mot. at 13 n.32 (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (stating that individual participation is "not *normally* necessary when an association

seeks prospective or injunctive relief for its members" (emphasis added)).  However, a plaintiff cannot satisfy prong three of the representational-standing inquiry simply by stating that it seeks only injunctive relief.  *See United Food & Com. Workers Union Loc. 751*, 517 U.S. at 546; *see also, e.g.*, *Hunt v. Wash. State Apple Ad. Comm'n*, 432 U.S. 333, 343 (1977) (explaining that the third prong of the representational-standing inquiry "depends in *substantial* measure" on the nature of the relief sought (emphasis added)).  Plaintiffs must show that *neither* the claims they have brought *nor* the relief they have sought "requires the participation of individual members in the lawsuit.'"  *S. Walk at Broadlands*, 713 F.3d at 184.

Assuming *arguendo* that Plaintiffs' requested injunctive relief does not require their members' participation, the same cannot be said for their Privacy Act claims (Counts I and II).  The Privacy Act does not provide for injunctive relief for disclosure claims and requires specific disclosures with respect to specific persons; in other words, the violations themselves are individualized.  *See* 5 U.S.C. § 552a(g)(4) (providing for a damages suit with recovery based on the "actual damages sustained by the individual").  There is a reason that organizations and associations cannot statutorily bring Privacy Act claims: those claims are specific and personal to individual persons.  *See* 5 U.S.C. § 552a(b)(4) (defining covered "records" to pertain to "individuals"), (2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence").  Plaintiffs should not be permitted to side-step those requirements here.  Because the Privacy Act requires "individualized determinations" to establish violations, the participation of individual members is required—and Plaintiffs lack representational standing.  *See, e.g.*, *Travelers United, Inc. v. Hyatt Hotels Corp.*, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025) (rejecting representational standing claim when "individualized determinations" were required).

12

B.    <u>Plaintiffs Fail to Establish Reviewable Final Agency Action</u>.

This Court lacks authority to resolve Plaintiffs' claims for an additional reason: Only "final agency action" is reviewable under the APA.  5 U.S.C. § 704.  In the Fourth Circuit, the inquiry is jurisdictional.  *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024); *City of New York v. DoD*, 913 F.3d 423, 430 (4th Cir. 2019).

The "final agency action" requirement has two distinct parts.  First, the challenged act must be an "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent."  5 U.S.C. § 551(13).  Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*"), against programs for which they are seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  As the Court explained in *Lujan*, moreover, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations."  *Id.* at 899.

Second, agency action must be "final."  There is a two-part test for finality, including that: (1) "the action must mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature"; and (2) the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]."  5 U.S.C. § 704.

1.  *Plaintiffs Have Failed to Clearly Identify the Agency Action They Challenge*.

Plaintiffs' Amended Complaint and Motion fail to identify a reviewable agency action. Instead, the Amended Complaint merely asserts the legal conclusion that the "Defendants'

13

conduct constitutes final agency action." Am. Compl. ¶¶ 103, 115, 119, 123. These allegations would be insufficient to survive even the minimal standards of a Rule 12(b)(6) motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (plaintiffs must go beyond "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" as such barebones pleadings "do not suffice"). Plaintiffs' Motion, for its part, targets the provision of access to certain informational systems to one individual, Mr. Bobba, but goes on to contend that that unnamed other "DOGE Officials have been able to access at least" several SSA informational systems. Mot. at 9; *see also* Am. Compl. ¶ 86; Mot. at 7–10.

It is unclear, for example, whether the alleged wrongful action is the provision of access to Mr. Bobba, the provision of access to Mr. Bobba and to other employees, or the advent of a new—or change to an existing—formal agency policy regarding access to agency informational systems, or sharing of data from those systems. Without clearly identifying an alleged agency action, it is impossible to examine such alleged action under the APA's standards or to craft meaningful preliminary relief. So much should doom Plaintiffs' Motion from the outset.

### 2. *Access Decisions Are Not Reviewable "Agency Action."*

To the extent Plaintiffs' alleged agency action can be loosely defined as the provision of access to certain government employees to certain SSA informational systems, this fails to constitute actionable final agency action under the APA.

