IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,<br><br>*Plaintiffs*,<br><br>vs.<br><br>SOCIAL SECURITY ADMINISTRATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:25-cv-00596 |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
"NOTICE OF COMPLIANCE"**

This Court previously described Defendant and Acting Social Security Administration ("SSA") Commissioner Leland Dudek's "unprecedented decision" to provide the Department of Government Efficiency ("DOGE") Team access to vast swaths of non-anonymized SSA records. Mem. Op. at 96, ECF 49. That access was given even though some team members "either were not properly detailed to SSA, or had not been vetted or adequately trained, or necessary work documents were not signed." *Id.* at 96–97. Most importantly, they had not demonstrated their need to access this personally identifying information ("PII"), instead making "vague and conclusory assertion[s]" that access to this data was needed to eradicate fraud. *See id.* at 97. The Temporary Restraining Order ("TRO") issued by this Court protects against just that type of unlawful behavior.

On March 24, 2025, Defendants submitted a "Status Report and Certification" in which they, among other things, declined this Court's invitation to "provide SSA DOGE Team Members with access to 'discrete, particularized, and non-anonymized data' as permitted under the

conditions contained in paragraph 3 of the [Temporary Restraining] Order." Certification at 3, ECF 56 (citations omitted). At 10:00 AM on March 27, Defendants submitted a "Notice of Compliance," rife with conclusory assertions and misleading characterizations of SSA systems, announcing a reversal: SSA planned, by 1:00 PM, to provide four DOGE Team members with unrestricted access to copious amounts of PII contained in seven agency data systems. *See generally* ECF 62 (the "Notice"); Dudek Decl., ECF 62-1.

What led to this sudden about-face remains unclear. The urgency with which Defendants proceeded is similarly mystifying, particularly given Defendant Dudek's representations to the Court that the DOGE Team is merely picking up the mantle of long-existing, dormant SSA projects. Transcript, at 10:20–23, ECF 73. But one thing is certain: Defendants' cursory explanations regarding these individuals' need-to-know and mischaracterizations of the agency's approach to data security fall far short of what the TRO and Privacy Act require. While Plaintiffs appreciate Defendants' (particularly Defendant Dudek's) efforts to comply, for the reasons explained below, the Court should bar Defendants from proceeding absent significant additional factual showings and a meaningful opportunity for the Court to review the relevant employees' alleged need to access large swaths of non-anonymized information.

**I.      Employees 5 and 8 may not access even anonymized data.**

Under the TRO, SSA Defendants may give DOGE Team members access to "redacted or anonymized data and records of SSA" after, among other things, "a background investigation is completed, comparable to the quality of background investigation conducted for SSA employees whose duties involve access to PII." TRO ¶ 2. Defendants admit that "the full background investigation for the four employees [covered by the Notice] is not complete." Notice at 1, ECF

2

62. They deem this acceptable because the employees "have completed all steps in the background investigation process that SSA would ordinarily require before granting access to personally identifiable information." *Id.* at 2.

Plaintiffs understand that assertion to be incorrect, at least with respect to individuals who are detailed to SSA from another agency—including Employees 5 and 8. *See* Felix-Lawson Decl. ¶ 4, ECF 62-2.[1] Detailees to SSA must have "an adjudicated clearance (or background check) before they can get an SSA Personal Identity Verification Card." Ex. A, Doe Decl. ¶ 4. Employees detailed to SSA from the U.S. Digital Service, now known as the U.S. DOGE Service ("USDS"), ordinarily are given access to data including PII "only after months of clearance" exceeding the preliminary clearance that allows them to begin work at the Executive Office of the President. *Id.* ¶ 5. Further, USDS employees detailed to SSA can only access data including PII on SSA devices, which are issued only after the agency confirms the detailees have the adjudicated clearance described above. *Id.* ¶ 6. Giving Employees 5 and 8 access to SSA records thus violates the TRO.

## II. Employees 1, 5, 8, and 9 may not access non-anonymized data.

As the Court knows, records covered by the Privacy Act may be disclosed to agency employees only when they have "a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Here, the TRO permits SSA to "provide members of the DOGE Team with access to discrete, particularized, and non-anonymized data" only when SSA first obtains a detailed,

---

[1] Ms. Felix-Lawson's declaration states that Employee 5 "detailed from U.S. DOGE Service." Felix-Lawson Dec. ¶ 4, ECF 62-2. As the Court is aware, Defendants' position is that DOGE is not a federal agency. *See* Mem. Op. at 109, ECF 49. For the avoidance of doubt, Plaintiffs do not concede that DOGE is a federal agency.

written explanation from the DOGE Team member addressing "the need for the record and why, for said particular and discrete record, an anonymized or redacted record is not suitable for the specified use." TRO ¶ 3, ECF 48. To explain their decision to imminently grant DOGE Team members access to discrete, particularized, and non-anonymized data, Defendants assert that SSA has obtained the explanations required by the TRO. Notice at 2, ECF 62. That assertion is incorrect because (1) there is no evidence of the written explanations required by the TRO; (2) Defendants' proffered explanations are general, conclusory, and insufficient; and (3) the DOGE Team members can perform their work without being granted access to the PII of millions.

