**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, <br><br>   *Plaintiffs*, <br><br>   *vs.* <br><br> SOCIAL SECURITY ADMINISTRATION, *et al.*, <br><br>   *Defendants*. | Civil Action No. 1:25-cv-00596 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION OR STAY UNDER 5 U.S.C. § 705**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

    I.    SSA And Its Collection of Personal Data ................................................................ 2

    II.   SSA Granting DOGE Personnel Access to SSA Data Systems.................................. 3

PROCEDURAL BACKGROUND........................................................................................... 6

STANDING .............................................................................................................................. 7

    I.    Plaintiffs' members would have standing to sue in their own right ........................... 7

    II.   Plaintiffs adequately allege injury in fact .................................................................. 7

    III.          Defendants' actions caused Plaintiffs' injuries, and a preliminary injunction
will redress those injuries ................................................................................................... 10

    IV.   The Interests Plaintiffs Seek to Protect are Germane to Their Purpose .................... 10

    V.    The Participation of Individual Members is Not Required ....................................... 10

PRELIMINARY INJUNCTION............................................................................................ 11

    I.    Plaintiffs are likely to succeed on the merits........................................................... 11

    A.   Defendants' actions violate the Privacy Act ............................................................ 12

    i.    Plaintiffs' members did not consent to Defendants' disclosure of their data. .......... 13

    ii.   DOGE Team members and DOGE Defendants do not have a need, within the
meaning of the Privacy Act, to access vast quantities of PII about hundreds of
millions of Americans. ................................................................................................. 13

    iii.   Defendants' actions do not fall within applicable routine uses. ................................ 15

    B. Defendants' actions violate the Social Security Act, Tax Reform Act of 1976, and
applicable regulations.................................................................................................. 16

           i.   Defendants seek to disclose tax return information in violation of the Tax
Reform Act and Social Security Act. .................................................................... 16

    ii.   Defendants' actions violate SSA's "general principles" regulations. ........................ 17

    C.   The SSA Defendants' decision to provide the DOGE Team with expansive access to
SSA record systems without signed detail agreements, adequate training, completed
background investigations, executive work forms, and/or actual need constitutes
final agency action for purposes of the APA. ............................................................ 18

    i.    Defendants' actions mark the consummation of the agency's decision-making
process. ........................................................................................................................ 19

    ii.   Defendants' actions determined rights and obligations............................................ 21

    iii.   Defendants' actions are contrary to law................................................................... 22

    iv.   Defendants' actions are arbitrary and capricious...................................................... 22

    v.    Plaintiffs have no other adequate remedy................................................................ 24

    II.   Plaintiffs Are Suffering Immediate, Irreparable Harm............................................. 25

A.  Plaintiffs' members are irreparably harmed by DOGE's unlawful access to their
    sensitive information. ................................................................................... 25

B.  Plaintiffs' members are irreparably harmed by the now-increased risk that their
    information is more easily accessible by bad actors. ................................................ 26

III.        Balance of Equities and Public Interest Both Favor an Injunction. ............. 28

STAY UNDER 5 U.S.C. § 705 ................................................................................. 29
CONCLUSION ........................................................................................................ 30
CERTIFICATE OF SERVICE ................................................................................. 1

## INTRODUCTION

Elon Musk, the Department of Government Efficiency ("DOGE"), the U.S. DOGE Service ("USDS-DOGE"), the U.S. DOGE Service Temporary Organization ("DOGE-STO"), Defendant Amy Gleason (collectively, the "DOGE Defendants"), DOGE Team members at the Social Security Administration (SSA), and DOGE Affiliates[1] are engaged in a "fishing" expedition at the agency "in search of a fraud epidemic" and "based on little more than suspicion." TRO Mem. Op., ECF 49, at 135[2] Defendants admit that SSA, Leland Dudek, and Mike Russo[3] (collectively, the "SSA Defendants") "granted DOGE personnel broad access to millions of Americans' sensitive PII." *Id.* Subsequent filings, record evidence, and public reporting all indicate that Defendants have continued to seek unprecedented and unlawful access to SSA data since this Court's TRO.

In the absence of this Court's injunction, SSA Defendants could and would resume providing DOGE affiliates with access to a "massive amount" of records containing sensitive, confidential, and personally identifiable information. TRO Hearing Tr., ECF 45, at 17. A preliminary injunction is necessary to prevent SSA Defendants from granting the DOGE Defendants "unfettered access to the SSA records of millions of Americans," *see* ECF 49 at 4, and address the harms already inflicted on Plaintiffs' members.

---

[1] The term "DOGE Team member" refers to individuals who are assigned to, detailed to, employed by, or otherwise working at SSA to implement the DOGE agenda and who can reasonably be considered a member, leader, supervisor, or director of the SSA DOGE Team contemplated by Section 2(c) of Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025), *see infra*. A "DOGE Affiliate" is any person working in concert with or at the direction of the DOGE Defendants or DOGE Team members, directly or indirectly, for the purpose of implementing the DOGE agenda or Executive Order No. 14158 at SSA.

[2] *See, e.g.*, Elon Musk (@elonmusk), X (Mar. 19, 2025, 8:29 PM), https://perma.cc/66M7-X88U; Elon Musk (@elonmusk), X (Mar. 24, 2025, 12:39 AM), https://perma.cc/HQ4M-BXYL; Jane C. Timm, *Musk uses immigration and claims of voter fraud to sell Social Security Administration cuts*, NBC News (Mar. 19, 2025), https://perma.cc/HJV8-5ZTW.

[3] Plaintiffs understand that Russo, sued in his official capacity as SSA CIO, has been replaced in that role. *See* Natalie Alms, *SSA tech shop to be led by another DOGE associate*, NextGov (Mar. 25, 2025), https://perma.cc/5A9W-KKMU. Defendants have not yet moved to substitute a defendant for Mr. Russo, so Plaintiffs refer to Mr. Russo throughout.

# FACTUAL BACKGROUND

## I.    SSA And Its Collection of Personal Data

SSA is the nation's largest benefit-paying agency and oversees essential programs including Old-Age, Survivors, and Disability Insurance ("OASDI" or "Social Security") and Supplemental Security Income ("SSI")[4] while helping administer programs run by other agencies, including Medicare, Medicaid, and SNAP.[5] The agency distributes over $1.5 trillion each year to its beneficiaries, most of whom are retired senior citizens.[6] To effectuate its own and other agencies' programs, SSA collects and stores among the most sensitive information a person may have. Along with names, birth dates, driver's license numbers, and addresses—already sensitive information that is often used by malicious actors to commit serious fraud—SSA houses Social Security numbers ("SSNs"); tax return information, bank account and credit card numbers, and other financial data; employment and wage histories; citizenship, immigration, and naturalization records; and medical records documenting information such as evaluations, hospitalizations, treatment, diagnoses, and disabilities, whether they relate to physical or mental health.[7]

Both SSA and Congress understand the importance of keeping this information confidential. The first regulation SSA published included a "commitment to the public to safeguard

---

[4] *See* Cong. Bdgt. Off., *Social Security*, https://perma.cc/D29K-YSFF (last visited Apr. 4, 2025); Soc. Sec. Admin., *Social Security Programs in the United States*, https://perma.cc/KAL3-GL9C (last visited Apr. 4, 2025).

[5] Soc. Sec. Admin., *Medicare*, https://perma.cc/X7DL-FT5X (last visited Apr. 4, 2025); Soc. Sec. Admin., *Understanding Supplemental Security Income (SSI) and Eligibility for Other Government and state Programs*, https://perma.cc/33CT-GJZL (last visited Apr. 4, 2025); E-Verify, *Social Security Administration Resumes E-Verify Operations,* https://perma.cc/G7YS-7BL9 (last visited Apr. 4, 2025); Soc. Sec. Admin, *Help America Vote Verification (HAVV) Transactions by State*, https://perma.cc/99ZK-AL3F (last visited Apr. 4, 2025).

