# EXHIBIT G

PLFS-091

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, <br><br> *Plaintiffs*, <br><br> *vs.* <br><br> SOCIAL SECURITY ADMINISTRATION, *et al.*, <br><br> *Defendants*. | Civil Action No. 1:25-cv-00596 |

**<u>DECLARATION OF ERIE MEYER</u>**

I, Erie Meyer, declare as follows:

1.      I am a founding member of the U.S. Digital Service and have served as the Chief Technologist of two federal agencies. I have significant experience in technology policy, data security, and artificial intelligence.

2.      Public statements and reporting indicate that the Department of Government Efficiency (DOGE) plans to incorporate artificial intelligence (AI) into its operations, including at the Social Security Administration. However, AI is a broad marketing term encompassing various technologies, and it remains unclear which specific AI tools will be used and for what exact purposes.

3.      A critical concern is the potential use of sensitive data from the Social Security Administration (SSA) in AI applications. If such data is used with AI models, the AI system itself integrates that data into its training process. This means that even if DOGE's direct access to SSA data is later revoked, the AI models will have already been trained by that data. In many

AI systems, once data is used for training, removing it would require deleting or retraining the entire system.

4. For example, if SSA data has been integrated into Grok, an AI tool owned by Elon Musk, this would create an unfair advantage, granting it access to uniquely sensitive government-held information that no competitor could obtain. Even if the data was later deleted, Grok would have already gleaned the benefit.

5. During my time at the Federal Trade Commission, we introduced algorithmic deletion remedies to address cases where companies were alleged to have used improperly obtained data to train their AI. This remedy is essential to curbing the relentless collection and exploitation of such data. Without intervention, once your information is absorbed into an AI system, it becomes an integral part of how that company operates – fueling further exploitation. This enforcement approach was first established under the Trump administration and continued under the Biden administration.[1]

6. Additionally, many AI systems have known security vulnerabilities, including instances where adversarial attackers have bypassed safeguards – such as security researchers successfully extracting private financial data from AI models. This poses significant privacy and security risks for the American public if those models have been granted access to sensitive data held by SSA.

7. Research shows that the now familiar problem of large language models (LLMs) routinely inserting incorrect details into factual statements is inherent to large AI models. In fact, these errors, often rebranded as "hallucinations." are fundamental to how LLMs work, and

---

[1] Example provisions in the following cases call for the deletion of "Affected Work Product," meaning any models or algorithms developed in whole or in part using improperly obtained data: Decision and Order at 3–7, *In the Matter of Everalbum, Inc.*, F.T.C. Matter No. 1923172 (May 7, 2021), Dkt. No. C-4743; Commission Final Order at 3–5, *In the Matter of Cambridge Analytica*, F.T.C. Matter No. 1823107 (Dec. 6, 2019), Dkt. No. 9383; Stipulated Order at 7–14, *FTC v. Ring, LLC*, No. 1:23-cv-1549 (D.D.C. June 16, 2023), ECF No. 12.

PLFS-093

researchers say that eliminating them completely is impossible.[2] I would be deeply concerned with SSA relying on systems with these kinds of unpredictable but routine failures.

8.      As the Chief Technologist of the Consumer Financial Protection Bureau (CFPB), I oversaw a report on the use of chatbots in banking services. The report found that when organizations attempt to cut costs by replacing human customer service agents with AI chatbots for complex financial conversations, they can create "doom loops" that prevent consumers – particularly seniors and veterans – from getting timely and meaningful help. Troublingly, recurring complaints indicated that chatbots failed to fulfill legally mandated responsibilities, such as conducting reasonable investigations into claims of fraud. Many consumers did not realize that sloppy AI was the cause of their frustration; they simply knew they were unable to reach a human representative to resolve urgent financial issues before losing their money.[3]

Executed on April 3, 2025, in Columbus, Ohio.

Erie Meyer

---

[2] Nicola Jones, *AI hallucinations can't be stopped — but these techniques can limit their damage*, Nature (Jan. 21, 2025), https://perma.cc/W2WM-P3G7.
[3] *Chatbots in consumer finance*, Consumer Financial Protection Bureau (June 2023), https://perma.cc/9WBZ-NMNN.

PLFS-094