# EXHIBIT H

PLFS-095

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> SOCIAL SECURITY ADMINISTRATION, *et al.*, <br><br> *Defendants*. | Civil Action No. 1:25-cv-00596 |

**DECLARATION OF MARCELA ESCOBAR-ALAVA**

I, Marcela Escobar-Alava, declare as follows:

1. I am a former Chief Information Officer at the Social Security Administration ("SSA"). In that role, I worked on helping to develop IT modernization and best-practice efforts at the agency. I recently left the agency.

2. In my experience, SSA's IT and data security practices are driven by a few ideas: (1) use least privilege access; (2) segregation of duties; and (3) incorporate other "Zero-Trust" principles (including assuming breach and verifying any requests for information as though they originated outside of the system). These principles are used widely both in and outside of government as standard best practices for any information security system.

3. "Least privilege access" is the idea that users should be granted permission to access the smallest amount of and least identifying data possible to complete their jobs. Least privilege access also includes the notion that users should be granted the most restrictive type of access—for example, read-only access instead of write access. Data should be sanitized or anonymized

wherever possible; users should be required to validate or explain what they are trying to access and why; and they should not be permitted to access production data with "write" permissions unless absolutely necessary, authorized and documented. Least privilege access is important because it prevents systems from having over-privileged users that may increase the potential for breach or misuse.

4. "Segregation of duties" ("SoD") is the idea that no user should have enough privileges to misuse a system on their own. For example, the person in charge of issuing benefits through a system should not be the same person crafting the code that govern that system. SoD likewise prevents misuse. Although SoD is not always operable at small tech start-ups (where, for example, a team may only include five people), it is easily incorporated into the organizational structure at larger entities such as SSA.

5. In my work at SSA, I saw these principles put into practice. For example, as required by the Privacy Act, anyone seeking access to sensitive data housed in SSA systems was required to provide a justification as to why they needed access to specific systems, information of that kind, of that quantity, or in that way.

6. SSA also conforms with industry-standard IT and data security practices by requiring a completed background check for employees who will be given access to PII. At SSA, no employees are given such access until they have been fully cleared. That often takes months, even when someone already has clearance from the White House or another agency.

7. In keeping with the principles outlined above, SSA's Enterprise Data Warehouse, or EDW, includes many sandbox functions. I have reviewed the declarations made in this case by Tiffany Flick, and I agree that standard practice would be to (1) grant DOGE Team members access to the

data they sought in a "sandbox" environment with anonymized data, and (2) refuse requests for write-access and access to SSA source code.

8. Before I left SSA, I was introduced to Steve Coulter at agency headquarters. Mr. Coulter identified himself as being from DOGE.

I declare under penalty of perjury under the laws of the United States of America, as prescribed in 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on April 3, 2025, in Mexico City, Mexico.

_____
Marcela Escobar-Alava