# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

        Plaintiffs,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*,

        Defendants.

Case No. 1:25-cv-00596-ELH

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION AND/OR
5 U.S.C. § 705 STAY**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 1

I.    The United States DOGE Service ............................................................................ 1

II.   The DOGE Team at the Social Security Administration ......................................... 2

      A.   The SSA DOGE Team's Anti-Fraud Projects ................................................ 2

      B.   Composition of the SSA DOGE Team ........................................................... 3

      C.   Scope of the SSA DOGE Team's Access to SSA Systems ............................ 4

III.  This Litigation ......................................................................................................... 4

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT ..................................................................................................................... 6

I.    The Court Lacks Jurisdiction over Plaintiffs' Claims. ............................................ 6

      A.   Plaintiffs Lack Standing. ................................................................................. 6

           1.   *Plaintiffs Do Not Have Members with Standing to Sue in Their Own Right.* ......... 7

           2.   *Individual Participation Is Necessary as to the Privacy Act Claims
                (Counts I, II).* ....................................................................................... 11

      B.   Plaintiffs Fail to Establish Reviewable Final Agency Action. ...................... 12

           1.   *Plaintiffs Have Failed to Clearly Identify the Agency Action They Challenge.* .... 13

           2.   *Access Decisions Are Not Reviewable "Agency Action."* ...................... 14

           3.   *Plaintiffs Have Failed to Identify "Final" Agency Action.* ................... 15

II.   Even if There Were Jurisdiction, Plaintiffs Are Not Likely to Succeed on the Merits of Their
      Claims. ................................................................................................................... 18

      A.   Plaintiffs Cannot Use the APA to Avoid the Privacy Act's Narrow Cause of Action. . 18

      B.   There Is No Privacy Act Violation. ............................................................... 19

      C.   There Is No Violation of Section 6103/SSA Regulations. ............................ 22

i

D.    Defendants' Conduct Is Not Arbitrary and Capricious.................................................... 25

III.    Plaintiffs Cannot Show Irreparable Harm. ....................................................................... 28

IV.    The Public Interest and Balance of Equities Counsel Against an Injunction........................ 29

V.    Plaintiffs Are Not Entitled to a Stay Under 5 U.S.C. § 705. .................................................. 30

CONCLUSION.............................................................................................................................. 30

## INTRODUCTION

Plaintiffs' Motion for Preliminary Injunction suffers from the same deficiencies as their Motion for a Temporary Restraining Order ("TRO").  Plaintiffs fail to proffer facts establishing standing to press their claims, which—in any event—challenge non-final agency decisions that are not cognizable under the Administrative Procedure Act ("APA").  Plaintiffs' claims also fail in substance because the provision of data access by federal agency employees to other federal agency employees does not violate either the Privacy Act or the Internal Revenue Code.  Because Plaintiffs cannot prove that their personal information has even been viewed by the Social Security Administration's ("SSA") "DOGE Team," much less misused by anyone at SSA or elsewhere, there is no irreparable harm.  Finally, it does not serve the public interest or the equities for Article III courts to micro-manage agencies' day-to-day operating decisions, as Plaintiffs would have this Court do.  Accordingly, Plaintiffs' application should be denied.

## BACKGROUND

### I.    The United States DOGE Service

On January 20, 2025, President Trump signed Executive Order 14,158, which redesignated the previously established United States Digital Service as the U.S. DOGE Service ("USDS") and charged it with implementing the President's agenda of "improv[ing] the quality and efficiency of government wide software, network infrastructure, and information technology (IT) systems."  90 Fed. Reg. 8441, §§ 3(a), 4 ("the EO").  The EO also established a "U.S. DOGE Service Temporary Organization" pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026.  *Id.* § 3(b).  Both USDS and the Temporary Organization sit within the Executive Office of the President and are headed by the USDS Administrator, who reports to the White House Chief of Staff.  *Id.*  Agency heads across the Executive Branch are required under the EO to establish within their respective

agencies a DOGE Team of at least four employees, which may include Special Government Employees. *Id.* § 3(c).

The EO also directs USDS to collaborate with Executive agencies to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity and ensure data integrity. EO § 4. To accomplish these objectives, the EO directs USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the EO instructs, USDS must "adhere to rigorous data protection standards." *Id.*

## II.    The DOGE Team at the Social Security Administration

SSA has a "strong business need" to identify fraud and thereby to ensure stewardship of agency funds. ECF 74-1 (Mar. 28, 2025 Dudek Decl.) ¶ 7. Before President Trump issued Executive Order 14,158, and separate and apart from USDS, SSA employees were pursuing efforts, on an ongoing and daily basis, to identify and address fraud in agency programs. *Id.*

### A.    The SSA DOGE Team's Anti-Fraud Projects

To promote government efficiency by identifying and eradicating fraud and other improper payments within its purview, SSA enlisted the assistance of ten individuals, all of whom are federal employees, as part of the SSA's "DOGE Team." AR-000001–32.[1] For instance, before the injunction issued in this case, members of the SSA DOGE Team were working on a project to ensure that SSA records accurately reflect whether an individual is alive or deceased. *See, e.g.*, AR-000009–18; ECF 62-1 (Mar. 27, 2025 Dudek Decl.) ¶ 9. Another project, since enjoined, was

---

[1] Since Plaintiffs filed their Amended Complaint, SSA has added an eleventh member to its DOGE Team. *See* ECF 56-1 (Mar. 24, 2025 Dudek Decl.) ¶ 4 n.1. For the Court's reference, citations to the Administrative Record for employment and training documents pertaining to each employee are provided in the table attached as Exhibit A.

to identify fraud in SSA's direct-deposit change, new claim, and wage-reporting.  ECF 62-1 ¶ 11.

SSA has provided testimony, under oath, explaining why these projects are important and why

access to personally identifiable information ("PII") is necessary to accomplish them.  *See*

*generally* ECF 62-1, ECF 74-1, ECF 80-1 (Apr. 1, 2025 Dudek Decl.).

      B.    <u>Composition of the SSA DOGE Team</u>

As of the filing of the Amended Complaint, the SSA DOGE Team was composed of a mix

of detailees and special government employees ("SGE").  Namely, six members—Employee Nos.

