## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, *et al.*,

   *Plaintiffs*,

    *vs.*

SOCIAL SECURITY
ADMINISTRATION, *et al.*,

   *Defendants*.

Civil Action No. 1:25-cv-00596

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND ........................................................................ 2

LEGAL STANDARD .............................................................................................................. 4

ARGUMENT ........................................................................................................................ 6

I.      The Fourth Circuit's en banc decision is the only appellate guidance relevant to this
        motion. ................................................................................................................... 6

II.     Plaintiffs have—and have sufficiently alleged—standing. ................................... 9

        A.      DOGE's improper access to sensitive records is a close analogue to intrusion upon
                seclusion. ................................................................................................... 9

        B.      DOGE's unlawful access has caused Plaintiffs' members unease sufficient to
                support an intrusion upon seclusion claim. ........................................... 13

        C.      Breach of confidence provides an independent basis for standing. ....... 13

        D.      Congress has made clear that improper, unnecessary access to information is
                Article III injury. ................................................................................... 14

        E.      Resolution of Plaintiffs' Privacy Act claims does not require participation of their
                members. ................................................................................................ 16

III.    Plaintiffs have sufficiently alleged, identified, and challenged a final agency action. ...... 17

IV.     Plaintiffs have adequately pled violations of the Privacy Act, both freestanding and
        through the APA, and Defendants are not entitled to judgment as a matter of law. .......... 20

        A.      The DOGE Team at SSA does not need unfettered access to agency systems or the
                PII contained therein. ............................................................................ 21

        B.      DOGE Team members at SSA are not employees of the agency. ......... 24

V.      Plaintiffs have adequately pled violations of Section 6103 and SSA Regulations, and
        Defendants are not entitled to judgment as a matter of law. .............................. 26

VI.     Plaintiffs' FISMA claim is subject to judicial review. ....................................... 27

VII.    Plaintiffs have adequately pled their arbitrary and capricious claim, and Defendants are
        not entitled to judgment as a matter of law. ...................................................... 28

VIII.   Plaintiffs have adequately pled that DOGE's actions are *ultra vires*, and Defendants are
        not entitled to judgment as a matter of law. ...................................................... 30

CONCLUSION ................................................................................................................... 32

i

This Court has had ample opportunity to consider, and has roundly rejected, the array of unavailing arguments Defendants now repeat—again—in their joint motion to dismiss and motion for summary judgment. The Court rejected those arguments in both a lengthy and detailed opinion granting a temporary restraining order and an even more comprehensive opinion granting a preliminary injunction.  An en banc panel of the Fourth Circuit declined to stay that preliminary injunction, with a near-majority expressly adopting this Court's preliminary injunction decision and specifically analyzing many of the same issues Defendants now aim to litigate for a third time in this Court.

The only significant development since this Court first rejected Defendants' arguments are the Fourth Circuit's refusal to stay this Court's preliminary injunction and the Supreme Court's summary issuance of such a stay. The most Defendants can make of the latter is that the Supreme Court "signaled concerns with" the injunction. Defs.' Mem. in Supp. of Mot. at 1 (ECF No. 168-1) ("Defs.' Mem."). But those concerns were neither identified nor explained: the Supreme Court's stay order, *SSA v. AFSCME*, 145 S. Ct. 1626 (2025), amounted to little more than a summary recitation of the familiar *Nken v. Holder*, 556 U.S. 418 (2009), factors. The order is therefore susceptible to a range of readings, many of which, even if laid out in detail, have little or no bearing in this procedural posture. In the absence of applicable guidance from the Supreme Court, this Court should follow its own two prior decisions—both based on a detailed review of the evidence—and the Fourth Circuit's robust affirmation of its reasoning. Plaintiffs have standing to bring their claims, which they have more than adequately pled, and Defendants are not entitled to judgment as a matter of law.[1]

---

[1] Plaintiffs do not oppose dismissal of their Appointments Clause claim (Count VII).

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Social Security Administration ("SSA") collects and maintains some of the most sensitive information that individuals may have. Along with Social Security numbers, birth dates, and addresses—sensitive information that is often used by malicious actors to commit serious fraud—SSA records include, among other things, employment and wage histories; financial data, including tax return information and bank account or credit card numbers; marriage certificates; school records; family court records; citizenship, immigration, and naturalization records; and medical records documenting information such as evaluations, hospitalizations, treatment, diagnoses, and disabilities, which may relate to physical or mental health. *See AFSCME v. SSA*, 778 F. Supp. 3d 685, 701, 705 (D. Md. 2025) (Hollander, J.) ("PI Mem. Op."); Am. Compl. ¶¶ 1, 34–36 (ECF No. 17). Since its inception, SSA has understood the importance of protecting the confidentiality of this sensitive, personal information. The first regulation SSA published included "a commitment to the public to safeguard the personal information [people] entrust to" SSA. PI Mem. Op. at 779; *see* 2 Fed. Reg. 1256 (June 18, 1937); Am. Compl. ¶ 37.

SSA abandoned its longstanding commitment to protecting the privacy of individuals' sensitive, confidential, and personally identifying information shortly after the January 20, 2025, issuance of Executive Order No. 14,158, *Establishing and Implementing the President's "Department of Government Efficiency*," 90 Fed. Reg. 8441 (Jan. 20, 2025), which renamed the United States Digital Service the "United States DOGE Service (USDS)" and reorganized it within the Executive Office of the President. *Id.* § 3(a). The Executive Order further directed the head of every federal agency to establish a "DOGE Team," whose leaders were to be selected "in consultation with" the USDS Administrator and who would "coordinate their [teams'] work with USDS." *Id.* § 3(c). Agency heads were also instructed to "take all necessary steps, in coordination

with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b); *see also id.* § 4(a).

DOGE began its work at SSA on January 30, 2025, demanding immediate access to all systems, data, and source code, but failing to articulate any need for such expansive access. PI Mem. Op. at 711; Am. Compl. ¶¶ 83–87. Sensitive to the requirements of the Privacy Act, the Federal Information Security Modernization Act ("FISMA"), and SSA's own privacy regulations, practices, and policies, SSA leadership offered to provide anonymized and read-only data that would enable DOGE to pursue its work without exposing PII. PI Mem. Op. at 711–13 (citing declarations). The resulting standoff led to the resignation of top SSA officials who had refused to provide data access on DOGE's terms. PI Mem. Op. at 710; Am. Compl. ¶¶ 84–85.

Leland Dudek, an SSA employee who had previously been put on leave for unauthorized data sharing, was designated as SSA's acting Commissioner. Ken Thomas, *The Newly Elevated Acting Head of Social Security Covertly Helped DOGE*, Wall Street J. (Feb. 20, 2025), https://perma.cc/F3V3XG9R; Am. Compl. ¶¶ 83–85. SSA then granted the DOGE team unfettered access to data systems containing enormous quantities of records containing sensitive, private and personally identifiable information. PI Mem. Op. at 698–99, *see also* Thomas, *supra* (quoting Defendants' counsel's acknowledgment that SSA had "provide[d] DOGE affiliates with access to a 'massive amount' of records."); Am. Compl. ¶ 86.

