**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SOCIAL SECURITY ADMINISTRATION, *et al.*,<br><br>Defendants. | Civil Action No. 1:25-cv-00596 |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL AND PROCEDURAL BACKGROUND ........ 4

LEGAL STANDARD ........ 11

ARGUMENT ........ 12

I. Defendants' factual assertions are immaterial and implausible. ........ 13

A. Plaintiffs' claims are not specific to the existence of the DOGE Team, the identity of its members, or the existence of the U.S. DOGE Service Temporary Organization. ........ 13

B. DOGE is alive and well. ........ 18

C. DOGE personnel are still employed at SSA, and Defendants should not benefit from the government's ongoing efforts to obscure DOGE's structure and membership. ........ 20

II. Plaintiffs' claims are not moot. ........ 26

A. Plaintiffs' injuries are redressable by this Court. ........ 27

B. Defendants have not met their heavy burden of proving that the conduct and policy Plaintiffs challenge cannot reasonably be expected to recur. ........ 34

CONCLUSION ........ 39

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*AFGE v. OPM*,
No. 25cv1237 (DLC), 2025 WL 3687548 (S.D.N.Y Dec. 19, 2025)............................... 38

*AFL v. DOL,*
No. 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026).................................. 38, 39

*AFSCME v. SSA*,
172 F.4th 361 (4th Cir. 2026) ..........................................................................passim

*AFSCME v. SSA*,
771 F. Supp. 3d 717 (D. Md. 2025)............................................................... 1nes18

*AFSCME v. SSA*,
778 F. Supp. 3d 685 (D. Md. 2025)...............................................................passim

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)........................................................................................ 12, 26, 34

*Burke v. Barnes*,
479 U.S. 361 (1987)........................................................................................... 35

*Chafin v. Chafin*,
568 U.S. 165 (2013)................................................................................ 3, 12, 26, 27

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992)........................................................................................... 28, 29

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)............................................................................................. 3

*Comite de Apoyo a los Trabajadores Agricolas v. U.S. Dep't of Labor*,
995 F.2d 510 (4th Cir. 1993) ............................................................................. 33

*Conservation Force, Inc. v. Jewell*,
733 F.3d 1200 (D.C. Cir. 2013) .......................................................................... 32

*Courthouse News v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) ............................................................................... 36

*Courthouse News Serv. v. Harris*,
No. ELH-22-0548, 2022 WL 17850125 (D. Md. Dec. 22, 2022) ........................ 11, 36, 37

*Cummings v. Missouri*,
71 U.S. (4 Wall.) 277 (1867). ........................................................................................ 34

*Deal v. Mercer Cnty. Bd. of Educ.*,
911 F.3d 183 (4th Cir. 2018) .................................................................................... 37, 38

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009) ........................................................................................ 32

*Democracy Forward Foundation v. SSA*,
Case No. 1:26-cv-1188 (D. Md. 2026) ............................................................................. 1

*Evans v. B.F. Perkins Co.*,
166 F.3d 642 (4th Cir. 1999) .......................................................................................... 22

*Fed. Bureau of Investigation v. Fikre*,
601 U.S. 234 (2024)..........................................................................................passim

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)............................................................................................ 34, 37, 39

*Genesis Healthcare, Inc., v. Becerra*,
39 F.4th 253 (4th Cir. 2022) ..................................................................................... 26, 32, 39

*Haaland v. Brackeen*,
599 U.S. 255 (2023)........................................................................................................ 34

*Karcher v. May*,
484 U.S. 72 (1987).......................................................................................................... 15

*Kremens v. Bartley*,
431 U.S. 119 (1977)........................................................................................................ 34

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ............................................................................................. 27

*Lighthouse Fellowship Church v. Northam*,
20 F.4th 157 (4th Cir. 2021) ........................................................................................... 35

*Mayor & City Council of Baltimore v. Trump*,
416 F. Supp. 3d 452 (D. Md. 2019)................................................................................. 11

*McMillan v. Erie Ins. Co.*,
*No. 1:25-cv-2444*, 2025 WL 3012887 (D. Md. Oct. 28, 2025) ........................................ 11

*Nat'l Treasury Emps. Union v. Vought,*
774 F. Supp. 3d 1 (D.D.C. 2025) ), *reh'g en banc granted, opinion vacated on other grounds*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) .................... 25

*New Mexico v. Musk*,
769 F. Supp. 3d 1 (D.D.C. 2025) ........................................................................... 25

*New Mexico v. Musk*,
No. 1:25-cv-429 (D.D.C. 2025) ............................................................................. 23

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
551 U.S. 701 (2007) ............................................................................................... 26

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ................................................................................. 36

*Reich v. Nat'l Eng'g & Contracting Co.*,
13 F.3d 93 (4th Cir. 1993) ................................................................................ 29, 30

*Rhodes v. Stewart*,
488 U.S. 1 (1988) (per curiam) .............................................................................. 33

*SSA v. AFSCME*,
145 S. Ct. 1626 (Mem.) (June 6, 2025) ................................................................... 8

*SSA v. AFSCME*,
Case No. 24A1063 (U.S. May 13, 2025) ........................................... 8, 16, 17, 34

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953) ............................................................................................... 35

**FEDERAL RULES**

Fed. R. Ci. P. 12(b)(1) .................................................................................. 4, 11, 22

Fed. R. Civ. P. 25(d) ............................................................................................... 15

**FEDERAL REGULATIONS**

Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ...................................... 4, 17, 20, 27

Exec. Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025) ............................................... 8, 17

**OTHER AUTHORITIES**

5C C. Wright & A. Miller, Federal Practice and Procedure § 1363(3d ed. 2004).......................... 4

American Oversight, *No Records Response from Various Agencies Regarding DOGE Teams* (April 24, 2025),https://perma.cc/ZV5P-24Z9 ..................................................... 23

Dep't. of Gov't Efficiency (@DOGE), X (Nov. 24, 2025), https://perma.cc/UZ7K-YMM3.................................................................................................................. 18

Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://perma.cc/L8BJ-X6H3 ........................................................................................ 4

*Full Transcript of President Trump's Speech to Congress*, N.Y. Times (March 4, 2025), https://perma.cc/AT4N-WRDY.................................................................... 23

Hannah Natanson and Lisa Rein, *Inside DOGE's push to defy a court order and access Social Security data*, Wash. Post. (Apr. 15, 2025), https://perma.cc/4V4H-755Y ................................................................. 2, 7, 16, 22

Hannah Northey & Danny Nguyen, *Ikea beds? Dressers? Inside the 'exceedingly odd' DOGE office setup*, Politico (Mar. 6, 2026), https://perma.cc/LL57-T8A7. ............................................................................................................... 23

Jory Heckman, *DOGE and its long-term counterpart remain, with a full slate of modernization projects underway*, Fed. News Network (Nov. 25, 2025), https://perma.cc/FN5L-54TU ............................................................................ 2, 19

Letter from Congressman Robert Garcia to Frank Bisignano (March 9, 2026), https://perma.cc/VZF5-MNNH.......................................................................................... 22

Letter from Senator Ron Wyden to Senator Michael Crapo (Mar. 28, 2025), https://perma.cc/7B9G-EAEZ.......................................................................................... 22

LinkedIn Post, U.S. DOGE Service (Apr. 19, 2026), https://perma.cc/J7Q3-YVXC.................. 19

LinkedIn Post, U.S. DOGE Service (Mar. 5, 2026), https://perma.cc/QQY8-59R8.................... 20

LinkedIn Post, U.S. DOGE Service (Nov. 25, 2025), https://perma.cc/4YHF-UZ2G................. 18

Lisa Rein et al., *DOGE is driving Social Security cuts and will make mistakes, acting head says privately*, Wash. Post (Mar. 6, 2025), https://perma.cc/FYY3- ......................... 6

Madison Alder, *Tech talent, authority to operate among federal CIO's 2026 priorities*, FedScoop (Dec. 9, 2025), https://perma.cc/3RVZ-LJL4 ................................ 19

Madison Alder, *US DOGE Service is alive and growing, organization official says*, FedScoop (April 14, 2026), https://perma.cc/4KAL-ZVUY .............................................. 2

Makena Kelly & Vittoria Elliott, *DOGE Isn't Dead: Here's What Its Operatives Are Doing Now,* Wired (Dec. 2, 2025),https://perma.cc/Z39F-Z8CL ..................................... 25

Sasha Rogelberg, *DOGE isn't dead–it's been absorbed into the bloodstream of the government, federal employees say*, Fortune (Dec. 12, 2025), https://perma.cc/PNA4-8MD2 ......................................................................... 3, 25

SSA Whistleblower Statement to Senator Ron Wyden (Mar. 24, 2025), https://perma.cc/2V4P-3PLP ............................................................................. 22

## INTRODUCTION

Much has occurred in the fifteen months since Plaintiffs filed this case. Former Social Security Administration Chief Data Officer Chuck Borges filed a whistleblower report regarding "serious data security lapses, evidently orchestrated by DOGE officials . . . employed as SSA employees, that risk the security of over 300 million Americans' Social Security data." Ex. A at 6.[1] Defendants themselves disclosed that certain information in two sworn declarations from top SSA officials was not truthful when provided to the Court, that Defendants violated the then-active temporary restraining order on at least two occasions, and that DOGE personnel at SSA signed a Voter Data Transfer Agreement with a "political advocacy group" focused on overturning election results in certain States. ECF 197, Notice of Corrections to the Record ("Notice").[2] Defendants further admitted that Plaintiffs' members' private data, meant to be held in trust by SSA, had been shared not just with DOGE, but further: data was both sent to the agency responsible for immigration enforcement and placed on a third-party server without governmental security controls. *Id.* Moreover, as of January 16, 2026, the SSA DOGE Team continued to seek access to and use the public's sensitive PII for purposes other than carrying out the projects described in the Executive Order establishing DOGE.[3] Most recently, the Washington Post reported on credible allegations made to the SSA Inspector General—but never disclosed by Defendants in this case—that an unidentified "U.S. DOGE Service employee" claimed "that he possessed two tightly restricted [SSA] databases of U.S. citizens' information," "had at least one on a thumb drive," and

---

[1] Where applicable, citations in this filing refer to a document's ECF pagination.

