# Exhibit A

KATZ BANKS KUMIN

WHISTLEBLOWER AID

*Report government and corporate lawbreaking.*
*Without breaking the law.*

REDACTED FOR CONGRESS

**– Protected Whistleblower Disclosure –**

June 3, 2026

***Via email***

The Honorable Richard Blumenthal
Ranking Member, Permanent Subcommittee on Investigations
U.S. Senate Committee on Homeland Security and Governmental Affairs
340 Dirksen Senate Office Building
Washington, DC 20510

The Honorable Elizabeth Warren
United States Senate
311 Hart Senate Office Building
Washington, DC 20510

**DOGE and DHS Abused Social Security Data in Furtherance of Anti-Immigrant Agenda and to Achieve other Improper Political Objectives of the Trump Administration**

## Introduction

1. Elon Musk's team descended upon the Social Security Administration ("SSA") immediately after Donald J. Trump became president on January 20, 2025. The so-called Department of Government Efficiency ("DOGE"), with its unclear mission and its philosophy of "disruption," did not let facts about how SSA was functioning get in the way of making alarming and attention-getting headlines. While addressing the media at a White House press briefing with President Trump, Elon Musk falsely proclaimed that people who were more than 150 years old were receiving Social Security benefits. President Trump repeated this patently absurd claim saying that "millions and millions of people over 100 years old" may be receiving improper benefits from the SSA. (In fact, only about 89,000 people aged 99 or older received SSA benefits in 2024.) In a March 4, 2025, speech to Congress, President Trump repeated and further

REDACTED FOR CONGRESS

exaggerated this falsehood insisting, "Believe it or not, government databases list … 3.47 million people from ages 120 to 129, 3.9 million people from ages 130 to 139. 3.5 million people from ages 140 to 149. **And money is being paid to many of them**."[1] (Emphasis added.)

2. During this tumultuous time, when laws were being violated with impunity by DOGE members and the SSA leaders who acceded to their demands, many loyal and hardworking SSA employees tried to hold the line and uphold the law. Jeremiah Schofield, a senior executive at SSA, was one such employee. Mr. Schofield interacted with DOGE personnel and their adherents at SSA and witnessed firsthand their willful disregard for the law, their disdain for SSA's unique mission, and their disrespect for individuals' privacy rights. He also witnessed the extreme and unlawful efforts that they took to enable the Department of Homeland Security ("DHS") to use SSA data and SSA databases to harass, mistreat, and purge immigrants. As detailed below, and attested to in the attached Declaration, DHS directed SSA to mark as dead first thousands and then millions of individuals without any documentation that they were in fact deceased, in violation of the Privacy Act and SSA regulations, policies, and procedures. Mr. Schofield refused to carry out this directive, which SSA counsel advised was illegal. Mr. Schofield was then privy to a conversation in which a DOGE member acknowledged that the reason that DHS was asking SSA to mark as dead these thousands then millions of people in SSA master databases was to force them to self-deport or to be captured when they went to SSA offices to try to prove they were alive. Such malevolent action is not only reprehensible, but also illegal.

[1] Glenn Kessler, *Records of Dead People Show How the Pro-Trump Spin Machine Keeps Going*, Wash. Post (June 3, 2025), https://www.washingtonpost.com/politics/2025/06/03/social-security-dead-trump-false/.

REDACTED FOR CONGRESS

3. Mr. Schofield has come forward now to provide his firsthand knowledge of what happened at SSA and to detail the ways SSA data has been misused in furtherance of the Trump Administration's political agenda to harass immigrants and to assist DHS in capturing and deporting them. His disclosure substantiates claims of other brave former federal employees who have come forward, both publicly and anonymously, to shed light on the breadth of illegality that occurred at the SSA during the first year of President Trump's second term. Despite his understanding that other public whistleblowers have suffered retaliation and harassment online and in person, Mr. Schofield is committed to making sure that the American public knows what has taken place at SSA and the risks Americans continue to face given the reckless misuse of SSA data.

4. The undersigned have prepared this disclosure with Mr. Schofield's assistance and the assistance of additional anonymous whistleblowers within the SSA. Where a factual statement is asserted and does not include a citation to a supporting document, the source is Mr. Schofield or an anonymous whistleblower.

## I. Jeremiah Schofield, American Public Servant

5. Like many federal employees who left government service in 2025, Jeremiah Conrad Schofield believed that his work at the Social Security Administration was more than just a job. Though it began as a job when he started as a customer service representative in 2000, Mr. Schofield's work at SSA became his passion. Throughout his more than 25 years of government service at SSA, he was recognized for his uniformly outstanding job performance[2] and rose

[2] Mr. Schofield received the highest rating, Level 5 – Outstanding, on four of his last five SES Performance Management System Executive Performance reviews, and a Level 4 – Exceeds Fully Successful on the fifth.

REDACTED FOR CONGRESS

steadily through the ranks to hold Associate Commissioner roles and Senior Executive Service ("SES") stature in SSA headquarters. Even as the actions of DOGE and the Trump Administration threw SSA into chaos, Mr. Schofield was committed to staying at SSA to help the public and assist agency employees whose professional lives were upended find new jobs within the agency.

6. Mr. Schofield held three different SES roles from January through October 2025. His position at the start of the second Trump Administration was Associate Commissioner for the Office of Public Service and Operations Support ("OPSOS"); at the end of February, OPSOS merged with the Office of Electronic Services and Technology, so he became Associate Commissioner for the new Office of Analysis, Integration, and Performance Oversight; and, once Commissioner Frank Bisignano implemented his own organizational structure, he became Head of Innovation for Field Operations. Mr. Schofield concurrently served as the Senior Executive Sponsor and Business Lead for Information Technology Modernization for Enumeration, a role he had held since October 2017, and as Senior Executive Sponsor and Business Lead for information technology development for Earnings Workloads from approximately 2022 to October 2025.

7. In these various roles, Mr. Schofield was responsible for operationalizing the policy decisions being made at SSA headquarters and for providing guidance to employees in the field offices. Because of these responsibilities and his roles in leading technology development for Enumeration and Earnings activities, he has a broad and deep knowledge of the Social

REDACTED FOR CONGRESS

Security Administration's master files, including the Numident,[3] the Death Master File,[4] the Master Earnings File,[5] the Master Beneficiary Record,[6] and the Supplemental Security Record.[7] Mr. Schofield's particular area of expertise, however, was "enumeration"—the process of assigning Social Security numbers ("SSNs") and cards to individuals.

8. By October 2025, Mr. Schofield reached the difficult decision that he could not continue to work in an environment that he perceived to be so lawless and cruel. Accordingly, he retired from federal service at that time. Removed from the deeply concerning activities of DOGE and the misuse of SSA data by DHS, Mr. Schofield believes that it is his civic duty to

[3] The Numerical Identification File ("Numident," "NUMI," or "NUMIDENT") is a record of applications for Social Security cards, from which Social Security Numbers ("SSNs") are assigned to individuals. The system retains a full record of all changes to the information (such as change of name). Through the "enumeration at birth" program, children can be issued a Social Security card when they are born. Data elements on a Numident record include name, date and place of birth, parents' names, and date of death. Jennifer McNabb et al., *Uses of Administrative Data at the Social Security Administration,* Soc. Sec. Admin. (2009), https://www.ssa.gov/policy/docs/ssb/v69n1/v69n1p75.html#mt9.

