# Exhibit B

REDACTED FOR CONGRESS

**DECLARATION OF JEREMIAH CONRAD SCHOFIELD**

I, Jeremiah Conrad Schofield, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this declaration based upon my personal knowledge and experience at the Social Security Administration ("SSA") regarding the Department of Government Efficiency ("DOGE") using SSA data for non-sanctioned purposes and introducing false information into the SSA's Privacy Act protected system of records. This declaration is prepared in support of my lawful whistleblower disclosure.

2. My career at SSA spanned more than 25 years. I was hired in 2000 as a customer service representative in the SSA field office in Burien, Washington. I took on successively more responsibility at SSA over the years, eventually becoming certified as a member of the Senior Executive Service ("SES") in 2016. I served as Associate Commissioner for the Office of Public Service and Operations Support from 2023 until late February 2025, when I became Associate Commissioner for the Office of Analysis, Integration, and Performance Oversight following a reorganization. Beginning in late August 2025, because of another reorganization and until the time of my retirement in October 2025, I unofficially served as Head of Innovation for Field Operations. I also served as the Senior Executive Sponsor and Business Lead for Information Technology ("IT") Modernization for Enumeration and Earnings Workloads, responsible for driving strategy, setting priorities, and ensuring successful execution of enterprise IT projects. One of my main responsibilities in these positions was to serve as a bridge between the headquarters and employees in the field offices, processing centers, and teleservice centers.

3. During my quarter-century working at SSA, I became expert in all phases of the "enumeration" process. Enumeration is the process of assigning Social Security numbers

REDACTED FOR CONGRESS

("SSNs") and cards to individuals. My work on this process included implementing the online Social Security Number Application; enhancing the Internet Social Security Number Replacement Card application and fully automating several other enumeration processes (*e.g.*, Enumeration Beyond Entry, Enumeration At Entry), which created an estimated $1.3 billion in cost avoidance; and overseeing massive operational changes to the program, including transitioning customer intakes to an appointment-based model and implementing numerous scheduling improvements.

4. In my personal time, I served my town of Sykesville, Maryland, in the elected position of Town Councilman from 2019-2025, providing executive oversight for municipal government, including public works, police, parks and recreation, and financial management. I also serve as an executive coach and a mental health advocate. I am a husband, father, dog lover, and pickleball and Fantasy Football player. I currently serve as Chief Administrative Officer of a nonprofit organization headquartered in New York City.

5. SSA was in a state of upheaval after the 2024 election and through the inauguration. From November 2024 through February 2025, SSA had four Commissioners or Acting Commissioners. After Martin O'Malley resigned on November 29, 2024, President Biden appointed Carolyn Colvin to serve as Acting Commissioner during the presidential transition period.

6. On January 20, 2025, Donald J. Trump was sworn in as President of the United States. He signed an Executive Order creating the Department of Government Efficiency ("DOGE") that very same day. E.O. 14158, *Establishing and Implementing the President's "Department of Government Efficiency,"* 90 Fed. Reg. 8441 (Jan. 29, 2025).

REDACTED FOR CONGRESS

7. Deputy Commissioner for Operations Michelle King was immediately named Acting Commissioner. She held this position until February 16, 2025, when, according to public reporting, she was forced out after refusing to give DOGE access to SSA's sensitive databases. Leland Dudek, a career employee at SSA who had been a Senior Advisor for SSA's Office of Program Integrity, took over as Acting Commissioner on February 16, 2025. He immediately began to threaten, and then implement, large-scale employee reductions. In his first weeks on the job, he eliminated several departments including the Office of Civil Rights and Equal Opportunity and the Office of Transformation, and staff across the agency were afraid for their jobs.

8. Acting Commissioner Dudek used intimidation tactics, such as yelling at people in meetings and terminating people without warning, which created a culture in which employees were afraid to speak up in meetings for fear of retaliation. Employees feared they were going to be fired without notice and even executives were afraid to speak up in meetings or disagree with Mr. Dudek's decisions. At this time, I understood that many executives and supervisors were not being transparent with employees about what was happening with the threat of RIFs and other large scale employment shifts; this silence from leaders contributed to the constant state of fear and confusion among rank and file staff.