The APA provides a list of five actions which it considers to be "agency action": rules, orders, licenses, sanctions, and relief. 5 U.S.C. § 551(13). The Act further defines each of these terms. *Id.* §§ 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief"). While construed expansively, these terms do not permit judicial review of the day-to-day operations of agencies. Courts recognize that this definition of agency action "is not so all-

encompassing as to authorize courts to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)).  For example, courts do not oversee agency training programs, *see Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023), or "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).  Put another way, judicial review does not reach the agency's "workaday" dealings.  *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427.

The avoidance of such review reflects separation of powers concerns and seeks to prevent the "broad programmatic attacks" disfavored in agency review.  *SUWA*, 542 U.S. at 64; *see also New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (internal quotations and citations omitted) ("When challenging agency action . . . the plaintiff must . . . identify specific and discrete governmental conduct, rather than launch a broad programmatic attack on the government's operations.").  By limiting review to only certain things agencies do, the APA "'protect[s] agencies from undue judicial interference with their lawful discretion, and . . . avoid[s] judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.'"  *Jones*, 701 F. Supp. 3d at 17 (quoting *SUWA*, 542 U.S. at 66).

Plaintiffs' Motion exemplifies this very concern.  It identifies the provision of access to certain SSA informational systems by only one employee, Mr. Bobba.  Mot. at 7–10.  The Motion even goes so far as acknowledging that, in attempting to grant Mr. Bobba access, the agency kept to "standard practices" in onboarding him.  *Id.* at 8–9.  Thus, by Plaintiffs' own framing, the provision of access to Mr. Bobba was a standard application of a preexisting

onboarding procedure to an individual employee.  These are precisely the day-to-day operations the Supreme Court in *Lujan* advised not to sweep into the APA's ambit.  *See Lujan*, 497 U.S. at 899.  As the Fourth Circuit has recognized, "[w]e are woefully ill-suited . . . to adjudicate generalized grievances asking us to improve an agency's performance or operations.  In such a case, courts would be forced either to enter a disfavored 'obey the law' injunction . . . or to engage in day-to-day oversight of the executive's administrative practices.  Both alternatives are foreclosed by the APA, and rightly so."  *New York*, 913 F.3d at 431 (quotations omitted).

Agencies make thousands of such decisions every day, whenever they decide to open an e-mail account for an employee, to staff an employee on a particular matter, or that an employee has the relevant training to access systems or participate in certain programs.  A court could not review such decisions without bringing within the scope of the APA virtually every aspect of an agency's relationship with its employees, a result the "final agency action" limitation of the APA is designed to prevent.

### 3.  *Plaintiffs Have Failed to Identify "Final" Agency Action.*

Plaintiffs' claims fail both *Bennett* prongs because they do not identify an action that marks the "consummation" of the agencies' decision-making process, by which "rights or obligations have been determined" or from which "legal consequences will flow."  *Bennett*, 520 U.S. at 177–78.  Therefore, there is no "final" agency action for the Court to review.

First, Plaintiffs' identified actions are both tentative and interlocutory in nature, as Plaintiffs have not identified: (1) whether additional government employees will be involved in implementing the DOGE Agenda at SSA; (2) what the status of those employees will be (*i.e.* detailees from USDS, direct hires at SSA, or detailees from other agencies); and (3) what systems they will have access to.  *See, e.g.*, Am. Compl. ¶ 87 ("[R]eporting suggests that SSA is

now pushing to get DOGE access to additional data systems[.]").  By contrast, as the Defendants' declarations demonstrate, no new finalized policy has been implemented—or existing policy definitively changed—as SSA continues to onboard employees where needed in a workaday application of previous standards.  *See* Felix-Lawson Decl. ¶¶ 5–15.