### A. There is no evidence of the written explanations required by the TRO.

Defendants represent that "SSA has obtained from each of [the] four DOGE Team members, in writing, and subject to possible review by this Court, a detailed explanation as to the need for access to specific data in the Enterprise Data Warehouse necessary to perform their job duties." Notice at 2, ECF 62. But neither of the declarations submitted with the Notice attest that those written explanations exist, and they were not attached to Defendants' filing. That leaves the Court unable to review the required explanations, which the TRO expressly contemplates. Plaintiffs' counsel raised this issue at the March 27 status conference, but Defendant Dudek's supplemental declaration neither addresses nor cures that deficiency. *See generally* Supp. Dudek Decl., ECF 74-1.

### B. Defendants' general and conclusory statements are insufficient under the TRO.

Defendant Dudek's characterizations of the alleged need-to-know for each employee are just the sort of "general and conclusory" explanations that "the information is needed to search for fraud or waste" barred by the TRO. *See* TRO ¶ 3, ECF 48.

4

Defendant Dudek's initial declaration asserts that two employees (Employees 1 and 9) need access to non-anonymized records to determine "whether the agency has assigned SSNs to all individual records, and to research and conduct outreach (as needed) to confirm a person's status as living or deceased." Dudek Decl., ECF No. 62-1 ¶ 9.[2] The declaration is utterly silent as to why it would be "impracticable" for these DOGE Team members to use redacted or anonymized records to determine whether a given record contains information in a given field. *See id.* Nor does the declaration explain why any of the requested data is relevant to a determination of whether a given individual is alive. Instead, Defendant Dudek summarily asserts that the data "are examples of data relevant to this analysis." *See id.*

Defendant Dudek describes Employee 5 as "working on a project focusing on ensuring death records that can be updated based on information currently available in agency records, for which we have sufficient confidence that would allow us to conclude a person is deceased." *Id.* ¶ 10. Because of what appears to be either a misplaced or omitted word, this verbiage is susceptible to several competing readings. For example, the employee may be working on a project to ensure that death records *can* be updated when there is adequate information to justify that update; they may be working on updating such records; or they may be working on determining whether all such records have been updated. Defendant Dudek offers no explanation of need beyond a summary statement that the project "involves updates to individual-level

---

[2] Plaintiffs would be remiss if they did not note their concern that Defendants, should the Court allow them to grant DOGE access to non-anonymized personally identifying information, appear to have empowered these DOGE Team members (and their affiliates) to "conduct outreach" to individual SSA clients without oversight or training. *See* Dudek Decl. ¶ 9, ECF 62-1.

5

records." *See id*. At a minimum, this Court needs a better understanding of what the project is before it can even attempt to determine whether access to non-anonymized records is necessary.

Finally, Defendant Dudek attests that Employee 8 "is working on direct-deposit change, new claim, and wage-reporting fraud detection." *Id.* ¶ 11. His declaration goes on to summarize that project and asserted that "[a]nonymization is not feasible because it could obscure information useful for identifying fraud." *Id.* That statement was amended in Defendant Dudek's supplemental declaration, which provides more context but admits that "Employee 8 needs access to discrete individual data only when anomalies are identified, in order to detect fraud in specific instances." *See* Supp. Dudek Decl. ¶ 8, ECF 74-1.

Moreover, Defendants previously represented that Employees 1, 8, and 9 needed access to PII in the MBR, SSR, and Numident. Russo Decl. ¶¶ 7(a), 9, 11, 12, ECF 36-1. Their recent filings are silent as to why those individuals now need access to not just the MBR, SSR, and Numident, but also PROME, PCHIP, PVIP, and PVIPR. *See* Dudek Decl. ¶¶ 9, 11, ECF 62-1; *see also* Supp. Dudek Decl., ECF 74-1.[3]

### C. DOGE Team members do not need access to the PII of millions.

As former General Services Administration Director of Technology Transformation Services Ann Lewis explains, any claim that the DOGE Team cannot do its work with anonymized

---

[3] Defendant Dudek also initially represented that, for Employee 8, "[a]nonymization is not feasible because it could obscure information useful for identifying fraud." Dudek Decl. ¶ 11, ECF 62-1. That statement was amended in Defendant Dudek's supplemental declaration, which admits that "Employee 8 needs access to discrete individual data only when anomalies are identified, in order to detect fraud in specific instances." Supp. Dudek Decl. ¶ 8. That change also goes unexplained.

6

data is "not technically sound." Ex. B, Lewis Decl. ¶ 3. It is also unsupported by Defendants' own evidence.