[6] Soc. Sec. Admin., *Fact Sheet*, https://perma.cc/595S-B36F (last visited Apr. 4, 2025).

[7] *See* Soc. Sec. Admin, *Form SSA-1 | Information You Need To Apply For Retirement Benefits or Medicare*, https://perma.cc/CPH7-Y97F (last visited Apr. 4, 2025); Soc. Sec. Admin., *Medical Evidence* (July 29, 2022), https://perma.cc/D5EY-GHE8; 71 Fed. Reg. 1810 (Jan. 11, 2006); 71 Fed. Reg. 1826 (Jan. 11, 2006); *see, e.g.*, Soc. Sec. Admin., *SSA-1-BK, Application for Retirement Insurance Benefits*, https://perma.cc/Y85T-GFLC, (last visited Apr. 4, 2025); Soc. Sec. Admin., *SSA-16, Application for Disability Insurance Benefits*, https://perma.cc/93GV-C5K6 (last visited Apr. 4, 2025).

the personal information [people] entrust" to SSA.[8] The agency's website advertises that SSA maintains "the highest level of privacy protections possible,"[9] and SSA is bound by laws and regulations—including the Privacy Act of 1974, Social Security Act, and Internal Revenue Code, among others—that restrict the use and disclosure of data both within and outside the agency.

## II.    SSA Granting DOGE Personnel Access to SSA Data Systems

Immediately after the election, Donald Trump announced his plans to create a "Department of Government Efficiency" to reform government agencies.[10] On his first day in office, he issued an executive order creating DOGE and setting forth its agenda. *See* Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025). DOGE's purpose, as described in Executive Order 14158, is to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* ¶ 1. The EO requires agencies to establish "DOGE Team[s]" and give those teams "full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* ¶¶ 3(c), 4(b).

The White House has represented that Amy Gleason is the current DOGE Administrator, but Trump "special advisor" and Elon Musk is the actual head of the "department."[11] Musk swiftly has actively involved himself in DOGE's agenda at SSA, as evidenced by several public statements

---

[8] Soc. Sec. Admin., Priv. Program, *SSA's Commitment to Protecting Privacy through Compliance*, https://perma.cc/RU63-89MC (last visited Apr. 4, 2025).

[9] *Id.*

[10] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://perma.cc/K75N-RTC7.

[11] Although the White House has represented that Amy Gleason is the current DOGE Administrator, *see* Kaitlan Collins & Tierney Sneed, *White House reveals who DOGE acting administrator is*, CNN Politics (Feb. 25, 2025), https://perma.cc/F8VY-TEPF, President Trump has repeatedly confirmed that DOGE is "headed by Elon Musk," *See Full Transcript of President Trump's Speech to Congress,* N.Y. Times (March 4, 2025), https://perma.cc/AT4N-WRDY ("I have created the brand new Department of Government Efficiency. DOGE . . . . [w]hich is headed by Elon Musk."); *see also* Fox News, *Elon Musk and DOGE team give behind the scenes look at their mission*, YouTube (Mar. 28, 2025), https://perma.cc/YM2D-D4LW (interview in which Elon Musk and "members of his DOGE team discuss efforts to eliminate waste, fraud, and abuse from government").

regarding purported (and disproven) fraud at the agency,[12] pillorying SSA as an "outdated, mismanaged system,"[13] and swiftly establishing a DOGE Team at the agency. That team, initially headed by Russo, exists outside the bounds of the agency's normal reporting structures. *See* ECF 22-10 (Flick Decl.) at PLFS-051 ¶ 10, PLFS-053 ¶ 18, PLFS-054 ¶ 22.  As of March 24, the SSA DOGE Team had eleven members. Dudek Decl., ECF 56-1, at 2 n.1.

Over the past months, DOGE, DOGE Team members, and their allies at SSA have wrought havoc on the agency, shuttering offices across the country,[14] drastically reducing customers' ability to access services,[15] and threatening to rewrite the agency's decades-old central code at a breakneck pace, "potentially putting the integrity of the system—and the benefits on which tens of millions of Americans rely—at risk."[16] Their decisions have often seemed at odds with the agency's interests. As but one example, a member of the House Oversight Committee earlier this week made public that Dudek canceled SSA contracts with the state of Maine as an act of political retaliation, despite Dudek's recognition that the cancellation would increase the risk of fraud and improper payments.[17] This is despite Defendants' constant protestations that the sweeping access to sensitive PII sought by DOGE Team members is necessary so that DOGE personnel can search for "improper or fraudulent payments" made by SSA. TRO Hearing Tr., ECF 45, at 17.

---

[12] *Seem e.g.*, Elon Musk (@elonmusk), X (Dec. 2, 2024, 9:47 PM ET), https://perma.cc/MX85-XK7K; Elon Musk (@elonmusk), X (Feb. 11, 2025, 1:23 AM ET), https://perma.cc/R6YD-5KY9.

[13] Elon Musk (@elonmusk), X (Dec. 2, 2024, 9:47 PM ET), https://perma.cc/MX85-XK7K; *see* ECF 49 at 23–26; Zachary B. Wolf, *Trump and Musk set their sights on Social Security by spreading rumors*, CNN (Feb. 19, 2025), https://perma.cc/YY7H-8XPA.

[14] Meg Kinnard, *A list of the Social Security offices across the US expected to close this year*, AP (March 19, 2025), https://perma.cc/ME5V-LRM6 (crediting office closures to DOGE).

[15] Lisa Rein, Justine McDaniel, *Social Security to require millions to make claims in person rather than by phone*, Wash. Post (Mar. 18, 2025), https://perma.cc/YMZ2-PKPF; Tara Siegel Bernard, *Social Security Employees Warn of Damage From DOGE*, N.Y. Times (Mar. 17, 2025), https://perma.cc/2ELH-ZQBQ.

[16] Makena Kelly, *DOGE Plans to Rebuild SSA Code Base in Months, Risking Benefits and System Collapse*, Wired (Mar. 28, 2025), https://perma.cc/7APD-2XJ9.

[17] Congressman Gerry Connolly, Ranking Member Connolly Calls on SSA Acting Commissioner Dudek to Resign After Emails Expose Retaliation Against the People of Maine (Apr. 2, 2025), https://perma.cc/SNA5-JW7K.

DOGE has, from the get-go, sought expansive access to SSA's data systems, which contain the personally identifying information ("PII") of millions. Indeed, as soon as Russo arrived at the agency, he demanded that a DOGE engineer, Employee 1,[18] be quickly onboarded and granted access to agency record systems to work on a "special project" and audit existing SSA work. *See* ECF 22-10 (Flick Decl.) at PLFS-051 ¶ 11, PLFS-052 ¶¶ 13, 14, PLFS-054 ¶¶ 22–23. When Employee 1's onboarding process moved too slowly in light of background-check difficulties, *see id.* at PLFS-052 ¶ 13, Russo and others from DOGE (including Steve Davis) began a pressure campaign that ultimately led to the resignation of top SSA officials who refused to provide data on DOGE's terms, *see id.* at PLFS-052 ¶¶ 14, 16; PLFS-054 ¶ 24, PLFS-054–PLFS-055 ¶ 26. President Trump immediately named Dudek as the new Acting Commissioner.[19]

Thereafter, SSA's provision of sensitive-data-system access to the DOGE Team accelerated. DOGE Team members continue to join the agency without completed background checks or detailing or employment agreements. *See, e.g.,* Russo Decl., ECF 36-1, ¶ 7(b), Felix-Lawson Decl., ECF 36-2, ¶ 15 (together describing the provision of access to PII for Employee 1 while background investigation pending). Even today, ███████████████████████ ████████████████████████████████████████████ as is standard practice, *see* Ex. I, Flick 2d Supp. Decl., at PLFS-103 ¶ 4; Ex. J, Brady Doe Decl., at PLFS-105 ¶¶ 3–4; Ex. H, Escobar-Alava Decl., at PLFS-097 ¶ 6.