2, 3, 5, 7, 8, and 10—are on detail, subject to written, signed agreements, to the SSA.  AR-000033–

86, 101–108; ECF 36-2 (Mar. 12, 2025 Felix-Lawson Decl.) ¶ 4.  The remaining four SSA

employees on the SSA DOGE Team as of March 7, 2025—Employee Nos. 1, 4, 6, and 9—were

appointed as expert SGEs under 5 U.S.C. § 3109 and C.F.R. Part 304.  AR-0000529–557; ECF

36-2 ¶ 4.  Every member of the SSA DOGE Team has attended a Privacy Training (either in person

or via Microsoft Teams) that covered privacy laws applicable to SSA data and the penalties for

improper use of that data.  AR-000606–10; ECF 36-2 ¶¶ 13(a)–(b).  SSA's DOGE Team members

each completed, and signed the Certificate of Completion for, SSA's Information Security and

Privacy Awareness / Rules of Behavior Training, which is a mandatory training for SSA

employees and covers requirements for compliance with information security and privacy policies

of the SSA.  AR-000558–605 & 000611–000615 (AR Supp., ECF 112); ECF 36-2 ¶ 13(c).

Further, the detailee agreements for the six employees detailed to SSA specify that the detailee

must not make unauthorized disclosures of SSA information and that the detailee must follow all

SSA rules and policies while working for SSA.  AR-000044–45, 69, 74, 77, 83–84, 105, 107; ECF

36-2 ¶ 14.  Most of the SSA DOGE Team members' background checks have been completed with

favorable determinations, and the remainder are pending completion.  ECF 36-2 ¶ 15.

C.    Scope of the SSA DOGE Team's Access to SSA Systems

Of the ten relevant SSA DOGE Team members, only eight were ever granted access to SSA data or PII, or access to systems containing such information.  ECF 36-1 (Mar. 12, 2025 Russo Decl.) ¶¶ 7–16.  These eight individuals all received SSA training on topics including ethics, the Privacy Act, and information security, and signed an acknowledgment that they read, understand, and agree to abide by SSA's Information Security and Privacy Awareness and Rules of Behavior.  ECF 36-1 ¶ 21; AR-000558–605 & 000611–615 (AR Supp.).  This is the same level of training provided to other SSA employees.  ECF 36-1 ¶ 21.  In each case of data access being granted, the SSA provided read-only access to production data, which does not allow modification or deletion of the underlying data.  *Id*.  The specific data sets provided were obtained from SSA's Enterprise Data Warehouse ("EDW").  *Id.* ¶ 20.  The EDW is an integrated data source created to service Management Information, Business Intelligence, and predictive analytics across SSA.  *Id.* SSA employees performing analysis on agency data within job duties, such as anti-fraud analysis or research, routinely use EDW data sets.  *Id*.  SSA's Office of Financial Policy and Program Integrity confirmed that the level of access granted to the SSA DOGE team to perform analysis has likewise been granted to 30 to 40 employees in their component.  *Id.*

## III.    This Litigation

Plaintiffs filed this lawsuit on February 21, 2025.  ECF 1.  The Amended Complaint, filed on March 7, alleges that the granting of access to SSA information and information systems to SSA DOGE Team members was unlawful under the APA, the Privacy Act, and the Internal Revenue Code (Counts I–V).  ECF 17.  Plaintiffs also challenge—under the Appointments Clause of the U.S. Constitution—Mr. Dudek's appointment as Acting Commissioner of the SSA and his ability to provide SSA DOGE Team members access to SSA information (Count VII).  Finally,

the Amended Complaint asserts a catchall claim alleging *ultra vires* activity that is duplicative of Plaintiffs' other claims.

Plaintiffs filed a Motion for a TRO on March 7.  ECF 21.  Following expedited briefing and oral argument, this Court entered a TRO.  ECF 48.  Among other things, the TRO: (i) enjoins SSA from granting access to PII-containing systems to SSA's DOGE Team and to any "DOGE affiliate" (TRO ¶ 1.a); (ii) directed SSA DOGE Team members and "DOGE affiliates" to disgorge and delete non-anonymized PII data previously procured from an SSA system (*id.* ¶ 1.b); (iii) enjoins SSA DOGE Team members and "DOGE affiliates" from installing any software on SSA devices (*id.* ¶ 1.c); and (iv) enjoins SSA DOGE Team members and "DOGE affiliates" from accessing, altering, or disclosing any SSA computer or software code (*id.* ¶ 1.d).

Defendants appealed the TRO and sought a stay of the TRO in both this Court and the Fourth Circuit, ECF 60.  This Court denied Defendants' motion for stay, ECF 79, and the Fourth Circuit dismissed Defendants' appeal for lack of jurisdiction.  *See* No. 25-1291, Dkt. 18 (Apr. 1, 2025).  Plaintiffs' Motion for Preliminary Injunction followed.  ECF 110.

## LEGAL STANDARD

Whether to grant interim injunctive relief is within the Court's "sound discretion."  *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).  "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it."  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1992) (quotations omitted); *accord Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)); *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).

"A party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quotations omitted). "[A]ll four requirements must be satisfied." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010). The movant's burden is "exceedingly high." *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024), *cert. granted sub. nom Mahmoud v. Taylor*, -- S. Ct. --, 2025 WL 226842 (Jan. 17, 2025) (Mem.).

## ARGUMENT

### I.     The Court Lacks Jurisdiction over Plaintiffs' Claims.

#### A.     Plaintiffs Lack Standing.

The Court has already rejected two of Plaintiffs' three claimed injuries. ECF 49 at 65–67 (internal pagination). The Court, however, accepted Plaintiffs' third argument—that SSA's provision of access to systems containing PII to other SSA employees (i.e., the SSA's DOGE Team) is akin to the tort of intrusion upon seclusion and is therefore injury-in-fact. Plaintiffs adopt the Court's reasoning in their Motion for Preliminary Injunction. *See* ECF 110-1 (Mem. ISO Mot. for Preliminary Injunction, hereafter, "Motion" or "Mot.") at 7–10. But, respectfully, the Court's prior ruling on that issue is contrary to Fourth Circuit and Supreme Court precedent.

An organization can assert standing "either in its own right or as a representative of its members." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). An organization establishes "representational standing" by

demonstrating that: "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Id.* at 184 (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)). To satisfy the first prong, organizational plaintiffs must offer specific facts "establishing that at least one *identified member* had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992).

Plaintiffs are three organizations: AFSCME (the "largest trade union of public employees in the United States, with around 1.4 million members"); ARA (a "grassroots advocacy organization with 4.4 million members"); and AFT (a national labor organization "representing over 1.8 million members"). Am. Compl. ¶¶ 16–18. Plaintiffs do not claim to have standing "in [their] own right." *S. Walk at Broadlands*, 713 F.3d at 182; *see* Mot. at 7; *see also, e.g.*, Am. Compl. ¶¶ 88–97 (describing "Harms to Plaintiffs"). As for their claim of representational standing, Plaintiffs fail to satisfy at least prongs one and three of the inquiry.