Plaintiffs, two national labor unions and membership organizations and one grassroots advocacy organization, filed suit against Defendants on February 21, 2025 (ECF No. 1). Accounting for rapidly evolving facts, Plaintiffs amended their complaint on March 7, 2025 (ECF No. 17) and moved for a temporary restraining order that same day (ECF No. 21). This Court

entered a TRO on March 20, 2025 (ECF No. 48) barring disclosure of PII to DOGE personnel at SSA under certain circumstances, requiring the same personnel to disgorge and delete any PII they had previously obtained, and outlining a path through which DOGE Team members could lawfully be granted access to PII. The government unsuccessfully appealed the TRO to the Fourth Circuit. *AFSCME v. SSA*, No. 25-1291 (4th Cir. Mar. 26, 2025).

Plaintiffs thereafter moved for a preliminary injunction (ECF No. 110). This Court entered that PI on April 17, 2025 (ECF No. 147). The following day, Defendants filed a motion in the Fourth Circuit to stay the PI pending appeal. *AFSCME v. SSA*, No. 25-1411, ECF No. 6 (4th Cir. Apr. 18, 2025). Sitting en banc, the Fourth Circuit denied that motion, i*d.*, ECF No. 20 (Apr. 30, 2025), and subsequently granted initial hearing of Defendants' appeal of the PI en banc. *Id.*, ECF No. 27 (May 6, 2025). That appeal is pending, and argument has been scheduled for September 11, 2025. *Id.*, ECF No. 48 (July 10, 2025).

Two days after the Fourth Circuit denied the stay, Defendants filed for a stay pending appeal in the United States Supreme Court. *SSA v. AFSCME*, No. 24A1063, Appl. for Stay (U.S. May 2, 2025). The Supreme Court entered a stay pending appeal on June 6. *AFSCME*, 145 S. Ct. at 1626.

On June 20, 2025, Defendants moved to dismiss, or in the alternative, for summary judgment (ECF No. 168).

## **LEGAL STANDARD**

In considering a Rule 12(b)(1) motion, "[the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *Maryland v. United States*, 360 F. Supp. 3d 288 (D. Md. 2019) (Hollander, J.) (quoting *Deal v.*

4

*Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (internal quotation marks omitted).[2] Likewise, for a Rule 12(b)(6) motion, courts consider "only whether the complaint states a claim to relief that is plausible on its face," construing "facts in the light most favorable to the plaintiff" and "draw[ing] all reasonable inferences in [his] favor." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (internal quotation marks omitted). "Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2)," which does not require that a plaintiff include "detailed factual allegations" to survive a motion to dismiss. *Ryan v. Wolf*, No. 19-cv-1968, 2021 WL 409747, at *8 (D. Md. Feb. 5, 2021) (Hollander, J.). Rather, "[t]he purpose of the rule is to provide the defendants with 'fair notice' of the claims and the 'grounds' for entitlement to relief." *Id.* at *9 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Indeed, "[d]ismissal under Rule 12(b)(6) is inappropriate unless it appears *beyond doubt* that the plaintiff cannot prove any set of facts to support [their] allegations." *Brentzel v. Fairfax Transfer & Storage, Inc.*, No. 21-1025, 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (citing *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989)).

And Defendants cannot prevail on their motion for summary judgment unless "there is no genuine dispute as to any material fact and [Defendants] are entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 263 (D. Md. 2023) (Hollander, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 48 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

---

[2] Defendants devote significant space to discussing the standard for a factual challenge to subject matter jurisdiction, Defs.' Mem. at 6, but such a challenge appears to be relevant only to Plaintiffs' Appointments Clause claim.

that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"[A] district judge has complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion" to a motion for summary judgment. *Sager v. Housing Com'n of Anne Arundel C'nty*, 855 F. Supp. 2d 524, 542 (D. Md. 2012) (Hollander, J.) (internal quotation marks and citation omitted). When a motion is styled as a motion to dismiss, or in the alternative, for summary judgment, it "implicates the court's discretion under Rule 12(d)," and "the parties are deemed to be on notice that conversion" to a motion for summary judgment may occur. *Id.*[3]

## ARGUMENT

Defendants' combined motion should be denied: Plaintiffs have suffered an injury-in-fact, have standing to bring their claims, and have more than sufficiently stated those claims. And Defendants have not demonstrated anything approaching entitlement to judgment as a matter of law.

### I.    The Fourth Circuit's en banc decision is the only appellate guidance relevant to this motion.

The Fourth Circuit, sitting en banc, has already declined to stay this Court's preliminary injunction. *AFSCME v. SSA*, No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025). Seven of the fifteen active Fourth Circuit judges explained their views at length in a concurrence. That

---

[3] Because Plaintiffs are potentially opposing both a motion to dismiss and a motion for summary judgment, throughout this opposition, Plaintiffs discuss both allegations in their Amended Complaint and evidence, arguments, and legal conclusions developed through declarations, the administrative record, party filings, and preliminary rulings by the Court.

concurrence expressly adopted this Court's preliminary injunction opinion, *id.* at *4 (King, J., concurring), which addresses many of the issues now resurrected by Defendants in their combined motion, and provided additional analysis of several issues, including, most crucially, the distinctions between this case and *Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025). Judge King's concurrence expressly described "this as a substantially stronger case than *Bessent*," *AFSCME*, 2025 WL 1249608 at *4 (King, J., concurring), and highlighted, among other things, the particularly sensitive nature of the information unlawfully disclosed by SSA. That characterization is plainly borne out by the opposite outcomes in the two cases: while the Fourth Circuit stayed the preliminary injunction in *Bessent*, it declined to do so here. *See also id.* at *5–6 (Heytens, J., concurring) (listing differences between the facts, terms of injunctive relief, and briefing in *Bessent* versus in this case).

Despite the Fourth Circuit's thorough appellate guidance, the government's motion relies significantly on the Supreme Court's subsequent stay of the preliminary injunction. But that decision provides little, if any, guidance relevant to the disposition of Defendants' present motion. That order consists solely of a recitation of the *Nken* factors and the Supreme Court's statement that "[a]fter review, we determine that the application of these factors in this case warrants granting the requested stay." *AFSCME*, 145 S. Ct. at 1626. Defendants never clarify *how* they believe the Supreme Court's stay order is relevant to this Court's consideration of their motion, but if it is relevant at all, it could only be due to a theoretical *sub silentio* determination that the government has "made a strong showing that [it] is likely to succeed on the merits," *id.* (quoting *Nken*, 556 U.S. at 434).[4] But even if the Supreme Court made that assessment, it may have done so for reasons

---

[4] Defendants have never argued that the second, third, or fourth *Nken* factors (irreparable injury to the applicant, injury to other parties, and public interest), any or all of which may have substantially

that do not bear on these motions. Unless the decision was based on analysis of Plaintiffs' standing or a defect in the Amended Complaint—and the Supreme Court has given no indication that it was—it offers no guidance for this Court's resolution of a motion to dismiss. Nor, absent any analysis from the Supreme Court, can it meaningfully inform summary judgment disposition. Members of the Supreme Court have previously stated that "an emergency application is not a precedent with respect to the underlying issue in the case," Michelle Adams et al., *Presidential Commission on the Supreme Court of the United States*, *Final Report* at 153 n.10, 208, 208 n.49 (Dec. 2021). The lone Supreme Court order that can be read to suggest otherwise, *Trump v. Boyle*, implicates—and quotes from—a stay order that included, unlike the Supreme Court's stay order in this case, multiple pages of legal analysis. No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) (citing *Trump v. Wilcox*, 145 S. Ct. 1415 (2025)).