[2] While Defendants initially described the document as a "Voter Data Agreement," a redacted version subsequently released by the agency in response to FOIA litigation, *Democracy Forward Foundation v. SSA*, Case No. 1:26-cv-1188 (D. Md. 2026), is captioned "Voter Data Transfer Agreement." *Compare* ECF 197 at 5, *with* ECF 216-1 at 11.

[3] In other sections of the Notice, Defendants affirmed that SSA believed that statements in various declarations were accurate when those statements were made and that SSA believes those statements are "accurate today." ECF 197 at 2, 6. But Defendants conceded that the statements about the DOGE Team's need for access to SSA records were, even at the time the Notice was filed, only "largely" accurate. *Id.* at 5.

intended to use that information in his post-DOGE work at a private-sector employer. ECF 208 at 1; ECF 208-1.

All the while, the U.S. DOGE Service has continued to boast that DOGE is "actively growing" and has "brought on a lot of staff within just the last few months . . . that are deployed across a lot of agencies."[4] Indeed, DOGE has bragged about its ongoing work "[s]trengthening Medicare's digital experience" and its efforts to "fix" government systems that Americans use to access "benefits."[5] Medicare benefits, of course, are administered by SSA, which is "the nation's principal benefit-paying agency." *AFSCME v. SSA*, 778 F. Supp. 3d 685, 701 (D. Md. 2025) (quoting ECF 17 ¶ 28). "DOGE Associate[]"[6] Michael Russo remains as SSA's Chief Information Officer, with extensive access to SSA data systems. Mark Steffensen, a "DOGE ally" who reportedly pressured SSA lawyers "to issue a memo giving DOGE access to Social Security data,"[7] is still acting as the agency's General Counsel and Head of Law, Policy, and Legislative Affairs. And multiple copies of sensitive PII datasets, misappropriated by DOGE affiliates and spirited from the building both physically and electronically, remain loose in the wild.[8]

Against that background, Defendants ask this Court to deem Plaintiffs' claims moot and dismiss this case. The strategy is obvious. Defendants, faced with the prospect of limited discovery into wrongdoing they were forced to disclose, have resorted to mischaracterizing Plaintiffs' claims and amplifying the administration's ongoing efforts to obscure DOGE's structure and the identity of its affiliates. But the story that Defendants tell—that SSA no longer has a DOGE team, that

---

[4] Madison Alder, *US DOGE Service is alive and growing, organization official says*, FedScoop (April 14, 2026), https://perma.cc/4KAL-ZVUY.
[5] Jory Heckman, *DOGE and its long-term counterpart remain, with a full slate of modernization projects underway*, Fed. News Network (Nov. 25, 2025), https://perma.cc/FN5L-54TU.
[6] ECF 22-10, Flick Decl., ¶ 9.
[7] Hannah Natanson and Lisa Rein, *Inside DOGE's push to defy a court order and access Social Security data*, Wash. Post. (Apr. 15, 2025), https://perma.cc/4V4H-755Y.
[8] *See, e.g.*, ECF 208, 208-1.

there are no longer any DOGE affiliates at SSA, and that the scheduled expiration of the DOGE Temporary Organization is somehow critical here—is both immaterial and implausible. And their arguments fall against decades of case law making clear that (1) "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks omitted); and (2) defendants, including the government, cannot automatically render a case moot by voluntarily ceasing their offending conduct partway through litigation, *FBI v. Fikre*, 601 U.S. 234, 241 (2024). Here, Plaintiffs' claims and requests for relief remain as live as ever. Plaintiffs' members' injuries are redressable by relief from this Court, and Defendants have not met their "heavy burden" of proving that "no reasonable expectation remains" that Defendants will return to their "old ways." *Id.* at 241–42 (citation and internal quotation marks omitted). This case is not moot, and this Court thus "has a 'virtually unflagging obligation' to hear and resolve" Plaintiffs' claims. *See id.* at 240 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

This Court should not be fooled. Even if individual DOGE staffers have left SSA, and regardless of the status of the DOGE Service Temporary Organization after July, DOGE operatives remain "tangled in the oversight of individual government agencies," including SSA.[9] Claiming that DOGE no longer exists is, as one government employee told the media, "like taking the dust jacket off of the book and saying, 'We've got rid of the book.'" *Id.* Defendants' motion has no merit, and it should be denied.[10]

[9] Sasha Rogelberg, *DOGE isn't dead–it's been absorbed into the bloodstream of the government, federal employees say*, Fortune (Dec. 12, 2025), https://perma.cc/PNA4-8MD2.
[10] Plaintiffs consent, however, to the dismissal of Count VII, their claim challenging the appointment of former SSA Acting Commissioner Leland Dudek. *See* ECF 17 ¶¶ 130–35.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 12, 2024, President-Elect Trump announced his intent to create a "Department of Government Efficiency" to "provide advice and guidance from outside of Government" to "the White House and Office of Management & Budget" and to help "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[11] ECF 17, Am. Compl., ¶ 47.[12] Shortly after his inauguration, President Trump signed an executive order "establish[ing] the Department of Government Efficiency to implement the President's DOGE Agenda." Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) § 1. That executive order renamed the existing United States Digital Service as "the United States DOGE Service (USDS) established in the Executive Office of the President" and "further established within USDS . . . a temporary organization known as 'the U.S. DOGE Service Temporary Organization.'" *Id.* § 3(b). Barring renewal or extension, the executive order provided that the U.S. DOGE Service Temporary Organization would terminate on July 4, 2026. *Id.* But the Order explicitly provided that termination of the temporary organization "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id.* One such provision required each agency head to "establish within their respective Agencies a DOGE Team of at least four employees," *id.* § 3(c), and another instructed agency heads to "take all necessary steps . . . to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," *id.* § 4(b). *See also* ECF 17 ¶¶ 48–52; *AFSCME v. SSA*, 778 F. Supp. 3d at 706–07.

---

[11] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://perma.cc/L8BJ-X6H3.

[12] "'The general rule' for Rule 12(b)(1) motions challenging subject-matter jurisdiction is to take allegations 'as true unless denied or controverted by the movant.'" *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 237 n.1 (2024) (quoting 5C C. Wright & A. Miller, Federal Practice and Procedure § 1363, p. 107 (3d ed. 2004)).

Following President Trump's inauguration, DOGE personnel "sought and in most instances obtained unprecedented access to information systems across numerous federal agencies." ECF 17 ¶ 57. DOGE affiliates "min[ed] data from and [work]ed within multiple agencies at the same time," engaging in "unauthorized cross-agency access" that "allow[ed] DOGE to collect sensitive information from multiple agency systems" and "combine and cross-reference data in ways never contemplated by each agency's security policies and/or safeguards." *Id.* ¶ 58. DOGE also publicly disclosed agency data, including by posting "sensitive SSA system code" on a public platform. *Id.* ¶ 59; *see also AFSCME v. SSA*, 778 F. Supp. 3d at 724 (collecting "analogous cases involving agency dissemination of PII to DOGE personnel").

In January 2025, senior SSA executive Tiffany Flick was informed that "some members of DOGE requested to be on-site immediately and wanted to come to [SSA] Headquarters that day." Flick Decl., ECF 22-10 ¶¶ 2, 9. One such DOGE member was incoming SSA Chief Information Officer Michael Russo, a "DOGE associate[]" who "introduced himself as a DOGE representative to multiple employees on multiple occasions." *Id.* ¶¶ 9, 11; *id.* ¶ 22 (alleging, without contradiction, that Mr. Russo "was actually reporting to DOGE."). As detailed in Plaintiffs' Amended Complaint, DOGE spent the next two weeks "ransack[ing] the agency, installing DOGE associates without proper vetting or training," and "demanding access to some of the agency's most sensitive data systems." ECF 17 ¶ 83. The agency "gave DOGE access to numerous data systems" while closing its Office of Transformation, which was dedicated to the digital modernization of agency programs and services, including improving the agency's website. *Id.* ¶¶ 76, 86; *see also AFSCME v. SSA*, 778 F. Supp. 3d at 753 (describing Ms. Flick's declaration as "unrefuted").

On March 4, 2025, then-Acting SSA Commissioner Leland Dudek acknowledged that the "U.S. DOGE Service [was] calling the shots," saying: "Things are currently operating in a way I

have never seen in government before."[13] Three days later, Plaintiffs filed an Amended Complaint bringing claims against the Social Security Administration, SSA's Acting Commissioner, and SSA's Chief Information Officer (collectively, the "SSA Defendants") and the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization, the DOGE Acting Administrator, and Elon Musk (collectively, the "DOGE Defendants"). ECF 217 at ¶¶ 19–27.

The Amended Complaint brings five counts against SSA and the other SSA Defendants. Plaintiffs allege that SSA "abandoned its commitment to maintaining the privacy of personal data" by "open[ing] its data systems to unauthorized personnel from [DOGE]," *id.* ¶ 2, and they challenge both "[t]he decision to grant DOGE personnel access to the extensive records that SSA maintains" and any "future decisions to do so," *id.* ¶ 94. Plaintiffs detail injuries specific to "DOGE's access" to their personally identifiable information, *id.* ¶ 2, as well as DOGE's "ab[ility] to cross-reference and potentially cross-contaminate information from different, previously secure and segregated sources," *id.* ¶ 5, and the Executive Branch's attempt to "seize and maintain access to agency systems, including SSA's," *id.* ¶ 9. Moreover, Plaintiffs allege that all Defendants "harmed Plaintiffs' members by depriving them of privacy protections guaranteed by federal law and by making their information available for, and subject to, investigation by DOGE and scammers," as well as by making their PII "more easily accessed and abused by malicious actors." *Id.* ¶ 97. Plaintiffs specifically challenge a series of actions by SSA and its leadership, including their disclosure of personal records contained in systems of records under SSA's control and entry into inter-agency data sharing agreements without abiding the process prescribed by law, *id.* ¶¶ 101, 102, 108, 109; their decision to unlawfully permit the DOGE Defendants to access and inspect tax return information protected by the Internal Revenue Code and the Social Security Act,

[13] Lisa Rein et al., *DOGE is driving Social Security cuts and will make mistakes, acting head says privately*, Wash. Post (Mar. 6, 2025), https://perma.cc/FYY3-QGRR; *see also* ECF 17 ¶ 81.