[4] The Death Master File is a record of deaths and contains the following information for each decedent: SSN, name, date of birth, date of death, state or country of residence (for records added before February 1988), ZIP code of last residence, and ZIP code of lump-sum death payment. *Id.*

[5] The Master Earnings File contains the individual lifetime records of wages and self-employment earnings. The file's primary sources of information are W-2 forms for wages and form 1040, schedule SE (for self-employment income), from the Internal Revenue Service ("IRS"). The most frequently used data elements are the individual's SSN, annual total wages, annual self-employment earnings, annual earnings used for Old-Age, Survivors, and Disability Insurance ("OASDI," which is what most people think of as Social Security) contributions, and report year. *Id.*

[6] The Master Beneficiary Record ("MBR") is used to administer the OASDI program and contains beneficiary and payment history data. An MBR record is created whenever an individual applies for benefits and SSA adjudicates the application as an award, a denial, an abatement, or a withdrawal. Information maintained in the MBR includes the primary worker's SSN, the beneficiary's own SSN, benefit application date, benefit entitlement date, and type and amount of benefit. *Id.*

[7] The Supplemental Security Record ("SSR") contains information on individuals applying for Supplemental Security Income ("SSI") payments. SSA uses the income, resources, disabling condition, and living arrangement information from the application and other sources in determining eligibility for and administering the needs-based SSI program. SSR data elements include SSN, date of claim, citizenship status, income, resources, eligibility code, payment code, and payment amount. *Id.*

REDACTED FOR CONGRESS

report the illegal conduct that he personally observed and tried to prevent. Though some of what is discussed below has already been revealed in the media by anonymous sources, Mr. Schofield is the first individual to come forward publicly and make himself available for questioning by Congress about the matters detailed in this Disclosure Statement and in his sworn Declaration.

## II. Factual Background

### *A. Mysterious DOGE Representatives Search for "Fraud" at SSA*

9. After the 2024 election and through the January 20, 2025, inauguration, SSA was in a state of upheaval. From November 2024 through February 2025, SSA had four Commissioners or Acting Commissioners in rapid succession. On January 20, 2025, Deputy Commissioner for Operations Michelle King was named Acting Commissioner, a position she held until February 16, 2025, when she was reportedly forced out after refusing to give DOGE access to SSA's sensitive databases.[8] Then, Leland Dudek, a career civil servant who had been a Senior Advisor for SSA's Office of Program Integrity, took over as Acting Commissioner on February 16, 2025.

10. Shortly after Mr. Dudek became Acting Commissioner, Mr. Schofield was ordered by his supervisor, Doris Diaz, then Acting Deputy Commissioner for Operations, to attend an unusual meeting on or about February 25, 2025, with members of the DOGE team assigned to SSA. Everything about this meeting, and the three-to-four subsequent meetings he had with these individuals, was peculiar.

[8] Associated Press, *Social Security head steps down over DOGE access of recipient information, sources say*, CNN (Feb. 18, 2025), https://www.cnn.com/2025/02/17/politics/social-security-head-steps-down-doge-access.

REDACTED FOR CONGRESS

11. Either Ms. Diaz or one of her assistants informed Mr. Schofield orally about these meetings with DOGE individuals. Calendar invitations were not issued. Thus, there is no permanent record of these meetings on the SSA employees' calendars, which normally preserves a record of all senior executives' meetings in accordance with the Federal Records Act. Furthermore, Mr. Schofield was told that attendance at the meetings was mandatory, regardless of what else might have been on his calendar for the specified time slot.

12. The first meeting, and all subsequent meetings, took place in an unused portion of the newly reconstructed Altmeyer building on the first floor (East side).[9] A uniformed SSA security guard was posted about halfway down the hallway, which was itself unusual. However, even more strange was that a plain-clothed individual who seemed to be a private security guard was sitting on a chair directly outside of the conference room where Mr. Schofield had been told the meeting would take place. This second security guard asked Mr. Schofield for his name and his purpose for being there before he allowed Mr. Schofield to enter the conference room. Once inside the conference room, Mr. Schofield noticed that several whiteboards placed around the room had the names of SSA's master files handwritten on them, while other whiteboards had SSA business process workflows.

13. Mr. Schofield understood that he was invited to these meetings because of his extensive knowledge of the workload, back-end processes, and information technology systems in enumeration (*i.e.*, he is expert in everything about the Social Security number process). The other senior SSA employees in attendance at the first meeting, though not at every meeting, were

[9] Though many of the senior leaders, including the Commissioner, had offices on the ninth floor of the Altmeyer building, this area of the building had been unoccupied since its renovation during the late 2010s-early 2020s and meeting in this location was highly unusual.

KATZ BANKS KUMIN

WHISTLEBLOWER AID

Report government and corporate lawbreaking.
Without breaking the law.

REDACTED FOR CONGRESS

Doris Diaz, Stephen Evangelista, then Deputy Commissioner for the Office of Retirement and Disability Policy, and [redacted].

14. At this first meeting, Mr. Schofield and his colleagues met with Antonio Gracias,[10] Jon Koval,[11] and Payton Rehling,[12] whom he later learned were close associates of Elon Musk, for about 45 minutes. The three men each had laptop computers, though none was an SSA-standard-issue Hewlett-Packard computer. Mr. Schofield believed that they were working on their personal laptops, though they could have been provided by DOGE or Mr. Musk. He wondered whether they had access to SSA data on their laptops and, if so, whether proper protocol was followed to give them such access. When Mr. Schofield asked the men to describe their roles at SSA, they responded that they were "volunteers." Mr. Schofield, a long-time federal employee, knew that the government does not usually accept the services of volunteers because of prohibitions against it in the Antideficiency Act.[13] Though they did not

[10] Antonio Gracias is founder, CEO, and chief investment officer of Valor Equity Partners. Valor Equity Partners, *Antonio Gracias*, https://www.valorep.com/team/antonio-gracias. He is a close friend of Elon Musk, who served as unofficial leader of DOGE. Theodore Schleifer et al., *A Close Elon Musk Friend Joins His Effort on Social Security*, N.Y. Times (March 14, 2025), https://www.nytimes.com/2025/03/14/us/politics/elon-musk-antonio-gracias-social-security-administration.html. He apparently left his DOGE service on or before July 1, 2025. Gretchen Morgenson, *High Ranking DOGE official and Elon Musk ally, Antonio Gracias, has left government*, NBC News (July 1, 2025), https://www.nbcnews.com/politics/doge/high-ranking-doge-official-elon-musk-ally-antonio-gracias-left-governm-rcna220611.

[11] Jon Koval is vice president of Valor Equity Partners. Valor Equity Partners, *Jon Koval*, https://www.valorep.com/team/jon-koval.

[12] Payton Rehling is vice president, data engineer of Valor Equity Partners. Valor Equity Partners, *Payton Rehling*, https://www.valorep.com/team/payton-rehling.