9. Early in Mr. Dudek's tenure, I received multiple messages from colleagues warning me that they had heard I was going to be laid off. I had not heard anything about my imminent termination myself, but these incidents, combined with the random and sudden nature of other terminations, left me feeling scared for my job security.

REDACTED FOR CONGRESS

10. At the same time, my job was extremely difficult and chaotic. I was tasked with reassigning hundreds of employees who lost their positions because of employee reassignments and restructurings.

11. It was in this fraught environment that I was ordered by my supervisor, Doris Diaz, then Acting Deputy Commissioner for Operations, to attend a meeting on or about February 25, 2025, with individuals I understood to be DOGE representatives. The meeting was not calendared, which was highly unusual and contrary to standard practice, especially for senior officials like me whose records are required to be saved pursuant to the Federal Records Act. Furthermore, this meeting took place in an unusual location, in the previously unoccupied first floor of the East side of the Altmeyer building on SSA's campus. Upon entering the East side of the building, as directed, I encountered a uniformed SSA security guard halfway down the hall, which was also unusual. When I reached the conference room where the meeting was taking place, I encountered what I presumed was a private security guard, dressed in plain clothes sitting on a chair at the door. He asked me for my name and my purpose in attending the meeting. Though he did not have a list, he seemed to know that I was expected and allowed me to enter the conference room.

12. The non-career SSA people present at this meeting were Antonio Gracias, Jon Koval, and Payton Rehling, individuals whom I later learned were close associates of Elon Musk. The career SSA employees present, to the best of my recollection, were Doris Diaz, Stephen Evangelista, then Deputy Commissioner for the Office of Retirement and Disability Policy, and [redacted].

13. I noticed a series of whiteboards around the room on which the names of SSA's master files (databases) had been handwritten, as well as what appeared to be some business

REDACTED FOR CONGRESS

process workflows. I also noticed that the computers used by Messrs. Gracias, Koval, and Rehling were not SSA-standard-issue Hewlett-Packard computers. Given my past work in provisioning hardware for SSA employees, I found it concerning that these individuals were using non-standard issue computers while working with SSA data, workflows, and master files. When I asked the three strangers what their roles were at SSA, they cryptically responded that they were "volunteers." Though they did not identify themselves as DOGE members, I and everyone in the room assumed they were from DOGE (and I will refer to them as such in this Declaration).

14. I had believed that I was invited to this meeting because of my expertise in the enumeration process, the process by which SSA assigns Social Security Numbers ("SSNs") and Social Security cards. Since DOGE was tasked with "government efficiency", I prepared for the meeting by collecting ideas about efficiencies and cost-saving measures that could be implemented in my area. But Mr. Gracias clarified that they were not looking for efficiencies but rather interested in identifying Social Security fraud, particularly with regard to people who "should not have" SSNs.

15. I was surprised by this line of questioning because SSA had a strong record of providing approximately 18 million new and replacement Social Security cards each year with a 99% or better accuracy rate. Moreover, SSA already had effective fraud detection tools built into the back end of the enumeration process. I told the DOGE team that a search for Social Security card fraud was not likely to find much fraud or produce significant savings given all the systems SSA already had in place to identify fraud and remediate it when it occurred. When I tried to tell the DOGE team about my ideas for implementing efficiencies in the enumeration process – which could have resulted in savings of approximately $10,000,000 or more – Mr. Gracias was

REDACTED FOR CONGRESS

dismissive of my ideas and responded that he was looking only for projects that would result in "$50 billion" in fraud savings. He asserted that he would go to the President "with nothing less." Mr. Gracias went on to say words to the effect that DOGE was looking for a "big win" related to fraud.

16. I met with this DOGE team four or five times in total during February and March of 2025. Not surprisingly, the meetings did not result in any findings of $50 billion in fraud because of course there was no such fraud within the Agency. However, at some point during this time, the DOGE team focused on the fact that a large number of individuals in the Numident system (a database of everyone who has applied for a Social Security card and through which SSNs are assigned to individuals) who would be well over 100 years old did not have death dates assigned to their records. Though this circumstance was well-known to SSA and well-documented in Office of the Inspector General ("OIG") reports, the DOGE team wanted dates of death added to Numident *immediately*. The SSA OIG had found that none of the dead people without death dates were receiving benefits. Nonetheless, the DOGE team erroneously insisted that death dates were needed to ensure that these dead people would not receive Social Security benefits.