Second, the Amended Complaint also fails to demonstrate how providing a new employee with system access necessary to his or her function "consummat[es]" the hiring agency's decision-making process in such a way that legal consequences flow to Plaintiffs.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  This prong of the *Bennett* test is measured by the "actual legal effect (or lack thereof) of the agency action in question on regulated entities."  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014); *see also Mashni v. U.S. Army Corps of Eng'rs*, 535 F. Supp. 3d 475, 482 (D.S.C. 2021) (quoting *Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 925 (E.D. Va. 2013), *aff'd sub nom. Versata Dev. Grp., Inc. v. Lee*, 793 F.3d 1352 (Fed. Cir. 2015)) ("for a decision to constitute a final agency decision, it 'must have a direct and immediate effect on the party's legal rights.'").

For example, the D.C. Circuit has found no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "[did] not subject them to new penalties or enforcement risks."  *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020).  Here, Plaintiff organizations are not regulated, or even affected by, the alleged provision of access to certain government employees at issue in this case.  The fact that such a decision could potentially have practical consequences for the regulated public does not change the analysis.  Adverse effects "accompany many forms of indisputably nonfinal government action.  Initiating an enforcement proceeding against a company, for example, may have a

devastating effect on the company's business, but that does not make the agency's action final."
*Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004).

Here, the data access decision alleged has no "direct and appreciable legal consequences" for any of the Plaintiffs. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). Indeed, as explained above, such decisions do not even give rise to an Article III injury, much less the sort of "legal consequences" that could ground an APA action. Plaintiffs would have to demonstrate that USDS personnel not only do not have a right to access their members' information, but that steps were taken with the information that had legal consequences on Plaintiffs and their members. By analogy, an agency's decision to give an employee access to its systems is not itself final agency action, even if the employee might conceivably use the computer to effect final agency action (*e.g.*, in approving or denying benefits) at some later date. Plaintiffs' claim that they are potentially harmed by the mere provision of access does not undermine this analysis; many unreviewable government actions have a significant effect on the public.[4]

Rendering data access decisions "final agency action" would sweep swaths of routine agency business within the APA's ambit, even though such decisions have no legal consequences for Plaintiffs or their members without some further step by the agency. As such,

---

[4] *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), which Judge Boardman found persuasive, does not, in fact, support the conclusion that Plaintiffs challenge final agency action. There, the EEOC was held to have a concrete (albeit informal) policy of *disclosing* confidential information, including trade secrets, without providing notice to the submitter. *Id.* at 929–30. The D.C. Circuit concluded that a decision "to disclose [a regulated party's] confidential information without notice" satisfied the requirements for reviewable final agency action. *Id.* at 931. By contrast, the decision at issue in this case is about an agency giving information access to other government employees at the direction of the responsible agency, not third parties. Such access decisions as to those working on agency business, with the agency's consent and approval, do not have legal consequences for Plaintiffs in the way a policy of *third-party* disclosure of confidential commercial information would.

the Court should find that Plaintiffs have failed to identify *final* agency action, which is fatal to their APA claims.

## II.    Even if There Were Jurisdiction, Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.

### A.    Plaintiffs Cannot Use the APA to Avoid the Privacy Act's Narrow Cause of Action.

As outlined above, it is not entirely clear what agency action Plaintiffs challenge.  *See supra* at 14.  To the extent that Plaintiffs' contention is that the SSA's decision to grant certain USDS personnel access to agency information systems runs contrary to the APA because it violates the Privacy Act, Plaintiffs cannot use the APA to circumvent the Privacy Act's carefully drawn limitations on the types of relief they can seek.  For this reason, Plaintiffs are unlikely to succeed on their APA claims.  *See* Am. Compl. ¶¶ 98–104, 111–116, 117–120, 121–124.

The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy."  5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").  By contrast, the Privacy Act provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals.  *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)).

Section 552a(g) of the Privacy Act establishes the narrow causes of action for which an "individual may bring a civil action against the agency."  *See* 5 U.S.C. § 552a(g)(1).  It is reasonable, based on the nature of their claims, to assume that Plaintiffs advance an "Other Action."  The Privacy Act, however, only provides for monetary damages for Other Actions, and then only for individuals, as compared to associations.  *See* 5 U.S.C. § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).  Prospective relief, such as that

sought by Plaintiffs, is reserved for Amendment or Access Actions.  5 U.S.C. § 552a(g)(2), (3).