***First,*** suggesting that the data access contemplated in Defendants' Notice is akin to that given to frontline SSA employees is preposterous. Defendant Dudek asserts that employees "conducting fraud or similar analysis" access PII from SSA's program records in the same way as those performing "front line" duties. *See* Dudek Decl. ¶ 5, ECF 62-1. But while front-line employees at SSA field offices do have access to PII, that access is of an entirely different character than the access sought by DOGE via this Notice. A field officer, for example, may search a single Social Security number in the agency's Personal Communications system to return a single person's records.[4] But field officers do not, generally speaking, have the ability to run bulk queries returning the PII of millions of people.[5] To suggest that the DOGE Team seeks similar access and that "employees granted access to EDW schemas must specifically search for relevant records in a schema for the records to be viewable," Dudek Decl. ¶ 5, ECF 62-1, is a gross mischaracterization.

***Second,*** Defendants' focus on EDW schemas paints an incomplete picture for the Court. Defendant Dudek claims that the EDW "schemas" to which the DOGE Team Members seek access are the "lowest schemas available containing the information needed." *See id*. ¶¶ 9–11; *id.* ¶ 6 (explaining that "schema levels" relate to the EDW). Plaintiffs dispute that there is no more restrictive schema that would provide access to the data sought. Regardless, Defendant Dudek's

---

[4] These searches, technically speaking, may also be called "queries."
[5] *See, e.g.*, Transcript, 7: 18-25, 8: 1-2 (suggesting that these DOGE Team members plan to examine millions of records of people "over 115" or without a "credit record").

narrow focus on the EDW is telling. Unrefuted record evidence shows that non-anonymized data contained in the EDW can be anonymized and made available in a separate "sandbox" environment. *See* Initial Flick Decl. ¶ 26, ECF 22-10. SSA uses that approach to handle "any request to review SSA's records for potential fraud, waste, and abuse by oversight agencies like OIG, GAO, or auditors conducting financial statement and FISMA audits." *Id.*

Defendant Dudek's own statements reflect the same. In the subsequent declaration he was required to file with the Court, Defendant Dudek explained that non-DOGE Team SSA employees can create "anonymized aggregate data sets" using data from EDW schema. Supp. Dudek Decl. ¶ 8(a), ECF 74-1. "Discrete individual data" can then be made available "only when anomalies are identified." *Id.* ¶ 8. Presumably, because the Court directed Defendant Dudek to submit the supplemental declaration to clarify inconsistencies in his testimony regarding Employee 8, he makes that representation only with respect to that individual (and, indeed, describes this process only as to Employee 8 in his supplemental declaration). Left unexplained is why Employees 1, 5, and 9 could not accomplish their work through a similar process.

Defendant Dudek does not specify in what data environment Employee 8 will view these non-anonymized records or explicitly state that SSA no longer plans to give Employee 8 access to multiple EDW schema, which raises a broader point. The cursory explanations of these DOGE Team members' need for access to PII, especially when viewed in combination with (1) the three-hour timeline Defendants attempted to impose on this Court's review and (2) the immediate backtracking on the scope of necessary access, indicates a concerning disregard for the strictures of the TRO and the Privacy Act more generally. Indeed, "SSA's attempt to give DOGE and its

8

affiliates such a high level of access suggests that they are circumventing existing SSA anti-fraud mitigation, resolution, and auditing processes." Ex. B, Lewis Decl. ¶ 8.

If non-DOGE Team SSA employees can create anonymized aggregate data sets using data from EDW schema, it stands to reason that they can also create narrower data sets comprising the discrete individual data subsequently identified. Doing so would permit the specified DOGE Team members to continue their work without granting them unfettered access to the sensitive, confidential PII of millions of Americans.[6]

## CONCLUSION

For these reasons, the Court should bar Defendants from proceeding absent significant additional factual showings and a meaningful opportunity for this Court to review the relevant employees' alleged need to access large swaths of non-anonymized information.

*Signatures on following page.*

---

[6] This filing does not represent an exhaustive list of the many reasons Defendants' Notice give cause for concern. For example: Mr. Dudek references several new SSA projects. But any new system, fraud model, or database that aids in identifying fraud would first need an Authorization to Operate ("ATO") review process and a Privacy Impact Assessment ("PIA"). *See* Ex. B, Lewis Decl. ¶ 7. There is no evidence of ATOs or PIAs for any of the projects identified.

Dated: March 31, 2025                                         Respectfully submitted,

*/s/ Alethea Anne Swift*
Alethea Anne Swift (Bar No. 30829)
Karianne M. Jones*+
Emma R. Leibowitz*+
Mark B. Samburg (Bar No. 31090)
Robin F. Thurston*+
Carrie Y. Flaxman+
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
aswift@democracyforward.org
kjones@democracyforward.org
eleibowitz@democracyforward.org
rthurston@democracyforward.org
msamburg@democracyforward.org
cflaxman@democracyforward.org

*Counsel for Plaintiffs*

* Admission to this Court pending
+ Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Alethea Anne Swift, certify that I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Maryland, Northern Division, by using the CM/ECF system, which sent a notice of such filing to all registered CM/ECF users who have appeared in this case.

/s/ Alethea Anne Swift
*Counsel for Plaintiffs*