DOGE Team members have—even without buttoning-up HR necessities—sought access to vast swaths of non-anonymized SSA records across sensitive databases containing PII at the

---

[18] Plaintiffs adopt Defendants' nomenclature for purposes of this filing but dispute that all members of the DOGE Team qualify as SSA "employees."

[19] Marisa Kabas, *The Curious Case of Leland Dudek*, The Handbasket (Feb. 20, 2025), https://perma.cc/D2UN-QMYE; Lisa Rein et al., *Top Social Security official exits after clash with Musk's DOGE over data*, Wash. Post (Feb. 17, 2025), https://perma.cc/4R9L-BM9T.

agency.[20] Those databases include but are not limited to the Master Beneficiary Record ("MBR"), SORN 60-0090; Numident (or Master File of Social Security Number Holders and SSN Applications), SORN 60-0058; Supplemental Security Income Record and Special Veterans Benefits ("SSI Record"), SORN 60-0103; and Social Security Online Accounting and Reporting System, SORN 60-0231.[21] *See* TRO Opp., ECF 36, at 25–26.[22] More recently, Defendants have represented that DOGE Team members also need access to PROME, PCHIP, PVIP, and PVIPR. *See* Dudek Decl., ECF 62-1, at 3–4 ¶¶ 9, 5 ¶ 11; Dudek Supp. Decl., ECF 74-1.[23]

But Defendants also appear to be endeavoring to link SSA data with that of other agencies.[24] For example, ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ That is even more alarming considering the recent Executive Order on "information silos," instructing agencies to approach both intra- and inter-agency data-sharing maximally.[25]

## PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on February 21, 2025, ECF 1, and amended it on March 7, ECF 17. They allege numerous statutory and constitutional violations, as well as *ultra vires* actions by DOGE Defendants. *Id.* at 24-29. The Court entered Plaintiffs' requested TRO on March 20. ECF

---

[20] Defendants have not been wholly consistent as to whether DOGE Team members seek access to the data solely though the Enterprise Data Warehouse, a repository of SSA systems, or whether they also seek direct access to each system of record.

[21] Originally published at 71 Fed. Reg. 1826 (Jan. 11, 2006),  87 Fed. Reg. 263 (Jan. 4, 2022), 71 Fed. Reg. 1830 (Jan. 11, 2006), and 85 Fed. Reg. 2224 (Jan. 14, 2020), respectively.

[22] At argument on the TRO, Defendants' counsel engaged in a back-and-forth with the Court during which he could not deny that access to the agency's Enterprise Data Warehouse did not give DOGE Team members access to other systems of record. *See* TRO Hearing Transcript, ECF 73, at 98: 5–25, 99: 1–3.

[23] Fox News, *Elon Musk and DOGE team give behind the scenes look at their mission*, *supra* note 11.

[24] *See id.*

[25] Exec. Order No. 14243, 90 Fed. Reg. 13681 (Mar. 20, 2025); *see also,* Caroline Nihill, *Trump orders full access to agency data for designated officials*, FedScoop (Mar. 21, 2025), https://perma.cc/B9BN-F6QJ.

48, 49. After Dudek's public threats to "turn [SSA] off" in response to the TRO,[26] the Court docketed an additional letter order and letter to counsel. *See* ECF 50-52.

Defendants appealed the TRO to the Fourth Circuit on March 24. ECF 57. Later the same week, they moved to stay the TRO in both this Court and the Fourth Circuit. ECF 60; Case No. 25-1291, Dkt. No. 5. At the same time, the parties agreed to extend the TRO and proceed with briefing a preliminary injunction. ECF 68. This Court denied Defendants' motion to stay on March 31, and the Fourth Circuit dismissed Defendants' appeal for want of jurisdiction on April 1. *See* ECF 78, 79; *AFSCME et al. v. SSA et al.*, 25-1291, Dkt. No. 20 (4th Cir. April 1, 2025).

## STANDING

Plaintiffs have associational standing to pursue their claims because their members would have standing to sue in their own right, the interests they seek to protect are germane to their purpose, and the participation of individual plaintiffs is not required.

## I.      Plaintiffs' members would have standing to sue in their own right

Plaintiffs adequately allege injury in fact, traceability, and redressability and have thus established that their members would otherwise have standing to sue in their own right.

## II.     Plaintiffs adequately allege injury in fact

Plaintiffs adequately allege injury in fact, which is the "[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). "[A]n injury in fact is 'an invasion of a legally protected interest' which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "[I]ntangible harms can … be concrete," *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 425 (2021). "Chief among them are injuries with a close relationship to harms traditionally

---

[26] Nnamdi Egwuonwu et al., *Social Security chief backs down on threat to shut down agency after DOGE ruling*, NBC News (Mar. 22, 2025), https://perma.cc/35HF-ZTNK.

recognized as providing a basis for lawsuits in American courts," including the common-law tort of intrusion upon seclusion. *Id.* Plaintiffs easily meet this standard.

The Fourth Circuit has defined intrusion upon seclusion as a cause of action "against defendants who invade[] the private solitude of another." *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 245 n.2 (4th Cir. 2023) (internal quotation marks and citation omitted). An intrusion upon seclusion may occur by an "investigation or examination into [the plaintiff's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." Restatement (Second) of Torts § 652B (1977) (October 2024 update) cmt. b.

Here, "the wholesale access to SSA records that the Agency has provided to the DOGE Team is sufficiently analogous to the tort of intrusion upon seclusion." ECF 49 at 85. Plaintiffs' members expected that their data maintained by SSA would remain private. *See, e.g.*, ECF 22-2 (Conard Decl.) at PLFS-013 ¶ 10 ("I always expected the personal data I have submitted, and continue to submit, to SSA would remain private and be used only to determine whether I was eligible for benefits, and not to be disclosed for any other purpose."); ECF 22-5 (Williams Decl.) at PLFS-024 ¶ 6 (same); ECF 22-3 (Doe Decl.) at PLFS-017 ¶ 6 (same); ECF 22-4 (Imperiale Decl.) at PLFS-021 ¶ 5 ("As a retiree with a disability, it is very important to me that my data remain private."); ECF 22-9 (Gray Decl.) at PLFS-046 ¶¶ 6, 8. Plaintiffs' members feel that their privacy has been violated by SSA's disclosure to DOGE. *See, e.g.*, Ex. B, Conard Supp. Decl., at PLFS-075 ¶ 4 ("DOGE access to the sensitive information about me [in SSA systems] is a severe violation of my trust and an invasion of my privacy and person. As a survivor of sexual assault, I know what that feels like."); Ex. D, Somo Supp. Decl., at PLFS-082 ¶ 9 ("DOGE having access

to my sensitive information is almost like someone breaking into my house and stealing stuff.");
Ex. F, Gray Supp. Decl., at PLFS-089 ¶ 2 ("My privacy is sacred to me.").

Plaintiffs' expectation of privacy was objectively reasonable. "It is almost self-evident that, in our society, PII, such as SSNs, medical information, and certain financial records, are regarded as private, sensitive, and confidential information." ECF 49 at 86. Indeed, in some jurisdictions the disclosure of "medical records amounts to a per se intrusion into seclusion if the records contain sensitive materials." *Sabrowski v. Albani-Bayeux, Inc.*, 124 F. App'x 159, 161 (4th Cir. 2005) (citing *Toomer v. Garrett,* 574 S.E.2d 76 (N.C. Ct. App. 2002)). The Health Insurance Portability and Accountability Act, 29 U.S.C. § 1181 *et seq*., and evidentiary psychotherapist-patient privilege both reflect societal views as to the sanctity of medical information. *See Jaffee v. Redmond*, 518 U.S. 1, 10 (1996) (discussing the privilege); *see* ECF 17 ¶ 12 (explaining that medical records maintained by SSA can include "notes from psychotherapist and counseling sessions"). And SSA has itself assured Plaintiffs' members that it will keep their information private. *See, e.g.*, Ex. B, Conard Supp. Decl., at PLFS-074 ¶ 2 (describing statements on SSA's website about privacy); Ex. D, Somo Supp. Decl., at PLFS-081 ¶ 4 ("I have an expectation that the agency will keep my information private because it's what they told me.").