### 1. *Plaintiffs Do Not Have Members with Standing to Sue in Their Own Right.*

<u>Plaintiffs' Members Do Not Demonstrate Injury-in-Fact.</u> To establish representational standing, Plaintiffs must show that their individual members have suffered injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "certainly impending"; "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And it must be "concrete—that is, real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).

Plaintiffs' Amended Complaint alleges that an unknown number of unnamed members either participate in an SSA program or receive SSA benefits, Am. Compl. ¶ 88, and that Defendants' alleged conduct has harmed this subset of Plaintiffs' members by "depriving them of privacy protections guaranteed by federal law and by making their information available for, and subject to, investigation by DOGE and scammers," *id.* ¶ 97. The Declarations accompanying Plaintiffs' Motion assert that Plaintiffs' members were injured by the SSA DOGE Team's mere access to data. *See, e.g.*, Suppl. Somo Decl. (Ex. D to Mot., ECF 110-6) ¶¶ 2, 9. In other words, Plaintiffs' theory of injury-in-fact is that their members have provided various forms of information to SSA with the expectation of confidentiality and privacy, and that Defendants' actions in allowing certain SSA employees to access those records violates the members' reasonable expectations.

That theory fails. "[O]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in federal court." *TransUnion*, 594 U.S. at 426–27. As the Fourth Circuit held in *O'Leary v. TrustedID, Inc.*, "[t]he intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III." 60 F.4th 240, 243 (4th Cir. 2023).

The *O'Leary* decision controls here, as even Plaintiffs seem to acknowledge. *See* Mot. at 7. Plaintiff O'Leary filed suit in state court against TrustedID, Inc., under South Carolina's Financial Identity Fraud and Identity Theft Protection Act and common-law right to privacy. 60 F.4th at 241. The lawsuit, which was removed to federal court, arose out of a data breach at Equifax, of which TrustedID is a subsidiary. *Id.* To confirm whether he had been affected by the breach, O'Leary was required to provide six digits of his social security number to TrustedID, who sent this PII to their corporate parent (Equifax). *Id.* On TrustedID's motion to dismiss, the district

court held that O'Leary had shown standing in the form of "'an intangible concrete *harm* in the manner of an invasion of privacy.'"  *Id.* at 242 (emphasis original).  Nonetheless, the court dismissed for failure to state a claim.  *Id.*

O'Leary appealed, and the Fourth Circuit reversed the district court's finding of subject-matter jurisdiction.  *Id.*  Relying heavily on *TransUnion*, which had just been decided, the Fourth Circuit emphasized that, without concrete harm, there can be no standing.  *Id.*  "The intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III— unless there's *separate* harm (or a *materially increased* risk of another harm) associated with the violation."  *Id.* at 243 (emphases added).  The Fourth Circuit examined precedent in analogous cases involving, *inter alia*, the Fair and Accurate Credit Transactions Act and instances of data breaches.  *Id.* at 243–44.  In so doing, the Fourth Circuit underscored that, "being subjected to a data breach isn't in and of itself sufficient to establish Article III standing without a nonspeculative, increased risk of identity theft."  *Id.* at 244 (discussing *Beck v. McDonald*, 848 F.3d 262, 267 (4th Cir. 2017) (holding that the mere theft of PII, without more, cannot confer Article III standing))).  Considering these principles, the Fourth Circuit announced that "Article III excludes plaintiffs who rely on an abstract statutory privacy injury unless it came with a nonspeculative increased risk of identity theft."  *Id.*  Under this rule, O'Leary's claims failed for lack of jurisdiction.  *Id.*

Notably, *O'Leary* considered—and expressly rejected—the plaintiff's attempt to recast the alleged harm as a violation of the tort of intrusion upon seclusion.  60 F.4th at 245.  "We . . . have recognized that violations involving unwanted calls under the Telephone Consumer Protection Act are concrete injuries in fact, based on federal courts' traditional protection of "'privacy interests in the home.'"  *Id.* (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019)).  Plaintiff O'Leary's allegation that he had to provide PII was inapposite, the Fourth Circuit held,

because "[i]t's the unwanted intrusion *into the home* that marks intrusion upon seclusion, and O'Leary hasn't pleaded anything that closely relates to that." 60 F.4th at 246 (emphasis added). Moreover, although the "disclosure of private information" can be another traditional analog for intangible harms that confer standing, O'Leary had not made any such argument or showing. *Id.*

There is no material distinction between *O'Leary* and this case. *But see* ECF 49 at 78 (internal pagination) (holding that *O'Leary* is "factually distinguishable"). To be sure, Plaintiffs bring suit under the Privacy Act instead of North Carolina law. The gravamen of their claims, however, is identical: that they have been injured simply because PII has been accessed. *See supra.* Nor can Plaintiffs carry their constitutional burden by retroactively shoe-horning the alleged misconduct into the tort of "intrusion upon seclusion" (a claim that does not exist in Plaintiffs' Amended Complaint). As the decision in *O'Leary* makes clear, regardless of how it is styled, Plaintiffs' alleged injury is not concrete. To start, unlike in *O'Leary*, there has been no data breach or any other harm "separate" from the underlying alleged Privacy Act violation. 60 F.4th at 243. Even if SSA's decision to provide data access to SSA employees could somehow be construed as a wrongful "data breach" (it cannot), Plaintiffs' claimed injuries still would not be concrete without a non-speculative, increased risk of identity theft. There is no such risk, as this Court already held. *See* ECF 49 at 65, 67 (internal pagination). Plaintiffs' statements that "DOGE having access to my sensitive information is almost like someone breaking into my house and stealing stuff" do not change the Article III outcome. Suppl. Somo Decl. (Ex. D to Mot., ECF 110-6) ¶ 9.[2] Agency employees accessing data for authorized agency work cannot be reasonably equated to a home break-in.

---

[2] Plaintiffs' supplemental declarations, submitted with their Motion, align with the Court's TRO ruling. *See, e.g.*, *id.* ¶ 9 (offering new legal conclusion that, "DOGE having access to my sensitive information is almost like someone breaking into my house and stealing stuff"). But it is the Court's independent duty to evaluate standing.