A "strong showing" of likelihood of success on the merits can be satisfied by nothing more than a party's ability to "demonstrate a substantial case on the merits." *Hilton v. Braunskill*, 481 U.S. 770, 778 (1987) (explaining application of factors later adopted in *Nken*). But demonstration of a "substantial case" is a far cry from a showing of *entitlement* to judgment as a matter of law. Every appellate stay presumably reflects "concerns" with the judgment or order it stays, but Defendants point to no authority to suggest that those concerns should, absent any guidance on a relevant legal issue, influence a trial court's independent judgment in applying the wholly distinct summary judgment standard. To the contrary, Supreme Court decisions regarding whether to enter a stay are not always indicative of that Court's ultimate dispositions on the merits of a case. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 10 (2023) (reflecting Supreme Court's initial stay of, and

---

formed the basis of the Supreme Court's stay, could bear on a motion under Rules 12(b)(1), 12(b)(6), or 56. Nor could they; motions brought under those rules do not involve consideration of the public's interest or whether preliminary relief would cause injury to a party.

subsequent affirmance on the merits of, the same injunction); *Biden v. Texas*, 597 U.S. 785, 794–95, 814 (2022) (reflecting Supreme Court's denial of a stay but subsequent reversal of the same judgment and injunction).

## II.    Plaintiffs have—and have sufficiently alleged—standing.

To satisfy the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), Plaintiffs must show that they have suffered an injury-in-fact that is traceable to Defendants' actions and redressable by a favorable decision. Defendants have not contested causation or redressability, and their arguments that Plaintiffs have not suffered an injury-in-fact remain as unavailing now as they were when considered by the Court at the TRO and PI stages of this litigation.

### A.   DOGE's improper access to sensitive records is a close analogue to intrusion upon seclusion.

This Court has already provided a fulsome overview of the history and elements of intrusion upon seclusion and its close relationship to the injury Plaintiffs have suffered. PI Mem. Op. at 728–45. As that discussion—adopted by seven members of the Fourth Circuit—and Plaintiffs' multiple prior submissions on this exact point have explained, Plaintiffs have suffered an injury-in-fact closely related to the harm of intrusion upon seclusion, which has "traditionally" been "recognized as providing a basis for a lawsuit in American courts." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)).

Intrusion upon seclusion is an intentional tort of intrusion "physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . [which] would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (Am L. Inst. 1977). Liability for the tort is triggered by "the intrusion itself." *Id.*, cmt. b. *See also* Am. Compl. ¶¶ 86

(DOGE has been granted access to numerous systems including private information), 90 (records DOGE has accessed carry stigma), 94 (intrusion "upends the reliance [Plaintiffs' members] had on their data being secure"), 97 (intrusion "harmed Plaintiffs' members by depriving them of privacy protections guaranteed by federal law and by making their information available for, and subject to, investigation by DOGE . . .").

Courts have recognized that wrongful access to financial or medical records is a "highly offensive" intrusion into "private affairs." Restatement (Second) of Torts § 652B; *see also, e.g., Sabrowski v. Albani-Bayeux Inc.*, 124 F. App'x 159, 161 (4th Cir. 2005) (per curiam) ("disclosure of one's private personnel files and medical records amounts to a per se intrusion into seclusion if the records contain sensitive materials"); *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009) ("conduct giving rise to unauthorized viewing of personal information such as a plaintiff's Social Security number and other identifying information can constitute an intrusion that is highly offensive to any reasonable person").

Injuries analogous to intrusion upon seclusion may work "intangible" but nevertheless "concrete" harms sufficient for injury-in-fact. *TransUnion*, 594 U.S. at 425; *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921–22 (4th Cir. 2022) (access to personal information in violation of statute constituted injury "closely related to the invasion of privacy, which has long provided a basis for recovery at common law"); *Persinger v. S.W. Credit Sys., LP*, 20 F.4th 1184, 1192 (7th Cir. 2021) (accessing credit information without permissible purpose in violation of statute resembled "harm associated with intrusion upon seclusion" sufficiently for standing); *Nayab v. Cap. One Bank, N.A.*, 942 F.3d 480, 492 (9th Cir. 2019) (access to credit report in violation of statute caused "same harm" as "the basis for the tort of intrusion upon seclusion"); *Rendon v. Cherry Creek Mortg., LLC*, No. 22-cv-1194, 2022 WL 17824003, at *3–4 (S.D. Cal. Dec. 20,

10

2022) ("*Nayab* remains precedential" after *TransUnion*, and injury of unauthorized credit inquiry is "sufficient 'in kind' to the harm suffered by intrusion upon seclusion" to support standing).

Against this backdrop, this Court has already concluded that the injury caused by SSA's disclosures to DOGE, "if unauthorized, or without adequate need, is surely sufficiently offensive so as to constitute concrete harm," and thus "sufficiently analogous to the tort of intrusion upon seclusion" to constitute injury-in-fact. PI Mem. Op. at 745. That ruling accords with several other courts that have held that unlawful agency disclosures to DOGE create harm closely analogous to intrusion upon seclusion, thus conferring standing. *See, e.g.*, *AFL-CIO v. DOL*, No. 25-339, 2025 WL 1129227, at *7 (D.D.C. Apr. 16, 2025) ("As three judges facing nearly identical issues have explained, the harm that plaintiffs allege their members are suffering has a close relationship with the harm asserted in a suit for the tort of intrusion upon seclusion"); *accord All. For Ret. Ams. v. Bessent*, No. 25-cv-313, 2025 WL 740401, at *15–17 (D.D.C. Mar. 7, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 777 F. Supp. 3d 253, 267 (S.D.N.Y. 2025).

Defendants have little new to say on this point. First, Defendants argue that *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023), compels a contrary result. Not so; *O'Leary* is of limited relevance here. As an initial matter, even the *Bessent* panel of the Fourth Circuit acknowledged that *O'Leary* cannot, in itself, act as a bar to treating disclosures to DOGE as analogous to intrusion upon seclusion: "intrusion upon seclusion can occur beyond the confines of the home. And the government overreaches when arguing for such a limited understanding of the tort." *Bessent*, 2025 WL 1023638 at *5. The government overreaches once again here, and this Court should decline Defendants' invitation to require an *exact* analogue to the historic tort. *See* Defs.' Mem. at 11.