*id.* ¶ 114; their choice to "administer[] systems containing vast quantities of sensitive personal information without complying with statutorily required security protections, *id.* ¶ 118; and their disclosure of "an unfathomable amount of sensitive, personally identifying information about the American public without acknowledging that SSA was changing its policies, identifying the source of its authority to do so, or providing any analysis whatsoever of why its decision [was] not arbitrary and capricious," much less "considering the consequences," *id.* ¶ 122.

Plaintiffs also allege that the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization—not any individual employees serving on or detailed to a particular DOGE "team"—"breached secure government systems and caused the unlawful disclosure of the personal data of hundreds of millions of people," injuring Plaintiffs' members by "exposing their sensitive, private, and personally identifiable information and increasing the risk of further disclosure and misuse thereof." *Id.* ¶¶ 126, 129. In summary, Plaintiffs seek to "protect [themselves] and their members against the ongoing (and ever increasing) harm caused by DOGE and certain SSA executives' unlawful seizure of personal, private, and sensitive data from SSA systems," as well as from the "unauthorized use of that data." *Id.* ¶ 13.

This Court issued a temporary restraining order (ECF 48, 49) and preliminary injunction (ECF 146, 147, 157) on March 20, 2025, and April 17, 2025, respectively,[14] basing both on only one of Plaintiffs' theories of harm. *See, e.g.*, *AFSCME v. SSA*, 778 F. Supp. 3d at 728 n.26. The preliminary injunction enjoined SSA, Leland Dudek, Michael Russo, and a series of entities and individuals that included "members of the DOGE Team established at the Social Security

---

[14] After the Court issued the temporary restraining order, then-Acting SSA Commissioner Leland Dudek threatened to shut down the agency, and DOGE personnel "sought for weeks" to get around the order, leading "the Justice Department to intervene to deny DOGE access" and resulting in the "physical removal . . . of a top career executive, who had been warned he would be fired if he kept refusing to let DOGE into Social Security's systems." Natanson and Rein, *supra* note 7.

Administration" but also "the Department of Government Efficiency ('DOGE'); the United States DOGE Service; the United States DOGE Service Temporary Organization"; and, among others, "any DOGE Affiliate(s)." ECF 147 ¶ 1(a). And the Court ordered that the "U.S. DOGE Service, U.S. DOGE Service Temporary Organization . . . [and] all SSA DOGE Team members and DOGE Affiliates—not just members of the SSA DOGE Team—disgorge and delete all non-anonymized PII data [from SSA] in their possession or under their control." *Id.* ¶ 1(b).

The Court explicitly recognized that "the members of the DOGE Team and the number of people on the DOGE Team may change," which is why the preliminary injunction did not refer to the then-current members of the DOGE Team as individuals. *Id.* ¶ 11(a). And it defined "DOGE Affiliate" to mean "any employee, agent, officer, contractor, special government employee, or consultant employed by *or affiliated in any way* with the Department of Government Efficiency, the United States DOGE Service, the United States DOGE Service Temporary Organization, members of the DOGE Team established at the Social Security Administration; any SSA employee, contractor, special government employee, or consultant *working on or implementing the DOGE agenda; anyone who has been granted access by SSA to SSA records for the purpose of implementing the DOGE agenda with respect to SSA; and any persons working, directly or indirectly, in concert with any of the above individuals*." *Id.* ¶ 11(b) (emphases added).

Defendants subsequently sought and received a stay of the preliminary injunction from the U.S. Supreme Court. *SSA v. AFSCME*, 145 S. Ct. 1626 (Mem.) (June 6, 2025). At the Supreme Court, Defendants for the first time invoked an additional executive order to justify DOGE's work. Appellants' Reply in Support of Stay Application at 10, *SSA v. AFSCME*, Case No. 24A1063 (U.S. May 13, 2025). That executive order was aimed at "eliminating bureaucratic duplication and inefficiency" and "enhancing the Government's ability to detect overpayments and fraud." Exec.

Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025). It directed agencies to tear down information silos and "ensure Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records, data, software systems, and information technology systems," including by "authorizing and facilitating both the intra- and inter-agency sharing and consolidation of unclassified agency records." *Id.* § 3(a).

Defendants also appealed the preliminary injunction. During the appeal's pendency, former SSA Chief Data Officer Chuck Borges filed a whistleblower complaint reporting "serious data security lapses" at the agency, which were "evidently orchestrated by DOGE officials" then "employed as SSA employees," including two members of the SSA DOGE Team, current SSA Chief Information Officer Michael Russo, and a third individual who Defendants have never identified as a member of the SSA DOGE Team in these proceedings. Ex. A at 6–7.[15] Mr. Borges, a career civil servant, described DOGE personnel's creation of a "live copy of the country's Social Security information in a cloud environment that circumvents oversight." *Id.* at 8.

Many months later, while the appeal sat fully briefed, argued, and pending decision, SSA filed a "Notice of Corrections to the Record." ECF 197. As Judge King later wrote, the Notice disclosed that "SSA and the other defendants provided patently false information to the district court" and, in so doing, made clear that the courts "should not accord the defendants any benefit of the doubt or readily trust in anything they say." *AFSCME v. SSA*, 172 F.4th 361, 394 (4th Cir. 2026) (en banc) (King, J., concurring). As detailed by Judge King, the Notice disclosed that SSA "falsely assured the district court of compliance with the TRO," "failed to disclose the full extent of the DOGE affiliates' systems access," and "falsely advised the district court that no DOGE

[15] Exhibit A contains a sworn declaration by Mr. Borges affirming that his whistleblower disclosure and subsequent prohibited personnel practice complaint, both of which are appended to his declaration, accurately reflect his personal knowledge and experience. Ex. A at 2 (¶ 6), 3 (¶ 8).

affiliate other than those assigned to SSA had ever had access to SSA records, that SSA had safeguards in place that would prevent DOGE affiliates from violating SSA security protocols and integrating SSA systems with outside servers, and that the DOGE affiliates' work at SSA had been limited to technology upgrades and fraud, waste, and abuse detection within the agency." *Id.* The Notice also admitted "repeated violations of the TRO and multiple incidents of the DOGE affiliates' misuse and mishandling of SSA records," including, among other things, DOGE affiliates' use of a "shared workspace" and "data visualization tool" that allowed them to pool individual grants of data access; a DOGE affiliate's transmission of a file believed to contain the PII of nearly 1,000 people to the DOGE umbrella organization and the Departments of Homeland Security and Labor; DOGE affiliates' exchange of PII through an unsecure and unapproved third-party server; and one DOGE affiliate's entry into a Voter Data Transfer Agreement with an unnamed political organization seeking to overturn state election results. *See id.* at 394–95.

Plaintiffs promptly moved to lift the stay governing the district court proceedings and sought permission to propound limited discovery pertaining to the Notice and the misconduct detailed therein. ECF 200. While that motion was pending, the Washington Post reported on credible allegations, first made to the SSA Inspector General on January 9, 2026—but never disclosed to Plaintiffs or the Court—that an unidentified "U.S. DOGE Service employee" claimed "that he possessed two tightly restricted [Social Security Administration] databases of U.S. citizens' information," "had at least one on a thumb drive," and intended to use that information in his post-DOGE work at a private-sector employer. *See* ECF 208, 208-1.

The en banc Fourth Circuit issued its opinion on April 10, 2026. The court affirmed that Plaintiffs have standing to pursue their claims, explaining that "disclosing plaintiffs' members' personally identifiable information to DOGE inflicts a harm that is a 'close . . . analogue' to the

common law tort of intrusion upon seclusion" and that Plaintiffs' members' injuries were "caused by the defendant[s]" and "would likely be redressed by judicial relief." *AFSCME v. SSA*, 172 F.4th at 368, 368 n.5. While the Fourth Circuit vacated the preliminary injunction, several judges noted that "[o]n remand . . . the parties will be able to introduce further evidence on [the Notice and whistleblower reports,] and the district court will be free to consider any future requests for appropriate relief or corrective action." *Id.* at 371 n.8.

Shortly thereafter, this Court granted Plaintiffs' pending motion to lift the stay and authorize limited discovery, emphasizing that the Fourth Circuit's opinion "makes clear that discovery is appropriate." ECF 212 ¶ 15. But after Plaintiffs propounded their discovery requests, Defendants asked the Court to deem its discovery order improvidently granted and rescind the same. Defendants' motion to rescind, ECF 215, argued almost exclusively that this Court should forestall discovery until it considered a speculative future motion to dismiss for lack of jurisdiction based on mootness. That motion is the subject of this brief. *See* ECF 217.

## LEGAL STANDARD

Under Rule 12(b)(1), plaintiffs bear the burden of proving the existence of subject matter jurisdiction. *McMillan v. Erie Ins. Co.*, No. 1:25-cv-2444, 2025 WL 3012887, at *3 (D. Md. Oct. 28, 2025) (collecting cases). But they must do so only "by a preponderance of evidence." *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019). And "a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Courthouse News Serv. v. Harris*, No. 1:22-cv-0548, 2022 WL 17850125, at *14 (D. Md. Dec. 22, 2022) (quotation marks omitted).

"[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party,'" *Chafin*, 568 U.S. at 172 (citation omitted), and a defendant may not moot a case "by the simple expedient of suspending its challenged conduct after it is sued," *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241–42 (2024) (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). On the contrary: a defendant asserting mootness must meet the "heavy burden" of proving that "'no reasonable expectation' remains that it will 'return to [its] old ways.'" *Id.* (citation omitted) (alteration in original).

**ARGUMENT**

Defendants' motion to dismiss Plaintiffs' claims as moot would shield Defendants from the limited discovery this Court has already authorized in light of the Fourth Circuit's en banc decision allowing this case to proceed. It is based on factual assertions that are immaterial, as Plaintiffs' claims are not specific to the existence of the DOGE Team, the identity of its members, or the existence of the DOGE Temporary Organization. The same factual assertions, which are supported by a single, self-serving affidavit, are also implausible at best. Rumors of DOGE's demise have been greatly exaggerated, and DOGE personnel remain at SSA. Defendants' claims otherwise reflect nothing more than the government's ongoing efforts to obscure DOGE's structure and membership and make it harder to hold the Administration to account.