[13] The Antideficiency Act states that an officer or employee of the government "may not accept voluntary services for either government or employ personal services exceeding that authorized by law

REDACTED FOR CONGRESS

identify themselves as DOGE representatives, everyone who met with them understood that they were part of SSA's DOGE team and referred to them as DOGE. Mr. Schofield does not have any personal knowledge of whether they were in fact volunteers, whether they were Special Government Employees ("SGEs"), or whether they had some other type of government appointment.

15. Because the word "efficiency" appears in the acronym for DOGE, Mr. Schofield assumed that the DOGE representatives had invited him to attend the meetings to ask him about where to find efficiencies in SSA operations. He went to the first meeting prepared to discuss inefficiencies within the enumeration processes, particularly his ideas for potential cost savings related to staff time. However, Mr. Gracias, who led the discussion, explained that their purpose was to identify "Social Security fraud," especially regarding people who, as he put it, "should not have" Social Security numbers.

16. Mr. Schofield was surprised by this line of questioning because of Social Security's system of providing approximately 18 million new and replacement Social Security cards each year with a 99% or better accuracy rate.[14] Moreover, Mr. Schofield knew that SSA already had highly effective fraud detection tools built into the back end of the enumeration process. Mr. Schofield told them that if they were attempting to identify massive fraud, they were not looking in the correct direction by focusing on the enumeration process and the

except for emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342.

[14] The data is available at: *Annual Data for Enumeration Accuracy*, (Feb. 13, 2019), https://www.ssa.gov/data/Enumeration-Accuracy.html. *See also* a 2023 SSA OIG report finding 99.8% accuracy in processing and assigning SSNs to noncitizens in FY2021, Gail S. Ennis, *"Processing Non-citizens' Original Social Security Numbers Electronically Through Enumeration Programs,"* Office of Inspector Gen., Soc. Sec. Admin., (September 20, 2023), https://oig.ssa.gov/assets/uploads/a-08-22-51136.pdf.

REDACTED FOR CONGRESS

Numident system. The DOGE team responded with skepticism. Mr. Schofield emphasized that a search for Social Security card fraud was not likely to find much fraud or produce significant savings, a conclusion that can be corroborated by audit reports prepared by the Office of the Inspector General ("OIG"). The DOGE team members insisted that SSA could not be sure there is no fraud in the SSN process. Mr. Schofield informed them that he had some other ideas about efficiencies, but Mr. Gracias responded that he was looking only for projects that would result in $50 billion fraud savings and that he would go to the President "with nothing less." They made clear that they were looking for a "big win" that they could tout publicly.

17. Over the course of this and subsequent meetings, Mr. Schofield and his colleagues—including [redacted], [redacted], and [redacted]—answered the DOGE team's questions about the back-end processes for providing Social Security cards, the systems that are in place to prevent and detect fraud, and other DOGE ideas for "improvements." Regardless of the recommendations Mr. Schofield and the career SSA employees made, the DOGE team focused on finding instances of Social Security fraud. Overall, Mr. Schofield met with the DOGE team a total of four or five times in February and March of 2025 to explain the data systems in which the DOGE team seemed determined to find large-scale Social Security card fraud.

18. By the second or third meeting Mr. Schofield had with the DOGE team, they became focused on the number of records in the Numident system that had no date of death.[15]

[15] This was not a novel issue for SSA. The SSA Office of the Inspector General ("OIG") had produced several reports on it, dating back to at least 2015. However, SSA management has averred that "the records identified by OIG involve non-beneficiaries and do not involve improper payments." Furthermore, management states that they "determined that updating death information on these records

REDACTED FOR CONGRESS

Mr. Schofield is not clear when or how the DOGE team gained access to the Numident system to be able to identify this issue, though based on his knowledge and understanding, Chief Information Officer ("CIO") Mike Russo[16] controlled access to SSA systems at that time and would have been able to give them access to the Numident.[17] Moreover, Mr. Schofield understands from subsequent public reporting that the DOGE team had unfettered access to SSA records and were able to access Numident information.[18]

19. Though Mr. Schofield explained repeatedly to the DOGE team that individuals whose file did not include a death date but would be over the age of 115 were a non-issue, the DOGE team insisted on making the death date field a focus of their attention. Mr. Schofield explained to the DOGE team that beginning in 2017, SSA had undertaken an initiative with the

---

poses a significant risk of recording incorrect death information on the Numident." SSA Office of the Inspector General Audit Report, *Numberholders Age 100 or Older Who Did Not Have Death Information on the Numident*, A-06-21-51022, (July 2023), https://oig.ssa.gov/assets/uploads/a-06-21-51022.pdf.

[16] Mr. Russo, a DOGE associate appointed to the CIO position on February 3, 2025, was replaced by fellow DOGE associate Scott Coulter on March 27, 2025. Coulter held the position until sometime in mid-June 2025. Aram Moghaddassi, another DOGE associate, took over the role in late June 2025. In early September 2025, Messrs. Russo and Moghaddassi were announced as co-CIOs. *See* Grace Dille, *SSA Taps Fourth New CIO Since January,* MeriTalk, (June 20, 2025), https://meritalk.com/articles/ssa-taps-fourth-new-cio-since-january/; Grace Dille, *SSA Announces Tech Leadership Changes With 2 CIOs,* MeriTalk (Sept. 8, 2025), https://meritalk.com/articles/ssa-announces-tech-leadership-changes-with-2-cios/.

[17] According to SSA whistleblower and former Chief Data Officer Charles Borges, when then CIO Michael Russo was forwarded a request to authorize a DOGE employee to transfer live Numident data to a cloud environment that lacked independent security controls, he immediately approved it even though it was identified as high risk and contrary to protocol. *See* Charles Borges, *Protected Whistleblower Disclosure of Charles Borges Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, Gross Mismanagement, and Substantial and Specific Threat to Public Health and Safety at the Social Security Administration*, Government Accountability Project (Aug. 26, 2025), https://whistleblower.org/wp-content/uploads/2025/08/08-26-2025-Borges-Disclosure-Sanitized.pdf.

[18] Eli Hager, *The President Wanted It and I Did It": Recording Reveals Head of Social Security's Thoughts on DOGE and Trump*, ProPublica, (Mar. 12, 2025), https://www.propublica.org/article/recording-reveals-leland-dudek-thoughts-trump-doge-social-security.

REDACTED FOR CONGRESS

states that already added about 10 million dates of death to the Numident (based on information received from the states, which is the entity that issues death certificates). Mr. Schofield advised that because the individuals without death dates were receiving no benefits, having the death field blank had no financial implications.

20. Even though Mr. Schofield had explained why it was unnecessary from a savings perspective, DOGE officials demanded that Mr. Schofield's group add death dates[19] for the individuals who they believed were dead. The DOGE team insisted that dates of death needed to be added to the Numident *to prevent* deceased individuals from receiving Social Security benefits. This "finding" by the DOGE team was clerical in nature but received extensive media attention after Elon Musk falsely claimed that "people who are 100, 200 and even 300 years old are improperly and routinely getting benefits."[20]

21. At the same time as Mr. Schofield was working with the DOGE team, leadership within SSA created a working group to address the missing death dates in the Numident.

---

[19] One of the reasons for not adding death dates for these people is that it was clear that the dates would not be accurate as they were not based on any evidence of the deaths. Adding such information was contrary to regulation and introduced false information into the Numident and Master Death Files.