17. Adding arbitrary death dates to the Numident is contrary to law, regulation, and policy. Numident is a Privacy Act-protected system of records and is required to maintain accurate records. To ensure accuracy, SSA has implemented regulations outlining what evidence is needed for recording deaths at 20 C.F.R. § 404.720 and 721. Additional sub-regulatory guidance is given to the SSA employees who input such data in the Numident. Without such evidence, SSA employees are trained not to add dates of death to an individual's social security record. Additionally, adding arbitrary death dates, *i.e.*, death dates without any evidence

REDACTED FOR CONGRESS

supporting them, introduces inaccuracies into a database upon which all SSN holders—and many federal agencies—rely. My staff and I believed it was far more prudent to leave the death date blank than to violate the law by knowingly introducing inaccurate information into the Numident system. I was confident that inputting death dates to these records was unnecessary because a blank date of death field is far from the sole determinant of whether an individual receives benefits.

18. Beginning in February, the DOGE team persisted in demanding that we add dates of death to the Numident system, after both Elon Musk and President Donald Trump had taken to falsely stating publicly that millions of people over 100 years of age were still receiving social security checks. Acceding to their pressure and fearing for my job, I did not stand in the way of posting false death dates to the Numident for individuals who would have been 120 or 125 years or older. Though the information would be inaccurate as to the date of death, as a practical matter we could be fairly certain that the individuals were indeed deceased. The actual updating was done in batches by the Office of Enterprise Information Systems ("OEIS"), a unit within the Office of the Chief Information Officer.

19. I met with this DOGE team a few more times in March 2025 to discuss other areas of potential fraud, but they seemed uninterested in, and thus took no action to address, most of these areas. We did work with them to implement new policies around direct deposit. Messrs. Gracias, Koval, and Rehling left the SSA immediately after a Temporary Restraining Order prohibiting DOGE members from accessing SSA data was issued in *AFSCME v. SSA*, No. 1:25-cv-00596 (D. Md. Mar. 20, 2025), at ECF Nos. 48 & 49 (the TRO and accompanying opinion).

REDACTED FOR CONGRESS

20. On April 7, 2025, as reported in the media, Acting Commissioner Leland Dudek received two memoranda from Kristi Noem, then Secretary of the Department of Homeland Security ("DHS"), requesting that SSA help DHS to prevent "suspected terrorists" and "convicted criminals" without lawful immigration status from using Social Security numbers.

21. A day or two later, I was asked to develop a strategic approach to "killing off" a list of 6,000+ individuals. I understood that this directive had come from DHS and "killing off" meant marking these individuals as deceased in the Numident system. Unlike with the previous effort to add death dates, there was no reason to assume that the individuals on this list were dead. I proceeded cautiously because once marked as deceased within the Numident system, their names would then automatically be added to the Death Master File.

22. Marking a live individual as deceased within these systems has dire real-life consequences for the individual. The individual's bank account and credit cards become frozen immediately. Any benefits for which they are eligible, such as Social Security or other public benefits, cease immediately. The individual cannot legally work. Though there is a process to "resurrect" individuals incorrectly marked as deceased, it is an onerous one that requires the individual to go to a Social Security office in person and provide a great deal of documentation.

23. I knew that "killing off" these individuals in the Numident system would be contrary to law, regulation, and policy, because no evidence was provided to substantiate their alleged "deaths." I immediately consulted with the Office of Policy and the Office of General Counsel to seek legal guidance about what I had been directed to do. The people I spoke with agreed that the request to arbitrarily "kill off" individuals without appropriate documentation was inappropriate and illegal. I also began a discussion about finding a legal course of action to mark these individuals in a way that responded to DHS's request without marking them as dead.