Quite simply, the Privacy Act does not permit organizations to sue for injunctive relief over a

decision to provide access to particular government employees.

Plaintiffs should not be permitted to circumvent the Privacy Act's carefully drawn

constraints by raising purported Privacy Act violations through the APA.  Defendants recognize,

that, in dicta, the Fourth Circuit has suggested that prospective injunctive relief may be available

under the APA for alleged Privacy Act violations.  *See Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th

Cir. 2006).  That dicta is not binding, but even if it were, Defendants raise the argument here to

preserve it.

B.  <u>There Is No Privacy Act Violation</u>.

Putting aside the fact that Plaintiffs cannot invoke the Privacy Act, *see supra*, they have

not established a likelihood of success on the merits of their argument that a Privacy Act

violation has occurred.  The Privacy Act, 5 U.S.C. § 552a, applies to certain types of protected

records stored by an agency.  *See id.* § 552a(a).  While Defendants acknowledge that at least

some of the information Plaintiffs identify may be protected under the statute, *see* Mot. at 3–5,

Plaintiffs have not shown a violation of the Privacy Act.

The DOGE Team at SSA currently consists of ten SSA employees.[5]  Felix-Lawson Decl.

¶ 4.  Of those ten, only seven (referred to as Employees 1, 3, 5, 7, 8, 9, and 10) have been granted

access to SSA programmatic systems containing personally identifiable information.  Russo

Decl. ¶¶ 7–11, 13–14; *see also id.* ¶¶ 13 & 16 (explaining that Employees 2, 4, and 6 have not

been given such access).  Because these seven individuals are "employees of the agency which

---

[5] The ten-member DOGE Team at SSA excludes "five other individuals whose services were authorized under our interagency agreements with U.S. DOGE Service, previously U.S. Digital Service," who never had access to personally identifiable information.  Russo Decl. ¶ 17.

maintains the record," 5 U.S.C. § 552a(b)(1), "who have a need for the record in the performance of their duties," *id.*, the Privacy Act poses no obstacle to their access to those records.

To start, the seven SSA employees with systems access are employees of their agency. Nothing in the USDS Executive Order is facially inconsistent with the Privacy Act; rather, the Order requires agencies to create so-called DOGE teams "*within* their respective Agencies." USDS E.O. § 3(c) (emphasis added); *see* 5 U.S.C. § 552a(b)(1).  And the facts surrounding the hiring of the seven individuals confirm that they are, in fact, SSA employees.  One is a Special Government Employee hired directly by SSA.  Felix-Lawson Decl. ¶ 5 (describing Employee 1). The remaining five are detailed from other government agencies and offices.  *Id.* ¶¶ 6, 7, 9, 10, 12.  Their detail agreements make them SSA employees in all relevant respects.  *See Judicial Watch v. Dep't of Energy*, 412 F.3d 125, 131-32 (D.C. Cir. 2005); *Freeman v. EPA*, No. 02-0387, 2004 WL 2451409, at *4–5 (D.D.C. Oct. 25, 2004).

The employees in question also have a need for the records to which they have access in the performance of their duties.  As an overarching matter, the DOGE Team exists under Executive Order 14,158 to modernize technology and to "maximize efficiency and productivity." Exec. Order 14,158 § 4.  To that end, the Order instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards."  *Id.* § 4(b).  The Russo Declaration further refines the contours of the DOGE Team's mission at SSA in particular.  In general, the SSA DOGE Team is charged with "detect[ing] fraud, waste and abuse in SSA programs," and with "provid[ing] recommendations for action to the Acting Commissioner of SSA, the SSA Office of the Inspector General, and the Executive Office of the President."  Russo Decl. ¶ 5.  The Russo Declaration comprehensively

documents the need of the seven SSA employees with systems access for the access they have been given, in order to accomplish the objectives of their team. *See generally* Russo Decl. And the remaining members of the SSA DOGE Team have no relevant systems access at all, placing them outside the reach of Plaintiffs' claims. *Id.* ¶¶ 13, 16.