Defendants' actions and the attendant invasion of Plaintiffs' members' privacy would be highly offensive to an objectively reasonable person. *See* ECF 49 at 85; *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009); *Toomer*, 574 S.E.2d at 90. At least three other federal courts evaluating agency disclosures of confidential information to DOGE Teams have agreed. *See Alliance for Retired Americans v. Bessent*, 25-CKK-0313, 2025 WL 740401, at *16 (D.D.C. Mar. 7, 2025); *American Federation of Teachers, et al., v. Bessent, et al.*, 25-DLB-0430,

2025 WL 582063, at *6 (D. Md. Feb. 24, 2025); *cf. New York v. Trump*, No. 25-CV-01144, 2025

WL 455406, at *12 (S.D.N.Y. Feb. 11, 2025).

Plaintiffs' allegations regarding Defendants' invasion of their privacy thus satisfies the

injury in fact requirement of Article III. *See, e.g.*, ECF 49.

### III.    Defendants' actions caused Plaintiffs' injuries, and a preliminary injunction will redress those injuries

Plaintiffs also adequately allege the second and third standing requirements—causation

and redressability—which "are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All.*

*for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Commc'ns Co. v. APCC*

*Services, Inc.*, 554 U.S. 269, 288 (2008)). The harms Plaintiffs allege are directly caused by the

SSA Defendants' failure to adequately secure the agency's databases and by the DOGE

Defendants' improper access to those databases, and a preliminary injunction will redress the

injuries suffered by Plaintiffs' members.

Because Plaintiffs adequately allege injury in fact, traceability, and redressability, they

have established that their members would otherwise have standing to sue in their own right.

### IV.    The Interests Plaintiffs Seek to Protect are Germane to Their Purpose

Among Plaintiffs' organizational goals is ensuring that their members have access to and

are able to benefit from well-run programs by SSA. All three Plaintiffs also seek to ensure

protection of their members' data and Social Security benefits, so that they can retire with the

dignity they deserve. ECF 22-1 (Widger Decl.) at PLFS-003–PLFS-004 ¶¶ 7, 8; ECF 22-6 (Fiesta

Decl.) at PLFS-027 ¶ 3; ECF 22-8 (Aguirre Decl.) at PLFS-039 ¶ 3, PLFS-040 ¶ 5.

### V.    The Participation of Individual Members is Not Required

Finally, neither the claims asserted nor the relief requested requires the participation of

individual members in the lawsuit. "'[I]ndividual participation' is not normally necessary when an

association seeks prospective or injunctive relief for its members," *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (quoting *Hunt v. Wash. State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977)), and Plaintiffs do not seek money damages for their Privacy Act claims. *See* ECF No. 49 at 91; Am. Compl., ECF 18, at 29–30. Nor do APA claims for injunctive relief require individual participation. *See Kravitz v. U.S. Dep't of Com.*, 366 F. Supp. 3d at 741; *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 493 (D. Md. 2020).

## PRELIMINARY INJUNCTION

Granting a preliminary injunction can "protect the status quo," "prevent irreparable harm during the pendency of a lawsuit," and give the Court time to "render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted). The substantive standard is the same as for granting a temporary restraining order. *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 281 (4th Cir. 2006). Preliminary relief is appropriate when plaintiffs show that: "(1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Here, all four factors weigh in Plaintiffs' favor.

## I.    Plaintiffs are likely to succeed on the merits

Defendants' unlawful provision of access to, and accessing of, SSA data systems ("Defendants' actions") compromise the security of massive amounts of personally identifiable, sensitive, and confidential information about Plaintiffs' members. Those actions violate the Privacy Act, Administrative Procedure Act, Social Security Act, Tax Revenue Act of 1976, and Federal Information Security Modernization Act of 2014 and SSA's own rules and regulations. Defendants' actions, which constitute final agency action, are also arbitrary and capricious because they were undertaken without any regard for the attendant—and significant—security risks and

because Defendants failed to consider more limited alternatives. Finally, Plaintiffs have no adequate remedy other than relief through the APA. They are therefore likely to succeed on the merits. *See* ECF 49 at 126 (concluding the same with respect to the Privacy Act and APA), 129 (arbitrary and capricious claim).

### A.    Defendants' actions violate the Privacy Act

SSA's maintenance of the public's personally identifiable information is governed by the Privacy Act of 1974,[27] which Defendants violated by granting DOGE Team members nearly unlimited access to systems of records containing sensitive PII even though (1) those individuals do not have a need-to-know justifying access to the PII of hundreds of millions of Americans, and (2) access is not justified by any applicable "routine use."

The Privacy Act protects against "invasion[s] of personal privacy" and requires federal agencies to "maintain, collect, use, or disseminate" records containing such information in a way that both (1) "assures that such action is for a necessary and lawful purpose" and (2) provides "adequate safeguards . . . to prevent misuses of such information." 5 U.S.C. §§ 552a(b), (b)(4). The Act defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency," *Id.* § 552a(a)(4), and liberally defines "disclosure" as "making a record about an individual available to . . . another party." 20 C.F.R. § 401.25. Disclosures may be "either the transfer of a record or the granting of access to a record," Off. of Mgmt. & Bdgt., Exec. Off. of Pres., Guidelines, 40 Fed. Reg. 28948, 28953 (July 9, 1975), and occur when "information

---

[27] The Privacy Act protects information regarding individuals like Plaintiffs' members and provides for private enforcement of violations of its provisions. 5 U.S.C. § 552a(a)(2) (defining "individuals" as citizens of the United States or aliens lawfully admitted for permanent residence); *id.* § 552a(g)(1) (discussing the right to bring a civil action). Because the Act gives Plaintiffs and their members one of the causes of action they assert, their claims fall within the statute's zone of interest. *See Bank of Am. Corp. v. Miami*, 581 U.S. 189, 196–97 (2017) (explaining standard); ECF 49 at 110-11.

has been exposed in a way that would facilitate easy, imminent access," ECF 49 at 112 (quoting *Bessent*, No. CV DLB-25-0430, 2025 WL 582063, at \*9).

      **i.**      **Plaintiffs' members did not consent to Defendants' disclosure of their data.**

First, Defendants have violated the Privacy Act's general prohibition preventing agencies from "disclos[ing] any record which is contained in a system of records . . . to any person, or to another agency" absent written authorization from the individual to whom the record pertains. 5 U.S.C. § 552a(b). Plaintiffs' members categorically did not consent to Defendants' disclosure of their data. *See, e.g.*, ECF 22-9 (Gray Decl.) at PLFS-046 ¶ 7; ECF 22-7 (Somo Decl.) at PLFS-035 ¶ 10; ECF 22-3 (Doe Decl.) at PLFS-017 ¶ 6; ECF 22-2 (Conard Decl.) at PLFS-013–PLFS-014 ¶ 10; ECF 22-4 (Imperiale Decl.) at PLFS-021 ¶ 7; ECF 22-5 (Williams Decl.) at PLFS-024 ¶ 7; Ex. A, Widger Supp. Decl., at PLFS-070 ¶ 5; Ex. C., Fiesta Supp. Decl., at PLFS-078 ¶ 5; Ex. E, Aguirre Supp. Decl., PLFS-086 ¶ 7; Ex. F, Gray Supp. Decl., at PLFS-089 ¶ 4. And none of the Act's enumerated exceptions apply.