<u>Plaintiffs' Members Do Not Demonstrate Causation.</u>  Plaintiffs also fail to establish the crucial element of causation for their members.  For example, some of Plaintiffs' claims amount to an allegation that third-party bad actors will gain access to the members' sensitive information and abuse it.  *See, e.g.*, Suppl. Somo Decl. ¶ 7.  For Plaintiffs' theory to hold, they would have to demonstrate that: (1) access by the SSA DOGE Team will—by some unknown mechanism—materially increase the risk of hacking, notwithstanding SSA's existing internal controls; (2) there will be a cybersecurity incident that will compromise SSA's information; (3) the Plaintiffs' members' information specifically will be compromised; and (4) compromise will cause the Plaintiffs' members cognizable harm.  Relying on this "speculative chain of possibilities . . . does not establish that injury based on potential future [action] is certainly impending or is fairly traceable[.]"  *Clapper*, 568 U.S. at 414; *O'Leary*, 60 F.4th at 244.

"Article III excludes plaintiffs who rely on an abstract statutory privacy injury unless it came with a nonspeculative increased risk of identity theft."  *O'Leary*, 60 F.4th at 244.  There being no such increased risk here, Plaintiffs have failed to show injury-in-fact.

### 2. *Individual Participation Is Necessary as to the Privacy Act Claims (Counts I, II).*

Regarding prong three of the representational-standing inquiry, Plaintiffs assert that the participation of individuals is unnecessary here, as the relief sought is equitable.  Mot. at 10–11 (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (stating that individual participation is "not *normally* necessary when an association seeks prospective or injunctive relief for its members" (emphasis added)).  However, a plaintiff cannot satisfy prong three of the representational-standing inquiry simply by stating that it seeks only injunctive relief.  *See United Food & Com. Workers Union Loc. 751*, 517 U.S. at 546; *see also, e.g.*, *Hunt v. Wash. State Apple Ad. Comm'n*, 432 U.S. 333, 343 (1977) (explaining that the third

prong of the representational-standing inquiry "depends in *substantial* measure" on the nature of the relief sought (emphasis added)). Plaintiffs must show that *neither* the claims they have brought *nor* the relief they have sought "requires the participation of individual members in the lawsuit.'" *S. Walk at Broadlands*, 713 F.3d at 184.

Assuming *arguendo* that Plaintiffs' requested injunctive relief does not require their members' participation, the same cannot be said for their Privacy Act claims (Counts I and II). The Privacy Act does not provide for injunctive relief for disclosure claims and requires specific disclosures with respect to specific persons; in other words, the violations themselves are individualized. *See* 5 U.S.C. § 552a(g)(4) (providing for a damages suit with recovery based on the "actual damages sustained by the individual"). There is a reason that organizations and associations cannot bring Privacy Act claims: those claims are specific and personal to individual persons. *See id.* § 552a(b)(4) (defining covered "records" to pertain to "individuals"), (2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence"). Plaintiffs should not be permitted to side-step those requirements here. Because the Privacy Act requires "individualized determinations" to establish violations, the participation of individual members is required—and Plaintiffs lack representational standing. *See, e.g.*, *Travelers United, Inc. v. Hyatt Hotels Corp.*, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025).

B.    Plaintiffs Fail to Establish Reviewable Final Agency Action.

This Court lacks authority to resolve Plaintiffs' claims for an additional reason: Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. In the Fourth Circuit, the inquiry is jurisdictional. *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024); *City of New York v. DoD*, 913 F.3d 423, 430 (4th Cir. 2019).

The "final agency action" requirement has two distinct parts.  First, the challenged act must be an "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent."  5 U.S.C. § 551(13).  Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*"), against programs for which they are seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  As the Court explained in *Lujan*, moreover, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations."  *Id.* at 899.

Second, agency action must be "final," meaning that (1) the action must "mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature"; and (2) the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]."  5 U.S.C. § 704.

### 1.  *Plaintiffs Have Failed to Clearly Identify the Agency Action They Challenge*.

Plaintiffs' Amended Complaint fails to identify a reviewable agency action.  Instead, the Amended Complaint merely asserts that the Defendants' "conduct" constitutes "final agency action."  Am. Compl. ¶¶ 103, 115, 119, 123.  This allegation fails to survive even the minimal standards of a Rule 12(b)(6) motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (plaintiffs must go beyond "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," as such barebones pleadings "do not suffice").  Plaintiffs' Motion targets the provision of access to certain data systems to members of SSA's DOGE Team.  *See* Mot. at

18. But that allegation fails as well.

## 2. Access Decisions Are Not Reviewable "Agency Action."

To the extent Plaintiffs' alleged agency action can be loosely defined as SSA's provision of access to SSA employees to SSA information systems, this fails to constitute actionable final agency action under the APA.  The APA provides a list of five actions which it considers to be "agency action": rules, orders, licenses, sanctions, and relief.  5 U.S.C. § 551(13).  The Act further defines each of these terms.  *Id.* §§ 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief").  While broadly construed, these terms do not permit judicial review of the day-to-day operations of agencies.  Courts recognize that agency action "is not so all-encompassing as to authorize courts to exercise 'judicial review [over] everything done by an administrative agency.'"  *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)).  For example, courts do not oversee agency training programs, *see Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023), or "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).  Put another way, judicial review does not reach the agency's "workaday" dealings.  *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427.

The avoidance of such review reflects separation of powers concerns and seeks to prevent the "broad programmatic attacks" disfavored in agency review.  *SUWA*, 542 U.S. at 64; *see also New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (internal quotations and citations omitted) ("When challenging agency action . . . the plaintiff must . . . identify specific and discrete governmental conduct, rather than launch a broad programmatic attack on the government's operations.").  By limiting review, the APA "'protect[s] agencies from undue judicial interference with their lawful discretion, and . . . avoid[s] judicial entanglement in abstract policy

14

disagreements which courts lack both expertise and information to resolve.'" *Jones*, 701 F. Supp.
3d at 17 (quoting *SUWA*, 542 U.S. at 66).

Consider the district court's rejection of an APA challenge to the U.S. Fish and Wildlife
Service's alleged preferential issuance of permits to applicants who supported conservation efforts.
*People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*, 130 F. Supp. 3d
999, 1000 (E.D. Va. 2015).  Even assuming plaintiffs had alleged a "specific" improper action, the
challenge could not proceed because the decision fell within the agency's "ordinary course of
business."  *Id.* at 1000–02.  The court noted that plaintiffs improperly "demand[ed] a general
judicial review of the agency's day-to-day operation."  *Id.* at 1001 (cleaned up).

Agencies make thousands of these decisions, when they decide to open an e-mail account
for an employee, to assign an employee on a particular matter, or to ensure that an employee has
the relevant training to access systems or participate in certain programs.  A court could not review
such decisions without bringing within the scope of the APA virtually every aspect of an agency's
relationship with its employees, a result the "final agency action" limitation of the APA is designed
to prevent.