Defendants separately argue that the *O'Leary* court, based on a review of prior cases, concluded that "plaintiffs who rely on an abstract statutory privacy injury" generally lack standing "unless it [comes] with a nonspeculative increased risk of injury theft." *O'Leary*, 640 F.4th at 244. But the cases the *O'Leary* court considered that found plaintiffs to lack Article III standing fell into only two categories: (1) claims under the Fair and Accurate Credit Transactions Act, a statute intended "to prevent identity theft," Pub. L. No. 108-159, 117 Stat. 1952 (2003); *see Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917 (11th Cir. 2020) (en banc); *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1066 (D.C. Cir. 2019); or (2) cases where the plaintiff's only purported injury was increased risk of future identity theft. *See Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017). Those cases demonstrate nothing more than that, as the *O'Leary* court held, increased risk of identity theft is a prerequisite for standing on a theory that requires such a risk. But that is not this case: Plaintiffs allege and have suffered concrete injury wholly separate from the increased risk of identity theft caused by Defendants' actions. Am. Compl. ¶¶ 94 (disclosure upends Plaintiffs' reliance interests), 97 (disclosure deprived Plaintiffs of legally guaranteed privacy protections and made their information available to DOGE); *see also* PI Mem. Op. at 745 ("providing the DOGE Team with access to the medical records and sensitive financial information of millions of people, if unauthorized, or without adequate need, is surely sufficiently offensive so as to constitute concrete harm"). And, in any event, the *O'Leary* court's discussion of these cases and the general principle on which Defendants now rely concerned only whether plaintiffs could allege a concrete injury based on a "mere procedural violation of a statute." *Id.* at 245. That question has no bearing on whether a plaintiff has independently established injury-in-fact by a traditional or common-law analogue, particularly where the analogue does not itself depend on increased risk. *See O'Leary*,

60 F.4th at 245 (treating injury by analogue as separate inquiry and separate potential basis for standing from allegation of nonspeculative increase in risk of identity theft).

**B. DOGE's unlawful access has caused Plaintiffs' members unease sufficient to support an intrusion upon seclusion claim.**

As a result of Defendants' disclosure of Plaintiffs' members' personal information to unvetted personnel without an actual need for that information, Plaintiffs have suffered "the feeling of unease when and where one should ideally be at peace." *Bessent*, 2025 WL 1023638 at *4. As this Court has already explained, they have "described the kind of 'unease' that Judge Richardson regards as integral to an intrusion upon seclusion claim." PI Mem. Op. at 733. *See, e.g.*, Somo Suppl. Decl. ¶ 9 (ECF No. 111-6) (describing the "horrible feeling" caused by DOGE having access to her sensitive information, "almost like someone breaking into [her] house and stealing stuff"); Conard Suppl. Decl. ¶ 4 (ECF 111-4) ("DOGE access to the sensitive information [in SSA systems] about [her] is a severe violation of [her] trust and an invasion of [her] privacy and person"); *see* Am. Compl. ¶¶ 94, 97, 129.

**C. Breach of confidence provides an independent basis for standing.**

Plaintiffs' claims are also closely analogous to the common law tort of breach of confidence, which independently establishes concrete harm for Article III standing purposes. *See AFL-CIO v. DOL*, 2025 WL 1129227, at *9. As Judge Bates recently explained,

> [breach of confidence] "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." Nothing beyond the "plaintiff's trust in the breaching party [being] violated must occur for the harm to be actionable. The trusted party's disclosure to a third party is sufficient.

*Id.* (internal citations omitted) (quoting *Jeffries*, 928 F.3d at 1064–65). Here, as in *AFL-CIO v. DOL*, Plaintiffs provided the sensitive, personally identifiable information at the heart of this case to SSA on the assurance and reasonable assumption that it would be protected by an extensive and robust network of laws. *See* Am. Compl. ¶¶ 37–46 (describing network of laws), 91 (describing

13

Plaintiffs' understanding of confidence); *see also, e.g.*, PI Mem. Op. 741–42 (discussing Plaintiff declarations describing expectation of confidence). Plaintiffs allege that such protections were breached when SSA made "unconsented, unprivileged disclosure[s] to a third party"—namely, DOGE Team members without completed background checks, detail agreements, or actual need. *Jeffries*, 928 F.3d at 1065 (quoting *Kamal v. J. Crew Grp.*, 918 F.3d 102, 114 (3d Cir. 2019)).[5]

"The tort [of breach of confidence] 'is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved.'" *Id.* at 1065 (quoting *Young v. DOJ*, 882 F.2d 633, 640 (2d Cir. 1989)). SSA's disclosure of Plaintiffs' confidential information to DOGE affiliates has undermined the confidence of the "discussions" between Plaintiffs and SSA; that alone is sufficient to demonstrate a harm analogous to breach of confidence. In that way, this case is akin to *AFL-CIO v. DOL*, where the plaintiffs had provided information to agencies "in confidence, backed by the Privacy Act's guarantee that the agencies would not disclose the information to any other person or agency," *AFL-CIO v. DOL*, 2025 WL 1129227, at *9, but alleged that the agencies had nevertheless made such disclosures. In that case, as here, breach of confidence's "common-law analogue is more like a common-law twin." *Id.*

### D. Congress has made clear that improper, unnecessary access to information is Article III injury.

Congressional judgment and intent also support Plaintiffs' Article III standing by analogy to intrusion upon seclusion or breach of confidence. Because it is "well positioned to identify

---

[5] This Court previously noted that Plaintiffs had not advanced a standing theory based on an analogue to breach of confidence in advocating for a preliminary injunction, *see* PI Mem. Op. at 738, n.33. But Plaintiffs' factual allegations are sufficient to demonstrate such an analogue, and neither Plaintiffs nor this Court are foreclosed from relying on that alternate analogue when assessing Defendants' motion. *See id.* at 744, n.41 ("a plaintiff must identify—not plead—a common law analog") (citing *TransUnion*) (internal quotation marks omitted).

intangible harms that meet minimum Article III requirements," Congress has the authority to "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (quoting *Defs. of Wildlife*, 504 U.S. at 578). And "[b]y enacting the Privacy Act, the Social Security Act, FISMA, and the Internal Revenue Code, Congress recognized, in general, that improper or unnecessary access to or disclosure of personally identifiable information—even to government employees—poses a harm to legitimate privacy interests." PI Mem. Op. at 744.

The legislative history of the Privacy Act shows that the act was intended to extend to government systems of records the same privacy protections that had long existed at common law. *See Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act and stating that Congress enacted the Act to "protect the privacy of individuals identified in information systems by Federal agencies"). As Congress understood, "[t]he privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by federal agencies." Privacy Act of 1974, Pub. L. No. 93-579 § 2(a)(1), 88 Stat. 1896 (1974). "[T]o provide certain safeguards for an individual against an invasion of personal privacy," Congress found it necessary "to regulate the collection, maintenance, use, and dissemination of information by such agencies." *Id.* §§ 2(a)(1), (5)(B). Congress viewed these safeguards as an extension of the common law—or in the words of Rep. Robert Drinan, "another important step in protecting the 'sacred precincts of private and domestic life.'" S. Comm. on Gov't Operations & H. Comm. on Gov't Operations, 94th Cong., *Legislative History of the Privacy Act of 1974*, at 964 (Comm. Print. 1976) (quoting Warren & Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 195 (1890)); *see also id.* at 776 (statement of Sen. Charles Percy) ("[W]e have computers, the type of devices Brandeis probably never even conceived of. I hope that we are prepared to take that next step by passing legislation

15

to safeguard privacy."); *id.* at 803 (statement of Sen. Barry Goldwater) ("[B]y privacy, . . . I mean the right 'to be let alone'—from intrusion by Big Brother in all his guises. . . . We must act now while there is still privacy to cherish."). Congress's judgment to extend common law protections to government-held personal records reinforces the close analogy between intrusion upon seclusion and Plaintiffs' harms. *See AFL-CIO v. DOL*, 2025 WL 1129227, at *8 (explaining that § 552a(b) of the Act "in effect created a new sphere in which individuals not only <u>expect</u> privacy, but have a right to it.")