More fundamentally, this case is not moot for two reasons: First, Plaintiffs' members' injuries remain redressable through both injunctive and declaratory relief. New equitable relief will both mitigate the irreparable harm Plaintiffs' members have already suffered and prevent additional irreparable injury, and a declaratory judgment declaring SSA's data-access policies unlawful is necessary to forestall future harm. Second, Defendants do not come close to meeting their heavy burden of proving that the conduct and policies that Plaintiffs challenge cannot

reasonably be expected to recur. The single, self-serving affidavit accompanying their motion does not demonstrate or ensure that Defendants will not resume the misconduct giving rise to this case.

## I. Defendants' factual assertions are immaterial and implausible.

### A. Plaintiffs' claims are not specific to the existence of the DOGE Team, the identity of its members, or the existence of the U.S. DOGE Service Temporary Organization.

Defendants inaccurately assert that "Plaintiffs filed this action to enjoin the Social Security Administration's ('SSA') DOGE Team from accessing SSA records." ECF 217-1, Mem. in Support of Mot. to Dismiss ("MTD"), at 7. Not so. Plaintiffs challenge, among other things, what this Court has described as the SSA Defendants' decisions, "akin to a binding agency opinion," to adopt a new data-access policy "that established DOGE's entitlement to access PII, notwithstanding the Agency's customs, practices, policies, and procedures." *AFSCME v. SSA*, 778 F. Supp. 3d at 756. References to SSA's decision to allow "the DOGE Team access to the PII of millions of Americans," *id.* at 757, reflect the details made available to the Court and Plaintiffs *by Defendants*, not the substance of Plaintiffs' claims or the types of injury they suffer.

Plaintiffs' Amended Complaint challenges SSA's "decision to grant DOGE personnel access to the extensive records that SSA maintains," SSA's decision to share data in its systems with other federal agencies "without abiding the process prescribed by law," and "DOGE's access" to SSA data systems." ECF 17 ¶¶ 2, 94, 102. And it alleges that Defendants' actions harm Plaintiffs by "depriving them of privacy protections guaranteed by federal law and by making their information available for, and subject to, investigation by DOGE and scammers." *Id.* ¶ 97. Plaintiffs did not limit their claims to, nor even bring any claims against, the *SSA DOGE Team*. Rather, their pleadings allege that the *SSA Defendants*, including the Social Security Administration and Messrs. Dudek and Russo, in their official capacities, *id.* ¶ 22:

- "[D]isclosed and continue to disclose personal records contained in systems of records under their control," *id.* ¶¶ 101, 108; and "entered inter-agency data sharing agreements without abiding [by] the process prescribed by law," *id.* ¶¶ 102, 109;
- "[U]nlawfully permitted DOGE Defendants to access and inspect tax return information" protected by the Internal Revenue Code and the Social Security Act, *id.* ¶ 114 (internal citations omitted);
- "[A]dministered systems containing vast quantities of sensitive personal information without complying with statutorily required security protections," *id.* ¶ 118; and
- "[D]isclosed an unfathomable amount of sensitive, personally identifying information about the American public without acknowledging that SSA was changing its policies, identifying the source of its authority to do so, or providing any analysis whatsoever of why its decision is not arbitrary and capricious, and without considering the consequences, including to the reliance interests of Plaintiffs and their members," *id.* ¶ 122.

*See also AFSCME v. SSA*, 778 F. Supp. 3d at 735 (adopting the same definition of "SSA Defendants"). Plaintiffs also bring a claim against the "DOGE Defendants," which include the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization, Mr. Musk, and Ms. Gleason, but not members of the SSA DOGE Team, for "directing and controlling the use and administration" of SSA systems; "breach[ing] secure government systems and caus[ing] the unlawful disclosure of the personal data of hundreds of millions of people"; and "engag[ing] (and continu[ing] to engage) in *ultra vires* actions that injure Plaintiffs' members by exposing their sensitive, private, and personally identifiable information and increasing the risk of further disclosure and misuse thereof." ECF 17 ¶¶ 27, 126, 129.

The above-detailed claims, and Plaintiffs' alleged injuries, extend far beyond the individual members of the SSA DOGE Team. *See, e.g.*, ECF 17 ¶ 97 (alleging harm based on the risk that Plaintiffs' members' improperly disclosed information "is more easily accessed and abused by malicious actors"). This Court has likewise described Plaintiffs' suit as "challenging the legality of the Agency's decision to provide DOGE with unlimited access to a trove of personal and confidential information pertaining to millions of Americans" and explained that members of each

Plaintiff organization are concerned about "DOGE's access" to their information. *AFSCME v. SSA*, 778 F. Supp. 3d at 699, 705; *id.* at 709 ("Plaintiffs assert that DOGE and the DOGE Team 'have wrought havoc' on SSA") (citation omitted). The Fourth Circuit also acknowledged that Plaintiffs "sued to prevent *DOGE* from accessing their members' personally identifiable information." *AFSCME v. SSA*, 172 F.4th at 365 (emphasis added). Declarations by Plaintiffs' members further underline that the existence and membership of the "SSA DOGE Team" have little relevance to their claims. *See, e.g.*, ECF 22-9, Gray Decl., ¶ 10 ("My anxiety is at an all-time high because of the threats to my personal information and my benefits that come from DOGE access to sensitive information like my Social Security information."); ECF 22-4, Imperiale Decl., ¶ 8 ("I am experiencing great distress over the possibility of my private data being accessed by DOGE . . . ."); ECF 111-6, Somo Decl., ¶ 9 ("DOGE having access to my sensitive information is almost like someone breaking into my house and stealing stuff. It's a horrible feeling . . . ."). None of these harms turn on the identity of the specific individuals whose employee badges, business cards, or email signatures say "SSA DOGE Team."

Defendants' argument that claims against a federal agency become moot when specific federal employees leave that agency would yield absurd results. Under Defendants' rationale, any lawsuit seeking any form of injunctive or declaratory relief against any federal department could be mooted by the agency informing the court that the individual who undertook the action had quit. That is not even the law where a named public official *is* the defendant. *See* Fed. R. Civ. P. 25(d); *Karcher v. May*, 484 U.S. 72, 83 (1987) ("The rules effectuating automatic substitution of public officers were specifically designed to prevent suits involving public officers from becoming moot due to personnel changes."). It certainly cannot be the case when the *agency itself* is sued.

Indeed, Defendants themselves characterize a DOGE Team member's execution of a Voter Data Transfer Agreement with a third-party group seeking to overturn state election results as having been done "in his capacity *as an SSA employee*." ECF 197, Notice of Correction, at 5 (emphasis added).[16] That phrasing suggests that it is a DOGE affiliate's access to SSA systems and data, not their membership on the SSA DOGE Team, that is most relevant. Guidance issued by SSA's general counsel in March 2025 reflects the same, reportedly defining DOGE Team members as "anyone (e.g., employees, contractors, special government employees, or consultants) working on the DOGE agenda and anyone, directly or indirectly, working with or being directed by DOGE."[17] In contrast, Ms. Felix-Lawson appears to use a different definition of "DOGE Team" membership than the SSA general counsel's definition. She characterizes a previously unknown DOGE affiliate at SSA as "not on SSA's DOGE Team" despite public reports of his association with DOGE and former SSA Chief Data Officer Chuck Borges's identification of the individual as a key DOGE actor at the agency. ECF 217-2, Felix-Lawson Decl., ¶ 5; *see* Ex. A at 7, 7 n.3. Indeed, it has at times been so unclear whether certain staffers at SSA were or were not members of the DOGE Team at the agency that former Acting Commissioner Leland Dudek, "not realizing [that a newly hired] staffer was a member of the DOGE team," reportedly granted that staffer "access to some of the agency's data" in violation of this Court's temporary restraining order.[18]

Defendants' own strategic decisions likewise belie the weaknesses in their argument that the departure of previous SSA DOGE Team members has any significant bearing on this case. For example, even if the Court were to take as true Defendants' assertions that "SSA no longer has a

[16] Plaintiffs do not concede that DOGE personnel at SSA, including members of the SSA DOGE Team, are in fact properly employees of the agency. *See, e.g.*, *SSA v. AFSCME*, Appellees' Response Opposing Stay Application, Case No. 24A1063, at 28–29 (U.S. May 12, 2025); ECF 183, Pls' Opp. to Defs.' First Mot. Dismiss, at 26–27. The point is only that Defendants themselves attribute a DOGE Team member's conduct to his capacity as an SSA employee.
[17] Natanson and Rein, *supra* note 7.
[18] *Id.*

DOGE Team or any DOGE-affiliated employees," MTD at 14, Defendants' own evidence states that the absence of the DOGE Team or any DOGE affiliates was established as early as February 2, 2026. ECF 217-2, Felix-Lawson Decl., ¶ 7. Yet Defendants did not alert the Court to this supposed mootness until April 21, 2026, ECF 215, and did not file the instant motion until May 1, ECF 217. Nor did Defendants raise the argument before the Fourth Circuit, which did not issue its opinion in this case until April 10, 2026. Indeed, no whisper of this argument appeared until the district court authorized limited discovery and Plaintiffs propounded their requests.

Finally, that the U.S. DOGE Service Temporary Organization is scheduled to expire on July 4, 2026, is even less compelling. First, as explained above, none of Plaintiffs' claims rely on the existence of that entity. Second, the "expiration date" has been known since before this case was filed. *See* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025). The date growing closer no more renders this case moot than its existence did when Plaintiffs first sued. Third, the Executive Order creating DOGE specifically states that termination of the temporary organization "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id.* at § 3(b). Fourth, the "expiration date" has not yet arrived, and Defendants cite no law in support of their proposition that courts may dismiss cases as moot in mere anticipation of events expected to occur months in the future. Nor did they raise this argument before the Fourth Circuit, which issued its opinion only 11 days before Defendants first claimed mootness here. Finally, the argument runs counter to Defendants' statements to the Supreme Court, where they grounded DOGE's need for unfettered access to PII in SSA systems not just in Executive Order 14,158 but also in Executive Order 14,243, which has no expiration date. *See* Appellants' Reply in Support of Stay App., Case No. 24A1063, at 10 (U.S. May 13, 2025); Exec. Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025).