[20] *New Social Security chief refutes claims of deceased people over 100 years old getting checks*, CBS News, (Feb. 19, 2025), https://www.cbsnews.com/news/social-security-doge-100-150-year-olds-cobol-elon-musk/. *See also*, Emily Badger & Alicia Parlapiano, *Millions of Dead People on Social Security? The Agency's Own Data Says Otherwise*, N.Y. Times, (Feb. 19, 2025), https://www.nytimes.com/2025/02/19/upshot/social-security-fraud-claim-musk.html, David Gilbert, *No, 150-Year-Olds Aren't Collecting Social Security Benefits*, Wired, (Feb. 17, 2025), https://www.wired.com/story/elon-musk-doge-social-security-150-year-old-benefits/, Alexandra Hutzler, *Musk misreads Social Security data, millions of dead people not getting benefits, experts say*, ABC News, (Feb. 19, 2025), https://abcnews.com/Politics/musk-misreads-social-security-data-millions-dead-people/story?id=118960821. ("President Donald Trump and Elon Musk, in their hunt for "fraud, waste and abuse" in the federal government, are falsely implying millions of dead Americans are receiving Social Security benefits" according to experts.).

REDACTED FOR CONGRESS

Following the public statements made by President Trump and Elon Musk, SSA officials understood the missing death dates as a top priority issue for the White House.

22. This working group had a core membership of about 15 SSA executives and staffers across teams working with a DOGE analyst and about 10 or so additional members who participated with some regularity. Members of SSA leadership received frequent updates on the project, including then Commissioner Leland Dudek and other members of DOGE.

23. At the same time that it became clear to Mr. Schofield that the DOGE team would not drop the idea of adding dates of death for people over 115 years old, the working group developed a process whereby several components within the Office of the Chief Information Officer ("OCIO") would add the dates of death to these records in batches, rather than manually as Mr. Schofield's group would have done. The process included employees in the Office of Analytics and Improvements reviewing and screening the records without death dates to ensure they did not include people who were still alive. They refused to make changes to any individuals below 115 years old[21] because there are people over 100 years old who are alive and entitled to receive SSA benefits, as may be their surviving spouses. For the individuals in that category, pursuant to process, practice and regulation, the SSA would require documentary evidence before marking them as deceased.

24. Members of the group drafted a memo with a planned, staggered schedule, and circulated it within the larger working group. The plan proposed waiting two to four weeks after an initial test run to see if any impacted individuals came to SSA offices to report their benefits

[21] Mr. Schofield cannot remember exactly what age was the cut-off point. It could have been as low as 115, but may have been 120 or 125.

REDACTED FOR CONGRESS

had been terminated. However, Commissioner Dudek instructed the working group not to wait for the results of the test run and instead ordered them to begin the project immediately.

25. The Numident system contained records for over three million people without death dates who would have been older than 115. The Office of Analytics and Improvements within the OCIO began screening this list of records to filter out any cases where they determined there were risks of marking living people as deceased or cutting off benefits for surviving spouses. Other components within the OCIO then processed the remaining records in batches because SSA systems could not process all three million records at once. Over the next several months, the team ran the records overnight in groups of hundreds of thousands at a time until they completed the project.

26. Before the project adding death dates to those over age 115 was complete, Mr. Schofield's interactions with this DOGE team ended abruptly. In March 2025, Judge Ellen Hollander of the U.S. District Court, District of Maryland, issued a temporary restraining order ("TRO") in *AFSCME v. SSA*, 1:25-cv-00596-ELH (D. Md. Mar. 20, 2025), prohibiting DOGE employees and those working at DOGE's direction from accessing non-anonymized SSA data systems of records, including the Numident. Shortly after that order was issued, Mr. Gracias, Mr. Koval, and Mr. Rehling left the SSA without any official notice and, presumably, went to work at other federal agencies.

### *B. SSA Employee(s) Ordered to Unlawfully and Untruthfully Kill Off 6,000+ Individuals in the Numident System*

27. On or about April 7, 2025, then Secretary for Homeland Security Kristi Noem sent two memoranda to then Acting Commissioner Dudek requesting that the agency, "take all measures consistent with law to prevent convicted criminals [suspected terrorists] who are here

REDACTED FOR CONGRESS

illegally from using social security numbers to obtain the privileges reserved for those with lawful status, including but not limited to access to financial institutions, state government agencies, credit bureaus, employers, and any other institutions that use social security numbers for verification." The memoranda further stated that "DHS will collaborate with you [SSA] on this project, providing the necessary immigration information and any other assistance that you [SSA] may require."[22]

28. According to public reporting, Acting Commissioner Dudek, at the urging of then Homeland Security Secretary Kristi Noem, signed two memoranda "allowing the database action" that caused the "mostly Hispanic names and their attached Social Security numbers [to be] added to the Death Master File."[23] Despite the implication of former Secretary Noem's memoranda that immigrants have SSNs illegally, any noncitizen immigrant who is authorized to work in the United States is *legally* eligible for an SSN.[24]

29. On or about April 8, 2025, the same week that Secretary Noem issued the memoranda to SSA, Mr. Schofield's office[25] was informed of DHS's request to post dates of

---

[22] *Protecting Our Country From Suspected Terrorists*; *Protecting Our Country From Suspected Convicted Criminals*, Memoranda from Sec'y of Homeland Sec. Kristi Noem to Acting Cmm'r Leland Dudek, (Apr. 7, 2025), https://www.ssa.gov/foia/resources/proactivedisclosure/2025/DHS%20Secretary%20Noem%20Email%20with%20Memos%20to%20ACOSS_Redacted.pdf

[23] Hannah Natanson, Lisa Rein and Meryl Kornfield, *Trump administration overrode Social Security staff to list immigrants as dead*, The Washington Post, (Apr. 12, 2025), https://www.washingtonpost.com/politics/2025/04/12/trump-immigrants-dead-social-security/. Mr. Schofield was not aware of any memoranda signed by Commissioner Dudek. It is possible that the reporting was inaccurate and the only memoranda were those from former Secretary Noem to Mr. Dudek.

[24] Social Security Numbers for Noncitizens, Soc. Sec. Admin, (Feb. 2026), https://www.ssa.gov/pubs/EN-05-10096.pdf.

[25] Mr. Schofield's office was responsible for reviewing ad hoc requests that came from high-profile external stakeholders, such as other federal agencies, relating to sensitive public relations

REDACTED FOR CONGRESS

death on the Numident system for approximately 6,000+ people that DHS claimed were immigrants who were convicted criminals or suspected terrorists.[26] DHS provided no substantiation of this serious claim.

30. Moreover, DHS's request to "kill off" these individuals came without any documentation showing they had actually died. Without any evidence of these 6,000+ individuals' deaths, Mr. Schofield's office refused to comply with the request from DHS. Unlike adding death dates to the records in the system for individuals who would have been at least 115 years old if they were alive and whom everyone assumed were in fact dead, this request was to kill off people that SSA had no reason to believe were dead.