REDACTED FOR CONGRESS

24. I conveyed this discussion and my conclusion that we could not take this action to my supervisor, Acting Deputy Commissioner for Operations Doris Diaz, and she agreed that the action was illegal. She told me that she would tell her superiors that we could not list individuals as dead within the Numident system without death dates and proof of their deaths. Though I have no actual knowledge of what Ms. Diaz told her superiors, she abruptly left the agency less than two weeks later. It is my belief that her departure was not voluntary.

25. After I and other members of my team refused to carry out what I believed to be an illegal direction, we soon discovered that unidentified staff in the Office of Chief Information Officer had in fact applied a death date of March 8, 2025, in the Numident system for the 6,000+ people, who were then automatically added to the Death Master File. No one in my office was informed that the Office of the Chief Information Officer had taken this action.

26. I realized that someone had killed off the 6,000+ individuals in the Numident system when I began to hear from the field offices about an unusual uptick in individuals coming into their offices because they were having issues using their SSN as a result of a date of death having been posted to their Numident record. These individuals were obviously very much alive, but their lives had been upended by this improper action. I directed field offices to use the standard procedure for "resurrecting" individuals when these individuals presented themselves to a Social Security field office.

27. In late April 2025, I learned through unofficial channels that DHS had provided SSA a list of 2.7 million names with a request to "kill off" those individuals in the Numident system. I was deeply disturbed by this direction, as were other career SSA employees, including [redacted] and others within our department. By this time, the actions taken with regard to the list of 6,000+ individuals had been widely reported, and the public was beginning to question the

REDACTED FOR CONGRESS

legality of SSA's actions. Though the memoranda from Secretary Noem indicated that DHS was asking SSA for its assistance with "suspected terrorists" and "convicted criminals," SSA does not have the capability to determine whether people with SSNs are terrorists or criminals. [redacted] and I decided to conduct a review of a small sample of the new list to ascertain whether the individuals were valid SSN holders and whether they had any flags in their record, such as expired immigration status (though we had no ability to identify criminal status or terrorist leanings), before beginning to consider how to respond to DHS's request to kill them off in the Numident system. [redacted] reviewed 25 records and found that almost all of the individuals were *legitimate* SSN holders who were in the United States legally. The vast majority were U.S. citizens or lawful permanent residents. As I recall, only two of the people needed further investigation to understand if they were in the U.S. unlawfully. In any event, they were certainly not dead.

28. I again contacted my colleague in the Office of Policy and counsel in the Office of General Counsel to report this request, seek legal guidance, and revisit our conversations about legal alternatives to killing off people that DHS had decided, without any form of due process or evidentiary documentation, should be added to the Death Master File. We discussed the option of putting a "special indicator" code ("SPIN code") on the 2.7 million records, which would show the users of this data that there was a potential issue with the individual's SSN. The individual with this special indicator would have to go in person to a Social Security field office to address the problem but their lives would not be immediately disrupted. Though this approach was certainly preferable to simply killing off people, it still involved introducing inaccuracies into the Numident system, which was a problem. But, the individuals would not be marked deceased and moved to the Death Master File. Furthermore, such an action would be reversible

REDACTED FOR CONGRESS

once the individual confirmed their identity and status with Social Security by visiting a Social Security field office.

29. Because the sample review showed that the majority of people did not fit DHS's stated criteria since they held valid SSNs, I raised the issue to Stephen Evangelista, who by then was Deputy Commissioner for Operations (succeeding Doris Diaz). I told Mr. Evangelista that I refused to carry out the direction to kill off the 2.7 million individuals and insisted that we go back to DHS and tell them that their data required further analysis. I also told Mr. Evangelista that DHS needed to send us a clean list after it analyzed the data.

30. I understand that Mr. Evangelista had numerous conversations with his counterparts at DHS, including Mr. Koval, who had apparently transferred to DHS after leaving SSA. In mid-to-late May 2025 I attended a meeting with Mr. Koval, Mr. Evangelista, and a few others from SSA to discuss the request to kill off the 2.7 million individuals identified by DHS. Most of the SSA participants gathered in a conference room on the eighth floor of the Altmeyer building; [redacted] and Mr. Koval joined the meeting by video call.