Despite referring to these SSA employees as "DOGE officials," Mot. at 9, 15, in an apparent insinuation that they are not in fact agency employees, Plaintiffs have no factual rebuttal to the employees' status and need. Rather, they focus on the absence of consent to disclosure and allege that no authorized routine use of the systems in question is applicable. Mot. at 15. But these are distractions; it is enough that the seven employees with systems access are employed by SSA and have a need for the information in the performance of their duties. *See* 5 U.S.C. § 552a(b)(1).

Were more needed, the employees' access also fits within the routine use exception. *See id.* § 552a(b)(3). All of SSA's Privacy Act systems of records notices ("SORN") from which information has been shared with the DOGE Team include the following routine use: "To student volunteers, individuals working under a personal services contract, and other workers who technically do not have the status of Federal employees, when they are performing work for us, as authorized by law, and they need access to personally identifiable information (PII) in our records in order to perform their assigned agency functions." *See* SSA's Numident/Master File of Social Security Number Holders and SSN Applications, SORN 60-0058 routine use no. 26, *published in full most recently at* 87 Fed. Reg. 263 (Jan. 4, 2022); Master Beneficiary Record, SORN 60-0090 routine use 32, *published originally at* 71 Fed. Reg. 1826 (Jan. 11, 2006); Supplemental Security Income Record and Special Veterans Benefits, SORN 60-0103 routine use 31, *published originally at* 71 Fed. Reg. 1830 (Jan. 11, 2006), and Social Security Online

Accounting and Reporting System, SORN 60-0231 routine use 12, *published at* 85 Fed. Reg.

2224 (Jan. 14, 2020).  Thus, even if these individuals were viewed as non-employees working

for the agency, SSA would have authority under the Privacy Act to disclose records to them.

C.  There Is No Violation of Section 6013/SSA Regulations.

Plaintiffs have also failed to show that Defendants have violated or will violate the

Internal Revenue Code, Social Security Act, or related regulations.  *See* Mot. at 16–18.

Although the unauthorized disclosure or access of tax return information is generally prohibited,

*see* 26 U.S.C. § 6103(a), Congress has established statutory exemptions that authorize disclosure

for purposes other than tax administration, *see id.* § 6103(*l*).  Relevant here, Congress has

authorized the disclosure of certain return information[6] from the Treasury to the Social Security

Administration "for purposes of its administration of the Social Security Act."  *Id.*

§ 6103(*l*)(1)(A).  The term "administration" is not defined in the law, and so it should be given

its ordinary meaning.  *See Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799,

816 (2024).  And that meaning is broad, encompassing "[t]he management or performance of the

executive duties of a government, institution, or business; collectively, all the actions that are

involved in managing the work of an organization" and, with respect to public law specifically,

---

[6] Of those systems to which the SSA DOGE Team has been granted access, only the
Master Beneficiary Record, SORN 60-0090 (*published originally at* 71 Fed. Reg. 1826 (Jan. 11,
2006)) and Supplemental Security Income Record and Special Veterans Benefits, SORN 60-
0103 (*published originally at* 71 Fed. Reg. 1830 (Jan. 11, 2006)) contain data derived from
federal tax information. Russo Decl. ¶¶ 7(b), 8, 9, 10, 11.  These claims systems contain limited
fields containing information sourced from federal tax information that SSA uses in benefits
eligibility calculations and determinations.  Russo Decl. ¶ 7(c).  None of the DOGE employees
were given access to SSA's primary repository of earnings, SSA's Master Earnings File (SORN
60-0059).  Russo Decl. ¶¶ 7–16.  One SSA detailee was provided a statistical count of
individuals from the Nuimident (SORN 60-0058) who had recent earnings from the Master
Earnings File (SORN 60-0059); however, no individual earnings data from this system was
provided.  Russo Decl. ¶ 9(b).

"the practical management and direction of the executive department and its agencies."

*Administration*, Black's Law Dictionary (12th ed. 2024) (first and second entries).  In turn, the

DOGE Team is responsible for modernizing, auditing, and improving the efficiency of the

systems through which SSA administers the Social Security Act, the integrity of which is

essential to the agency's execution of its statutory mission.  Russo Decl. ¶ 5; *see also* 5 U.S.C.