      **ii.**      **DOGE Team members and DOGE Defendants do not have a need, within the meaning of the Privacy Act, to access vast quantities of PII about hundreds of millions of Americans.**

Under the Privacy Act, employees[28] may access records maintained by their agency only when they have a need to access those records in the performance of their job duties. With respect to the DOGE Team members and DOGE Defendants, Defendants fail to make that showing. *See* 5 U.S.C. § 552a(b)(1).

Cases interpreting the "need" requirement typically consider need as "need to know." *Doe v. U.S. Dep't of Just.*, 660 F. Supp. 2d 31, 44–46 (D.D.C. 2009). Principles of statutory construction and the legislative history of the Act make clear that "need" means "need to know" in this context.

---

[28] Plaintiffs dispute DOGE Team members' employee status.

ECF 49 at 119-24; Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 ("In order to protect the privacy of individuals identified in information systems maintained by federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies.").

Defendants claim that DOGE Team members "need" access this broad data to "detect fraud, waste and abuse." Russo Decl., ECF 36-1, at 2 ¶ 5; *but see supra* note 18. But even where Defendants have identified specific projects on which a Team member plans to work, *see* Dudek Decl., ECF 62-1, at 3–5 ¶¶ 9–11, their articulations of need have been tautological, *see* Mem. Op., ECF 49 at 125 (detailing the exchange between the Court and Defendants' counsel about the DOGE Team members' "need" for such a high quantity of sensitive information), and without sufficient or consistent explanation as to why anonymization is not possible in the first instance, *compare* Dudek Supp. Decl., ECF 74-1, at 3 ¶ 8 ("Employee 8 plans to work with non-DOGE Team SSA employees in order to retrieve anonymized, aggregated data . . . . Employee 8 needs access to discrete individual data only when anomalies are identified, in order to detect fraud in specific instances."), *with* Dudek Decl., ECF 62-1, at 5 ¶ 11 ("[For Employee 8], [a]nonymization is not feasible because it could obscure information useful for identifying fraud."), *and* Dudek Decl., ECF 80-1, at 3 ¶ 5 (describing "[d]e-identification of data as "impracticable" and apt to "result in the removal of information relevant to the SSA DOGE Team's analysis"); *compare*

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

The articulations of need provided within the agency are likewise paltry and inconsistent. *Compare*

████████████████████████████████████████████████

███████████████████████████████████████  *with* Transcript of

Emergency Telephone Conference at 10:20–23, ECF No. 67.[29] These articulations of need are also

nebulous and frequently change without explanation. ███████████████████████████

████████████████████████████████████████████████

██████████  Nor is the asserted "need" tailored to the Executive Order by which the DOGE teams

were established.

      **iii.**    **Defendants' actions do not fall within applicable routine uses.**

Nor can Defendants find safe harbor in the Privacy Act's routine use provision, which

applies to those DOGE Team members who are not employed by or properly detailed to SSA. For

disclosure to be deemed acceptable under this provision, a non-employee's use of the record must

be (1) for a purpose which is compatible with the purpose for which it was collected, 5 U.S.C.

§ 552a(a)(7); and (2) consistent with the "routine use" established by the agency for each system

of record, *see* 5 U.S.C. § 552a(e)(4)(D).

Agencies establish a system of record's "routine use" in System of Records Notices

("SORNs") published in the Federal Register, which serve to inform the public about how agencies

collect and maintain personal information. Agencies must publish a SORN each time they

"establish[] or revis[e]" a system of records. 5 U.S.C. § 552a(e)(4). The SORNs corresponding to

the data system to which DOGE Team members were granted permit "student volunteers,

individuals working under a personal services contract, and other workers who technically do not

have the status of Federal employees . . . [and] need access to personally identifiable information

---

[29] ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

(PII) in our records in order to perform their assigned agency functions." 71 Fed, Reg. 1826, 1827 (Jan. 11, 2006); see also TRO Opp., ECF 61, at 25–26 (citing other SORNs).

Members of the DOGE Team granted access to these systems are not "student volunteers" or "individuals working under a personal services contract." As employees of DOGE, they would be considered federal employees or contractors. Moreover, even assuming that members of the DOGE Team fit into one of the categories outlined in the SORN—which they do not—the SORN still requires that these individuals "need access to personally identifiable information (PII) . . . in order to perform their assigned agency functions." As discussed earlier, Defendants have not and cannot establish need sufficient to justify wholesale access to a "vast quantity of PII belonging to millions of people." *See* ECF 49 at 127.[30]

There is no question that Defendants' actions constitute unlawful "disclosure" of "records" forbidden by the Privacy Act. *See Am. Fed'n of Tchrs. v. Bessent*, 2025 WL 582063, at *9.

**B. Defendants' actions violate the Social Security Act, Tax Reform Act of 1976, and applicable regulations.**

Defendants' actions also flout the Tax Reform Act of 1976 (also cited as the Internal Revenue Code), Social Security Act, and SSA's own agency-specific rules and regulations.

**i.    Defendants seek to disclose tax return information in violation of the Tax Reform Act and Social Security Act.**

First, Defendants have disclosed, and, absent the temporary restraining order, seek to disclose tax return information in violation of Section 6103 of the Internal Revenue Code and Section 1306 of the Social Security Act. *See* 26 U.S.C. § 6103(a) ("Returns and return information

---

[30] The applicable SORNs also permit the disclosure of certain data to the Department of Treasury for the collection of Social Security taxes, *see* 71 Fed. Reg. 1827 (Jan. 11, 2006), or to respond to federal, state, and local agencies after a data breach, *see* 72 Fed. Reg. 69723 (Dec. 10, 2007). But the SORNs permit disclosure to the Office of the President only for the purpose of responding to an inquiry made by "[an] individual or from a third party on [the individual's] behalf." 71 Fed. Reg. 1827; 71 Fed. Reg. 831.

shall be confidential."), 42 U.S.C. § 1306(a)(1) ("No disclosure of any return or portion of a return . . . shall be made.").

The SSA databases DOGE captured—and seeks to capture again—contain tax return information, which is broadly defined to include "a taxpayer's identity, the nature[s], source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments." 26 U.S.C. § 6103; *see Judicial Watch, Inc. v. Soc. Sec. Admin.*, 701 F.3d 379 (D.C. Cir. 2012) (holding that certain data housed at SSA is "return information" protected from disclosure by 26 U.S.C. § 6103); ECF 22-10 (Flick Decl.) at PLFS-049 ¶ 2. While Section 6103 enumerates limited circumstances in which individual tax reform information may be disclosed outside the agency, none are applicable here. Nor did Defendants' disclosures comply with the specific and rigorous procedures provided in Section 6103 for the limited circumstances in which individual tax return information may be made available to the President or White House Office employees. 26 U.S.C. § 6103(g). Defendants' disclosure of return information contained in SSA systems to non-agency personnel, including DOGE, thus violates both the Internal Revenue Code and the Social Security Act.