### 3.   *Plaintiffs Have Failed to Identify "Final" Agency Action.*

Plaintiffs' claims fail both *Bennett* prongs because they do not identify an action that marks
the "consummation" of the agencies' decision-making process, by which "rights or obligations
have been determined" or from which "legal consequences will flow."  *Bennett*, 520 U.S. at 177–
78.  Therefore, there is no "final" agency action for the Court to review.

First, Plaintiffs' identified actions are both tentative and interlocutory in nature, as the
nature of the SSA DOGE Team's composition and projects are in flux.  *See, e.g.*, Am. Compl. ¶ 87
("[R]eporting suggests that SSA is now pushing to get DOGE access to additional data

systems[.]").  By contrast, as the Defendants' declarations accompanying their Opposition to the Motion for TRO demonstrate, no new finalized policy has been implemented—or existing policy definitively changed—as SSA continues to onboard employees where needed in a workaday application of previous standards.  *See* ECF 36-2 (Mar. 12, 2025 Felix-Lawson Decl.) ¶¶ 5–15.

Second, the Amended Complaint also fails to demonstrate how providing a new employee with system access necessary to his or her function "consummat[es]" the hiring agency's decision-making process in such a way that legal consequences flow to Plaintiffs.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  This prong of the *Bennett* test is measured by the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014); *see also Mashni v. U.S. Army Corps of Eng'rs*, 535 F. Supp. 3d 475, 482 (D.S.C. 2021) (quoting *Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 925 (E.D. Va. 2013), *aff'd sub nom. Versata Dev. Grp., Inc. v. Lee*, 793 F.3d 1352 (Fed. Cir. 2015)) ("for a decision to constitute a final agency decision, it 'must have a direct and immediate effect on the party's legal rights.'").

For example, the D.C. Circuit has found no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "[did] not subject them to new penalties or enforcement risks."  *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020).  Here, Plaintiff organizations are not regulated, or even affected by, the alleged provision of access to certain government employees at issue in this case.  The fact that such a decision could potentially have practical consequences for the regulated public does not change the analysis. Adverse effects "accompany many forms of indisputably nonfinal government action.  Initiating an enforcement proceeding against a company, for example, may have a devastating effect on the

company's business, but that does not make the agency's action final." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004).

Here, the alleged data access decision has no "direct and appreciable legal consequences" for any of the Plaintiffs. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). Indeed, as explained above, such decisions do not even give rise to an Article III injury, much less the sort of "legal consequences" that could ground an APA action. Plaintiffs would have to demonstrate that these particular SSA personnel not only do not have a right to access their members' information, but that steps were taken with the information that had legal consequences for Plaintiffs and their members. By analogy, an agency's decision to give an employee access to its systems is not itself final agency action, even if the employee might conceivably use the computer to effect final agency action (*e.g.*, in approving or denying benefits) at some later date.

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), which the Court found instructive, does not, in fact, support the conclusion that Plaintiffs challenge final agency action. There, the EEOC was held to have a concrete (albeit informal) policy of *disclosing* confidential information, including trade secrets, without providing notice to the submitter. *Id.* at 929–30. The D.C. Circuit concluded that a decision "to disclose [a regulated party's] confidential information without notice" satisfied the requirements for reviewable final agency action. *Id.* at 931. By contrast, the decision in this case is about an agency internally giving information access to its own government employees for performance of official duties at the direction of the responsible agency's management officials, not third parties. Such access decisions for those working on agency business, with the agency's consent and approval, do not have legal consequences for Plaintiffs in the way that a policy of *third-party* disclosure of confidential commercial information would.

Similar to the plaintiffs in *People for the Ethical Treatment of Animals, Inc.*, Plaintiffs here ask this Court to insert itself into the agency's routine decision-making of granting SSA employees access to data systems. 130 F. Supp. 3d at 1000. This Court should follow that court's reasoning and reject Plaintiffs' attempt to turn "ordinary course of business" decisions into reviewable final agency actions. *Id.* Indeed, rendering data access decisions "final agency action" would sweep swaths of routine agency business within the APA's ambit, even though such decisions have no legal consequences for Plaintiffs or their members without some further step by the agency. Plaintiffs' failure to identify *final* agency action is fatal to their APA claims.

## II.    Even if There Were Jurisdiction, Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.

### A.    Plaintiffs Cannot Use the APA to Avoid the Privacy Act's Narrow Cause of Action.

Plaintiffs' contention is that the SSA's decision to grant certain personnel access to agency information systems runs contrary to the APA because it violates the Privacy Act. Plaintiffs, however, cannot use the APA to circumvent the Privacy Act's carefully drawn limitations on the types of relief they can seek. For this reason, Plaintiffs are unlikely to succeed on their APA claims. *See* Am. Compl. ¶¶ 98–104, 111–116, 117–120, 121–124.

The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."). By contrast, the Privacy Act provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals. *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)).

Section 552a(g) of the Privacy Act establishes the narrow causes of action for which an "individual may bring a civil action against the agency." *See* 5 U.S.C. § 552a(g)(1). It is reasonable, based on the nature of their claims, to assume that Plaintiffs advance an "Other Action." The Privacy Act, however, only provides for monetary damages for Other Actions, and then only for individuals, as compared to associations. *See* 5 U.S.C. § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007). Prospective relief, such as that sought by Plaintiffs, is reserved for Amendment or Access Actions. 5 U.S.C. § 552a(g)(2), (3). Quite simply, the Privacy Act does not permit organizations to sue for injunctive relief over a decision to provide access to particular government employees.

Plaintiffs should not be permitted to circumvent the Privacy Act's reticulated constraints by raising purported Privacy Act violations through the APA. Defendants recognize, that, in dicta, the Fourth Circuit has suggested that prospective injunctive relief may be available under the APA for alleged Privacy Act violations. *See Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006). Those dicta are not binding, but even if they were, Defendants raise the argument for preservation.

B.    There Is No Privacy Act Violation.

Plaintiffs also have not established a likelihood of success on the merits of their argument that a Privacy Act violation has occurred. While the Privacy Act generally prohibits disclosure of covered records containing personal information absent consent, it authorizes disclosure of such records to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Providing access to agency records to members of the SSA DOGE Team falls within that authorization.