### E.  Resolution of Plaintiffs' Privacy Act claims does not require participation of their members.

Organizations may bring claims on behalf of their members where adjudicating those members' claims would not require "individualized proof" which would preclude the claims from being "properly resolved in a group context." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). However, as Defendants acknowledge, Defs.' Mem. at 14–15, this is typically a barrier to associational standing in cases seeking *monetary* relief, because individualized proof of damages requires the participation of members. In contrast, individual participation is "not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996)*; see also AFSMCE v. SSA,* 771 F. Supp. 3d 717, 782–83 (D. Md. 2025).

Defendants do not dispute this framework, instead relying on authority indicating that injunctive relief *generally* does not require individual participation to infer that it must sometimes do so. But Defendants do not articulate any reason why the Court should require it here. Instead, they gesture to the Privacy Act's provision of individualized damages to imply that individualized proof would be required to determine damages. That provision has no bearing on this matter, as Plaintiffs do not seek damages.  And, in any event, the Privacy Act, on its own terms, separately

provides for judicial review of claims that the government has "fail[ed] to comply" with certain of its provisions, including the disclosure provisions of § 552a(b) central to this case, "in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D). Defendants' conclusory statement that "organizations and associations cannot bring Privacy Act claims," Defs.' Mem. at 14, is flatly incorrect: they can, and they do, including in similar challenges to this one. *See, e.g.*, *AFL-CIO v. DOL*, 2025 WL 1129227, at *7 (unions had associational standing to bring Privacy Act claims arising from agency disclosures of information to DOGE); PI Mem. Op. at 727 (citing cases). This Court has already explained that reasons of judicial economy are the driving force behind the rule that associational standing is appropriate only where individual members' involvement is not necessary, *id.*, and Defendants have offered no reason that those concerns are outweighed here.

## III. Plaintiffs have sufficiently alleged, identified, and challenged a final agency action.

Plaintiffs challenge SSA's alteration of its longstanding access policies in order to allow unfettered DOGE access to SSA systems. That change is discrete, final agency action and anything but "workaday." And it is "final" within the meaning of the APA. Agency action is final when it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 570 U.S. 154, 177–78 (1997). But courts take a "'pragmatic' approach . . . to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

SSA maintains—or did until recently—careful protocols regarding systems access, ensuring, among other things, that access is subject to and consistent with applicable laws. Am. Compl. ¶¶ 37–40, 45. SSA concededly may grant certain access to its systems "thousands" of times per day under its access policies, Defs.' Mem. at 18, but each of those grants is simply an

effectuation of a policy. *See Chem. Weapons Working Grp., Inc. v. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997) (individual instance of weapons disposal pursuant to previously finalized disposal plan was simply "implementation of a final disposition already made" and thus not final agency action) (internal quotation marks omitted). SSA has changed or wholly disregarded its policies in granting unfettered access to DOGE in a significant departure from prior existing protocols and policies. Plaintiffs challenge that *change*, and judicial review of changes to policies—as opposed to individual decisions made pursuant to those changed policies—is far from the day-to-day oversight Defendants portray it to be. Am. Compl. ¶ 122.

Plaintiffs' Amended Complaint sufficiently alleges facts supporting a conclusion that the challenged change is final agency action. Plaintiffs' Amended Complaint describes some of the regulations that govern access to SSA systems; *see*, *e.g.*, Am. Compl. ¶ 45; and goes on to describe some of the ways that Defendants have departed from those regulations—and other protections—in an unprecedented and consistent manner when requests or demands for access come from DOGE. *See*, *e.g.*, *id.*, ¶¶ 86, 102. Those facts, as pled, more than adequately demonstrate a change in SSA policy, but the Amended Complaint makes explicit the allegation that Defendants changed their access policies: when Defendants "disclosed an unfathomable amount of sensitive, personally identifying information," they did so "without acknowledging that *SSA was changing its policies*, identifying the source of its authority to do so," analyzing its decision to do so, or considering the consequences of doing so. *Id.* ¶ 122 (emphasis added). Defendants' assertion that Plaintiffs did not identify this challenged action until their Motion for Preliminary Injunction, Defs.' Mem. at 17, is flatly incorrect—Plaintiffs alleged it in the Amended Complaint sufficiently to overcome a motion to dismiss.

The change to SSA policy is neither interlocutory nor tentative—it reflects the consummation of SSA's decisionmaking. Agency head approval of agency action is a "signpost[] of authoritative determination, finality[,] and ripeness," *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971), and former Acting Commissioner Dudek made the change to SSA policies, Am. Compl. ¶ 86. And the decision was made over and subsequent to contrary advice, *id.* ¶¶ 84–85. Defendants do not meaningfully dispute that the change is the consummation of agency decisionmaking, instead suggesting that subsequent arrivals of additional DOGE affiliates at SSA and DOGE requests for access to additional systems somehow evince that decisions are ongoing. But grants of access to new systems or new individuals pursuant to the changed policies are simply exercises of those policies: the final agency action has already occurred.

Defendants' actions also caused the kind of "'direct and appreciable legal consequences'" required under the second *Bennett* prong's "'pragmatic' inquiry." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (quoting *Hawkes Co.*, 578 U.S. at 598–99). As soon as SSA changed its access standards, Plaintiffs' rights and obligations changed with respect to their sensitive data. Regulations permitting information disclosure "certainly affect individual . . . confidentiality rights of those who submit [that] information." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979). Defendants' actions also changed SSA's position as to requirements for those seeking access to PII in its data systems, altering its "own rights or obligations." That too is independently sufficient to constitute final action. *Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 461 (D. Md. 2021) (relevant inquiry under *Bennett* is whether agency action "determined its own rights or obligations" *or* "determin[ed] Plaintiff's rights or obligations"). And the change determined DOGE personnel's rights to access SSA information.

Defendants point to no authority to question that these determinations of legal rights and obligations rise to the level of final agency action. Defendants' reliance on *Sierra Club* to suggest that agency action can only be final when it impacts regulated entities is misplaced: *Sierra Club* discussed agency action's impact on regulated entities as part of an expressly non-exhaustive list of factors for evaluation whether agency guidance statements are final agency action. 955 F.3d at 63. The direct impact of a guidance statement is necessarily limited to regulated entities; not so for changes to policies governing access to PII belonging to tens of millions of people. And contrary to Defendants' characterization, this Court correctly relied on *Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008). Defendants attempt to distinguish *Venetian Casino* on the theory that the policy at issue there concerned the EEOC disclosing information outside the agency. So too here: DOGE affiliates are not SSA employees. And even if they are, unauthorized intra-agency access to Plaintiffs' PII still infringes on their individual confidentiality rights.[6]

## IV. Plaintiffs have adequately pled violations of the Privacy Act, both freestanding and through the APA, and Defendants are not entitled to judgment as a matter of law.