**B. DOGE is alive and well.**

Regardless of the DOGE Temporary Organization's future expiration, the U.S. DOGE Service, a named defendant in this case, persists. And, as USDS Director and Centers for Medicare and Medicaid Services Senior Advisor Chase Ausley told the media just last month, DOGE is "actively growing" and has "brought on a lot of staff within just the last few months . . . that are deployed across a lot of agencies."[19] Indeed, the agency has three directors whose job it is to "oversee the organization's work at various agencies." *Id.* Although Mr. Ausley indicated that DOGE was no longer focused on "reduction-in-force and contract slashing," he emphasized that DOGE continues to focus on "driving technology strategies for agencies." *Id.*; *see also* ECF 113, Defs.' Resp. Opposing Prelim. Inj., at 23 (describing DOGE and agency DOGE Teams as being charged with modernizing technology and coordinating on ways to maximize efficiency and productivity). And the administration has made clear through other channels that DOGE and its work will continue. For example, the day after *Reuters* reported on comments that DOGE no longer existed in November 2025, the official DOGE LinkedIn account posted the following:

> Despite the reporting by the media, nothing has changed with the U.S. DOGE Service and it still exists as defined by the Establishing and Implementing the Department of Government Efficiency Executive Order. Both the temporary org and U.S. DOGE Service (previously U.S. Digital Service) are still operational. In addition to the staff hired directly into the agency DOGE teams, the U.S. DOGE Service partners with agencies on projects that modernize critical systems, improve public services, deliver fast, practical solutions where the country needs them most, and eliminate fraud, waste and abuse.[20]

On X (formerly Twitter), the agency characterized reports of its demise as "fake news" and emphasized that "President Trump was given a mandate by the American people to modernize the federal government and reduce waste, fraud, and abuse."[21] *See also* ECF 36-1, Russo Decl., ¶ 5

---

[19] Alder, *supra* note 4.
[20] LinkedIn Post, U.S. DOGE Service (Nov. 25, 2025), https://perma.cc/4YHF-UZ2G.
[21] Dep't of Gov't Efficiency (@DOGE), X (Nov. 24, 2025), https://perma.cc/UZ7K-YMM3.

(contending that the "overall goal of the work performed by SSA's DOGE Team is to detect fraud, waste, and abuse in SSA programs"); *AFSCME v. SSA*, 771 F. Supp. 3d at 734 (describing Defendants' counsel's acknowledgment that SSA had "provided DOGE affiliates with access to a 'massive amount' of records" and his "claim[ing] that such access is needed so that DOGE personnel can search for 'improper or fraudulent payments'"). In December, federal Chief Information Officer Greg Barbaccia explained that "[w]hile the more centralized organization has been dispersed," the DOGE teams assigned to agencies are "alive and well" and "embedded within those organizations."[22] And just one month ago, DOGE posted the following on LinkedIn:[23]




Nor can Defendants credibly claim that DOGE is no longer working at SSA or seeking access to and/or using PII stored in the agency's systems of record. In November 2025, a DOGE spokesperson included the following on a list of current U.S. DOGE Service projects: "Strengthening Medicare's digital experience with better security, fraud reporting, caregiver access and reduced paper burden."[24] As this Court has noted, SSA assists in the administration of

---

[22] Madison Alder, *Tech talent, authority to operate among federal CIO's 2026 priorities*, FedScoop (Dec. 9, 2025), https://perma.cc/3RVZ-LJL4.
[23] LinkedIn Post, U.S. DOGE Service (Apr. 19, 2026), https://perma.cc/J7Q3-YVXC (image cropped).
[24] Heckman, *supra* note 5.

Medicare benefits. *AFSCME v. SSA*, 778 F. Supp. 3d at 705 (quoting ECF 17 ¶ 33). And on March 5, 2026, more than one month after Defendants say the last member of the SSA DOGE Team stopped work at the agency, *see* ECF 217-2 ¶ 7, the U.S. DOGE Service's official LinkedIn account wrote that DOGE was "working to fix" government systems because Americans deserve, in part, "easy access to benefits."[25] SSA, of course, is "the nation's principal benefit-paying agency." *Id.* at 701 (quoting ECF 17 ¶ 28).

Finally, the fact that Mr. Ausley and DOGE itself describe DOGE's ongoing work as anodyne "technology strategies" or "moderniz[ing] critical systems" should not be taken to provide assurance that DOGE's work will henceforth be limited to unobjectionable software upgrades. These are the same terms used to describe DOGE's work in the original Executive Order establishing the entity, which Defendants have steadfastly identified as the primary source of their authority to engage in the misconduct alleged in the Amended Complaint. *See* Exec. Order. 14,158 (describing the "President's DOGE Agenda" as "modernizing Federal technology and software to maximize governmental efficiency and productivity").

**C. DOGE personnel are still employed at SSA, and Defendants should not benefit from the government's ongoing efforts to obscure DOGE's structure and membership.**

Disregarding those public reports, Defendants ask this Court to believe—based on a single self-serving declaration—that "SSA has no current DOGE Team, DOGE Team members, or DOGE detailees or affiliates." MTD at 2. But DOGE has deliberately obscured who works for the entity since its inception, and no credible evidence suggests that DOGE and/or its personnel no longer have access to SSA systems or the data contained therein. Nothing makes that more obvious

---

[25] LinkedIn Post, U.S. DOGE Service (Mar. 5, 2026), https://perma.cc/QQY8-59R8.

than the agency's continued employment of Chief Information Officer Michael Russo and General Counsel and Head of Law, Policy, and Legislative Affairs Mark Steffensen.

***Messrs. Russo and Steffensen are DOGE affiliates.*** More than a year into this litigation, Defendants for the first time assert that Mr. Russo has no affiliation with DOGE and was hired neither "as part of SSA's DOGE Team" nor "to implement the President's DOGE agenda." ECF 217-2, Felix-Lawson Decl., ¶ 9(a). But in a sworn statement submitted to this Court well over a year ago, senior SSA executive Tiffany Flick averred that Leland Dudek identified Mr. Russo as a "DOGE associate" who "would be working at SSA" as early as January 30, 2025. Flick Decl., ECF 22-10, ¶ 9. According to Ms. Flick's testimony, which went unrebutted through over 15 months of active litigation, Mr. Russo "came onsite to begin his onboarding process" on January 31, 2025, despite not officially joining the agency as Chief Information Officer until February 3. *Id.* ¶ 11. He "introduced himself as a DOGE representative to multiple employees on multiple occasions." *Id.* And he immediately "requested to bring in a software engineer named Akash Bobba, who was already assisting DOGE in multiple agencies." *Id.* ¶ 13. Mr. Russo worked in concert with "DOGE manager" Steve Davis and others to expedite Mr. Bobba's onboarding, despite "challenges with Mr. Bobba's background check" and "contrary to standard practice," ¶¶ 13–16, and worked outside agency leadership, "never fully disclos[ing] to the Commissioner's office the details on what information DOGE wanted." *Id.* ¶ 18. He also refused to report to then-Acting SSA Commissioner Michelle King, "as the CIO normally would," and it appeared to Ms. Flick that Mr. Russo "was actually reporting to DOGE." *Id.* ¶ 22. Indeed, Mr. Russo's own "rushed" onboarding and training made Ms. Flick "deeply concerned about DOGE's access to SSA systems and the potential to inappropriately and inaccurately disclose this information." *Id.* ¶ 48.

Ms. Flick's testimony does not stand alone. Mr. Russo's affiliation with DOGE has been thoroughly and publicly documented, including by Congressman Robert Garcia, Ranking Member of the House Committee on Oversight and Government Reform.[26] Congressman Garcia has publicly described Mr. Russo as a "DOGE member[]" who "sidestepped network security protocols . . . and copied every American's sensitive Social Security data into an unsecure test cloud environment." Former SSA Chief Data Officer Chuck Borges, who worked with Mr. Russo at SSA, has likewise identified Mr. Russo as among the "DOGE personnel" whose "violations of internal SSA security protocols and federal privacy laws" created a "substantial and specific threat to public health and safety." Ex. A at 7.

The same is true of Mr. Steffensen, who Ms. Felix-Lawson also identifies as a person who "had prior association with DOGE before onboarding at SSA." ECF 217-2 ¶ 9. Ms. Felix-Lawson alleges that Mr. Steffensen was hired neither "as part of SSA's DOGE Team" or "to implement the President's DOGE agenda." *Id.* But a whistleblower has described Mr. Steffensen as one of several "DOGE officials at SSA,"[27] and news reports indicate that Mr. Steffensen is a "DOGE ally" who "was tasked with determining whether DOGE representatives should be allowed to access Social Security data."[28] Indeed, Mr. Steffensen reportedly pressured SSA lawyers "to issue a memo giving DOGE access to Social Security data" and, when that failed, "began circumventing the lawyers by telling DOGE representatives to keep working on their projects anyway." *Id.*[29]

---

[26] Letter from Congressman Robert Garcia to Frank Bisignano (March 9, 2026), https://perma.cc/VZF5-MNNH.

[27] Letter from Senator Ron Wyden to Senator Michael Crapo (Mar. 28, 2025), https://perma.cc/7B9G-EAEZ; SSA Whistleblower Statement to Senator Ron Wyden (Mar. 24, 2025), https://perma.cc/2V4P-3PLP (identifying the whistleblower as a "senior Social Security Administration employee who recently left the agency").

[28] Natanson and Rein, *supra* note 7.

[29] All credible evidence indicates that both Mr. Russo and Mr. Steffensen continue to associate with DOGE, and Plaintiffs have already met their burden at this stage by a preponderance of the evidence. But even if there were a genuine dispute of fact about Mr. Russo and Mr. Steffensen's continued DOGE involvement, dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction would be appropriate "only if the material jurisdictional facts [were] not in dispute." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). At minimum, Plaintiffs are entitled to limited discovery to assess the scope of Mr. Russo and Mr. Steffensen's continued affiliation with DOGE.