31. As discussed in Section III, *infra*, it is contrary to law and SSA regulation for SSA to mark an individual as deceased without evidence of death. Furthermore, doing so would introduce inaccuracies into the system. Worse, the real-life consequences to a living person being "killed off" by SSA are sudden and debilitating, wreaking havoc on their lives. Individuals marked dead lose access to financial institutions, healthcare, housing, utilities, drivers' licenses and many other services that terminate upon death. SSA officials understand the requirements for entering a death date are rigorous because of the serious damage caused when a live person is improperly designated as dead in the Numident system.

---

matters, that required Office of Operations personnel to take some type of action to an individual's SSA record.

[26] White House officials stated publicly that "the immigrants in question are temporarily paroled on the terror watchlist or have FBI criminal records and are ineligible to receive Social Security benefits." Rene Marsh, *Trump administration lists thousands of immigrants as dead in new policy*, CNN, (Apr. 11, 2025), https://www.cnn.com/2025/04/11/politics/trump-administration-social-security-dead-dhs. It provided SSA no evidence to support that claim.

REDACTED FOR CONGRESS

32. Marking an individual as deceased when they are actually alive has dire consequences for that individual. Once someone is marked as deceased in the Numident, that information is automatically exported to the Death Master File, which is used by many federal, state, and local municipal governments, as well as nonprofits and private sector businesses to conduct financial and other actions. For example, once marked deceased, an individual's bank accounts and credit cards are frozen and public benefits cease. Proving that someone is not actually deceased is an arduous task that must be done in person at a local Social Security field office, all of which have been affected by reduced staff and appointments-only policies, meaning that an individual could wait weeks to be "resurrected," during which time they are effectively precluded from any financial transaction.

33. Mr. Schofield consulted with a colleague in the Office of Policy and with counsel in the Office of General Counsel ("OGC") to make sure he was correct in his initial analysis that the request was illegal. These individuals confirmed his view that adding dates of death to individuals' records for whom there is no evidence of death would be contrary to law and regulation. In an effort to provide an alternative solution rather than just saying no outright to DHS's request, Mr. Schofield and his colleagues began discussions to identify a legal course of action to respond in some way to DHS since he understood that SSA leadership had approved the request.

34. Mr. Schofield then notified his supervisor, Acting Deputy Commissioner Doris Diaz, of his concerns about the illegal nature of the request and she too agreed that it was illegal to add dates of death to Numident without proof of death. Ms. Diaz told Mr. Schofield that she would tell her superiors that the office could not list individuals as dead within the Numident

REDACTED FOR CONGRESS

system without death dates and proof of their deaths. Mr. Schofield believes that she then discussed this with her superior, Acting Commissioner Dudek.[27]

35. While Mr. Schofield and his colleagues were deliberating about a legal path to address the request, an unidentified individual in the Office of the Chief Information Officer put a death date in the Numident system for the 6,000+ people on the list provided by DHS following a directive by then CIO Scott Coulter.

36. Scott Coulter began working at SSA in February 2025 as a member of the DOGE team as a Special Advisor to the Acting Commissioner. After Judge Hollander issued the TRO on March 20, 2025, ruling that DOGE staff could no longer access confidential SSA data, Mr. Coulter was appointed CIO on March 27, 2025, which made him an SSA employee rather than a DOGE team member.

37. At some point shortly after SSA received the memoranda from Secretary Noem, Mr. Coulter requested that the Office of the CIO make changes in the Numident system for a list of names that DHS had provided. SSA employees within the Office of the CIO understood that Mr. Coulter and other members of leadership wanted to use the list as a tool for immigration enforcement and they understood the list to contain people with violent criminal records.

38. When the Office of Analytics and Improvements received the assignment from Mr. Coulter to review and screen the list of 6,000+ records, the team estimated that the project would take at least a few days. They prepared to do a close review of the files to ensure that the

[27] Within two weeks of this conversation, Ms. Diaz abruptly left the agency. Mr. Schofield believes that her departure was involuntary.

REDACTED FOR CONGRESS

records corresponded with the correct Social Security numbers in the same manner as they had done for the records of people aged 115 and older.

39. Shortly after Mr. Coulter assigned the task to the Office of Analytics and Improvements, he ordered a call with several OCIO senior staff. Once on the call, he angrily demanded updates on the project and said that he was getting direct calls from the White House asking what was going on with the list of 6,000 names. He said dates of death needed to be added to the list that day.

40. Mr. Coulter expressed frustration with the time the Office of Analytics and Improvements was taking to complete the review and screening and said he would have a DOGE employee, John Solly, do it instead. At this time, the TRO from Judge Hollander would have still been in place and should have prohibited a DOGE employee from accessing the Numident. Acceding to the pressure from Mr. Coulter, staff in the Office of Analytics and Improvements ultimately completed their review of every individual on the list by the following morning, but they also flagged a small number of names because of data discrepancies. The Office of Analytics and Improvements identified around 40 cases on the list of roughly 6,000 that showed a data discrepancy such as the name and date of birth DHS provided did not match the Social Security number they had on file. They were directed to send the list of records with data discrepancies to a DOGE team member at DHS, Aram Moghaddassi.[28] The SSA staff does not know what happened to the records it flagged for DHS.

41. The 6,000+ individuals were marked in the Numident as having died on March 8, 2025. They were then automatically added to the Death Master File by SSA's standard process.

[28] Mr. Moghaddassi later joined SSA as a CIO.

REDACTED FOR CONGRESS

The Death Master File reflected the updated information the next morning after the upload was completed overnight.

42. Though people in the CIO's office knew that the records in the Numident had been changed, Mr. Schofield and his colleagues in the Office of Analysis, Integration, and Performance Oversight only learned that the action had been taken when they began to get calls from field offices seeking guidance about what to do for individuals who were alive but who had been identified in the Numident and Death Master File as deceased. In fact, many of the individuals branded by the administration as having links to terrorist activity or criminal records and placed on this list were neither.[29]

43. Though not a frequent occurrence, SSA occasionally marks a living individual as deceased in error. Accordingly, there is longstanding guidance in the Social Security Program Operations Manual Systems ("POMS") detailing the procedure to "resurrect" an individual who has been incorrectly marked deceased. Because Mr. Schofield's office was responsible for writing business procedures for policies that would be implemented by all Operations personnel

---

[29] The *Washington Post* reported details about the 6,000+ individuals DHS claimed were "criminals" who were marked deceased by SSA:

> The immigrants added to the death database include a 13-year-old, a 14-year-old and two 16-year-olds—as well as one person in their 80s and a handful in their 70s, according to records obtained by The Post. Some agency staff have since checked the names and Social Security numbers of some of the youngest immigrants against data the agency typically uses to search for criminal history and found no evidence of crimes or law enforcement interactions, staffers said. Among the people targeted were immigrants with valid Social Security numbers who had lost legal status, such as those who participated in Biden-era work programs that ended under the new administration, according to a White House official.

Hannah Natanson, Lisa Rein and Meryl Kornfield, *Trump administration overrode Social Security staff to list immigrants as dead*, The Washington Post, (Apr. 12, 2025), https://www.washingtonpost.com/politics/2025/04/12/trump-immigrants-dead-social-security/.

REDACTED FOR CONGRESS

in field offices, processing centers, and teleservice centers, they were tasked with writing the process documents for this action. After a long internal debate about whether to create a new process for "resurrecting" any of these 6,000+ individuals, Mr. Schofield ultimately issued guidance that the field offices should stick to the standard resurrection process. Months later, death dates were removed for all 6000+ individuals and they were removed from the Death Master File, though it is unknown who issued or implemented the directive to do so.