31. There were two items on the agenda for that meeting: (1) to discuss our review of the 25 sample records from the list of 2.7 million people and demonstrate that the list was not accurate because the vast majority of the people we reviewed were legitimately granted SSNs (though we had no way to prove or disprove whether they were suspected terrorists or convicted criminals based on the data available to us); and (2) to discuss the option of using a SPIN code and what actions SSA employees would take if an individual showed up at a Social Security field office and a SPIN code had been added to their SSA record. After sharing the results of our sampling review, I asked Mr. Koval to take the entire list of 2.7 million individuals back to review and confirm that the list contained only suspected terrorists and convicted criminals

REDACTED FOR CONGRESS

without lawful immigration status, *not* citizens and others lawfully in the U.S. He agreed to do so. We also discussed where to direct people if they were marked deceased or if their accounts were disabled by a SPIN code. We noted that we traditionally refer individuals with potential immigration issues to the U.S. Citizenship and Immigration Services ("USCIS"). Mr. Koval surprised us by stating that these individuals should be referred directly to Immigration and Customs Enforcement ("ICE"). We had never sent people to ICE before and I was uncomfortable with the direction.

32. After the meeting with Mr. Koval concluded, I told Mr. Evangelista that I believed DHS asked SSA to "kill off" 2.7 million people in the Numident system regardless of whether they were suspected terrorists or convicted violent criminals to further DHS's aggressive deportation campaign. I made it clear to him that I suspected that the list contained individuals who were not covered by then Secretary Noem's memoranda. I also told him that I did not believe SSA should be involved in DHS's effort to deport immigrants. Mr. Evangelista responded that he did not believe my concerns were correct and decided to call Mr. Koval while I and another SSA employee were still in the meeting room.

33. Mr. Evangelista told us to stay quiet while he placed the call with his cell phone on speaker mode so that we could hear both sides of the conversation. Mr. Evangelista asked Mr. Koval why DHS wanted to kill off the 2.7 million people on the list. Mr. Koval responded that doing so would have two possible outcomes, either of which would be welcomed by DHS. The result would either be (1) that the lives of these individuals would be ruined because of the real-life hardship that results from being "killed" in SSA systems and they would be driven to "self-deport," or (2) they would have to go to a local Social Security office, at which point SSA field office staff would send them to DHS offices where ICE or USCIS would detain them for

REDACTED FOR CONGRESS

deportation. I clearly heard Mr. Koval explain that DHS's goal in having SSA make the changes in the Numident system was to lead to the deportation of these 2.7 million people. Mr. Koval could not have been more explicit about his unlawful purpose in asking us to "kill off" these 2.7 million individuals. Hearing Mr. Koval blithely confirm my suspicions, Mr. Evangelista looked extremely uncomfortable. He quickly terminated the call and the meeting without making any further comment to me or the others in the room. We all exited the room immediately and I never had another conversation with Mr. Evangelista on the subject.

34. When I left the room, I felt sickened by Mr. Koval's confirmation that the United States government was attempting to falsify Social Security data in this improper and illegal manner for the purpose of deporting millions of people. From that day on until I left SSA, I continued to do my best to keep SSA functioning *on behalf of* the American people, and I kept firm in my resolve to not allow SSA data to be used for illegal purposes.

35. While this declaration is focused on the DOGE team's directions to illegally make changes to the Numident system and the Death Master File, I was involved in other conversations from which I learned that DOGE may have been engaged in similar activities misusing SSA data with other agencies. Specifically, I understand that DOGE was trying to use SSA data to prevent immigrants from receiving SNAP benefits and Medicare benefits. Furthermore, their actions in other areas had significant negative impacts on the administration of benefits for individuals, including by making it more difficult for SSA employees to provide adequate service to American citizens and lawful SSN holders.

36. Since leaving SSA, I have had conversations with other former SSA officials who observed the same misconduct and remain deeply disturbed by what they observed.

I do solemnly affirm under penalty of perjury that the contents of the above statement are true and correct to the best of my knowledge.

Jeremiah Conrad Schofield

Date: May 12, 2026

REDACTED FOR CONGRESS