§ 552a(e)(5)–(6); 44 U.S.C. § 3506.

The Social Security Act does not bar the seven SSA employees with systems access from

viewing the data on those systems, either.  Plaintiffs point to a provision of the Act that, like the

Internal Revenue Code, generally restricts disclosure of tax information.  Mot. at 16 (citing 42

U.S.C. § 1306).  But that provision also admits of exceptions, including "as the head of the

applicable agency[, SSA,] may by regulations prescribe."  42 U.S.C. § 1306(a)(1).  The agency

has prescribed such regulations.  *See* 20 C.F.R. § 401.135 ("Section 1106 of the Social Security

Act [42 U.S.C. § 1306] requires that disclosures which may be made must be set out in statute or

regulations; therefore, any disclosure permitted by this part is permitted by section 1106.").  The

relevant regulation allows disclosure of "information to officers and employees of SSA who

have a need for the record in the performance of their duties."  *Id.* § 401.115.  For the reasons

given in the Russo Declaration, *see supra*, the seven individuals with systems access are

employees with a need to know this information to perform their official duties.  They thus

satisfy § 1306 and its implementing regulations.

Plaintiffs, as before, do not engage with the merits of these arguments.  Instead, they

argue that Defendants have impermissibly disclosed tax return information "outside the agency,"

Mot. at 16, seemingly referring to the SSA employees responsible for implementing the DOGE

Agenda.  Because those individuals are SSA employees, *see supra*, this argument fails.

Furthermore, the Internal Revenue Code's provisions governing disclosure of tax return information "to the President or White House Office employees," Mot. at 16, are beside the point. *See* 26 U.S.C. § 6103(g). Here, the relevant disclosure was properly made by the Internal Revenue Commissioner to the Social Security Administration, and thereafter within SSA to employees in the performance of their duties.

As a last resort, Plaintiffs invoke the SSA's internal regulations governing "whether to disclose information" "[w]hen no law specifically requiring or prohibiting disclosure applies." 20 C.F.R. § 401.140 (cited in Mot. at 17). Even assuming this is such a situation, *but see* 26 U.S.C. § 6103; 42 U.S.C. § 1306, the regulation requires only the agency "follow FOIA principles." 20 C.F.R. § 401.140. In particular, the regulation highlights Exemption 6 to FOIA, which protects against a "clearly unwarranted invasion of personal privacy." *Id.* (quoting 5 U.S.C. § 552(b)(6)). Plaintiffs complain that "Defendants did not engage in this assessment." To start, their only factual support for this assertion is the opinion of one former agency employee, who was apparently dissatisfied with the justification for system access of which she was aware. *See* Mot. at 17 (citing Flick Decl. ¶¶ 36, 38, 40, 43). That sole perspective does not mean no one at the agency considered FOIA principles when deciding whether to provide employees with necessary system access.

More fundamentally, Plaintiffs offer no reason (and Defendants are aware of none) to think that this internal regulation establishes a procedural right that they may seek to vindicate through the APA. What matters for present purposes is that there is no reasonable argument that affording employees of an agency access to the systems necessary to perform their duties represents a "clearly unwarranted invasion of personal privacy."

D.  Defendants' Conduct Is Not Arbitrary and Capricious.

Plaintiffs go on to assert that Defendants acted arbitrarily and capriciously in purportedly "suddenly throwing open the gates to the sensitive, personally identifying information of hundreds of millions of Americans."  Mot. at 18.  This claim fails.

Plaintiffs have not articulated final agency action, *i.e.*, an actual change in policy.  That shortcoming dooms their arbitrary-and-capricious claim.  Plaintiffs insist that "[f]or decades, SSA has carefully guarded the information submitted to it, engraining into every employee the importance of data and information security practices."  Mot. at 18.  Even to the extent that is an actual policy and not merely Plaintiffs' label, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990), Plaintiffs have not identified a change: as the Russo Declaration shows, SSA has merely given a small, limited set of new employees access to data systems they need to perform the duties of their roles.  *See supra*.  That Plaintiffs do not like the broader political program to which the DOGE Agenda is related is no reason to allow them to superintend the agency's day-to-day operations, a prospect the APA categorically rules out.  *See SUWA*, 542 U.S. at 62–65.