> ii.    **Defendants' actions violate SSA's "general principles" regulations.**

Defendants' actions also violate an SSA regulation establishing the "general principles" used to determine whether to permit disclosure of information in the absence of another legal requirement. That regulation requires the agency to follow FOIA principles and consider "whether the disclosure would result in a 'clearly unwarranted invasion of personal privacy.'" 20 C.F.R. § 401.140. In making that determination, to "insure uniform treatment in all situations," SSA considers (a) the "sensitivity of the information (e.g., whether individuals would suffer harm or embarrassment as a result of the disclosure)," (b) "public interest in the disclosure," (c) the "rights and expectations of individuals to have their personal information kept confidential," (d) the

"public's interest in maintaining general standards of confidentiality of personal information," and (e) the "existence of safeguards against unauthorized redisclosure or use." *Id.*

Defendants did not engage in this assessment. To the contrary: when SSA personnel asked questions that could have informed that type of analysis, Defendants obfuscated or refused to respond. *See* ECF 22-10 (Flick Decl.) at PLFS-056 ¶¶ 36, 38, PLFS-057 ¶¶ 40, 43. Had they considered the mandatory factors listed above, they surely would have been required to take a different course. *Cf. Havemann v. Astrue*, No. CIV. ELH-10-1498, 2012 WL 4378143, at *6 (D. Md. Sept. 24, 2012), *aff'd sub nom. Havemann v. Colvin*, 537 F. App'x 142 (4th Cir. 2013) (noting the "significant privacy interest in the control of private information maintained in SSA's databases") (citations omitted); *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 166 (2004) ("There is special reason, therefore, to give protection to this intimate personal data, to which the public does not have a general right of access in the ordinary course.")). *See, e.g.*, Ex. H, Escobar-Alava Decl., at PLFS-097–PLFS-098 ¶ 7.

### C.   The SSA Defendants' decision to provide the DOGE Team with expansive access to SSA record systems without signed detail agreements, adequate training, completed background investigations, executive work forms, and/or actual need constitutes final agency action for purposes of the APA.

The Administrative Procedure Act provides for judicial review for a "final agency action for which there is no adequate remedy in a court." *Id.* An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). But courts take a "'pragmatic' approach . . . to finality," *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs.,* 387 U.S. at 149). The SSA Defendants' decision to provide the DOGE Team with expansive access to SSA record systems without signed detail agreements, adequate training, completed background

investigations, executive work forms, need-to-know, and without regard for agency principles including segregation of duties and least-privilege access, constitutes final agency action for purposes of the APA.

i. **Defendants' actions mark the consummation of the agency's decision-making process.**

A challenged agency action need not be reduced to writing to satisfy this element. *See, e.g.*, *Her Majesty the Queen in Right of Ontario*, 912 F.2d at 1531. Instead, agency head approval of an agency action is a "signpost[] of authoritative determination, finality[,] and ripeness." *Nat'l Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971).

In his declaration, Russo states that "data access to the DOGE team was first approved by SSA's Acting Commissioner [Dudek]" and that personally identifiable information was granted with respect to SSA's MBR, SSR, Numident, and Treasury Payment Files on February 12 and February 20. Russo Decl., ECF 36-1, at 2–3 ¶ 6–7. That assertion is supported by the administrative record, which evidences. *See, e.g.*, ████████████████████████████████ ████████████████████████████ The access granted gave DOGE Team members access to virtually all data and records systems maintained by SSA, despite longstanding policy and practice at SSA of guarding the confidentiality and privacy of PII. Ex. I, Flick 2d Supp. Decl., at PLFS-100–01 ¶¶ 3–5; Ex. H, Escobar-Alava Decl., at PLFS-096 ¶ 2.

Critically, the DOGE Team received far broader access than what is automatically afforded when SSA records are reviewed "for potential fraud, waste, and abuse by oversight agencies . . . or auditors. . . ." ECF 22-10 (Flick Decl.) at PLFS-054–PLFS-055 ¶ 26; *see id.* at PLFS-056 ¶ 37, PLFS-057 ¶ 43; ECF 39-1 (Supp. Flick Decl.) at PLFS-062–PLFS-063 ¶¶ 4–5. More than just the scope of the access, SSA has made a change to what requirements need to be met by employees to obtain such broad access. Dudek's decision to authorize the DOGE Team's access to the SSA data systems is at odds with SSA's earlier policy and practices. According to Ms. Flick, the

onboarding process for one of the DOGE Team employees was "contrary to standard practice," ECF 22-10 (Flick Decl.) at PLFS-052 ¶ 16, and the speed at which access to systems was provided was "unprecedented." *Id.* at PLFS-052 ¶ 15; *see* Ex. J, Brady Doe Decl., at PLFS-105; Ex. H, Escobar-Alava Decl., PLFS-097 (background check "often takes months").

The administrative record, when compared against Defendants' declarations, makes clear that at least one employee of the DOGE Team ████████████████████████████ ████████████████████████████████, *e.g.,* ████████████████████████ ██████████████████████████████ *and* Russo Decl., ECF 36-1 ¶ 8 (noting Employee 3, as of Feb. 21, was "granted access to, a production copy with read-only access and no update ability, personally identifiable information from SSA's MBR, SSR, Numident, and Treasury Payment Files Showing SSA Payments from SSOARS"). That "is not in keeping with agency practice because the agency does not consider a detailee to be an employee of SSA until a detail agreement is signed and finalized." *Id.* Team members also accessed SSA data systems prior to having fully adjudicated background checks, *see, e.g.*, Felix-Lawson Decl., ECF 62-2, at 2–4 ¶¶ 6–11, and ████████████████████████████████. Even so, SSA Defendants gave those individuals access to PII in agency systems. *See* Felix-Lawson Decl., ECF 36-2, at 5 ¶ 15.

SSA's policy of respecting privacy is consistent with federal regulations governing the Social Security Administration, which admonish SSA employees to be mindful of their responsibilities under the Privacy Act. 20 C.F.R. Pt. 401, App. A(a) (Employee Standards of Conduct for SSA). The regulations also provide that SSA employees shall "[d]isclose records within SSA only to an employee who has a *legitimate need to know* the record in the course of *his or her* official duties. *Id.* App. A(d)(1) (emphasis added); *see* Ex. I, Flick 2d Supp. Decl., at PLFS-

101–PLFS-102 ¶¶ 4–8.

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████ Defendants have not show that less privilege is not possible.

CF 74-1 (Dudek Supp. Decl.) at 3 ¶ 8 *with* ECF 62-1 (Dudek Decl.) at 5 ¶ 11, *and* ECF No. 80-1

(Dudek Decl.) at 3 ¶ 5. ████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████ But Defendants have indicated that at least some DOGE Team

members plan both audit agency systems (e.g., by ensuring that death records "*can* be updated"

based on available information in the system) and update individual-level information for persons

that employee believes is dead. ECF 62-1, Dudek Decl., at 4 ¶ 10; *see id.* at 4–5 ¶ 9.

The SSA Defendants' decision to provide the DOGE Team with expansive access to SSA

record systems without signed detail agreements, adequate training, completed background

investigations, executive work forms, need-to-know, and without regard for agency principles

including segregation of duties and least-privilege access, constitutes final agency action for

purposes of the APA "is surely a 'consummation of the agency's decisionmaking process,' and

'one by which [the submitter's] rights [and the agency's] obligations have been determined.'"

*Venetian Casino Resort, L.L.C.*, 530 F.3d at 931.

**ii.    Defendants' actions determined rights and obligations.**

Defendants' actions resulted in the kind of "'direct and appreciable legal consequences'"

required under the "'pragmatic' inquiry prong of *Bennett*." *Sierra Club v. EPA*, 955 F.3d 56, 63

(D.C. Cir. 2020) (cleaned up) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590,

598–99 (2016)). As soon as the decision to change access standards was taken, Plaintiffs' members

saw their rights and obligations change vis-à-vis the SSA. That is sufficient for showing final

agency action. *Port of Boston Marine Terminal Assn.* v. *Rederiaktiebolaget Transatlantic,* 400 U. S. 62, 71 (1970). Defendants' actions also marked a change for the *agency's* position as to what will be required of employees (or non-employees) seeking access to PII through SSA data systems, and that is itself sufficient for final agency action. *See Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 461 (D. Md. 2012) (stating that the relevant inquiry under *Bennett* is whether the agency action "determined its own rights or obligations" *or* "determine[d] Plaintiff's rights or obligations").