The relevant employees at SSA are employees of the agency for Privacy Act purposes. "[F]or purposes of" Title 5 of the U.S. Code, which includes the Privacy Act, "employee" "means

an officer and an individual who is" first "appointed in the civil service by one of the following acting in an official capacity"; as relevant here, the ensuing list of potential appointers includes "the President" and "an individual who is an employee under this section." 5 U.S.C. § 2105(a)(1)(A), (D). An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act; and . . . subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position." *Id.* § 2105(a)(2), (3). The relevant employees easily satisfy that definition. Each of the six detailees are subject to written, signed agreements from other government agencies to SSA. AR-000033–86, 101–108. The remaining four employees were appointed to SSA as expert SGEs. AR-000033–86, 101–108, 529–557. All ten have been subject to supervision by Mr. Dudek directly or other employees at SSA. *See* ECF 36-1, 36-2; AR-000001–30.

Moreover, the employees at issue have a "need" to access the records contained in the relevant systems to perform their official duties. In creating a framework for agency DOGE Teams and USDS collaboration, Executive Order 14,158 charged both groups with working to modernize technology and coordinating on ways to "[m]aximiz[e]fficiency and [p]roductivity." USDS EO § 4, 90 Fed. Reg. at 8442. The Order instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." *Id.* § 4(b). Given the purpose of the order—to modernize technology—it necessarily follows that agency personnel seeking to improve agency systems would need access to them to undertake and consult on that modernization. Indeed, the agency considered whether other options, like masking or otherwise protecting PII contained in the records would be viable. AR-000005. But the agency did "not identify a solution that enables the necessary analysis to continue

at the pace necessary" to respond timely to "fraud and improper-payment-related concerns." *Id.*

It is likewise plain that SSA DOGE Team members investigating whether the government has made improper expenditures require access to the records detailing the relevant payments. To assess the propriety of any payment, an analyst needs to know the details surrounding that payment, including information about the recipient of that payment, the amount of the payment, the payment's purpose, and so forth. It is difficult to understand how such investigative work could be performed without access to the relevant records, which means that access in these circumstances falls squarely within the authorization in 5 U.S.C. § 552a(b)(1).

The "need" underlying the employees access here arises directly from the mandates of an Executive Order and the complex functions being performed by agency DOGE Team employees, and it would be impossible to effectively review and modernize a data system without accessing that system, including the records within it, or to investigate improper payments without reviewing payment records). Defendants therefore respectfully disagree with the Court's prior conclusion that SSA had not sufficiently articulated the employees' need to access the relevant information. ECF 49 at 116–22 (internal pagination). Nothing in the Privacy Act requires written statements from individual employees establishing their need to access information in order to perform their job duties. Nor does the statute impose the granular explanation of need that the Court suggested is required. The Court's reasoning would call into doubt SSA's granting of access to other employees with similar access to data—as well as routine grants of access across the Federal government. It would also give litigants a carte blanche to challenge any access decision by an agency whenever the litigant dislikes or distrusts new personnel in any new administration— putting the agencies to the daunting task of papering routine access grants in anticipation of litigation.

21

Were more needed, the employees' access also fits within the routine use exception. *See* 5 U.S.C. § 552a(b)(3). All of SSA's Privacy Act systems of records notices ("SORN"), from which information has been shared with the DOGE Team, include the following routine use: "To student volunteers, individuals working under a personal services contract, and other workers who technically do not have the status of Federal employees, when they are performing work for us, as authorized by law, and they need access to personally identifiable information (PII) in our records in order to perform their assigned agency functions." *See* SSA's Numident/Master File of Social Security Number Holders and SSN Applications, SORN 60-0058 routine use no. 26, *published in full most recently at* 87 Fed. Reg. 263 (Jan. 4, 2022); Master Beneficiary Record, SORN 60-0090 routine use 32, *published originally at* 71 Fed. Reg. 1826 (Jan. 11, 2006); Supplemental Security Income Record and Special Veterans Benefits, SORN 60-0103 routine use 31, *published originally at* 71 Fed. Reg. 1830 (Jan. 11, 2006), and Social Security Online Accounting and Reporting System, SORN 60-0231 routine use 12, *published at* 85 Fed. Reg. 2224 (Jan. 14, 2020). Thus, even if these individuals were non-employees working for the agency—a conclusion that is belied by the administrative record—SSA would have authority under the Privacy Act to disclose records to them as "other workers who technically do not have the status of Federal employees."

C.    There Is No Violation of Section 6103/SSA Regulations.

Plaintiffs have also failed to show that Defendants have violated or will violate the Internal Revenue Code, Social Security Act, or related regulations. *See* Mot. at 16–18. Although the unauthorized disclosure or access of tax return information is generally prohibited, *see* 26 U.S.C. § 6103(a), Congress has established statutory exemptions that authorize disclosure for purposes other than tax administration, *see id.* § 6103(*l*). Relevant here, Congress has authorized the disclosure of certain return information from the Treasury to the Social Security Administration

"for purposes of its administration of the Social Security Act." *Id.* § 6103(*l*)(1)(A). The term "administration" is not defined in the law, and so it should be given its ordinary meaning. *See Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 816 (2024). And that meaning is broad, encompassing "[t]he management or performance of the executive duties of a government, institution, or business; collectively, all the actions that are involved in managing the work of an organization" and, with respect to public law specifically, "the practical management and direction of the executive department and its agencies." *Administration*, Black's Law Dictionary (12th ed. 2024) (first and second entries). In turn, the SSA DOGE Team is responsible for modernizing, auditing, and improving the efficiency of the systems through which SSA administers the Social Security Act, the integrity of which is essential to the agency's execution of its statutory mission. AR-000005; *see also* 5 U.S.C. § 552a(e)(5)–(6); 44 U.S.C. § 3506.

The Social Security Act does not bar the eight SSA employees with prior systems access from viewing the data on those systems, either. Plaintiffs point to a provision of the Act that, like the Internal Revenue Code, generally restricts disclosure of tax information. Mot. at 16–17 (citing 42 U.S.C. § 1306). But that provision contains exceptions, including "as the head of the applicable agency[, SSA,] may by regulations prescribe." 42 U.S.C. § 1306(a)(1). The agency has prescribed such regulations. *See* 20 C.F.R. § 401.135 ("Section 1106 of the Social Security Act [42 U.S.C. § 1306] requires that disclosures which may be made must be set out in statute or regulations; therefore, any disclosure permitted by this part is permitted by section 1106."). The relevant regulation allows disclosure of "information to officers and employees of SSA who have a need for the record in the performance of their duties." *Id.* § 401.115. Because the SSA DOGE Team members are employees who require access to the relevant data to perform their duties, § 1306 and its implementing regulations are satisfied. Further, to the extent the SSA DOGE Team was found

23

to lack the status of Federal employees, agency regulations allow disclosure as routine uses permit. 20 C.F.R. § 401.150.