This Court has already concluded that Plaintiffs "have shown a likelihood of success on the merits as to their claim that the access to records that SSA seeks to provide to the DOGE Team does not fall within the need-to-know exception to the Privacy Act," PI Mem. Op. at 774, and that "SSA's provision to the DOGE team of access to SSA is 'not in accordance with' the Privacy Act." *Id.* at 67. This Court should reject Defendants' arguments to the contrary once again.

---

[6] Defendants separately suggest that if SSA's disclosure to DOGE were intra-agency (which it is not), that fact would somehow render the harm suffered by Plaintiffs disanalogous from intrusion upon seclusion. But Defendants' entire argument relies on the Supreme Court's holding in *TransUnion* that internal "publication" is inadequate to create an analogue to torts *involving publication*. Intrusion upon seclusion, critically, does not depend upon publication, so even an intra-agency disclosure to DOGE is adequately analogous to intrusion upon seclusion to cause the legal consequence of concrete injury.

**A. The DOGE Team at SSA does not need unfettered access to agency systems or the PII contained therein.**

First, the government has never shown—as it must to avail itself of the "need-to-know" exception of 5 U.S.C. § 552a(b)(1)—that SSA DOGE Team members have a need to access all of SSA's systems of record. The Privacy Act requires the government to show that *each* disclosure was supported by a need: Each time a DOGE Team member was given access to a system of records, he must have accessed the system only "in connection with the performance of the duties assigned to him and [must have] had to do so in order to perform those duties properly." *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000). The government has never identified, and the DOGE Team has never had, such a need for unfettered access to *any* SSA system.[7] In its combined motion, the government relies on vaguely described work "to modernize technology" and "investigating whether SSA has made improper expenditures." Defs.' Mem. at 24–25. Beyond reciting these purported needs, the government makes no effort to explain why access to Privacy Act-protected information at SSA would be needed for those purposes. That is fatal under the Privacy Act. *See Bigelow*, 217 F.3d at 877.

Nor could those limited articulations constitute valid needs even if the government explained why each would require access. The government primarily relies on Executive Order No. 14,158, *Establishing and Implementing the President's "Department of Government Efficiency*," 90 Fed. Reg. 8441 (Jan. 20, 2025) ("Exec. Order") to establish its purported need, but an Executive Order cannot supersede a duly enacted statute and does not demonstrate that any particular DOGE Team member needs access to any particular record "in order to perform [his]

---

[7] The Amended Complaint includes numerous allegations related to this point. *See, e.g.*, Am. Compl. ¶ 92 ("SSA Defendants are required by law to protect the sensitive personal and financial information that they collect and maintain about individuals from unnecessary and unlawful disclosure."), ¶ 118 ("SSA Defendants have administered systems containing vast quantities of sensitive personal information without complying with statutorily required security protections.").

duties properly." *Bigelow*, 217 F.3d at 877 (describing requirements to satisfy Privacy Act need-to-know exception). An Executive Order, by itself, cannot "license the defendants to violate the Privacy Act." *Parks v. IRS*, 618 F.2d 677, 681 (10th Cir. 1980). Allowing a generalized Executive Order to supply a "need" for such expansive access would specifically frustrate the Privacy Act, which was "designed to prevent the kind of illegal, unwise, overbroad, investigation and record surveillance of law-abiding citizens produced in recent years from actions of some over-zealous investigators, and the curiosity of some government administrators." S. Rep. No. 93-1183 (1974). If a broad and general Executive Order could be read to provide adequate "need" for access to agency systems of record generally, the Privacy Act would no longer guarantee any such protection.

Further, Executive Order 14,158, on its own terms, does not provide a "need" for access, even if it could theoretically do so. Executive Order 14,158 created the President's "DOGE Agenda" of "modernizing Federal technology and software to maximize governmental efficiency and productivity," Exec. Order § 1, including through a "Software Modernization Initiative," *id.* § 4. These provisions arguably provided a *reason* for the SSA DOGE Team's work, but such generalized direction to the whole of government is not sufficient to meet the Privacy Act's standard that individual agencies determine the *need* for various individuals to access any given system, let alone sufficient to permit unfettered access to all systems in that agency. The government's contrary interpretation would eliminate Privacy Act limitations on those implementing the DOGE agenda across the government.

Separately, the government continues to baldly assert that unfettered access to PII is necessary to investigate fraudulent payments, Defs.' Mem. at 25, but "when analysts or auditors review agency data for possible payment issues, including for fraud, the review process would

start with access to high-level, anonymized data based on the least amount of data the analyst or auditor would need." Flick Decl. ¶ 4 (ECF No. 39-1).[8] If indicia of fraud are identified, those analysts or auditors would *then*, consistent with the Privacy Act, be able to access non-anonymized data pertaining *only* to suspicious records. *Id.* In other words, even the anti-fraud work the government characterizes as creating a need for sweeping access in fact only provides—at most— a need for access to a limited subset of records, after initial review of anonymized data. "[F]ull, non-anonymized access of individual data on every person who has a social security number or receives benefits from Social Security is unnecessary at the outset of any anti-fraud or other auditing project." *Id.*

The government's position is also inconsistent with Defendants' acknowledgment that the SSA DOGE Team did not *need* access to Privacy Act-protected information but would merely be able to work faster with that information. PI Mem. Op. at 771. A desire to be able to work faster does not qualify as need for the purposes of the Privacy Act; the need-to-know exception is available only when the recipient of protected information "had to" view the information to do their job. *Bigelow*, 217 F.3d at 877. And, in any event, there is no indication that the government ever engaged in that particular analysis *before* granting unfettered access to DOGE Team members.

As this Court has already concluded, "[n]othing in the specific requests" for system access "suggests that the DOGE Team members required unlimited access to PII to perform their work." PI Mem. Op. at 771. For example, SSA granted three DOGE Team members access to the entire universe of PSSNAP data because they cursorily alleged that they needed such expansive access

---

[8] In addition to the cited declaration, the evidentiary record forestalls any argument that there is no genuine dispute as to any material fact on this point. *See, e.g.*, ECF 110-10 ¶ 7 ("[S]tandard practice would be to (1) grant DOGE Team members access to the data they sought in a 'sandbox' environment with anonymized data, and (2) refuse requests for write-access and access to SSA source code.").

to "understand how many people request SSI benefits"—a mere numerical computation. *Id.* at *773 (quoting ECF 86-2 at 27). Defendants also granted a DOGE Team member access to USCIS SAVE, including all the personally identifying information contained therein, despite there being "no indication . . . of a project that is based on a suspicion that immigrants are engaging in fraud or abuse of SSNs." *Id.* (quoting ECF 86-2 at 28–29).

### B. DOGE Team members at SSA are not employees of the agency.

Even if this Court were to revisit its prior determination that DOGE personnel lack a "need" for access to deanonymized SSA records, Plaintiffs have separately alleged that DOGE affiliates, including the SSA DOGE Team, are not employees of SSA, Am. Compl. ¶¶ 81, 83–84, and they thus cannot be covered by the intra-agency need-to-know exception.[9] Defendants have never established that the SSA DOGE Team are SSA employees, much less shown so via undisputed facts or as a matter of law. Instead, Defendants go to great lengths to demonstrate that the members of the SSA DOGE Team are federal government employees. Defs.' Mem. at 24. But Plaintiffs have never disputed that DOGE affiliates are federal employees; they simply are not *SSA* employees, and that forecloses the need-to-know exception, which "applies only to *intra-agency* disclosures." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 547 (3d Cir. 1989) (emphasis added); *see also* 5 U.S.C. § 552a(b)(1) (disclosure under need-to-know exception permissible only to employees "of the agency which maintains the record").