***DOGE is a paradigmatic "shell game."*** Defendants' newly revealed certainty that Mr. Russo is not a DOGE affiliate is in keeping with the Administration's efforts to obscure DOGE's structure (and resist even limited discovery), as well as the identity of its staff and affiliates, from the entity's very inception—including with respect to its work at SSA. For example, in DOGE's first months, President Trump publicly stated that it was being "headed by Elon Musk." ECF 17, Am. Compl., ¶ 54.[30] But the White House told courts the opposite, representing that Mr. Musk was not even "an employee of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization," much less "the U.S. DOGE Service Administrator." *See, e.g.*, Decl. of Joshua Fisher [ECF 24-1 ¶ 6], *New Mexico v. Musk*, Case No. 1:25-cv-429 (D.D.C. Feb. 17, 2025). Likewise, the Department of Interior, Department of Health and Human Services, Food and Drug Administration, and Centers for Disease and Control in April 2025 responded to FOIA requests for materials identifying members of the U.S. DOGE Service by saying they had no responsive documents.[31] But the New York Times identified DOGE staff connected to both the CDC and the Department of the Interior, and Politico reported that DOGE "arrived at the FDA" as early as February 26, 2025. And the General Services Administration's acting administrator insisted to reporters that GSA did not have a DOGE team, despite the presence of multiple DOGE workers using GSA email accounts and literally sleeping in the building.[32]

---

[30] *See also* Full Transcript of President Trump's Speech to Congress, N.Y. Times (March 4, 2025), https://perma.cc/AT4N-WRDY ("I have created the brand new Department of Government Efficiency. DOGE . . . . [w]hich is headed by Elon Musk.").

[31] American Oversight, *No Records Response from Various Agencies Regarding DOGE Teams* (April 24, 2025), https://perma.cc/ZV5P-24Z9.

[32] Hannah Northey and Danny Nguyen, *Ikea beds? Dressers? Inside the 'exceedingly odd' DOGE office setup*, Politico (Mar. 6, 2026), https://perma.cc/LL57-T8A7.

In this case, Defendants have refused to publicly disclose the identities of most SSA DOGE Team members.[33] Moreover, by not even using the agreed-upon "employee numbers" assigned to them, *see* ECF 134, Defendants have obfuscated when specific DOGE Team members left the agency, ECF 217-2 ¶ 7, or which of them engaged in egregious conduct like sharing PII via an unsecured, third-party server, ECF 197 at 6; sending a file containing PII to DOGE and DOGE affiliates at two other agencies, *id.* at 2; and/or executing a Voter Data Transfer Agreement with a third-party political organization seeking to overturn state election results, *id.* at 5.

Nor have Defendants accurately described the scope of DOGE's presence at SSA to this Court. In the declaration accompanying the instant Motion to Dismiss, Ms. Felix-Lawson for the first time admits that SSA in June 2025 "onboarded a twelfth employee who, although not on SSA's DOGE Team, was DOGE-affiliated." ECF 217-2, Felix-Lawson Decl., ¶ 5. That individual appears to be Edward Coristine, whom Defendants have never identified in this litigation. Mr. Borges' whistleblower report, which became public in August 2025, identified Mr. Coristine as a then-nineteen-year-old programmer known as "Big Balls" who supposedly resigned from DOGE in June 2025 but "reappeared as part of SSA days later." Ex. A at 7 n.3 (citation omitted). According to Mr. Borges, Mr. Coristine was among the "DOGE personnel" at SSA who violated both internal SSA security protocols and federal privacy laws to an extent that "risk[ed] the security of over 300 million Americans' Social Security data." *Id.* at 1. Indeed, Ms. Felix-Lawson's admission that an employee, "although not on SSA's DOGE Team," may nevertheless be "DOGE-affiliated" upends Defendants' entire argument. ECF 217-2 ¶ 5.

[33] *See, e.g.*, ECF 134, at 1 ("Counsel for Defendants asked whether [members of the SSA DOGE Team] have a view on whether their identities should be disclosed publicly, and the employees request that their names continue to be withheld.").

All of the above confirms DOGE's current existence as a "shell company" with its operatives "tangled in the oversight of individual government agencies."[34] The "shell game" has persisted since DOGE's inception. *See, e.g., New Mexico v. Musk*, 769 F. Supp. 3d 1, 3 n.1 (D.D.C. 2025) (comparing sworn testimony by a White House executive regarding the scope of DOGE's authority with contradictory text in Executive Order 14,210). Reports that DOGE has disbanded or abandoned its work are "absolutely false."[35] On the contrary: DOGE affiliates are "in fact burrowed into the agencies like ticks," even "leading agencies in powerful jobs." *Id.*

Defendants' representations that there are no longer any DOGE affiliates at SSA are not credible and fall in the face of overwhelming evidence to the contrary—especially given that Defendants' credibility is at its nadir. As Judge King noted, "going forward, we should not accord the defendants any benefit of the doubt or readily trust in anything they say." *AFSCME v. SSA*, 172 F.4th at 394 (King, J., concurring); *see also Musk*, 769 F. Supp. 3d at 3 n.1 ("remind[ing] [government counsel] of their duty to make truthful representations to the court"); *see also Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 57 (D.D.C. 2025) (describing a declaration submitted by the government as "highly misleading, if not intentionally false," and stating that the Court "is left with little confidence that the defense can be trusted to tell the truth about anything"), *vacated and remanded on other grounds*, 149 F.4th 762 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated on other grounds*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

Even if SSA's DOGE Team has dissolved its formal existence as such, Plaintiffs' claims do not rely on the existence of an SSA DOGE Team—much less the DOGE Temporary

---

[34] Rogelberg, *supra* note 9.

[35] Makena Kelly & Vittoria Elliott, *DOGE Isn't Dead: Here's What Its Operatives Are Doing Now*, Wired (Dec. 2, 2025), https://perma.cc/Z39F-Z8CL.

Organization—and the absence of either or both of those entities has no impact on Plaintiffs' injuries or this Court's ability to grant relief.

**II. Plaintiffs' claims are not moot.**

Defendants' mootness argument would fail even if Plaintiffs' claims were specific to the "SSA DOGE Team" or to the U.S. DOGE Service Temporary Organization (which they are not), and even if no DOGE affiliates remained at SSA (which they do). *See supra* Section I. "[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party," *Chafin*, 568 U.S. at 172, a situation which is far afield from the present case. Moreover, a defendant may not moot a case "by the simple expedient of suspending its challenged conduct after it is sued," *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241–42 (2024) (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)), and the government has not met its "heavy burden" to prove that "'no reasonable expectation' remains that it will 'return to [its] old ways,'" *id.* (citation omitted) (alteration in original). The government has not even attested that it will not resume the challenged conduct, which is the bare minimum requirement for defendants seeking to invoke a mootness defense. *See, e.g.*, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (emphasizing that voluntary cessation does not moot a case unless "subsequent events ma[ke] absolutely clear" that the challenged conduct cannot reasonably be expected to recur). Further, even if everything Defendants say is true, nothing prevents the Defendants from once again disclosing the sensitive, personally identifying information of millions of people to DOGE personnel or other actors without a lawful need for that information. This is not a case where "events in the world overtake those in the courtroom, and a complaining party manages to secure outside of litigation all the relief he might have won in it." *See Fikre*, 601 U.S. at 240. There is no risk that this Court, if it denies Defendants' motion, will be forced to "pronounce on past actions that have no 'continuing effect' in the world." *See id.* at 235. Plaintiffs

are not "asking the federal courts for an advisory opinion on what the law is based on hypothetical facts," and their case is not "simply an effort to satisfy a curiosity on who is right in a now defunct controversy." *See Genesis Healthcare, Inc. v. Becerra*, 39 F. 4th 253, 261 (4th Cir. 2022). On the contrary: this Court's issuance of permanent relief and a declaratory judgment is the only way to minimize Plaintiffs' members' existing injuries and prevent new harms from occurring every day.

**A. Plaintiffs' injuries are redressable by this Court.**

Defendants ground their mootness argument in assertions that "SSA no longer has a DOGE Team or any DOGE-affiliated employees" and that "[t]he DOGE Temporary Organization will imminently expire." MTD at 14. In Defendants' view, those assertions—if taken as true—mean that "this Court cannot grant Plaintiffs effective injunctive relief," rendering the case moot. *Id.* But that argument is both incomplete and inaccurate.

***Plaintiffs' injuries remain redressable through injunctive relief.*** The Fourth Circuit has established that "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 336 (4th Cir. 2021) (quoting *Chafin*, 568 U.S. at 172 (citation omitted)). That is certainly the case here, where, because of SSA's unlawful access policies, DOGE and its personnel still enjoy enfettered access to PII housed in SSA systems of records and retain the ability to disclose that PII outside the agency at will. The DOGE Executive Order, which demands "full and prompt access" to agency records, remains in force.[36] And Defendants continue to unlawfully access, disclose, and use Plaintiffs' members' PII, including their tax return information,[37] and share that data with other agencies without any effort to comply with laws and regulations

[36] Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) § 4(b).
[37] *See* ECF 111-1, Application for Prelim. Inj., at 19–20.

governing such transfers. Neither Defendants' motion nor the single, self-serving affidavit offered in support thereof say otherwise.

Indeed, Defendants' other filings reflect the opposite of that declaration: the self-styled "Notice of Corrections to the Record," ECF 197, revealed that SSA and other defendants "provided patently false information to the district court in the preliminary injunction proceedings"; "failed to disclose the full extent of the DOGE affiliates' systems access"; and "falsely advised the district court that no DOGE affiliate other than those assigned to SSA had ever had access to SSA records, that SSA had safeguards in place that would prevent DOGE affiliates from violating SSA security protocols and integrating SSA systems with outside servers, and that the DOGE affiliates' work at SSA had been limited to technology upgrades and fraud, waste, and abuse detection within the agency." *AFSCME v. SSA*, 172 F. 4th at 394 (King, J., concurring). Perhaps most egregiously, the Notice admitted that a DOGE affiliate at SSA executed a Voter Data Transfer Agreement with a political advocacy group seeking to overturn state election results. ECF 197 at 5.

While the Supreme Court's stay of the preliminary injunction permitted Defendants to resume conduct that caused irreparable harm to Plaintiffs, some of that harm is redressable through new injunctive relief. *Church of Scientology of Cal. v. United States* and other cases make clear: that is enough. 506 U.S. 9 (1992); *see also AFSCME v. SSA*, 172 F. 4th at 373 (citing *Church of Scientology* and suggesting that this court could, if Plaintiffs prevail on the merits, "order[] the relevant employees to destroy any illegally obtained data or work derived from such data"). In that case, after the government accessed and copied tapes recording conversations between officials at the Church of Scientology and their attorneys, the Supreme Court declined to find mootness even though it was at that point "too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy" caused by the defendant. *Church of Scientology*, 506 U.S. at 13. As the Court

explained, "a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies" of data unlawfully in its possession, and the availability of that "possible remedy" is sufficient to prevent a case from becoming moot. *Id.* The Fourth Circuit has long embraced the same principle, declining to deem a case moot where the plaintiffs had already delivered to OSHA forms containing information in which the plaintiffs had a privacy interest because that privacy interest "would be benefitted by an order requiring OSHA to return or destroy" its copies. *Reich v. Nat'l Eng'g & Contracting Co.*, 13 F.3d 93, 98 (4th Cir. 1993). "While a court may not be able to return the parties to the *status quo ante*," it is enough that it "can fashion *some* form of meaningful relief." *Church of Scientology*, 506 U.S. at 12–13.