### *C. DHS Asks SSA to "Kill Off" at Least 2.7 Million Additional Living Individuals in Numident System*

44. In late April 2025, DHS sent SSA a second list—this one for 2.7 million individuals—that DHS wanted SSA to "kill off" in the Numident. Alarmed by this direction, because OGC had already determined this type of action to be a blatant violation of law and regulation, Mr. Schofield and [redacted], decided to conduct a review of a sample of the 2.7 million people on the list to determine next steps. With Mr. Schofield's assent, [redacted] reviewed a random sample of 25 individuals on the list of 2.7 million. Of those 25, [redacted] the vast majority were U.S. citizens or lawful permanent residents. Several in this sample had been in the United States for decades. To the best of Mr. Schofield's recollection, only two of the 25 records appeared to require further investigation to understand if they were in the U.S. illegally (though simply being in the U.S. was not part of the memorandum from Secretary Noem). It was not possible from SSA data and processes to determine if any of them were "convicted criminals" or "suspected terrorists." At a minimum, none of the 25 people were dead. As a result of this sampling effort, where they found 90 percent of the people sampled were in the United States lawfully and, moreover, alive, Mr.

REDACTED FOR CONGRESS

Schofield and his team stood firm with their refusal to label the 2.7 million people on the list as deceased. Mr. Schofield told Mr. Evangelista that he refused to carry out the direction to kill off the 2.7 million individuals and insisted that they inform DHS that their data required further analysis. Mr. Schofield also told Mr. Evangelista that DHS needed to send SSA a clean list after it analyzed the data.

45. Because SSA leadership was clearly committed to carrying out DHS's direction, Mr. Schofield and his staff again conferred with their colleague in the Office of Policy and counsel in the Office of General Counsel to try to find a solution that would not compromise the Numident data or have such dire consequences for the 2.7 million people. They suggested putting a "special indicator" ("SPIN") code on the 2.7 million records, which would effectively show the users of this data that there was a potential issue with the individual's SSN and the individual would need to go to the local Social Security office to address the problem. Under the SPIN code proposal, the individuals would not be marked deceased and would not therefore suffer the draconian consequences discussed in paragraph 32, *supra.* Rather, they would be required to take some action in person at a Social Security field office.

46. During this time, Mr. Schofield learned that Mr. Koval had transferred to the DHS and in that role was behind the effort to mark these 2.7 million individuals as deceased. In mid-to-late May 2025, Mr. Schofield attended a meeting in person with Deputy Commissioner of Operations Evangelista,[30] [redacted], and [redacted] and Mr. Koval, both of whom attended by video. Mr. Evangelista set the agenda for

[30] By May of 2025, Stephen Evangelista had replaced Doris Diaz as Deputy Commissioner of Operations.

REDACTED FOR CONGRESS

the meeting, which was held in a conference room on the 8th floor of the Altmeyer Building, to discuss two topics: (1) a presentation of the results of Mr. Schofield's [redacted] review of the 25 samples from the list of 2.7 million people and a request to DHS to clean up its list to ensure that it was comprised of people who it deemed ineligible for SSNs; and (2) a discussion of the options for follow-up if SSA placed SPIN codes in the records and individuals then showed up at Social Security field offices. On this second issue, SSA had traditionally referred individuals whose records indicated immigration issues to the U.S. Citizenship and Immigration Services ("USCIS"). In this discussion, Mr. Koval stated that these individuals should be referred to Immigration and Customs Enforcement ("ICE") instead. Mr. Schofield found Mr. Koval's solution to be deeply concerning given ICE's aggressive and highly questionable tactics to try to identify and remove undocumented immigrants.[31]

### *D. Mr. Koval Admits that DHS Wants to Misuse and Corrupt SSA Data for Unauthorized and Illegal Purposes*

47. After the meeting with Mr. Koval concluded, Mr. Schofield told Mr. Evangelista that he believed DHS asked SSA to "kill off" these 2.7 million people in the Numident system as part of DHS's efforts to deport immigrants, regardless of whether they were suspected terrorists or convicted violent criminals. Mr. Evangelista disagreed with Mr. Schofield's supposition and decided to call Mr. Koval on his cell phone to question him directly about the 2.7 million people while Mr. Schofield and [redacted] were still in the meeting room. Mr.

[31] In early-mid April 2025, DHS was in the news for revoking "the legal status of hundreds of thousands of immigrants who used the CBP One app." Associated Press, *What we know about the Social Security Administration listing thousands of living immigrants as dead*, (April 11, 2025), https://apnews.com/article/social-security-immigration-dhs-deportation-12cf4ab92d5cac3406ded3a343f75005. DHS and the Treasury Department had also just signed a deal to "allow the IRS to share immigrants' tax data with Immigration and Customs Enforcement for the purpose of identifying and deporting people illegally in the U.S." *Id.*

REDACTED FOR CONGRESS

Evangelista told Mr. Schofield and [redacted] to be quiet and placed the call on speakerphone while he asked Mr. Koval why DHS requested that SSA "kill off" the 2.7 million people. Mr. Koval stated that such an action would likely have two possible and, from DHS's standpoint, desirable outcomes. In one potential scenario, the lives of individuals would be ruined because of the difficulties that result when an individual who is alive is marked deceased such that they would likely "self-deport." In the other more likely scenario, according to Mr. Koval, those marked deceased would have to go to their local Social Security field office and either ICE would detain them there or SSA staff would direct them to their local immigration office, at which point ICE would detain them there. Mr. Koval made it clear to Mr. Evangelista that DHS's goal in having SSA make the changes in the Numident system was to cause the deportation of these 2.7 million people through an illegal use of SSA data. Hearing Mr. Koval's unequivocal admission, Mr. Evangelista abruptly terminated the call and the meeting. He never spoke to Mr. Schofield about Mr. Koval's statements, and Mr. Schofield was excluded from further conversations about the list of 2.7 million individuals.

48. At the time of Mr. Schofield's departure in October 2025, as far as he knew, SSA had not marked as deceased on the Numident system the 2.7 million people on DHS's list. However, he has no personal knowledge of what has transpired at SSA since that time.

## III. Legal Framework

### *A. Violation of Temporary Restraining Order*

49. On March 20, 2025, Judge Ellen Hollander of the District of Maryland, issued a TRO that, as further elucidated in a letter to counsel dated March 21, 2025,[32] enjoined SSA from:

[32] On April 17, 2025, Judge Hollander granted a preliminary injunction in the matter, and on June 6, 2026, the Supreme Court stayed the preliminary injunction, giving DOGE access to SSA data.

REDACTED FOR CONGRESS

> granting access to *non-anonymized* personally identifiable information in any SSA system of record to [DOGE]; the United States DOGE Service; the United States DOGE Service Temporary Organization; members of the DOGE Team at the SSA; Elon Musk; Amy Gleason; and "DOGE Affiliates," as defined in the Order. Conversely, paragraph 2 of the Order *expressly allows* the SSA to provide access to redacted or anonymized data and records to the DOGE Team, subject to proper training and the like. Notably, paragraph 3 of the TRO permits the SSA to provide non-anonymized data to the DOGE Team, subject to certain conditions. … Employees of SSA who are not involved with the DOGE Team or in the work of the DOGE Team are not subject to the Order. A DOGE Affiliate is defined in the Order, inter alia, as a person working on or implementing the DOGE agenda."[33] (Emphasis in original.)