By extension, none of the criticisms Plaintiffs level raises a cognizable claim to relief. True, an agency must generally "display awareness that it is changing positions," Mot. at 18 (quoting *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018)), but only when it in fact changes position.  The requirement to consider "important aspects" of a "problem," Mot. at 19 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)), also depends on a discrete decision—a final agency action—that is absent here.  *See SUWA*, 542 U.S. at 62–65.  The same is true of the general APA obligation to consider reliance interests. Mot. at 19–20.  The awkward fit of all three of these doctrines reveals that the APA was simply

not intended for plaintiffs to monitor agency operations—here, which agency employees get access to agency data systems—through litigation.

Importantly, even if the APA did contemplate review here, Defendants have already done all that Plaintiffs insist they should have. They "allow[ed] for appropriate onboarding and training of SSA employees," "assess[ed] [those] individual[s'] need to know with respect to each data system to which they [were granted] access," and have "maintain[ed] reasonable restrictions on access to data," *See* Mot. at 20; *see generally* Russo Decl.

E.  Plaintiffs' Ultra Vires Claim Also Fails.

Plaintiffs' final claim is a nearly citationless argument that USDS lacks any statutory authority and is limited (by the Presidential Records Act) to advising or assisting the President. Mot. at 20. For those reasons, Plaintiffs argue, USDS acted *ultra vires*—how, precisely, they do not say—and so should be enjoined.

This half-argument deserves little of the Court's time. Because Plaintiffs do not specify which actions of USDS they find troubling, it is not apparent the Court could grant any injunction consistent with Rule 65. *See* Fed. R. Civ. P. 65(d) (requiring that an injunction "state its terms specifically" and "describe in reasonably detail . . . the act or acts restrained or required). Nor is it clear how Plaintiffs' claim fits within the Court's "necessarily narrow" standard of review of *ultra vires* claims. *See Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171, 179 (4th Cir. 2012). In fact, Plaintiffs seek to have the Court do precisely what the Fourth Circuit has explicitly said it may not—"dictate how government goes about its business," *id.*—with respect to hiring and onboarding of personnel.

### III.     Plaintiffs Cannot Show Irreparable Harm.

Even if there were a clear likelihood of success on Plaintiffs' claims (there is not), the

Motion should be denied because Plaintiffs have not shown irreparable harm.  A plaintiff is

entitled to a TRO or preliminary injunction *only* if it can establish that it will likely suffer

irreparable harm in the absence of such relief.  *Winter*, 555 U.S. at 20.  "The Court will not grant

a TRO or preliminary injunction when the plaintiff's injury could be adequately remedied in the

ordinary course of litigation."  *HMS Holdings LLC v. Ted. A. Greve & Assocs., P.A.*, 2021 WL

5163308, at *3 (W.D.N.C. Nov. 5, 2021).  To justify an injunction, the alleged irreparable harm

must be "actual and imminent."  *Direx*, 952 F.2d at 812 (quotations omitted).  A "possibility" of

future irreparable harm does not suffice.  *Real Truth*, 575 F.3d at 346.  As discussed *supra* at 8–

11, Plaintiffs lack standing because their members' claimed *existing* injury (USDS access to SSA

data, Mot. at 21–22) is not concrete, and their members' claimed *future* injury (potential misuse

of their data by third-party bad actors, *id*. at 23–24) is speculative.  For similar reasons, these

injuries cannot serve as the basis for irreparable harm.  *See, e.g.*, *Univ. of Cal. Student Ass'n v.*

*Carter*, -- F. Supp. 3d --, 2025 WL 542586, at *5 (D.D.C. Feb. 17, 2025) (denying analogous

TRO against Education and Acting Secretary of Education because plaintiffs did not establish

irreparable harm; observing that, "courts have declined to find irreparable injury where the

challenged disclosure is not 'public,' but [rather] involves individuals obligated to keep it

confidential"); *id.* at *6 (possibility of future misuse of data by bad actors is "entirely

conjectural"); *accord, e.g.*, *EPIC v. OPM*, 2025 WL 580596, at *6–7 (E.D. Va. Feb. 21, 2025)