This Court previously summarized the import of these facts, describing Defendants' actions as "a sea change that falls within the ambit of a final agency action." ECF 49, at 99–100. That remains true today.

### iii.    Defendants' actions are contrary to law.

For the reasons stated above, *see supra*, Defendants' actions are contrary to law.

### iv.    Defendants' actions are arbitrary and capricious.

Defendants' actions are also arbitrary and capricious. The law "requires agencies to examine relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). Normally, an agency rule is considered arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* For several reasons, Defendants' actions fail this standard.

***First***, despite suddenly throwing open the gates to the sensitive, personally identifying information of hundreds of millions of Americans, Defendants neither disclosed nor acknowledged a change in position. *See Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) ("At a minimum, an agency must 'display awareness that it is changing position[s].'" (quoting *Encino*

*Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).  For decades, SSA has carefully guarded the information submitted to it, engraining into every employee the importance of data and information security practices. *See*, *e.g.*, ECF 22-10 (Flick Decl.) at PLFS-050–PLFS-051 ¶¶ 4–8. Now, under the control of Defendants Musk, Dudek, and Russo, the agency is unlawfully sharing the public's data without even acknowledging the seismic shift in agency policy. That renders Defendants' actions arbitrary and capricious. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

**Second**, Defendants seek to disclose vast amounts of sensitive, personally identifying data about millions of Americans without adequate explanation as to why giving DOGE and its personnel such unfettered access is necessary. *See* ECF 22-10 (Flick Decl.) at PLFS-057 ¶ 43.

Nor have Defendants accounted for, or even acknowledged, the serious risks their actions inflict on the American public, including Plaintiffs' members. *See supra.* Those risks are without doubt "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43; *see also Sierra Club v. Dep't of Interior*, 889 F.3d 260 (4th  Cir. 2018) (explaining that an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made."). Defendants also have considered neither how SSA will be able to continue performing its essential work if sensitive data sets are compromised nor the work required to rebuild public trust in the agency. *See* ECF 22-10 (Flick Decl.) at PLFS-059 ¶ 50 (noting the fragility of SSA systems).

**Third**, Defendants have acted without any recognition of the serious reliance interests of Americans, including millions of Plaintiffs' members,[31] engendered by SSA's repeated

---

[31] *See* ECF 22-6 (Fiesta Decl.) at PLFS-028, ¶ 10; ECF 22-8 (Aguirre Decl.) at PLFS-041 ¶ 9; ECF 22-1 (Widger Decl.) at PLFS-005 ¶ 13; Ex. D Imperiale Decl., at PLFS-021 ¶ 7; ECF 22-2 (Conard Decl.) at PLFS-013–PLFS-14 ¶ 10; ECF 22-3 (Doe Decl.) at PLFS-017 ¶ 6; ECF 22-5 (Williams Decl.) at PLFS-024 ¶ 6; ECF 22-7 (Somo Decl.) at PLFS-035 ¶ 9; Ex. B, Conard Supp. Decl., PLFS-074 ¶ 2; Ex. D, Somo Supp. Decl., at PLFS-081 ¶ 4.

assurances—throughout its regulations, on its website, and even in one-on-one communications with everyday Americans—about the protections the agency uses to prevent the unauthorized disclosure of sensitive and personally identifying information. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (requiring consideration of reliance interests to survive arbitrary and capricious review). As but one example, an SSA employee explicitly told one member of Plaintiff AFT that his information "was going to be extremely confidential—that only specific, qualified people would have access to it." ECF 22-9 (Gray Decl.) at PLFS-046 ¶ 6. That assurance has gone out the window, with nary a thought for those who reasonably depended on it.

Nor have Defendants explained why they cannot adjust their approach to review of this data to account for these reliance interests, such as by following the standard agency practices of (1) allowing for appropriate onboarding and training of SSA employees, (2) assessing an individual's need to know with respect to each data system to which they seek access, (3) maintaining reasonable restrictions on access to data, and (4) adhering to the principle of segregation of duties, as the agency did before January 20. *Regents of the Univ. of Cal*, 591 at 33; *Casa de Maryland,* 486 F. Supp. 3d at 963 (finding "failure to consider an important policy alternative" rendered agency action arbitrary and capricious (internal citations omitted)).[32]

### v.    Plaintiffs have no other adequate remedy.

The Administrative Procedure Act requires courts to enjoin unlawful final agency action when there is "no other adequate remedy" available. 5 U.S.C. §§ 704, 706(2)(A). That is the case

---

[32] Defendants' decision-making was purely due to political pressure and was divorced from statutory considerations. An agency can only take into account "factors which Congress has . . . intended it to consider" in taking final agency action that affects third party rights and obligations. *Motor Vehicle Manufacturers Association v. State Farm*, 463 U.S. 29, 43 (1983). Where it appears that the agency head is merely enforcing a pre-determined pre-appointment political position as agency policy, this Court can strike down that agency action as arbitrary and capricious. *Id.* Here, Defendant Dudek and others have stated expressly that they made their decisions at the direction of President Trump and DOGE. They did so subject to obvious pressure campaigns, and their actions were therefore arbitrary and capricious.

here, where nothing absent an injunction will prevent Defendants' disclosure of and improper access to the data in question. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) (noting that though the Privacy Act does not itself address standards governing equitable relief, the APA does); *Doe v. Stephens*, 851 F.2d 1457, 1460-61, 1463 (D.C. Cir. 1988) (violations of the Privacy Act can be remedied by injunctive relief under the APA).

Plaintiffs are therefore likely to succeed on the merits of their claims.

## II.    Plaintiffs Are Suffering Immediate, Irreparable Harm.

To show irreparable harm, a party must clearly show that it will suffer actual, imminent harm that "cannot be fully rectified" by a final judgment after trial. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks and citations omitted). Plaintiffs more than meet this standard.

### A.  Plaintiffs' members are irreparably harmed by DOGE's unlawful access to their sensitive information.

As the Court previously concluded, the DOGE Team's access to plaintiffs' members' sensitive, personally identifiable information on a daily basis and with no proper justification constitutes irreparable injury. ECF 49 at 129. As detailed above, *see supra*, Plaintiffs' members share information with SSA based on their understanding that the agency is both legally obligated and committed to keeping their data secure, and SSA systems contain an immense amount of their data. "Put simply," one ARA member explained, "SSA knows basically everything about us." ECF 22-7 (Somo Decl.) at PLFS-034 ¶ 7.

The Master Beneficiary Record, for example, contains information about each claimant who has applied for retirement, survivor, or disability benefits. To receive disability insurance, which some of Plaintiffs' members do, *see, e.g.*, ECF 22-4 (Imperiale Decl.) at PLFS-020–PLFS-021 ¶ 4, ECF 22-6 (Fiesta Decl.) at PLFS-030 ¶ 18, ECF 22-1 (Widger Decl.) at PLFS-004–PLFS-

005 ¶ 10, members must submit extensive medical information, including details about the prescription and non-prescription medicines the applicant takes; lists of their healthcare providers and the medical conditions for which they were evaluated and treated, including mental health conditions; and other sensitive medical information, *see* ECF 22-1 (Widger Decl.) at PLFS-005 ¶ 11. Some information, including concerning "health conditions like HIV or other STDs," can result in stigma, social isolation, job loss, housing loss, and other harms." *Id.* at PLFS-005 ¶ 14.

Disclosure of this information to DOGE is an actual harm to Plaintiffs' members, who did not consent to DOGE accessing their sensitive information and who face injury in the form of a privacy violation every day the department accesses their private data. As another judge in this district recently held, harm like this cannot be rectified by money damages down the road. *Bessent*, 2025 WL 582063 at *14 (citations omitted) ("The unauthorized disclosure of the plaintiffs' sensitive personal information to DOGE affiliates is irreparable harm that money damages cannot rectify."). Moreover, "because defendants believe this access is necessary for [DOGE] employees, there is no reason to think it will end anytime soon." ECF 49 at 129; *see, e.g.*, Compliance Notice, ECF 62. Public statements by Defendants and DOGE evidencing that DOGE Team members are directing changes to millions of individuals' SSA records—including since the TRO was issued—further underscore the harms faced by Plaintiffs' members.[33]

**B.  Plaintiffs' members are irreparably harmed by the now-increased risk that their information is more easily accessible by bad actors.[34]**

For Plaintiffs' members, the disclosure of their information to DOGE is made more concerning by the attendant heightened risk of non-governmental bad actors accessing that

---

[33] Aliss Higham, *DOGE Issues Update on 'Major Cleanup' of Social Security, Newsweek* (March 25, 2025), https://perma.cc/HDR5-AS9M (DOGE and Elon Musk "confirmed that more than 7 million Social Security numbers with no registered confirmation of death have now been updated in SSA systems").
[34] Plaintiffs are also harmed by Defendants' attempts to pair their data with artificial intelligence systems. *See generally* Ex. G, Meyer Decl.

sensitive, personally identifiable data. SSA has in its systems "anything that a scammer would want to know, to do just about anything a scammer would want to do." ECF 22-7 (Somo Decl.) at PLFS-034 ¶ 7. As the agency itself acknowledges, Social Security impersonation scams are "one of the most common government imposter scams reported to the Federal Trade Commission."[35] The risks associated with unauthorized access to SSA data are widely known—including by this Court, which has previously described the "very real danger" to privacy "enabled by extensive publicly available data on individuals." *Havemann v. Astru*e, 2012 WL 4378143, at *11, *aff'd sub nom*. *Havemann v. Colvin*, 537 F. App'x 142. An "unscrupulous individual" armed with a person's SSN could obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain the person's paycheck. *Greidinger v. Davis*, 988 F.2d 1344, 1353 (4th Cir. 1993). Plaintiffs' members' risk of being targeted by such fraudsters increased meaningfully as soon as Defendants unlawfully shared their information, and it will persist and deepen if DOGE is once again free to troll the PII of hundreds of millions of Americans. ECF 22-1 (Widger Decl.) at PLFS-006 ¶ 15 ("As soon as uncredentialed DOGE personnel accessed this data, it was compromised, making AFSCME members more apt targets for identity theft and other scams."); ECF 22-6 (Fiesta Decl.) at PLFS-029 ¶ 13 ("Granting DOGE unfettered access to this data immediately increased the risk that our members' sensitive information will be stolen or misused"); Ex. C, Fiesta Supp. Decl., at PLFS-978 ¶ 7; Ex. E, Aguirre Supp. Decl., PLFS-086–PLFS-087 ¶ 8; *see* Ex. B, Conard Supp. Decl., at PLFS-075  ("I am worried that someone may have access to my SSN."); Ex. F, Gray Decl., PLFS-

---

[35] Soc. Sec. Admin., Press Release, *Social Security and OIG Partner for National Slam the Scam Day* (Mar. 6, 2025), https://perma.cc/YH3F-8YLE; Privacy Act, Pub. L. No 93-579, § 2(a)(2), 88 Stat. 1896 (1974) ("[T]he increasing use of computers and sophisticated information technology, while essential to the efficient operations of the Government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information.").

090 ¶ 5 ("Seniors like myself are quite vulnerable.").

A court addressing DOGE's capture of sensitive information at another agency has already found that the "heightened risk that the systems in question will be more vulnerable than before to hacking" constitutes irreparable harm. *New York v. Trump,* No. 25 CIV. 1144, 2025 WL 435411, at *1 (S.D.N.Y. Feb. 8, 2025), modified, No. 25-CV-01144 (JAV), 2025 WL 455406 (S.D.N.Y. Feb. 11, 2025). Here, Plaintiffs' members are particularly vulnerable as senior citizens who are the "frequent target[s] of scammers." *See United States v. Lawson*, No. 23-4137, 2025 WL 422397, at *5 (4th Cir. Feb. 7, 2025). AFSCME members, for example, are "already flooded with phone calls and texts from scammers seeking to take advantage of their age and health conditions." ECF 22-1 (Widger Decl.) at PLFS-009 ¶ 30; *see, e.g.*, ECF 22-7 (Somo Decl.) at PLFS-034–PLFS-035 ¶ 8; Ex. F, Gray Supp. Decl., at PLFS-089 ¶5. Defendants' unlawful actions meaningfully increase the risk of these scammers gaining additional personally identifiable information about Plaintiffs' members and using that information to better disguise their malintent. As one ARA member who already frequently receives fraudulent messages purporting to be from her bank explained, "if these messages included more of my personal information, I'm not sure that I would be able to tell that they are fake." ECF 22-7 (Somo Decl.) at PLFS-034–PLFS-045, ¶ 8.

## III.    Balance of Equities and Public Interest Both Favor an Injunction.

The final two factors, which address whether the balance of equities tips in a movant's favor and whether the injunction is in the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, both favor Plaintiffs.

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States*, 838 F.3d at 12. But there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); see *Roe*, 947 F.3d at 230–31.

"[T]here is a strong public interest in maintaining the confidentiality of PII, such as medical records and financial information." ECF 49 at 134. "It is almost self-evident that, in our society, PII, such as SSNs, medical information, and certain financial records, are regarded as private, sensitive, and confidential information." ECF 49 at 137. With respect to health records, specifically, the enactment of HIPAA "is a reflection of societal views as to the sanctity of medical information" and "speaks to the expectation of privacy in medical records that is engrained in our culture." ECF 49 at 86-87. The evidentiary psychotherapist-patient privilege reflects the same. *See supra,* at 9. The risks associated with unauthorized access to SSA data are widely known—including by this Court, which has previously described the "very real danger" to privacy "enabled by extensive publicly available data on individuals." *Havemann v. Astrue*, 2012 WL 4378143, at *11, *aff'd sub nom. Havemann v. Colvin*, 537 F. App'x 142. The balance of equities and the public interest therefore weigh in Plaintiffs' favor.

## STAY UNDER 5 U.S.C. § 705

Alternatively, this Court should enter a universal stay under 5 U.S.C. § 705. A finding on the merits that Defendants' actions were either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity," mandates that the Court "hold unlawful and set aside [such] agency action." 5 U.S.C. § 706(2). *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 295 (4th Cir. 2018) (explaining that the "default rule" is that unlawful agency action must be "set aside").

Just as Section 706(2) of the APA allows a court to vacate an agency action at conclusion of the merits of the case, Section 705 grants this Court authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-

restricted and allows a court to 'set aside' an unlawful agency action." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion and grant the relief requested in the accompanying Motion for Preliminary Injunction and Proposed Order.[36]

---

[36] The Court should exercise its discretion to waive or set at $0 the security requirement of Fed. R. Civ. P. 65(c) because Defendants will face no monetary injury from any relief ordered by the Court. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." (citations omitted)); *see* ECF 48 ¶ 4 (setting bond of $250 per Plaintiff).

Dated: April 4, 2025

Respectfully submitted,

*Alethea Anne Swift*

Alethea Anne Swift (Bar No. 30829)
Mark B. Samburg (Bar No. 31090)
Karianne M. Jones[*+]
Robin F. Thurston[*+]
Emma R. Leibowitz[*+]
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
aswift@democracyforward.org
msamburg@democracyforward.org
kjones@democracyforward.org
rthurston@democracyforward.org
eleibowitz@democracyforward.org

*Counsel for Plaintiffs*

[*] Admission to this Court pending
[+] Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I, Alethea Anne Swift, certify that I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Maryland, Northern Division, by using the CM/ECF system, which sent a notice of such filing to all registered CM/ECF users who have appeared in this case

/s/ Alethea Anne Swift__
*Counsel for Plaintiffs*