Plaintiffs, as before, do not engage with the merits of these arguments. Instead, they argue that Defendants have impermissibly disclosed tax return information "outside the agency," Mot. at 17, seemingly referring to the SSA DOGE Team. Because those individuals are SSA employees, *see supra*, this argument fails. Furthermore, the Internal Revenue Code's provision governing disclosure of tax return information "to the President or White House Office employees," Mot. at 17, is beside the point. *See* 26 U.S.C. § 6103(g). Here, the relevant disclosure was properly made by the Internal Revenue Service to the SSA, and thereafter within SSA to its employees in the performance of those employees' duties.

Plaintiffs also invoke the SSA's internal regulations governing "whether to disclose information" "[w]hen no law specifically requiring or prohibiting disclosure applies." 20 C.F.R. § 401.140 (cited in Mot. at 17). Even were this such a situation, *but see* 26 U.S.C. § 6103; 42 U.S.C. § 1306, the regulation requires only that the agency "follow FOIA principles." 20 C.F.R. § 401.140. SSA's regulations walk through the step-by-step analysis that SSA takes in considering FOIA in disclosures. *Id.* § 401.115(c). SSA's regulation explains that when no law requires or prohibits disclosure, we look to FOIA principles, and "[w]hen FOIA principles do not require disclosure, [SSA] may disclose information" if permitted by the Privacy Act and section 1106 of the Social Security Act." *Id.* § 401.115(c).

Further, even reading the regulation at § 401.140 alone, it highlights Exemption 6 to FOIA, which protects against a "clearly unwarranted invasion of personal privacy." 20 C.F.R. § 401.140 (quoting 5 U.S.C. § 552(b)(6)). Plaintiffs complain that "Defendants did not engage in this assessment." Mot. at 18. To start, their only factual support for this assertion is the opinion of one

former agency employee, who was apparently dissatisfied with the justification for system access

of which she was aware.  *See* Mot. at 18 (citing ECF 22-10, Flick Decl.).  That sole perspective

does not mean no one at the agency considered FOIA principles when deciding whether to provide

employees with necessary system access.  To the contrary, the administrative record shows the

agency considered avenues to restrict access DOGE Team members' access to PII but concluded

it would be unworkable.  AR 000005–6.

More fundamentally, this internal regulation does not establish a procedural right that

Plaintiffs may seek to vindicate through the APA, as there is no freestanding private right of action

to enforce a regulation.  *See Alexander v. Sandoval*, 532 U.S. 275, 293 & n.8 (2001).  What matters

for present purposes is that there is no reasonable argument that affording employees of an agency

access to the systems necessary to perform their duties represents a "clearly unwarranted invasion

of personal privacy"—the standard under FOIA.  *See* 5 U.S.C. § 552(b)(6).

D.  <u>Defendants' Conduct Is Not Arbitrary and Capricious</u>.

Plaintiffs assert that Defendants acted arbitrarily and capriciously in purportedly "throwing

open the gates to the sensitive, personally identifying information of hundreds of millions of

Americans."  Mot. at 22.  But their claim lacks any merit.

Arbitrary and capricious review is highly deferential to the agency, and "a court is not to

substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Roe*, 947 F.3d at 220.  Under this standard, the

agency is afforded a presumption that its actions are "valid" and need only articulate a "satisfactory

explanation" that has a "rational connection between the facts found and the choice made."  *Roe*,

947 F.3d at 220.  And courts should be wary of interfering with an agency's "ordinary course of

business" decisions, even if Plaintiffs identify a "specific allegedly-improper . . . action" within

such ordinary decisions.  *See People for the Ethical Treatment of Animals*, 130 F. Supp. 3d at 1001–02.

First, Plaintiffs insist that Defendants changed their position on data access without acknowledging such a change.  Mot. at 22 (quoting *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018)).  They claim that, "[f]or decades, SSA has carefully guarded the information submitted to it, engraining into every employee the importance of data and information security practices."  Mot. at 23.  Even if this is an actual policy and not merely Plaintiffs' perspective, *see Lujan*, 497 U.S. at 890, Plaintiffs have not specifically identified a change in that purported policy across SSA.  SSA has merely given a small, limited set of new employees access to data systems they need to perform the duties of their roles.  *See* AR-000001–30; ECF 36-1.  And SSA did this within its standard procedures for new employees.  The relevant SSA employees have attended a privacy training and signed privacy awareness acknowledgements—all of which are standard SSA procedures.  AR-0000562–610; ECF 36-2 ¶¶ 13(a)–(c); ECF 36-1 ¶¶ 7–16, 21.  Defendants are also following procedures for adjudicating background checks for the SSA DOGE Team members. *See* ECF 36-1, 36-2; ECF 62-2 ¶¶ 7–11.  Plaintiffs fail to articulate any change in policy that would render Defendants' actions arbitrary and capricious.  And Plaintiffs' disagreement with the specific work the SSA DOGE Team performs provides no basis for them to superintend the agency's day-to-day operations, a prospect the APA categorically precludes.  *See SUWA*, 542 U.S. at 62–65.

Second, Plaintiffs claim that Defendants did not adequately explain why "giving DOGE and its personnel" access to SSA data systems is "necessary."  Mot. at 23.  But Defendants have adequately explained why.  In February 2025, the SSA's then-Chief Information Officer—though the agency's Office of the General Counsel—issued a memorandum to Mr. Dudek "requesting approval to grant employees (including details from other federal agencies and Special

Government Employees . . . assigned to . . . SSA) access" to certain SSA records that included PII. AR-000005. The memo states that "SSA has a need to rapidly respond to concerns regarding potentially large-scale fraud and improper payments." *Id.* To address these concerns, the memo explains that these new employees need access to SSA systems that includes PII. *Id.* The memo states that the SSA "investigated options for masking or otherwise protecting PII-containing and FTI-containing fields within these records but have not identified a solution that enables the necessary analysis to continue at the pace necessary to respond timely to the fraud and improper-payment-related concerns." *Id.*

Further, the SSA DOGE Team followed a reasonable process for obtaining access to certain systems based on an articulated need. For example, Employee #5 asked for certain SSA records to investigate "the number of people beyond a reasonable age who can be marked dead." AR-000023. Upon receipt of that request and the reason for the requested access, Mr. Dudek approved access for Employee #5. *Id.* The SSA DOGE team continued to follow this process when requesting and obtaining access at SSA. *See* AR-000009–30. But despite all this, Plaintiffs are still not satisfied and apparently want Defendants to act according to the judgment of their declarant, Ms. Flick. That is not the standard. Defendants have provided a rational explanation for their actions; Plaintiffs, and this Court, should not second-guess those actions.

Third, Plaintiffs claim that Defendants have "acted without any recognition of the serious reliance interests of Americans." Mot. at 23–24. This is such a generalized, unsupported accusation that it is insufficient on its face to show that defendants acted arbitrarily and capriciously. *See Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*, 2023 WL 7458379, at *30 (D.D.C. Apr. 10, 2023) (holding that "generalized grievances are insufficient to show that the . . . decision-making was arbitrary and capricious"). But Plaintiffs are also wrong as a factual matter.

Defendants have already done all that Plaintiffs insist they should have. They "allow[ed] for appropriate onboarding and training of SSA employees," "assess[ed] [those] individual[s'] need to know with respect to each data system to which they [were granted] access," and have "maintain[ed] reasonable restrictions on access to data," *See* Mot. at 24; ECF 36-1, 36-2, 62-2; AR-00001–30, 33–86, 101–108, 529–557, 562–605.

Plaintiffs fail to show that Defendants acted arbitrarily and capriciously. The mismatch between Plaintiffs' arguments and the APA underscores again that the APA was simply not intended for litigants and courts to monitor, through litigation, SSA's everyday operations—like determining which agency employees are granted access to agency data systems.

## III.    Plaintiffs Cannot Show Irreparable Harm.

Even if there were a clear likelihood of success on Plaintiffs' claims (there is not), the Motion should be denied because Plaintiffs have not shown irreparable harm. A plaintiff is entitled to a preliminary injunction *only* if it can establish that it will likely suffer irreparable harm in the absence of such relief. *Winter*, 555 U.S. at 20. To justify an injunction, the alleged irreparable harm must be "actual and imminent." *Direx*, 952 F.2d at 812 (quotations omitted). A "possibility" of future irreparable harm does not suffice. *Real Truth*, 575 F.3d at 346.

Plaintiffs claim that they suffer irreparable harm because (1) DOGE has "unlawful access" to their information and (2) there is an "increased risk" that their information is more easily accessible to bad actors. Mot. at 25–28. But these claims of injury are not irreparable for the same reasons Plaintiffs lack standing: their claimed *existing* injury (based on access to SSA data) is not concrete, and their claimed *future* injury (potential misuse of their data) is speculative.

Even if they had shown a cognizable injury for the purposes of standing, Plaintiffs nonetheless fail to make a clear showing of actual and imminent harm from the intra-agency

disclosure of information, where employees who view that information are subject to the same confidentiality obligations that apply to other similarly situated agency employees. Indeed, three other courts addressing similar claims have denied motions for emergency relief based on similarly situated plaintiffs' failure to establish irreparable harm. *See Univ. of Cal. Student Ass'n v. Carter*, 2025 WL 542586, at *5 (D.D.C. Feb. 17, 2025); *Electronic Privacy Info. Ctr. v. U.S. Office of Personnel Mgmt.*, 2025 WL 580596, at *6–7 (E.D. Va. Feb. 21, 2025); *Alliance for Retired Ams. v. Bessent*, 2025 WL 740401, at *20–24 (D.D.C. Mar. 7, 2025).

Plaintiffs' claim of irreparable harm fails for another reason. Plaintiffs' members have an adequate alternative remedy to the emergency relief they seek: a private right of action under the Privacy Act. *See* 5 U.S.C. § 552a(g)(4) (authorizing civil penalties for violation of the Privacy Act). "To the extent [Plaintiffs'] members have been injured by violations of [this] statute[], and they meet the other requirements for obtaining relief, there is at least a 'possibility' of compensatory relief at a later date." *Univ. of Cal. Student Ass'n*, 2025 WL 542586, at *6.

## IV.    The Public Interest and Balance of Equities Counsel Against an Injunction.

The last two factors—balance of equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—likewise favor denying Plaintiffs' motion. An injunction would cause irreparable injuries to the government and the public. As described in Acting Commissioner Leland Dudek's recent declaration, an injunction harms the agency's operations by halting ongoing efforts to detect and eliminate fraud. *See* ECF 60-1 (March 26, 2025 Declaration of Leland Dudek). Preventing the SSA DOGE Team from continuing their work, moreover, deprives the agency of valuable expertise and effectively stops work on projects that could otherwise reduce improper payments to the tune of millions of dollars per day that will be difficult, if not impossible, for the government to recover. *Id.* ¶¶ 5–8.

More broadly, a preliminary injunction will impinge on the President's broad authority over and responsibility for directing agency employees. It is therefore "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers). By instructing the government who can and cannot access the Defendant agency's data systems, Plaintiffs' requested injunction would curtail the Executive Branch's core duty to manage the day-to-day operations of its agencies. *See City of New York v. United States Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019); *see also Walmart Inc. v. U.S. Dep't of Just.*, 517 F. Supp. 3d 637, 655 (E.D. Tex. 2021) (finding that challenges to agency action "must identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on government's operations.'"), *aff'd*, 21 F.4th 300 (5th Cir. 2021).

Plaintiffs' argument for why the equities and the public interest weigh in their favor largely collapses into the merits. They say that "[t]here is generally no public interest in the perpetuation of unlawful agency action." Mot. at 28 (quotation omitted). To be clear, Plaintiffs have not shown that Defendants' practice is unlawful. And the proposed injunction would harm the public interest, for the reasons stated above.

## V.    Plaintiffs Are Not Entitled to a Stay Under 5 U.S.C. § 705.

In the alternative, Plaintiffs request a "universal stay." 5 U.S.C. § 705; Mot. at 29–30. The standard for a § 705 stay is the same for a motion for preliminary injunction, as this Court previously recognized. ECF 49 at 106. For all the reasons discussed above, Plaintiffs are not entitled to a stay.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

Dated:  April 7, 2025                Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division, Federal Programs Branch

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

BRADLEY P. HUMPHREYS
Senior Trial Counsel

_/s/ Marianne F. Kies____
MARIANNE F. KIES
SAMUEL S. HOLT
Trial Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

Kelly O. Hayes
Interim United States Attorney

MICHAEL J. WILSON
USDC Md Bar No. 18970
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4941
Fax: (410) 962-2310
Michael.Wilson4@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 7, 2025, I electronically filed the foregoing and thereby caused a copy to be served on counsel of record.

<u>/s/ Marianne F. Kies</u>
MARIANNE F. KIES