To determine which agency, "as a practical matter," *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 132 (D.C. Cir. 2005), employs an individual federal employee, it is appropriate to consider "all the circumstances," *id.* at 131 (quoting *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir.

---

[9] This Court has not yet addressed this question. *See* PI Mem. Op. at 764 (assuming without deciding that SSA DOGE Team members were SSA employees).

1979)), including the matters on which an employee works and who supervises them, *id.* at 131–32.

As Plaintiffs alleged, the members of the SSA DOGE Team perform DOGE work and are functionally supervised by USDS. Am. Compl. ¶¶ 3–5, 48–52, 56, 68, 81, 83–86, 126. The government's own characterization of the DOGE Team's work relies heavily on the Executive Order, Defs.' Mem. at *24–25, which exclusively pertains to work on the DOGE Agenda. The Executive Order provides no indication that DOGE Teams perform work for their host agencies.

Indeed, the Executive Order requires DOGE Teams to "coordinate their work with" USDS, while requiring only that they "advise" their host agency heads, *id.* § 3(c). To "coordinate" their work with USDS means that the SSA DOGE Team must "bring into a common action, movement, or condition" or "harmonize" their work with USDS. "Coordinate," *Webster's Third New International Dictionary* 501 (1971). Because *every* agency DOGE Team is subject to the Executive Order, it would be impossible to read the Executive Order as requiring DOGE Teams to be supervised by each agency and simultaneously harmonized in their work across the government. Coordination can therefore only mean that DOGE Teams are required to work in a way that "harmonizes" with the instructions and expectations of USDS. In contrast, those same teams are required only to "advise" agency heads, which requires neither supervision by agency heads nor even any form of alignment with them. In practice, in order to comply with the Executive Order, the SSA DOGE Team must be taking direction from and reporting not to the SSA Administrator, but to USDS.[10]

---

[10] Defendants curiously rely, as an alternate authority for the DOGE Team's access, on a routine use in an SSA SORN. That routine use, 87 Fed. Reg. 263, 265 (Jan. 4, 2022), is available only for "workers who technically do not have the status of Federal employees." But as Defendants have amply demonstrated, the members of the DOGE Team are federal employees, so this routine use

Finally, Defendants attempt to cast confusion over Plaintiffs' claims by repeatedly suggesting that Plaintiffs have failed to identity who "DOGE" is. *See, e.g.*, Defs.' Mem. at 23, 28, 33. But Plaintiffs identified DOGE in the second paragraph of their Amended Complaint, alleging plainly that "SSA and its acting official have opened its data systems to unauthorized personnel from the 'Department of Government Efficiency.'" Am. Compl. ¶ 2. The Amended Complaint later specifies that Plaintiffs bring claims against, among others, "Defendant U.S. DOGE Service (previously the U.S. Digital Service)," which was "established by Executive Order 14158"; and "Defendant U.S. DOGE Service Temporary Organization," a "temporary organization also created by Executive Order 14158 and headed by the U.S. DOGE Service Administrator." *Id.* at ¶¶ 24–25. Moreover, the government did not raise this concern at the hearing on Plaintiffs' application for a temporary restraining order. *See generally* TRO Tr. (ECF No. 45). On the contrary: it engaged in extended discussion about whether USDS should be considered a federal agency and identified DOGE variously as both USDS and members of the SSA DOGE Team. *See, e.g.*, *id.* at 12:10–14:11, 27:18–25 ("I think DOGE, the people who are at the agency, employees fulfilling the DOGE mission . . . ."). Finally, "[t]he purpose of [Rule 12(b)(6)] is to provide the defendants with 'fair notice' of the claims and the 'grounds' for entitlement to relief," *Ryan v. Wolf*, 2021 WL 409747, at *9 (D. Md. Feb. 5, 2021) (quoting *Twombly*, 550 U.S. at 555–56), which Plaintiffs' allegation plainly do.

## V.    Plaintiffs have adequately pled violations of Section 6103 and SSA Regulations, and Defendants are not entitled to judgment as a matter of law.

The Internal Revenue Code provides that "[r]eturns and return information shall be confidential" and that "no officer or employee of the United States . . . shall disclose any return or

---

is inapplicable. And, in any event, as this Court recognized, the Administrative Record contains no reference to the routine use as a basis for access; the government's invocation of it is therefore a *post hoc* justification. PI Mem. Op. at 774.

return information" where "'disclosure' means the making known to any person in any manner whatever." 26 U.S.C § 6103(a), (b)(8). The prohibition has only limited exceptions, "guarantee[ing] . . . personal information in a return will be guarded from persons not directly engaged in processing or inspecting the return for tax administration purposes." *Gardner v. United States*, 213 F.3d 735, 738 (D.C. Cir. 2000) (internal quotation marks omitted). Plaintiffs have alleged, and Defendants do not dispute, that SSA has disclosed protected return information to members of the SSA DOGE Team. Am. Compl. ¶¶ 1, 89, 114. Faced with this blatant violation of the Internal Revenue Code, Defendants invoke an exception permitting such disclosure "to officers and employees of SSA who have a need for the record in the course of their duties." Defs.' Mem. at 29 (quoting 20 C.F.R. § 401.115). But SSA DOGE Team members are not officers or employees of SSA and do not need access to Plaintiffs' return information in the performance of their duties. *See* Section IV, *supra*. Defendants are twice-over unable to avail themselves of need-to-know exceptions and have not otherwise opposed Plaintiffs' § 6103 claim.

## VI.    Plaintiffs' FISMA claim is subject to judicial review.

Under FISMA, the "head of each agency shall be responsible for providing information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of" information or systems maintained by the agency. 44 U.S.C. § 3554(a)(1)(A). By failing even to assess necessary protections with respect to DOGE access, Defendants have wholly failed to meet FISMA's mandate.

Compliance with FISMA is judicially reviewable, and Defendants' arguments to the contrary are unavailing. Courts may conduct "barebones review" for compliance with basic obligations even when a statute "smacks of flexibility." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 492, 494 (2015). Where a statute directs an official to consider certain factors, "narrow"

review is available to ensure the official "addressed the terms" of the statute while still "allowing the exercise of broad discretion" by not "reach[ing] the correctness of the assessment of the factors considered or of the ultimate decision." *Sluss v. DOJ, Int'l Prisoner Transfer Unit*, 898 F.3d 1242, 1252 (D.C. Cir. 2018). Defendants' decisionmaking must therefore evince *some* consideration of "risk and magnitude of the harm resulting from" SSA's modification to its access policies. 44 U.S.C. § 3554(a)(1)(A). Plaintiffs allege that it does not; instead SSA simply granted DOGE access to its systems. Am. Compl. ¶ 86. This case presents an entirely distinct situation from those instances where courts have declined to undertake searching and substantive review of FISMA decisions. *See, e.g. Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006) (court declined to review a robust, years-long record of agency IT decisions and render its own judgments about the agency's FISMA compliance). The facts here suggest *no* meaningful attempt by Defendants to consider or comply with FISMA's requirements, and that failure is susceptible to narrow judicial review.

## VII. Plaintiffs have adequately pled their arbitrary and capricious claim, and Defendants are not entitled to judgment as a matter of law.

Courts must set aside "arbitrary" or "capricious" agency action. 5 U.S.C. § 706(2)(A). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 169 (1962)). "An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," and must "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency need not "demonstrate . . . that the reasons for the new policy are better than the reasons for the old one" or "provide a more detailed justification than what would suffice for a new policy," but must at least "display awareness that it *is* changing position." *Id.*

28

As this Court has already explained, DOGE's "mere utterance of the word 'need' is not like the proverbial 'get out of jail free card,'" PI Mem. Op. at 775, by which the "entire DOGE Team" may receive "full access to the wide swath of data maintained in SSA systems." *Id* at *67. This sweeping change in SSA practice was hasty, ill-considered, unsupported, and detrimental to the interests of government privacy laws. And it was executed by Defendants running "roughshod over SSA protocols for proper hiring, onboarding, training, and, most important, access limitations and separation of duties." *Id.*

Defendants argue that Plaintiffs have not actually alleged a change in SSA's access policy. In their telling, SSA has "merely given a small, limited set of new SSA employees access to data systems they need to perform the duties of their roles." Defs.' Mem. at 33. But this anodyne description belies the truth: Defendants have given a small set of non-SSA employees access to *all* PII in *any* data system the employee claims to "need." And even if Defendants were correct that each of those employees has followed ordinary training and security protocols, *but see* PI Mem. Op. at 757 (examining the evidentiary record and concluding that access was granted "without signed detail agreements, adequate training, completed background investigations, and/or executed work forms for all DOGE Team members"), the decision to grant that access constitutes a sea change in SSA's policy and practice. *Id.* That is precisely what Plaintiffs alleged in their Amended Complaint. *See* Section III, *supra*. Defendants' argument that the change in access policy was adequately supported by identified needs fares no better: neither SSA nor DOGE had a need for DOGE to have the access at issue here, and Defendants have never identified one. *See* Section IV.A, *supra*.

Finally, Defendants argue that they have adequately respected Americans' reliance interest in the protection and safekeeping of their private information because DOGE personnel had

adequate training. Plaintiffs have alleged to the contrary, Am. Compl. ¶¶ 83, 94, 122, and those allegations must be accepted as true for purposes of a motion to dismiss. In any event, SSA would violate Americans' reliance interests by providing their confidential information to even the best-trained government employee if that employee lacked authorization or actual need to receive that information. Here, SSA has provided such information to unauthorized employees who lack adequate training and vetting.

## VIII.    Plaintiffs have adequately pled that DOGE's actions are *ultra vires*, and Defendants are not entitled to judgment as a matter of law.

DOGE and its affiliates have acted and are acting far in excess of any lawful authority, including by "directing and controlling the use of" SSA systems. That action is *ultra vires*, and Defendants have demonstrated no entitlement to have Plaintiffs' *ultra vires* claim dismissed.

The core of an *ultra vires* claim is whether government action is within the bounds of an official's or entity's lawful authority. "Government action is *ultra vires* if the agency or other government entity 'is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden." *Ancient Coin Collectors Guild v. Customs & Border Prot.*, 698 F.3d 171, 179 (4th Cir. 2012) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)). All "officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it." *Butz v. Economou*, 438 U.S. 478, 506 (1978). Plaintiffs are not aware of, nor have Defendants invoked, any statute or other source of legal authority which would authorize DOGE to exercise control over SSA or any other agency. In light of that lack of legal authority, two courts to consider motions to dismiss *ultra vires* claims against DOGE for directing agency disclosure of information have already denied those motions. *See AFL-CIO v. DOL*, 2025 WL 1129227 at *22 ("motion to dismiss points to no legal source that grants USDS the authority to take these actions" so "'the Court will permit' the <u>ultra vires</u> claim 'to

proceed.'" (quoting *Ctr. For Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 48 (D.D.C. 2020)); *Am. Fed'n of Gov't Emps.*, 777 F. Supp. 3d at 283 (denying motion to dismiss *ultra vires* claim that "disclosure of . . . records . . . was directed and controlled by the DOGE Defendants" who "have no statutory authority with respect to [agency] records").

Defendants make one argument styled two ways against Plaintiffs' *ultra vires* claim; neither version is persuasive. Defendants argue that Plaintiffs can otherwise vindicate their rights and are therefore foreclosed from challenging Defendants' conduct under an *ultra vires* theory, and separately suggest that Plaintiffs' *ultra vires* claim is just a "repackaging" of their statutory claims. Defs.' Mem. at 36. These arguments ignore that Plaintiffs' *ultra vires* claims challenges DOGE's control and direction of SSA, Am. Compl. ¶¶ 126, 128, not SSA's decision to grant systems access to DOGE: it so happens that the actions SSA took at DOGE's direction are *also* unlawful under the Privacy Act and the APA, but Plaintiffs' *ultra vires* claims do not depend on the nature of those actions. Nor do Plaintiffs' APA and Privacy Act claims reach DOGE's unlawful direction and instruction: the *ultra vires* claim is the only means by which Plaintiffs can challenge DOGE having "plainly and openly crossed a congressionally drawn line in the sand." *Am. Fed'n of Gov't Emps.* 777 F. Supp. 3d at 282 (quoting *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022).

Defendants' passing reference to *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762 (2025) does not affect Plaintiffs' *ultra vires* claim. *See* Defs.' Mem. at 36. *NRC* simply reiterated established law that an *ultra vires* claim must satisfy two requirements: first, the challenged action must have been "in excess of [the agency's] delegated powers and contrary to a specific prohibition in a statute," and second, there must be no alternative "meaningful and adequate" opportunity for judicial review. *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776. *Ultra vires* review is available so long

as an agency has violated a plain statutory limit on its authority and Congress has not explicitly provided an alternate path for judicial review. *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F. 4th 960, 971 (D.C. Cir. 2022). DOGE's conduct meets these requirements.

<u>CONCLUSION</u>

Defendants' combined motion should be denied. Plaintiffs respectfully request that the Court hold argument on that motion and that, if the Court rules in Defendants' favor with respect to the motion to dismiss, the Court grant leave to file an amended complaint within 14 days of that order. *See* Fed. R. Civ. P. 15(a)(2) (courts should "freely give leave when justice so requires"); *Brown v. Hydrochem LLC*, No. 21-cv-2992, 2022 WL 888422, at *2 (D. Md. Mar. 25, 2022) (Hollander, J.) ("[L]eave should be granted absent some reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment." (internal quotation marks and citation omitted)).

Dated: August 8, 2025

Respectfully submitted,

*/s/ Mark B. Samburg*
Mark B. Samburg (Bar No. 31090)
Alethea Anne Swift (Bar No. 30829)
Robin F. Thurston (Bar No. 31584)
Carrie Y. Flaxman*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
msamburg@democracyforward.org
aswift@democracyforward.org
rthurston@democracyforward.org
cflaxman@democracyforward.org

*Counsel for Plaintiffs*

* Admitted *pro hac vice*