Here, opportunities for meaningful relief abound. Plaintiffs' Amended Complaint asks the Court to enjoin the *DOGE Defendants*—not individual members of the SSA DOGE Team—from accessing, inspecting, disclosing, or using PII or non-anonymized information "contained in or obtained, derived, copied, or exported from SSA information systems or systems of record" or from directing or controlling the access to, inspection of, disclosure, or use of any SSA systems of record or data copied or exported therefrom. ECF 17 at 28–29. It further asks the Court to order the DOGE Defendants—again, not the individual members of the SSA DOGE Team—to "disgorge or delete all unlawfully obtained, disclosed, or accessed data" from SSA systems of record that those defendants "could not lawfully access" prior to President Trump's issuance of the DOGE executive order. *Id.* at 30. And it asks the Court to enjoin *all* Defendants from accessing, inspecting, disclosing, or using data in SSA systems of record "for any purpose other than those permitted by the Privacy Act, a published System of Records Notice, the Internal Revenue Code, and the Federal Information Security Modernization Act." *Id.* at 28.

Plaintiffs have continued to seek that relief throughout this litigation and anticipate requesting the same in a final order. For example, their proposed preliminary injunction drew on stipulated orders for permanent injunctions developed by the Federal Trade Commission and enforced by courts throughout the country, which were designed specifically to "address cases where companies were alleged to have used improperly obtained data to train their AI." ECF 111-9, Meyer Decl., ¶ 5. That proposed framework mirrored, albeit in more detailed fashion, the same type of remedial relief available to the plaintiffs in *Church of Scientology* and *Reich*. For example, the proposed preliminary injunction sought, among other things, certifications by the SSA Defendants (1) that "no DOGE Defendant, DOGE Team member, or DOGE Affiliate" would be given access to records in SSA systems of records or to data derived, copied, or exposed therefrom, and (2) that the same parties had "deleted or destroyed" the material in question, including "any models or algorithms developed in whole or in part using PII obtained, disclosed, derived, copied, or exposed from any SSA system of record." ECF 111-2 ¶¶ 13(c), 14. Moreover, "[t]o the extent [that] any DOGE Defendants, DOGE Team members, and/or DOGE Affiliates" were aware of any of the above-described material being "not under their supervision or control and thus impossible for them to delete or destroy," the proposed preliminary injunction would have required those Defendants to "disclose the identity of the person or entity supervising or controlling" the material and provide "written evidence of their notice to that person or entity of the existence of [the Court's order] and effort to seek deletion and destruction" of the material in question. *Id.* ¶ 14.

For private information in the form of electronic data, relief remains available even when the information in question has been shared on untraceable and unsecured cloud-based servers or exfiltrated via portable drives, emails to other agencies, or unauthorized Voter Data Transfer Agreements. *See, e.g.*, Ex. A at 17–21; ECF 197, 208, 208-1. Indeed, injunctive relief from this

Court may be the only avenue by which Plaintiffs can mitigate the irreparable harm they have already suffered and prevent additional irreparable injuries from accruing. Injunctive relief directing Defendants to "disclose the identity of the person or entity supervising or controlling" unlawfully disclosed PII and "provide written evidence of their notice to that person or entity of [a relevant Court order] and effort to seek deletion and destruction" of the material would help redress these injuries. *See* ECF 111-2, Proposed PI, ¶ 14. Such relief is particularly important because, while Defendants admitted some of their misconduct in their Notice of Corrections to the Record, that document neither identifies the scope of the internal review that led to those corrections nor purports to address potential non-compliance unrelated to the cited declarations. Nor does it reveal whether Defendants have determined whether any other data sharing occurred, made any effort to claw back the PII impermissibly shared with the DOGE umbrella group and two other agencies, or even attempted to secure the SSA data exchanged on an unauthorized third-party server.

Further, Defendants' Notice omitted that the SSA Inspector General on January 9, 2026, received credible allegations that a DOGE affiliate possessed copies of two entire SSA databases containing PII and intended to use that data in his work outside the government. *See* ECF 208, 208-1. Defendants do not even acknowledge the tension between that whistleblower report and Ms. Felix-Lawson's cursory and dubious assertion that "SSA's offboarding actions" for members of the SSA DOGE Team and a previously undisclosed "DOGE affiliate" working at the agency "included revoking all agency systems and data access previously granted," ECF 217-2 ¶ 6. Now, as new elections approach, Defendants continue to shroud the true extent of DOGE's misconduct at SSA, and Plaintiffs lack the information and tools necessary to claw back their PII or prevent

such egregious harm from continuing. Any suggestion that Plaintiffs have no interest in the outcome of this litigation is meritless.

***Plaintiffs seek declaratory relief as to an ongoing policy.*** Furthermore, Plaintiffs seek both injunctive and declaratory relief. *See AFSCME v. SSA*, 778 F. Supp. 3d at 726; Am. Compl., ECF 17, at 28 (asking the Court to "[d]eclare unlawful and fully enjoin DOGE Defendants' access, inspection, disclosure, or use of any information, including but not limited to return information, personally identifiable information, or non-anonymized information, that is contained in or obtained, derived, copied, or exported from SSA information systems or systems of record"). And an action is not moot if the plaintiff "'seeks declaratory relief as to an ongoing policy.'" *Genesis Healthcare*, 39 F. 4th at 261 (quoting *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009)). Just as the Health Resources and Services Administration took action against the *Genesis* plaintiffs "based, in part, on its definition of 'patient,'" *id.*, Defendants here injured Plaintiffs' members based on a skewed definition—or, perhaps, wholesale dismissal—of the "need to know" requirements in the Privacy Act and SSA's own policies and procedures.

Certainly, "plaintiffs who challenge an ongoing policy must still demonstrate both that 'the request for declaratory relief is ripe' and that they have standing to bring such a forward-looking challenge." *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1206 (D.C. Cir. 2013) (quoting *Del Monte*, 570 F. 3d at 321). But Plaintiffs have already made that demonstration. *See, e.g.*, *AFSCME v. SSA*, 172 F.4th at 368, 368 n.5 (determining that Plaintiffs have standing because "disclosing plaintiffs' members' personally identifiable information to DOGE inflicts a harm that is a 'close . . . analogue' to the common law tort of intrusion upon seclusion" and the remaining standing requirements are "easily satisfied here").

Defendants seek to escape this well-established law primarily by citing outdated and out-of-circuit cases. *See* MTD at 17. The Supreme Court case they rely on, *Rhodes v. Stewart*, has no bearing in cases like this, where plaintiffs challenge an *ongoing* policy and not merely specific instances of past government misconduct. *See generally* 488 U.S. 1 (1988) (per curiam). In *Rhodes,* the district court determined "that correctional officials had not *applied* the proper procedural and substantive standards in denying" two inmates "permission to subscribe to a magazine" despite the fact that one inmate had already died and another was given a final release from parole. *Id.* at 2–3 (emphasis added). The case did not involve a challenge to both a specific agency action and the policy that underlies that action, as Plaintiffs do here.

The same is true for *Comite de Apoyo a los Trabajadores Agricolas v. U.S. Dep't of Labor*, 995 F.2d 510, 513 (4th Cir. 1993), which Defendants cite for the proposition that "a declaratory judgment cannot be the redress that satisfies the third standing prong." MTD at 17. While Defendants assert that "Plaintiffs now lack a personal interest in this case" (because "the former SSA DOGE Team can no longer access Plaintiffs' records") and that "the Court cannot grant Plaintiffs any effectual relief" (because "the Court cannot enjoin a DOGE Team that no longer exists"), MTD at 17, those arguments misapprehend the nature of Plaintiffs' claims. *See, e.g.*, *AFSCME v. SSA*, 778 F. Supp. 3d at 756 (describing SSA officials' approval of access grants to DOGE Team members as "akin to a binding agency opinion" that "established DOGE's entitlement to access PII, notwithstanding the Agency's customs, practices, policies, and procedures"). Indeed, the Amended Complaint explicitly alleges that SSA changed its access *policies*: when Defendants "disclosed an unfathomable amount of sensitive, personally identifying

information," they did so "without acknowledging that SSA was changing its policies, identifying the source of its authority to do so," analyzing its decision to do so, or considering the consequences of doing so. ECF 17 ¶ 122. Plaintiffs have alleged the same throughout the course of this litigation. *See, e.g.*, *SSA v. AFSCME*, Appellees' Response Opposing Stay Application, Opposition Brief, Case No. 24A1063, at 22 (U.S. May 12, 2025) (challenging "SSA's decision to adopt wholesale changes to its prior access policies"). A declaratory judgment will "establish a binding adjudication that enables the [plaintiffs] to enjoy the benefits of reliance and repose secured by res judicata," which establishes redressability. *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (citation omitted).

**B. Defendants have not met their heavy burden of proving that the conduct and policy Plaintiffs challenge cannot reasonably be expected to recur.**

Defendants' mootness argument would fail even if Plaintiffs' claims relied on the ongoing existence of the "SSA DOGE Team" or the U.S. DOGE Service Temporary Organization, which they do not. *See supra* Section I.A. A defendant may not moot a case "by the simple expedient of suspending its challenged conduct after it is sued." *Fikre*, 601 U.S. at 241 (citing *Already, LLC v. Nike, Inc.*, 568 U.S. at 91. On the contrary: "a defendant's 'voluntary cessation of a challenged practice' will moot a case only if the defendant can show that the practice cannot 'reasonably be expected to recur.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). That is a "formidable burden." *Id.* (same). Such a strict requirement is necessary because "'[t]he Constitution deals with substance,' not strategies," and "[w]ere the rule more forgiving, a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *Id.* (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867), and *Already*, 568 U.S. at 91). "A live case or controversy cannot be so easily disguised, and a federal court's constitutional authority cannot be so readily manipulated." *Id.* Cases where

the voluntary cessation exception does *not* apply usually involve the repeal of a challenged statute, *Kremens v. Bartley*, 431 U.S. 119, 132 (1977); expiration of challenged proposed legislation, *Burke v. Barnes*, 479 U.S. 361, 363 (1987); or, more recently, termination of a state of emergency regarding a worldwide pandemic, *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 163–64 (4th Cir. 2021). The gulf between those circumstances and Defendants' assertion that "there is no concrete evidence that DOGE Teams are being deployed to SSA now or are likely to be deployed to SSA in the future," MTD at 19–20, could not be wider.

Defendants' cursory argument that "the voluntary cessation exception to the mootness doctrine . . . does not apply" because "SSA did not voluntarily cease its conduct to manipulate the Court's jurisdiction," MTD at 20, is likewise insufficient. To show that this case is "truly moot," Defendants must prove that "'no reasonable expectation' remains" that they "will 'return to [their] old ways." *Fikre*, 601 U.S. at 241–42 (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)). That burden "holds for governmental defendants no less than for private ones." *Id.* (citations omitted). Here, the government falls far short.

Defendants' entire motion rests on a single, self-serving affidavit stating that "SSA has no future plans to have a DOGE Team, DOGE Team members, or DOGE detailees or affiliates working at SSA." ECF 217-2 ¶ 10. Setting aside the fact that DOGE affiliates are presently working at the agency, *see supra* pages 20–26, the statements in the affidavit are just the type of ambiguous and incomplete attestations that the Supreme Court previously found insufficient to satisfy Defendants' heavy burden. In *FBI v. Fikre*, the plaintiff alleged that the government unlawfully placed him on the No Fly List after questioning him about his attendance at a mosque and pressuring him to report on other members of his religious community. 601 U.S. at 234. Mr. Fikre sought, among other things, an injunction prohibiting the government from keeping him on

the No Fly List and a declaratory judgment confirming the government had violated his rights. *Id.* After the government notified Mr. Fikre that he had been removed from the list, the district court granted the government's motion to dismiss the case as moot. *Id.* The Ninth Circuit subsequently reversed. On remand, the government submitted a declaration asserting that Mr. Fikre would not be placed on the No Fly List in the future. *Id.* The Supreme Court held that the declaration failed to demonstrate mootness, emphasizing that a court with jurisdiction over a matter "has a virtually unflagging obligation to hear and resolve questions properly before it." *Id.* at 240 (quotation marks omitted). In doing so, the Court explained that the government's representation that it would "not relist Mr. Fikre based on 'currently available information'" could "mean that his past actions are not enough to warrant his relisting," but did not mean that the government would not "relist him if he does the same or similar things in the future." *Id.* at 242. The same is true of Defendants' meager attestation that SSA currently "has no future plans to have a DOGE Team, DOGE Team members, or DOGE detailees or affiliates working at SSA." ECF 217-2 ¶ 10.

Moreover, the Fourth Circuit has made clear that "a defendant does not meet its burden of demonstrating mootness when it retains authority to 'reassess' the challenged policy 'at any time,'" *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013), as Defendants do here. *Courthouse News v. Schaefer*, 2 F.4th 318 (4th Cir. 2021), is instructive. There, the plaintiff sued the clerks of two Virginia courts because it was not provided with contemporaneous access to newly filed complaints. The defendants argued that the case was moot because they "ha[d] minimized document-access delays since Courthouse News initiated th[e] suit," but the Fourth Circuit rejected that argument because nothing barred the defendants from reverting to the allegedly unconstitutional rates of access in the future. *Id.* at 323–24. This Court followed that approach in *Courthouse News Service v. Harris*, No. ELH-22-0548, 2022 WL 17850125 (D. Md. Dec. 22,

2022), where the same plaintiff sued the administrator of Maryland's administrative courts and the clerk of almost every circuit court in the state, complaining that the defendants failed to provide the public and the press with contemporaneous access to non-confidential, electronically submitted lawsuits. *Id.* at *1. This Court rejected the *Harris* defendants' argument that the case against them should be dismissed as moot because the courts had implemented a new "queue" that expedited public access, finding that dismissal based on mootness was inappropriate because the defendants retained "the power to revert to their alleged unconstitutional delays." *Id.* at *29.

Dismissal is particularly inappropriate where, as here, the defendant says one thing in court (that it has suspended the activity) and another in public (the activity continues). In *Deal v. Mercer County Board of Education*, 911 F.3d 183 (4th Cir. 2018), a student and her parent challenged a "Bible in the Schools" ("BITS") program in public schools. *Id.* at 186. Counsel for the defendants "suggested at oral argument before the district court that the suspended version of the program would not return." *Id.* at 187. That failed to demonstrate mootness, as the defendant had "consistently described the BITS program as 'suspend[ed],' rather than eliminated outright," and had—in what the Fourth Circuit deemed a "dubious suggestion"—"characterized the suspension as part of a regular review process." *Id.* at 191. The court specifically noted that "news reports submitted to the district court . . . emphasized that the County was 'still vigorously contesting' this suit and 'fighting' to retain the BITS program." *Id.* at 192. Indeed, the Fourth Circuit found that the *existence* of those press reports—even if they had later been proven incorrect—"reveal[ed] the precise problem with relying on a party's voluntary cessation . . . to establish mootness" and determined that the county had not "ma[d]e it 'absolutely clear'" that the program would not return. *Id.* (citing *Laidlaw*, 528 U.S. at 189). Here, the Court may rely not just on news reports quoting DOGE personnel but also on record evidence, DOGE's social media accounts, and whistleblower

reports. *See supra* pages 18–26. Against those facts, Defendants' assertion that no members of the SSA DOGE Team remain at the agency falls short.

Courts addressing DOGE's access to and use of PII at other federal agencies have found the same. A district court recently noted that, while "there are presently few DOGE Agents at OPM, and none that have direct access to OPM systems," the government had failed to "provide adequate assurance that DOGE Agents will not be granted improper access in the future." *AFGE v. OPM*, No. 25cv1237 (DLC), 2025 WL 3687548, at *10 (S.D.N.Y. Dec. 19, 2025). That court rejected the government's mootness argument because "the course of events that occurred at OPM in the very first days of the administration, when operational needs were admittedly unclear, is unlikely to recur on similar facts," *id.* at *9—an argument far broader than counsel's present statement that "there is no concrete evidence that DOGE Teams are being deployed to SSA now or are likely to be deployed to SSA in the future," MTD at 19–20, or Ms. Felix-Lawson's noncommittal statement that "SSA has no future plans to have a DOGE Team, DOGE Team members, or DOGE detailees or affiliates working at SSA," ECF 217-2 ¶ 10. Moreover, Defendants—like those in *AFGE v. OPM*— "still take the position that the 'need to know' criteria of the Privacy Act was satisfied" when the relevant agency "granted DOGE Agents broad access to [agency] systems because that access might later be needed"—a rationale that both Courts have rejected. 2025 WL 3687548, at *8. And "whether a defendant repudiates its past actions" is relevant insofar as "what repudiation can prove about [the defendant's] future conduct." *Fikre*, 601 U.S. at 244; *see also Deal*, 911 F.3d at 191–92 (deeming news reports that the defendant was "still vigorously contesting" the legality of the conduct relevant to the mootness inquiry).

Another federal district court recently rejected similar claims that the dissolution of an agency's DOGE Team mooted a lawsuit. There, as here, affiliates of President Trump's

Department of Government Efficiency," "armed with executive orders," "descended" on the agency in question. *AFL v. DOL*, No. 25-339 (JDB), 2026 WL 879518, at *1 (D.D.C. Mar. 31, 2026). There, as here, those agents sought "broad access to the sensitive records the government holds," and agency officials "largely handed them the keys." *Id.* And there, as here, the defendants subsequently "contend[ed] that the court lacks jurisdiction because no DOGE affiliates remain at DOL." *Id.* at *9 n.9. In that case, too, the district court found that the defendants offered no assurances regarding the impossibility of future recurrence and "maintain[ed] that their actions were and remain[ed] lawful." *Id.* As a result, the Court concluded that "the absence of DOGE affiliates at [the agency] does not deprive the Court of jurisdiction to issue prospective relief." *Id.*

The Supreme Court "has set a high bar for finding [an] action moot," *Genesis*, 39 F.4th at 259 (citation omitted), and described that standard as "stringent," *Laidlaw*, 528 U.S. at 189. "The heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* (citation and internal quotation marks omitted) (alteration in original). Defendants bear the burden of establishing that the conduct and policy Plaintiffs challenge "cannot reasonably be expected to resume"—whether "immediately or later at some more propitious moment." *Fikre,* 601 U.S. at 243 (citation omitted). Defendants do not come close to meeting that burden, and their motion should be denied.

## CONCLUSION

This case is not moot. Defendants' argument otherwise, in addition to being a thinly disguised effort to avoid even limited discovery into Defendants' admitted misconduct, is based on factual assertions that have little bearing on Plaintiffs' actual claims and prayer for relief. The same factual assertions are undercut by DOGE and Defendants' own statements, as well as by whistleblower reports and ample news reporting. Most importantly, decades of case law make

obvious that Plaintiffs' members' injuries' remain redressable through both injunctive and declaratory relief and that Defendants have fallen far short of the heavy burden they bear.

This Court has already acknowledged that Plaintiffs "have alleged an ongoing injury" that "is not a 'one and done' situation." On the contrary: "Every improper exposure [of Plaintiffs' data] is an invasion of privacy." *AFSCME v. SSA*, 778 F. Supp. 3d at 734 n.30. That remains true, and Plaintiffs' members will continue to suffer injury absent the injunctive and declaratory relief they seek. Defendants' motion to dismiss should be denied.[38]

Dated: May 19, 2026

Respectfully submitted,

*/s/ Alethea Anne Swift*
Alethea Anne Swift (Bar No. 30829)
Mark B. Samburg (Bar No. 31090)
Simon C. Brewer (Bar No. 31813)
Ronald Fein*
Robin F. Thurston (Bar No. 31584)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
aswift@democracyforward.org
msamburg@democracyforward.org
sbrewer@democracyforward.org
rfein@democracyforward.org*
rthurston@democracyforward.org
*Counsel for Plaintiffs*

*Application for admission *pro hac vice* pending

[38] Plaintiffs do not object to dismissing Count VII, regarding the appointment of Defendant Dudek. *See supra* note 10.