50. The TRO was in effect in early April 2025 when the DOGE team at SSA, or SSA employees who were working at the direction of the DOGE team, were updating the records of those who would be 115 or older and marked 6,000+ individuals deceased in the Numident system. During this period, the DOGE team was barred from having access to non-anonymized personally identifiable information in any SSA system or record, which would include the Numident or the Death Master File. Clearly, for the DOGE team (or for SSA employees who unwittingly became "DOGE Affiliates" by implementing DOGE's directions) to mark specific individuals as deceased, they had to have access to non-anonymized data. Such an action was in direct violation of the TRO issued by Judge Hollander. The individuals who made the changes in Numident, whether DOGE team members or SSA employees unwittingly implementing the DOGE agenda, acted in violation of a court order.

---

[33] *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. CV ELH-25-0596, 2025 WL 1141737 (D. Md. Apr. 17, 2025, ECF No. 51), https://www.courtlistener.com/docket/69664313/51/american-federation-of-state-county-and-municipal-employees-afl-cio-v/ (last visited May 11, 2026).

REDACTED FOR CONGRESS

### *B. Introducing Inaccurate Information into SSA Databases is a Violation of the Privacy Act and SSA Privacy Act Regulations*

51. All of the master files at the SSA, including the Numident and the Death Master File, are covered under the Privacy Act of 1974 and are considered "systems of records." "[T]he term 'system of records' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). When DOGE team members had access to the Numident and other SSA databases, as they did prior to the implementation of Judge Hollander's TRO and at least until the prohibition was lifted by the Supreme Court, it is likely that those individuals were in violation of the Privacy Act.

52. Records stored in a Privacy Act system of records may not be disclosed "by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains [subject to 12 exceptions]." 5 U.S.C. § 552a(b). Because the individuals whose records DOGE accessed did not give consent for their use, for DOGE to access the master files, they would need to qualify for one of the Privacy Act's 12 exceptions even though President Trump's executive order establishing DOGE urged agencies to give DOGE staff access to their records.[34] The President's executive order explicitly states that it is to "be implemented consistent with applicable law,"[35] which includes the Privacy Act.

[34] "Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and **to the maximum extent consistent with law**, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," Exec. Order No. 14158, "*Establishing and Implementing the President's "Department of Government Efficiency*," 90 Fed. Reg. 8441 (Jan. 29, 2025) § 4(b) (emphasis added).

[35] *Id.* at § 5(b).

REDACTED FOR CONGRESS

53. Among the exceptions pertinent to this matter are the "routine uses," 5 U.S.C. § 552a(b)(3), and the "law enforcement request," 5 U.S.C. § 552a(b)(7).

54. In order for DOGE to invoke a routine use exception, the agency must have published the routine use (called a System of Records Notice or "SORN") in the Federal Register, 5 U.S.C. § 552a(e)(4)(D), and disclose records only when the request for use of the record is compatible with the purpose for which the record was collected. 5 U.S.C. § 552a(e)(3)(C). Some courts, including the Courts of Appeals for the Ninth and D.C. Circuits, require actual notice of the purpose for which it will be used at the time the information is collected. *See Covert v. Harrington*, 876 F.2d 751, 754-56 (9th Cir. 1989); *USPS v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 146 (D.C. Cir. 1993).[36]

55. The law enforcement exception allows disclosure:

> to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought.

5 U.S.C. § 552a(b)(7).

56. The DOGE team was not part of SSA. Rather, DOGE was another agency or instrumentality of the government. If DOGE were to qualify for this exception, it would have had to make a specific written request to SSA specifying what information it needed and the law

[36] The E-Government Act of 2002, 44 U.S.C. § 101 *et seq.*, and Office of Management and Budget guidance, https://georgewbush-whitehouse.archives.gov/omb/memoranda/m03-22.html, state that data collected for one purpose cannot be reused without proper authority. This restriction also applies to data collected by SSA through tax return information pursuant to 42 U.S.C. § 1306.

REDACTED FOR CONGRESS

enforcement activity in which it was engaging. DOGE's apparent reliance on the executive order's authority for its access does not overcome the Privacy Act's procedures and obligations.

57. Additionally, SSA regulations specify the circumstances under which SSA data protected by the Privacy Act can be shared for law enforcement purposes pursuant to the Privacy Act law enforcement exception. The regulation, initially promulgated in 1997 and updated in 2007, allows such information to be shared only "if the head of the law enforcement agency makes a written request giving enough information to show that [one of two prescribed] conditions … are met, what information is needed, and why it is needed." 20 C.F.R. § 401.155(a). One of the two conditions is an instance of serious crime, "where a violent crime such as murder or kidnapping has been committed and the individual about whom the information is being sought has been indicted or convicted of that crime." 20 C.F.R. § 401.155(b). The other is where there is criminal activity involving social security or similar benefit programs, *i.e.*, "when necessary to investigate or prosecute fraud or other criminal activity involving the social security program … other income-maintenance or health-maintenance programs." 20 C.F.R. § 401.155(c). Despite the DOGE team's claims that their purpose was to identify fraud at the SSA, DOGE is not a law enforcement agency. Per the executive order, DOGE was established "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."[37] DOGE failed to meet this first step of the regulatory exception to the Privacy Act and was thus unauthorized to access SSA's master files. Furthermore, there was no written request by the head of DOGE.

[37] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) § 1.

REDACTED FOR CONGRESS

58. The Privacy Act also requires that every agency "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). In order to comply with this Privacy Act requirement, SSA implemented regulations and subregulatory guidance (*i.e.*, the POMS) to help ensure that the information added to these critical databases is accurate and complete. When DOGE and DHS ordered SSA to introduce inaccurate information into the Numident system—and when inaccurate death dates were entered into the system—this clause of the Privacy Act was violated.

59. As such, every individual whose record was knowingly and willfully altered through the actions described in this document has the right to bring a Privacy Act suit against the agency pursuant to 5 U.S.C. § 552a(g)(1)(D) ("Whenever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual . . . the individual may bring a civil action.") and potentially receive financial remedies. Individual Privacy Act plaintiffs historically have had trouble substantiating the intentional and willful prong, but in this case there is strong evidence that both DOGE and DHS insisted that SSA employees add death dates that they knew to be false to Privacy Act protected records. Dead people have no rights under the Privacy Act and there were apparently no adverse impacts as a result of adding an artificial date for people who were already dead as directed by DOGE. However, there were real and significant consequences and damages for the 6,000+ people who were "killed off" at the request of DHS, such that individual Privacy Act suits could succeed against DHS and/or SSA.

REDACTED FOR CONGRESS

### C. *Improper Coding of People as Deceased Also Violates SSA Regulations and the SSA Employee Standards of Conduct*

60. Pursuant to 42 U.S.C. § 405(a), the Social Security Commissioner has the authority to "make rules and regulations and to establish procedures … which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." Any regulations prescribed by the Commissioner must undergo rulemaking pursuant to 5 U.S.C. § 553 and 42 U.S.C. § 902(a)(5). In plain English, the statute provides that the Commissioner of the SSA can implement regulations to govern what types of proof and evidence is required to grant SSNs and any benefits that flow from them, but that must be done through the notice-and-comment rulemaking process.

61. Subpart H of Part 404 of Title 20 of the Code of Federal Regulations identifies what evidence SSA requires to prove age, marriage, or death. The regulations state that the best evidence of a person's death includes:

> (a) A certified copy or extract from the public record of death, coroner's report of death, or verdict of a coroner's jury; or a certificate by the custodian of the public record of death;
> (b) A statement of the funeral director, attending physician, intern of the institution where death occurred;
> (c) A certified copy of, or extract from an official report or finding of death made by an agency or department of the United States; or
> (d) If death occurred outside the United States, an official report of death by a United States Consul or other employee of the State Department; or a copy of the public record of death in the foreign country.

20 C.F.R. § 404.720(b). In the absence of such information, SSA will request an explanation of why that information is unavailable and will request other evidence such as "the signed

REDACTED FOR CONGRESS

statements of two or more people with personal knowledge of the death, giving the place, date, and cause of death." 20 C.F.R. § 404.720(c).

If a person cannot be proven dead but is presumed dead, SSA will presume that the individual died based on the following:

> (a) A certified copy of, or extract from, an official report or finding by an agency or department of the United States that a missing person is *presumed to be* dead as set out in Federal law (5 U.S.C. 5565). Unless we have other evidence showing an actual date of death, we will use the date he or she was reported missing as the date of death.
> (b) Signed statements by those in a position to know and other records which show that the person has been absent from his or her residence and has not been heard from for at least 7 years. If the presumption of death is not rebutted pursuant to § 404.722, we will use as the person's date of death either the date he or she left home, the date ending the 7 year period, or some other date depending upon what the evidence shows is the most likely date of death.
> (c) If you are applying for benefits as the insured person's grandchild or stepgrandchild but the evidence does not identify a parent, we will presume the parent died in the first month in which the insured person became entitled to benefits.

20 C.F.R. § 404.721. Such a presumption can be rebutted by certain types of evidence as well. *See* 20 C.F.R. § 404.722.

62. The POMS expands upon the regulatory requirements outlined above and provides additional explanations and requirements to the individuals who implement changes to the Social Security databases such as the Numident and Death Master File. There is no indication that any of the types of evidence required by 20 C.F.R. § 404.720 and 721 were submitted for the more than 6,000 people marked as deceased by the DOGE team or the SSA employees working at their direction. Such actions are a clear violation of regulations that were implemented to ensure the accuracy of data and the rights of individuals.

REDACTED FOR CONGRESS

63. Part 401 of Chapter 20 of the Code of Federal Regulations covers the SSA's policies and procedures on Privacy and the Disclosure of Official Records and Information, including as related to the Privacy Act and other statutes. These rules govern all SSA employees, including special government employees and volunteers as authorized by law. 20 C.F.R. § 401.10(a). Appendix A to Part 401 contains the SSA's Employee Standards of Conduct with regard to the Privacy Act. The Standards note that the SSA itself may be subject to civil liability for its employees' actions including:

> Failing to maintain any record pertaining to any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such a record, and consequently makes a determination which is adverse to the individual.

20 C.F.R. § 401 Appendix(b)(1)(c). (For the purposes of this part, employees would include the DOGE team.)

64. Furthermore, employees whose duties require use of or reference to systems of records (such as SSA employees who may have carried out DOGE's or DHS's instructions to individuals as deceased without supporting documents), shall "[m]aintain records as accurately as practicable," 20 C.F.R. § 401 Appendix(d)(1)(d), and shall not "[k]knowingly or willfully take action which might subject SSA to civil liability." 20 C.F.R. § 401 Appendix(d)(2)(c).

65. Any DOGE team member or SSA employee who engaged in falsifying SSA records by knowingly marking live individuals as deceased in the Numident and/or transferring their records to the Death Master File likely violated the codified Employee Standards of Conduct.

REDACTED FOR CONGRESS

## IV. Conclusion

66. On its public facing website, the Social Security Administration makes grand claims about the integrity and security of Americans' data. SSA states: "One of our most important responsibilities is protecting your investment and personal information. Social Security takes this responsibility very seriously."[38] The same webpage urges Americans to be confident that their information is protected because they use leading security practices, including "real-time identity verification and stringent access control mechanisms" to ensure that "only authorized personnel handle your data."[39] SSA states it is "committed to securing your data from emerging threats, preventing misuse or unauthorized access to assets and sensitive data, and adhering to federal policies and regulations."

67. Such a declaration sounds reassuring, but Mr. Schofield's disclosure demonstrates that no matter the publicly stated commitment, when DOGE team members ignore the laws and regulations that protect Americans' data integrity and security, the words are hollow. Mr. Schofield witnessed the DOGE team and DHS willfully and knowingly breaking the law and shattering the commitments of integrity and security of data made to the American people. In service to President Trump's agenda, they disregarded a court order and the laws and regulations designed to safeguard SSN holders' most private data, indiscriminately and intentionally inflicting harm on lawful American citizens and others with legal status. They exhibited a brazen disregard for the laws passed by Congress and the regulations implemented by the SSA that are designed to keep Americans' data secure and accurate.

---

[38] *Security*, Soc. Sec. Admin., https://www.ssa.gov/agency/pillars/security.html (last visited May 11, 2026).

[39] *Id.*

REDACTED FOR CONGRESS

68. In addition to the foregoing, Mr. Schofield was involved in other conversations from which he learned that DOGE may have been engaged in similar activities misusing SSA data with other agencies. Specifically, he learned that DOGE was trying to use SSA data to prevent immigrants from receiving SNAP benefits and Medicare benefits. Furthermore, he became aware of actions DOGE took in other areas that had significant negative impacts on the administration of benefits for individuals, including by making it more difficult for SSA employees to provide adequate service to American citizens and lawful SSN holders, such as through major staffing cuts and arbitrary policy changes.

69. The undersigned respectfully submit this disclosure for inquiry and investigation into mishandling and mistreatment of SSA data by DOGE and its agents.

*<signatures on next page>*

KATZ BANKS KUMIN

WHISTLEBLOWER AID

*Report government and corporate lawbreaking. Without breaking the law.*

REDACTED FOR CONGRESS

Sincerely,

Debra S. Katz
Katz Banks Kumin LLP
11 Dupont Circle, NW
Suite 600
Washington, D.C. 20036

Pamela J. Stone
Katz Banks Kumin LLP
11 Dupont Circle, NW
Suite 600
Washington, D.C. 20036

Elena Rodriguez Anderson
Katz Banks Kumin LLP
111 Broadway
Suite 1403
New York, NY 10006

Andrew P. Bakaj, Esq.
Chief Legal Counsel
Whistleblower Aid
1250 Connecticut Ave., NW
Suite 700
Washington, D.C. 20036

Kyle Gardiner, Esq.
Senior Counsel
Whistleblower Aid
1250 Connecticut Ave., NW
Suite 700
Washington, D.C. 20036