(denying TRO in analogous case against OPM, Treasury, and agency heads because plaintiffs

did not establish irreparable harm); *Alliance for Retired Americans v. Bessent*, --- F. Supp. 3d ----

, 2025 WL 740401, at *20–24 (D.D.C. Mar. 7, 2025) (denying requested preliminary injunction

as to Treasury for lack of irreparable harm).  Respectfully, for the reasons explained in
*University of California Student Association, EPIC*, and *Alliance for Retired Americans*, the
decision in *American Federation of Teachers v. Bessent*, 2025 WL 582063, does not comport
with well-established principles governing the availability of emergency relief.

     Plaintiffs' irreparable-harm theory fails for an additional, independent reason.  Plaintiffs'
members have an adequate alternative remedy to the emergency relief they seek: a private right
of action under the Privacy Act.  *See* 5 U.S.C. § 552a(g)(4) (authorizing civil penalties for
violation of the Privacy Act).  "To the extent [Plaintiffs'] members have been injured by
violations of [this] statute[], and they meet the other requirements for obtaining relief, there is at
least a 'possibility' of compensatory relief at a later date."  *Univ. of Cal. Student Ass'n*, 2025 WL
542586, at *6.[7]

## IV.    The Public Interest and Balance of Equities Counsel Against an Injunction.

     The last two factors—balance of equities and the public interest—"merge when the
Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

     Plaintiffs' argument for why the equities and the public interest fall in their favor largely
collapse into the merits.  They say that the "government cannot suffer harm from an injunction
that merely ends an unlawful action."  Mot. at 25.  To be clear, Plaintiffs have not shown that

---

[7] Further, a plaintiff's delay in bringing a Motion for TRO "may indicate an absence of
the kind of irreparable harm required to support a preliminary injunction."  *Quince Orchard
Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989).  That principle applies here.
Plaintiffs filed suit on February 21, 2025.  ECF 1 (Compl.).  Plaintiffs waited more than two
weeks—until Friday, March 7—to file their Motion, in which they claim to have experienced
irreparable harm.  ECF 21.  Because any emergency is of Plaintiffs' own making, Plaintiffs
cannot show entitlement to interim injunctive relief.  *Quince Orchard Valley*, 872 F.2d 75, 80
(4th Cir. 1989).

Defendants' practice is unlawful, for the reasons stated above.  Regardless, considering only likelihood of success is insufficient to justify injunctive relief.  *Winter*, 555 U.S. at 376–77.

The proposed injunction would harm the public interest.  At its core, it would harm the public interest by limiting the President's ability to effectuate the policy choices the American people elected him to pursue by limiting his advisors and other employees' ability to access information necessary to inform that policy.  It would also frustrate the President's ability to identify fraud, waste, and abuse throughout the federal government. *See supra*.  And it would draw false distinctions between different types of employees, unsupported in the statutory text, frustrating the flexibility that Congress itself provided in allowing multiple avenues to federal employment.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and/or 5 U.S.C. § 705 Stay.


Dated:  March 12, 2025                              Respectfully submitted,

                                                    YAAKOV M. ROTH
                                                    Acting Assistant Attorney General
                                                    Civil Division, Federal Programs Branch

                                                    ELIZABETH J. SHAPIRO
                                                    Deputy Branch Director
                                                    Civil Division, Federal Programs Branch
                                                    United States Department of Justice
                                                    1100 L Street, N.W.
                                                    Washington, D.C. 20005
                                                    Tel: (202) 514-2705
                                                    Fax: (202) 616-8470
                                                    Elizabeth.Shapiro@usdoj.gov

                                                     */s/ Bradley P. Humphreys*
                                                    BRADLEY P. HUMPHREYS

Senior Trial Counsel
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

MARIANNE F. KIES
BENJAMIN S. KURLAND
SIMON G. JEROME
Trial Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005

Kelly O. Hayes
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that on March 12, 2025, I electronically filed the foregoing and the

accompanying attachments, and thereby caused a copy to be served on counsel of record.

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS