IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN FEDERATION OF
STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-
CIO, *et al.*

    *Plaintiffs*,

    v.

SOCIAL SECURITY
ADMINISTRATION, *et al.*

    *Defendants*.

Civil Action No. ELH-25-0596

**MEMORANDUM OPINION**

The Social Security Administration ("SSA" or "Agency") "oversees retirement, disability, and survivor benefits for nearly 72 million people." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 365 (4th Cir. 2026) (en banc) ("*AFSCME VI*");[1] *see* ECF 1, ¶ 58; ECF 17, ¶¶ 34–36. In order for the Agency to fulfill its responsibilities, SSA collects and maintains "sensitive information about nearly everyone in the United States," including Social

---

[1] For clarity, I shall refer to the decisions issued in this case by this Court, the Fourth Circuit, and the Supreme Court, as follows: *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717 (D. Md. 2025) ("*AFSCME I*") (granting plaintiffs' motion for temporary restraining order); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 2025 WL 1111245 (4th Cir. Apr. 1, 2025) ("*AFSCME II*") (dismissing defendants' appeal of temporary restraining order for lack of jurisdiction); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685 (D. Md. 2025) *("AFSCME III")* (granting plaintiffs' motion for preliminary injunction)*; Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,* 2025 WL 1249608 (4th Cir. Apr. 30, 2025) (en banc) *("AFSCME IV")* (denying defendants' motion to stay preliminary injunction pending appeal); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 605 U.S. ___, 145 S.Ct. 1626 (2025) *("AFSCME V")* (granting defendants' application to stay preliminary injunction)*; Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,* 172 F.4th 361 (4th Cir. 2026) (en banc) *("AFSCME VI")* (vacating preliminary injunction and remanding case to the district court).

Security numbers, employment and wage records, physical and mental health records, tax information, immigration records, bank and financial information, and home addresses, among other things. *AFSCME VI,* 172 F.4th at 365.

On February 21, 2025, three organizations filed suit against SSA and three others, seeking to prevent SSA from providing ten individuals affiliated with the Department of Government Efficiency ("DOGE") with unfettered access to SSA systems of records containing the sensitive, personally identifiable information ("PII") of millions of Americans. The plaintiffs are the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"); the Alliance for Retired Americans; and the American Federation of Teachers. Their combined membership includes millions of current and retired workers, the vast majority of whom are Social Security beneficiaries whose sensitive personal data is housed in SSA systems of records. ECF 1, ¶¶ 17–19; ECF 17, ¶¶ 16–18.

A First Amended Complaint followed on March 7, 2025, adding additional defendants. ECF 17 ("Amended Complaint"). At the same time, plaintiffs moved for a temporary restraining order ("TRO"). ECF 21. In particular, plaintiffs sued the SSA; Leland Dudek, in his official capacity as Acting Commissioner of SSA; Michael Russo, in his official capacity as Chief Information Officer of SSA; Elon Musk, in his official capacity as Senior Advisor to the President and de facto head of DOGE; the U.S. DOGE Service; the U.S. DOGE Service Temporary Organization; and Amy Gleason, in her official capacity as Acting Administrator of the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization. ECF 17, ¶¶ 19–26. Pursuant

2

to Fed. R. Civ. P. 25(d), Frank Bisignano, the current Commissioner of SSA, has since been substituted for Dudek.[2]

This Memorandum Opinion concerns plaintiffs' "Motion to Lift Stay and Authorize Limited Discovery" (ECF 200, "Discovery Motion") and the Court's Order of April 14, 2026 (ECF 212), lifting the case stay it had imposed on August 13, 2025 (ECF 189), while the case was on appeal to the Fourth Circuit, and granting plaintiffs' Discovery Motion.  In the Order, the Court expressly afforded defendants the opportunity to move for rescission of the Order, as improvidently granted.  Defendants have so moved.  ECF 215.  Plaintiffs have filed an opposition.  ECF 216.  Defendants replied.  ECF 224.  Accordingly, this Memorandum Opinion resolves defendants' "Motion to Rescind or Stay Court's April 14 Order as Improvidently Granted."  ECF 215 ("Motion to Rescind").[3]

In the Memorandum Opinion, I shall generally refer to SSA and SSA personnel collectively as the "SSA Defendants" or "SSA."  I shall sometimes refer to the DOGE entities and DOGE members collectively as "DOGE," the "DOGE Defendants," or the "DOGE Team."  On occasion, I refer to defendants collectively as the "government."

No hearing is necessary to resolve the Motion to Rescind.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion to Rescind.

---

[2] Fed. R. Civ. P. 25(d) states: "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded."

[3] As discussed, *infra*, defendants have also moved to dismiss for lack of jurisdiction. ECF 217.  I reference that motion but do not resolve it here.

## I. Factual and Procedural Summary

The parties are familiar with the allegations and with the already long procedural history of this case. Therefore, it is not necessary for me to recount the procedural and factual history at length. Instead, I shall set forth the factual background and the procedural history to the extent that it is helpful for context in regard to the Discovery Motion, the Order of April 14, 2026, and the Motion to Rescind.

As noted, suit was filed on February 21, 2025. ECF 1. The Amended Complaint (ECF 17), filed March 7, 2025, is the operative pleading. It contains seven counts. Counts I, III, IV, and V allege unlawful and arbitrary and capricious Agency action, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

Count I alleges that the SSA Defendants unlawfully disclosed and continue to disclose "personal records contained in systems of records under their control," without consent of plaintiffs' members, in violation of the Privacy Act, 5 U.S.C. § 552a, and § 706(2) of the APA. ECF 17, ¶ 101. Count I also alleges that the SSA Defendants "entered inter-agency data sharing agreements without abiding [by] the process prescribed by law, 5 U.S.C. § 552a(o)." *Id*. ¶ 102. And, plaintiffs allege that the SSA Defendants "have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2). *Id*. ¶ 104.

In Count II, plaintiffs allege that the SSA Defendants violated the Privacy Act, 5 U.S.C. § 552a(o), by the same actions identified in Count I. *Id*. ¶¶ 108–09. Accordingly, plaintiffs allege that they are entitled to civil remedies under 5 U.S.C. § 552a(g). *Id*. ¶ 110.

Count III alleges that the SSA Defendants "unlawfully permitted DOGE Defendants to access and inspect tax return information protected by the Internal Revenue Code, 26 U.S.C.

§§ 6103, 7213A, and the Social Security Act, 42 U.S.C. § 1306." *Id*. ¶ 114. Under 5 U.S.C. § 706(2), plaintiffs allege that defendants "engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id*. ¶¶ 115, 116.

Count IV alleges that the SSA Defendants "have administered systems containing vast quantities of sensitive personal information without complying with statutorily required security protections" under the Federal Information Security Modernization Act, 44 U.S.C. §§ 3554(a)(1)–(2). Thus, plaintiffs assert a violation of the APA, 5 U.S.C. § 706(2). *Id*. ¶ 118.

In Count V, plaintiffs allege: "SSA Defendants have disclosed an unfathomable amount of sensitive, personally identifying information about the American public without acknowledging that SSA was changing its policies, identifying the source of its authority to do so, or providing any analysis whatsoever of why its decision is not arbitrary and capricious, and without considering the consequences, including the reliance interests of Plaintiffs and their members." *Id*. ¶ 122. Plaintiffs allege that this conduct is in violation of 5 U.S.C. § 706(2). *Id*.

Count VI alleges *ultra vires* actions by the DOGE Defendants. Plaintiffs assert that, "[i]n directing and controlling the use and administration of Defendant SSA's systems, the DOGE Defendants have breached secure government systems and caused the unlawful disclosure of the personal data of tens of millions of people." *Id*. ¶ 126. And, according to plaintiffs, this constitutes "*ultra vires* actions that injure Plaintiffs by exposing their sensitive, private, and personally identifiable information and increasing the risk of further disclosure of their information." *Id*. ¶ 129.

Count VII asserts that the naming of Leland Dudek as the Acting Commissioner of SSA constituted a violation of the Appointments Clause of the Constitution, U.S. CONST. art. II, § 2,

cl. 2. *Id.* ¶ 132. They state: "Defendant Dudek was neither nominated by the President nor confirmed by the Senate. Nor has Congress enacted a law authorizing him to perform the functions and duties of the Commissioner without Senate confirmation." *Id*. ¶ 133. Therefore, plaintiffs posit that Dudek was acting in violation of 42 U.S.C. § 902, *id*. ¶ 134, and his "grant of initial and continued access to SSA systems is thus unlawful and must be invalidated." *Id*. ¶ 135.

In the suit, plaintiffs seek declaratory and injunctive relief. In particular, they seek an order directing defendants to disgorge or delete all unlawfully obtained SSA data and prohibiting DOGE personnel from accessing SSA systems. *Id.* at 28–29.[4]

The Court held a hearing on the TRO motion on March 14, 2025. ECF 43. On March 20, 2025, the Court issued a TRO, barring SSA's disclosure of PII to DOGE under certain circumstances. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717 (D. Md. 2025) ("*AFSCME I*"); *see* ECF 48, ECF 49. The government noted an appeal to the Fourth Circuit on March 24, 2025. ECF 57. And, on March 26, 2025, defendants asked this Court to stay the TRO, pending appeal. ECF 60. Defendants also moved for a stay in the Fourth Circuit. *See* Case No. 25-1291, Docket Entry No. 5. By agreement of the parties (ECF 68), the TRO was extended through April 17, 2025. ECF 69.

By Memorandum (ECF 78) and Order (ECF 79) of March 31, 2025, I denied the motion for stay. Moreover, the Fourth Circuit dismissed defendants' appeal of the TRO on April 1, 2025, "for lack of jurisdiction." *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,* 2025 WL 1111245, at \*1 (4th Cir. Apr. 1, 2025) ("*AFSCME II*"); *see also* ECF 81 (Order); ECF 82 (Judgment); ECF 83 (Corrected Order).

---

[4] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

Plaintiffs subsequently moved for a preliminary injunction (ECF 111, "P.I. Motion"), which defendants opposed. ECF 113. The reply is docketed at ECF 122. There were several other filings with regard to the P.I. Motion. *See* Docket. The Court held an evidentiary hearing on April 15, 2025. ECF 139. Thereafter, on April 17, 2025, the Court granted plaintiffs' P.I. Motion, in part. *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685 (D. Md. 2025) *("AFSCME III"); see also* ECF 146; ECF 147. In general, the Court enjoined the SSA Defendants from providing the DOGE Defendants with access to any SSA system of record containing PII, except as specified. The preliminary injunction allowed SSA to provide DOGE staffers with access to redacted or anonymized data and SSA records, subject to certain conditions. *See* ECF 147. In addition, the preliminary injunction allowed SSA to provide DOGE with access to "discrete, particularized and non-anonymized data," subject to specific need. *Id.* ¶ 3. Moreover, "ordinary operations" of SSA were left intact. *Id.* ¶ 7.

On April 17, 2025, defendants noted an appeal to the Fourth Circuit with regard to the preliminary injunction. *See* ECF 148. They also requested a stay of the preliminary injunction, pending the appeal. *See* ECF 149.

A divided Fourth Circuit, sitting en banc, denied defendants' motion to stay the preliminary injunction. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 2025 WL 1249608, at *1 (4th Cir. Apr. 30, 2025) (en banc) ("*AFSCME IV*"). And, as discussed, *infra*, in September 2025, the Court, again sitting en banc, heard the appeal concerning the merits of the preliminary injunction. *See AFSCME VI*, 172 F.4th 361.

In the meantime, after the Fourth Circuit denied the government's application for a stay of the preliminary injunction, the government filed an application for stay with the Chief Justice of the Supreme Court. It was considered on that Court's emergency docket. On June 6, 2025, by a

vote of six to three, the Supreme Court granted defendants' request for a stay of the preliminary injunction, pending disposition of the appeal in the Fourth Circuit as to the merits of the preliminary injunction and disposition of a petition for a writ of certiorari, if sought. *Soc. Sec. Admin. v. Am. Fed'n of State, Cnty. & Mun. Emps.,* 605 U.S. ___, 145 S.Ct. 1626 (2025) ("*AFSCME V*").[5]  Therefore, said the Supreme Court, "SSA may proceed to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work." *Id.*

In this Court, on June 20, 2025, defendants moved to dismiss or, in the alternative, for summary judgment. ECF 168.  The appeal of the preliminary injunction was pending in the Fourth Circuit at that time.  Plaintiffs opposed that motion.  ECF 183.

On August 12, 2025, while the appeal of the preliminary injunction was still pending in the Fourth Circuit, plaintiffs filed a "Motion for Limited Discovery" (ECF 187), in which they sought "an order (1) permitting them to serve the discovery requests attached to this motion, and (2) requiring Defendants to respond to those requests within 30 days of service of the requests." *Id.* at 1.  In the "Motion for Limited Discovery," plaintiffs sought extra-record discovery, asserting that the "administrative record and additional information produced by Defendants contain gaps, reveal inconsistencies, and present issues that would impede this Court's ability to fully review Plaintiffs' claims." *Id.* at 2.

As a result of the filing, this Court held a telephone conference with counsel on August 12, 2025 (*see* Docket), which was transcribed.  ECF 190.  The Court discussed the matter of discovery sought by plaintiffs.  *See* ECF 187.  Plaintiffs' counsel explained: "We certainly don't want to stress the Court's resources but especially in a world where the organization structure and

---

[5] The Supreme Court's majority ruling consists of three paragraphs.

membership of the DOGE team at Social Security is varying and continuing to become more opaque, we don't want to risk delaying even seeking discovery until after the Fourth Circuit rules because at that point, the case is just completely paused." ECF 190 at 8. Government counsel argued that "if there's no [Article III] standing, really there should be no discovery." *Id.* at 16. The Court commented: "I don't know how I can authorize discovery when [the appeal] is pending . . . I'm not sure I would agree to put the Government through [plaintiffs' discovery] until I know the case survives." *Id.* at 21, 22.

By Order of August 13, 2025 (ECF 189), this Court entered a stay of the case, pending resolution of the appeal, and denied defendants' "Motion to Dismiss or, in the Alternative, for Summary Judgment" (ECF 168), without prejudice. But, the Court indicated that defendants could "file a renewed motion to dismiss, due within three weeks of the Fourth Circuit's ruling in regard to defendants' Appeal, unless the date is otherwise extended." ECF 189. And, the Court set a briefing schedule for plaintiffs' "Motion for Limited Discovery" (ECF 187). ECF 189. However, on September 17, 2025, plaintiffs withdrew their "Motion for Limited Discovery" (ECF 187). ECF 194. Plaintiffs' counsel stated: "On the basis of intervening events since filing their motion, Plaintiffs believe that it may be appropriate to move for substantially different discovery at a later date and therefore seek to withdraw their pending motion to preserve judicial economy." *Id.* at 1.

The Fourth Circuit, sitting en banc on September 11, 2025, heard argument as to the merits of the preliminary injunction. *See AFSCME VI*, 172 F.4th 361. On January 16, 2026, while that appeal was still pending, SSA filed a "Notice of Corrections to the Record," disclosing several

inaccuracies in regard to information previously provided by defendants to the Court.  ECF 197 ("Notice").[6]

The Notice provided disturbing information.  The government advised that, based on the Agency's review of records obtained during or after October 2025, SSA had identified communications and actions by the former SSA DOGE Team that were potentially outside SSA policy and/or noncompliant with the Court's TRO of March 20, 2025.  *See id.*  Among other things, SSA indicated that a DOGE Team member ran PII searches on SSA's systems on the morning of March 24, 2025, before that access was terminated around noon that day (*id.* at 2); in an email of March 3, 2025, a DOGE advisor was copied on an encrypted attachment that SSA believes contained PII derived from SSA systems (*id.* at 2–3); and a DOGE Team member executed a "Voter Data Agreement" with a political advocacy group seeking to analyze state voter rolls.  *Id.* at 5.

On January 21, 2026, also during the pendency of the appeal in the Fourth Circuit, plaintiffs moved to supplement the record on appeal (ECF 198), to include the information disclosed by the government in the Notice.  The Court granted that motion.  ECF 199.

Then, on February 9, 2026, plaintiffs filed the Discovery Motion.  ECF 200.  They cited defendants' Notice as evidence of ongoing harm, noncompliance with prior Court orders, and bad faith conduct by defendants.  *Id.*  With this motion, plaintiffs included proposed Requests for Admission, Interrogatories, Requests for Production of Documents, and Requests for Deposition. ECF 200-1.  Defendants opposed this motion.  ECF 204.  Plaintiffs replied.  ECF 207.

---

[6] Judge King pointed out in his concurrence and dissent in *AFSCME VI*, 172 F.4th at 394 n.4: "Notably, the defendants include not only SSA and two of its leaders, but also two DOGE entities and two DOGE officials. In my view, it is beyond passing strange that only SSA filed the 'Notice of Corrections to the Record.'"

Thereafter, on March 10, 2026, plaintiffs filed a "Notice of Factual Development." ECF 208 ("First Factual Notice"). There, they provided the Court with an article from the Washington Post, titled "Whistleblower claims ex-DOGE member says he took Social Security data to new job." *See* ECF 208-1. The news article reported that the member of DOGE "allegedly told several co-workers that he possessed two tightly restricted databases of U.S. citizens' information, and had at least one on a thumb drive." ECF 208-1 at 2. The article identified the databases as "Numident" and the "Master Death File," and states that they "include records for more than 500 million living and dead Americans, including Social Security numbers, places and dates of birth, citizenship, race and ethnicity, and parents' names." *Id.* Further, the article indicated that "[a] separate complaint, made in August by the agency's former Chief Data Officer, Charles Borges, alleges members of DOGE improperly uploaded copies of Americans' Social Security data to a digital cloud, putting individuals' private information at risk." ECF 208-1 at 6. According to Borges, "DOGE members had access to data that had been blocked by [this Court's] order and . . . the DOGE team used unsanctioned methods to put data into the cloud." *Id.* at 7.

Defendants responded. ECF 209. They noted that the Washington Post had not "independently confirmed" the accusations contained in the article. *Id.* at 1.[7] Further, defendants maintained: "Plaintiffs' speculation, based on media reporting, is not a factual basis for Article III injury-in-fact." *Id.* at 2.

On April 10, 2026, the Fourth Circuit issued its decision in the appeal concerning the merits of the preliminary injunction. In a nine to six ruling, the Court vacated the preliminary injunction

---

[7] The government pointed out that the accusations in the First Factual Notice (ECF 208) were not confirmed. *See* ECF 209. But, the government has not actually disputed the accuracy of the Washington Post article.

and remanded the case to the District Court for further proceedings. *See AFSCME VI*, 172 F.4th at 365. The Mandate issued on June 2, 2026. *See* ECF 232.

Of relevance, nine members of the Court agreed with the District Court's finding as to Article III standing. *AFSCME VI*, 172 F.4th at 368. Moreover, the majority agreed that the disclosure of the PII of plaintiffs' members to DOGE "inflicts a harm that is a 'close . . . analogue'" to the common law tort of intrusion upon seclusion." *Id.* at 368. However, the Fourth Circuit vacated the injunction on the ground that plaintiffs had not established irreparable harm sufficient to justify preliminary injunctive relief. *Id.* at 372.

On the same date, April 10, 2026, plaintiffs filed a "Notice Regarding Supplemental Authority" in this Court. ECF 211. They asserted: "Discovery is necessary for—as the Fourth Circuit contemplated—the parties to be able to introduce further evidence, and for the Court to have an adequate record to consider further requests for relief or corrective action." *Id.* at 2.

Thereafter, by Order of April 14, 2026 (ECF 212), this Court granted plaintiffs' Discovery Motion (ECF 200), which had been filed on February 9, 2026. But, the Order expressly provided defendants with the opportunity to move for rescission of the Order, as improvidently granted.

Defendants subsequently filed a "Motion for Clarification of the Court's Order." ECF 213. They asked "whether the Court's April 14, 2026, Order was a final order" and inquired about "the time to respond to Plaintiffs' discovery requests." *Id.* at 2. Defendants also indicated that they intended to move to rescind the Order (ECF 212) as improvidently granted. *Id.* at 1.

By Order of April 17, 2026 (ECF 214), the Court stated that defendants need not respond to plaintiffs' discovery requests until the Court had the opportunity to consider defendants' rescission arguments. *Id.* at 1. The Court also stated that, "if defendants wish to propose limitations for the scope of discovery, they should include such proposed parameters in their

forthcoming motion to rescind." *Id.* at 2. With regard to plaintiffs' expedited timelines for discovery, the Court ordered that, "[i]f discovery is permitted, defendants shall respond in accordance with the Federal rules." *Id.*

Defendants subsequently filed the Motion to Rescind. ECF 215. They argue that the case is now moot; plaintiffs' Amended Complaint does not adequately plead a basis for extra-record discovery under the APA; and, even if some discovery were appropriate, plaintiffs' proposed requests are overbroad and untethered to their pleadings. *Id.* at 1–2. Defendants included plaintiffs' discovery requests as an exhibit. *See* ECF 215-1.

On May 1, 2026, defendants filed a "Motion to Dismiss for Lack of Jurisdiction." ECF 217. It is supported by a memorandum. ECF 217-1 (collectively, "Motion to Dismiss"). Defendants again contend that the case is moot. They argue that SSA no longer has any DOGE-affiliated employees or a DOGE Team and, pursuant to the relevant Executive Order, the DOGE Temporary Organization expires on July 4, 2026. ECF 217-1 at 7. Therefore, according to defendants, "Plaintiffs cannot obtain prospective injunctive relief, and the Declaratory Judgment Act does not supply an independent basis for jurisdiction." *Id.* Defendants submitted with the Motion to Dismiss the Declaration of Florence Felix-Lawson, the Chief of Human Resources for SSA. *See* ECF 217-2.

Plaintiffs oppose defendants' Motion to Dismiss. ECF 226. Defendants replied on June 15, 2026. ECF 234. This Memorandum Opinion does not address the Motion to Dismiss.

Then, on June 5, 2026, plaintiffs filed a "Notice of Factual Development," alerting the Court to another whistleblower report that became public that day. ECF 233 ("Second Factual Notice"). It centers on the sworn Declaration of Jeremiah Schofield, a senior SSA executive. According to plaintiffs, Schofield describes several incidents of misconduct by DOGE at SSA.

For example, Schofield asserts that DOGE personnel directed SSA staff to add inaccurate death dates to records; the Department of Homeland Security ("DHS") asked Schofield to "kill off" 6,000 individuals, despite a lack of evidence that these individuals are dead; and DHS sent SSA a list of 2.7 million individuals and asked SSA to "kill off" those people. *Id.* at 2–3. Schofield and his colleagues allegedly reviewed a small sample of those 2.7 million people and determined that the vast majority were U.S. citizens or lawful permanent residents. *Id.* at 3. DHS official Jon Koval later admitted to Schofield that these directives were intended either to ruin the lives of those individuals and drive them to self-deport, or to cause them to visit Social Security offices where ICE could detain them. *Id*. at 2–3.

Of import, plaintiffs argue that these disclosures directly reinforce their need for discovery. They posit that the disclosures undermine defendants' claim in the pending Motion to Dismiss (ECF 217) that no DOGE affiliates remain at SSA, and demonstrate that defendants have systematically obscured DOGE's activities at SSA. *Id.* at 1.

Defendants responded to plaintiffs' Second Factual Notice on June 18, 2026. ECF 235. They contend that the information provided by plaintiffs "does not 'reinforce' Plaintiffs' efforts for extra-record discovery; nor does it render Plaintiffs' claims any less moot." *Id.* at 1. Defendants argue that the conduct described in the whistleblower report postdates the discrete Agency action challenged in the Complaint, namely SSA's decision to grant the DOGE Team access to its record systems. *Id.* at 2.

According to defendants, to the extent that the whistleblower report bears on the case at all, it confirms the absence of subject matter jurisdiction, because plaintiffs have not lodged and could not maintain a broad programmatic attack on the Agency's internal operations. *Id.* Further, defendants maintain that nothing in the whistleblower report "is actually news to the Court.[]" *Id.*

14

They point to prior disclosures of SSA's review of Numident records for individuals over 100 years old and SSA's handling of lists provided to the Agency by DHS. *Id.* (citing ECF 62-1, Dudek Declaration, dated March 27, 2025, ¶¶ 9–10; ECF 73, March 27, 2025 telephone conference transcript, at 7–9; ECF 136-1, Third Supplemental Declaration of Flick, dated April 14, 2025, ¶ 15). In addition, defendants contend that "these stories have been in the public domain, from multiple news reports, for over a year.[]" *Id.* at 2.

In sum, defendants argue: "Plaintiffs' notice does not inform the Court of anything new and, to the extent it is relevant at all, demonstrates the lack of subject-matter jurisdiction over this case." *Id.* at 3.

Additional facts are included, *infra*.

## II. Discussion

As mentioned, in the defendants' Motion to Rescind (ECF 215) the Order of April 14, 2026 (ECF 212), defendants argue that the case is now moot, because the Agency no longer has a DOGE Team and the DOGE Temporary Organization, created by Executive Order 14,158, is set to expire on July 4, 2026. ECF 215 at 10-11. They also maintain that extra-record discovery is generally not permitted under the APA (*id.* at 12–14) but, even if discovery were appropriate, plaintiffs' proposed requests are overbroad. *Id.* at 14–15; *see* ECF 215-1. The Fourth Circuit's recent en banc ruling informs my analysis. *See AFSCME VI*, 172 F.4th 361.

## A.

As indicated, defendants contend in the Motion to Rescind that this case is now moot because SSA no longer has a DOGE Team, and the DOGE Temporary Organization will expire on July 4, 2026. ECF 215 at 10–11; *see* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025), § 3(b). Similarly, in defendants' Motion to Dismiss, filed on May 1, 2026 (ECF 217), they

again argue that the case is now moot and must be dismissed in its entirety.  ECF 217-1 at 7.[8] There, defendants state: "SSA no longer has a DOGE Team (or even a DOGE-affiliated employee), and SSA terminated each former DOGE Team member's access to SSA records upon their departure from the Agency. Nor will 'DOGE' plausibly regain access in the future: by operation of Executive Order, the DOGE Temporary Organization expires on July 4, 2026. And SSA has no future plans to have a DOGE Team." *Id.*

With the Motion to Dismiss, defendants submitted the Declaration of Felix-Lawson, the Chief of Human Resources for SSA.  *See* ECF 217-2.  Felix-Lawson avers: "SSA has no current DOGE Team, DOGE Team members, or DOGE detailees or affiliates" (*id.* ¶ 8), and "SSA has no future plans to have a DOGE Team, DOGE Team members, or DOGE detailees or affiliates working at SSA." *Id.* ¶ 10.   But, the Declaration also indicates that Russo, SSA's current Chief Information Officer, and Mark A. Steffenson, SSA's Head of Law, Policy, and Legislative Affairs and General Counsel, both "had prior association with DOGE before onboarding at SSA" and continue to work at SSA.  *Id.* ¶ 9.

Defendants posit that the Court should resolve the issue of mootness as a threshold matter. ECF 215 at 10; *see* ECF 224 at 10.  I agree.  As the Fourth Circuit has said, "'mootness goes to the heart of the Article III jurisdiction of the courts.'"  *Castendet-Lewis v. Sessions*, 855 F.3d 253, 260 (4th Cir. 2017) (quoting *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002)).

"'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir.

---

[8] As noted, this Memorandum Opinion does not resolve the Motion to Dismiss.  However, the mootness argument in the Motion to Dismiss is similar to the argument advanced in the Motion to Rescind.

2008) (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)); *see also Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). Therefore, "[w]hen a case or controversy ceases to exist—either due to a change in the facts or the law—'the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.'" *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs,* 789 F.3d 475, 482 (4th Cir. 2015)); *see Winston v. Stewart Title & Guar. Co.,* 920 F. Supp. 2d 631, 634 (D. Md. 2013) (citing *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011)).

A case becomes moot when the issues presented are "'no longer live or the parties lack a legally cognizable interest in the outcome.'" *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)) (other internal citations omitted); *see Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 349 (4th Cir. 2017).  And, a case is moot if the court is "unable to grant any effectual relief whatever to the parties." *Church of Scientology of Calif. v. United States*, 506 U.S. 9, 12 (1992); *see Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (stating that a case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.").

Of relevance here, a case is not moot if the court can provide prospective, injunctive relief.  *McLean v. City of Alexandria,* 86 F. Supp. 3d 475, 478–79 (E.D. Va. 2015).  In other words, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell-Ewald Co.*, 577 U.S. at 161.  Moreover, "[a] case is not moot . . . if a party can demonstrate that the apparent absence of a live dispute is merely a temporary abeyance of a harm that is 'capable of repetition, yet evading review.'" *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006) (quoting *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003)).

17

Whether a claim is moot must be determined by its particular facts. *Int'l Bhd. of Boilermakers v. Kelly,* 815 F.2d 912, 915 (3d Cir. 1987) (stating that "there is no precise test for ascertaining with precision whether a particular claim has become moot . . . Such a determination therefore becomes 'an intensely factual inquiry'"). Courts are especially wary of attempts to force mootness on an unwilling plaintiff by the defendant taking unilateral, voluntary action. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 170–71 (2000) ("A defendant's voluntary cessation of a challenged practice ordinarily does not deprive a federal court of its power to determine the legality of the practice."). When the defendant has voluntarily ceased the conduct which has created the controversy, "[t]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." *Id.* at 170.

Defendants contend that because the Amended Complaint seeks no retroactive relief, "there is no relief this Court can provide to Plaintiffs that would remedy their alleged harms." ECF 215 at 10. But, the assertion that plaintiffs do not seek retroactive relief appears incorrect. Among other things, plaintiffs seek disgorgement of PII that was previously disclosed by SSA to DOGE. *See* ECF 17 at 28–29.

In any event, the question is whether the Court can grant "any effectual relief whatever." *Church of Scientology of Calif.*, 506 U.S. at 12. Plaintiffs point out that "[w]hile [DOGE] Team Members' individual access to data was the focus of this Court's temporary restraining order and preliminary injunction, it is neither the sole focus of Plaintiffs' claims nor their only theory of injury." ECF 216 at 5. Among other remedies, plaintiffs seek prospective, corrective action regarding data that may have been improperly disclosed or accessed. *Id*. at 5–6 (citing, *inter alia*, ECF 17, ¶¶ 58, 97, 102, 109, 118, 126, 129).

18

In *AFSCME VI*, nine members of the Fourth Circuit agreed that plaintiffs have Article III standing. *Id.*, 172 F.4th at 371. Nevertheless, nine judges also agreed to vacatur of the preliminary injunction, on the ground that plaintiffs had not demonstrated irreparable harm. *Id.* at 375.

Notably, in rejecting this Court's finding of irreparable harm, the majority posited that "there are two forms of corrective relief that may be available *down the line*: money damages and a reparative permanent injunction." *Id.* at 373 (emphasis added). Therefore, the majority determined, "based on the record before the district court when it entered this preliminary injunction" (*id.* at 374), that plaintiffs did not demonstrate "that they were 'likely to suffer *irreparable* harm in the absence of preliminary relief.'" *Id.* at 375 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)) (emphasis in *AFSCME VI*).[9] The majority also referenced "the elephant in the room," *id.* at 374, *i.e.*, the Supreme Court's stay of the preliminary injunction.

In reaching its conclusion, the Fourth Circuit majority declined to consider the corrected record. It said: "[E]ven though the notice has been made part of the official record on appeal, our task in *this appeal* is 'to review the record that was before the district court at the time the preliminary injunction was entered.'" *AFSCME VI*, 172 F.4th at 371 n.8 (quoting *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020)) (cleaned up) (emphasis in *AFSCME VI*). Accordingly, based on the original record, the majority determined that plaintiffs had not shown irreparable harm. *AFSCME VI*, 172 F.4th at 373.

Nevertheless, the reference by the majority to remedies available to plaintiffs "down the line" is crucial. As stated, a case is not moot if the court can provide relief at a later time. *Church*

---

[9] Judge King, joined by Judges Gregory, Wynn, Thacker, Benjamin, and Berner, opined that plaintiffs satisfied the irreparable harm factor, whether one considered the original record or the corrected record. *Id.* at 399.

*of Scientology of Calif.*, 506 U.S. at 12.  And, the majority in *AFSCME VI* was of the view that because plaintiffs' alleged injuries could be remediated at a later time, the irreparable harm element was not satisfied.  If so, the fact that SSA no longer has DOGE affiliates working at the Agency, or that the DOGE Temporary Organization expires on July 4, 2026, is of no moment.

In the concurrence authored by Judge Richardson, he agreed that plaintiffs had failed to make the requisite showing of irreparable harm.  Noting that plaintiffs "allege harm arising from the knowledge that DOGE Team members may see their personal information," he said: "If there is a reason to think that monetary damages or a permanent injunction could not remedy this harm it does not now occur to me.  Plaintiffs' failure to show irreparable harm is sufficient to require us to vacate the preliminary injunction." *Id.* at 386–87 (Richardson, J., concurring).  Such a statement suggests the potential of a remedy at a future time.

The view of the Fourth Circuit appears at odds with defendants' claim of mootness.  In short, the Fourth Circuit rejected the finding of irreparable harm because of the potential, in the future, of an award of compensatory damages and/or a reparative injunction.  On this basis, the Court's majority determined that the element of irreparable harm was not satisfied.  Defendants cannot have it both ways.  If irreparable harm was not established because the alleged harm can be remedied "down the line," by way of monetary damages or a reparative injunction, then the availability of such remedies means that the case is not moot.

Moreover, the impending expiration of DOGE does not extinguish claims grounded in conduct that preceded the expiration.[10]  Nor does it preclude the Court from ordering appropriate

---

[10] Akin to a company that goes out of business, the DOGE Temporary Organization cannot escape responsibility for the conduct it undertook while it existed simply by reaching its expiration date. *See Pierce v. United States*, 255 U.S. 398, 402 (1921) ("The law which sends a corporation into the world with the capacity to act imposes upon its assets liability for its acts. The corporation cannot disable itself from responding by distributing its property among its stockholders and

retrospective relief.  The DOGE Temporary Organization's impending expiration date has been known since before this case was filed on February 21, 2025.  *See* ECF 1.  As plaintiffs put it: "That date having grown closer no more renders this case moot now than the date's existence did when the case was filed."  ECF 216 at 2.[11]

At bottom, the Fourth Circuit made clear that it views the case as alive and well.  Its vacatur of this Court's preliminary injunction was premised on the concept that relief could be made available to plaintiffs in the future and therefore irreparable harm did not exist.  And, specifically with respect to defendants' Notice, the majority said that "the district court will be free to consider any future requests for appropriate relief or corrective action."  *AFSCME VI*, 172 F.4th at 371 n.8. These statements are as broad a hint as any to this Court that the case is far from moot.

Defendants' position is also circular.  They argue that the Court should resolve mootness before permitting any discovery, yet the factual predicate for any meaningful mootness analysis lies exclusively within defendants' possession and control.  For example, without the discovery that defendants seek to forestall, the Court cannot assess whether DOGE's involvement with SSA has truly ended, whether improperly accessed data has been retrieved or destroyed, or whether individuals with prior DOGE associations continue to exercise meaningful influence over SSA systems.  Indeed, defendants ask the Court to accept at face value their representations about the

---

leaving remediless those having valid claims."); *Cyr v. B. Offen & Co.*, 501 F.2d 1145, 1153 (1st Cir. 1974) (stating that "a corporation cannot disable itself from responding to liability for its acts by distributing its assets"); *Southland Mfg. Corp. v. N. L. R. B.*, 475 F.2d 414, 416 (D.C. Cir. 1973) ("It does not seem rational to suppose that . . . Southland could escape liability for backpay in respect of periods prior to its going out of business.").

[11] Of course, nothing in the law prevents the President from extending the DOGE organization through future executive action.

current state of affairs at SSA, in a case where defendants themselves admitted that DOGE representatives were not truthful in their prior representations to the Court. *See* ECF 197.

The Court retains the power to grant plaintiffs' requested relief. Therefore, the case is not moot.

**B.**

Even if the case is not moot, defendants contend that the Fourth Circuit's recent opinion does not justify discovery at this stage. ECF 224 at 5, 10. Upon review of *AFSCME VI*, this Court rejects defendants' argument. The Fourth Circuit's majority opinion and several concurrences suggest that discovery of the kind that plaintiffs request is warranted. Indeed, the Fourth Circuit seems to have contemplated exactly the kind of evidentiary development of the record that discovery would provide.

In the majority opinion, the Fourth Circuit referenced the Notice filed by SSA on January 16, 2026 (ECF 197) and said, *AFSCME VI*, 172 F.4th at 371 n.8 (citation omitted):

> After we heard oral argument—and months after the district court entered the preliminary injunction at issue here—the government submitted a "Notice of Corrections to the Record." In that notice, the government admits: (1) that it provided inaccurate information to the district court and may not have fully complied with its temporary restraining order; (2) that DOGE used an unauthorized third-party server to share SSA data; and (3) that DOGE team members may have agreed to share SSA data with a political advocacy group that aims to "find evidence of voter fraud and to overturn election results in certain States."

The Court majority characterized the government's admissions in the supplemental record as "alarming." *Id.* It also stated that the admissions in the Notice "raise serious questions about [the government's] earlier conduct before the district court." *Id.*

Moreover, with respect to plaintiffs' First Factual Notice (ECF 208), filed on March 10, 2026, and the news article from the Washington Post, the Court majority wrote, *id.* at 371 n.8: "The same goes for the even more recent—and even more alarming—allegations that plaintiffs

22

flagged in their March 10 district court filing, which have not been made part of the record on appeal and thus are not properly before us in any sense."  Of import, the Court majority stated: "'On remand, however, the parties will be able to introduce further evidence on' these points . . . and the district court will be free to consider any future requests for appropriate relief or corrective action." *Id.* (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 673 (2004)).

Judge Wilkinson concurred in the judgment.  He said: "The district court may assess this [whistleblower] report, as well as all new revelations, when considering whether a permanent injunction is appropriate upon remand."  *AFSCME VI*, 172 F.4th at 375 n.2 (Wilkinson, J., concurring).

Judge King, joined by five other judges, concurred in part and dissented in part.  He maintained that the merits of the preliminary injunction should be assessed on the basis of the corrected record, but would affirm in any event.  *Id.* at 399.  He stated, *id.* at 390:

> As SSA recently revealed in a "Notice of Corrections to the Record [ECF 197]," a significant portion of the information provided by SSA and the other defendants in the preliminary injunction proceedings was patently false. The Notice of Corrections confesses repeated violations of the district court's prior temporary restraining order . . . and multiple instances of the DOGE affiliates' misuse and mishandling of SSA records. Moreover, the Notice of Corrections belies SSA's entire justification for opening its records to the DOGE affiliates — that the DOGE affiliates are regular SSA employees working under SSA's supervision, in accordance with its rules, and on its behalf — by exposing that the DOGE affiliates are actually rogue actors whose activities are hidden from SSA itself.

As if to underscore the gravity of the false information presented to the District Court by the government, Judge King added, *id.* at 394:

> From the corrected record, we now know that SSA and the other defendants provided patently false information to the district court in the preliminary injunction proceedings.[] We thus know that the prior rulings in this matter — the district court's issuance of the preliminary injunction, our Court's denial of a stay, and the Supreme Court's grant of a stay — were rendered on a materially erroneous record. And we know that, going forward, we should not accord the defendants any benefit of the doubt or readily trust in anything they say.

23

Even without the imprimatur of the Fourth Circuit in *AFSCME VI* as to the matter of discovery at this juncture, the record before this Court warrants the pursuit of limited discovery at this time.

Defendants attempt to minimize the significance of their Notice, in which they reported to the Court serious if not egregious misrepresentations by members of DOGE and SSA. The seriousness of the Notice cannot be overstated. Judge King's description of the Notice, *id.* at 394–95 (King, J., concurring and dissenting), provides a useful framework, *id.*:

> Regarding the false information proffered in the preliminary injunction proceedings, we specifically know that SSA falsely assured the district court of compliance with the TRO of March 20, 2025, and that SSA failed to disclose the full extent of the DOGE affiliates' systems access. We further know that SSA falsely advised the district court that no DOGE affiliate other than those assigned to SSA had ever had access to SSA records, that SSA had safeguards in place that would prevent DOGE affiliates from violating SSA security protocols and integrating SSA systems with outside servers, and that the DOGE affiliates' work at SSA had been limited to technology upgrades and fraud, waste, and abuse detection within the agency.
>
> Correspondingly, we know that SSA found itself obliged to belatedly confess the following, which includes repeated violations of the TRO and multiple incidents of the DOGE affiliates' misuse and mishandling of SSA records:
>
> • The TRO was violated by SSA's failure to terminate the DOGE affiliates' unfettered records access until approximately noon on March 24, 2025, as well as by a DOGE affiliate's searches of SSA records for personal information earlier that morning;
>
> • The TRO was again violated when SSA gave a DOGE affiliate access to certain records containing personal information from March 26 to April 2, 2025, and yet again when SSA gave a DOGE affiliate access to different records containing personal information from April 9 to June 11, 2025, through the period that the preliminary injunction was unstayed;
>
> • SSA failed to disclose that it had granted DOGE affiliates systems access enabling them to, inter alia, exchange data with each other in a "shared workspace" and access personal information via a "data visualization tool"; and

• It was unknown to SSA at the time of the preliminary injunction proceedings but later discovered that:

- On March 3, 2025, an SSA DOGE affiliate copied DOGE affiliates with the DOGE umbrella organization and the Department of Labor on an SSA email to the Department of Homeland Security, attaching an encrypted and password-protected file believed to contain personal information derived from the SSA records of some 1,000 people;

- From March 7 to 17, 2025, DOGE affiliates shared SSA data through the third-party server "Cloudflare"; and

- On March 24, 2025, acting in his official capacity with SSA, a DOGE affiliate entered a "Voter Data Agreement" with an unnamed "political advocacy group" for the purpose of proving voter fraud and overturning certain state election results.[ 12]

Further, the whistleblower report in August 2025, made by Charles Borges, SSA's former Chief Data Officer, alleges serious data security lapses at SSA. *AFSCME VI*, 172 F.4th at 395 (King, J., concurring and dissenting). In particular, as Judge King describes it, the Borges report claims that "DOGE affiliates evidently authorized themselves to create a copy of SSA's Numerical Identification System ('NUMIDENT') database, which contains the detailed and extremely sensitive personal information relating to each of the more than 450 million Social Security numbers ever issued." *Id.* And, "the DOGE affiliates then transferred the NUMIDENT data to a highly vulnerable 'cloud environment' controlled by DOGE and beyond SSA oversight, exposing the data to misuse by not only DOGE, but also identity thieves, blackmailers, and other bad actors." *Id.* at 395–96 (King, J., concurring and dissenting).

Simply put, defendants may have "provided patently false information to the district court in the preliminary injunction proceedings.[]" *AFSCME VI*, 172 F.4th at 394 (King, J., concurring

---

[12] As indicated, Judge King also proclaimed "that, going forward, we should not accord the defendants any benefit of the doubt or readily trust in anything they say." *AFSCME VI*, 172 F.4th at 394 (King, J., concurring and dissenting).

and dissenting).  I credit government counsel for doing what is expected of an officer of the court—disclosing the misconduct described in the Notice.  But, defendants now ask this Court, in effect, to ignore those disclosures and to preclude an inquiry into them, notwithstanding that the Fourth Circuit majority characterized the disclosures as "alarming."  *Id.* at 371 n.8.  In my view, the proper course is to develop the factual record, not to thwart its development.

As stated, when defendants' Notice was filed in January 2026 (ECF 197), this case was on appeal to the Fourth Circuit as to the merits of the preliminary injunction, and I had previously stayed the case, pending appeal.  *See* ECF 189.  Because of the stay and the pendency of the appeal, I took no action with regard to the Notice.  But, my inaction did not mean disinterest.  To the contrary, I contemplated an inquiry regarding defendants' misrepresentations at the appropriate time.

Notably, "a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citing *Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 579 (1946)).  This "inherent power" is "necessary to the integrity of the courts, for 'tampering with the administration of justice in [this] manner . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" *Chambers,* 501 U.S. at 44 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).

Moreover, defendants' failure to comply with the terms of the TRO could lead to a contempt hearing. *See United States v. Rylander*, 460 U.S. 752, 761 (1983) (affirming decision to initiate civil contempt proceedings when defendant failed to comply with the court's enforcement order); *Consolidation Coal Co. v. Loc. 1702, United Mineworkers of Am.*, 683 F.2d 827, 831 (4th Cir. 1982) (affirming finding of contempt for failure to comply with a temporary restraining order).

26

District courts have "the inherent authority to hold parties in civil contempt" to ensure compliance with their lawful orders. *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018) (citing *Shillitani v. United States,* 384 U.S. 364, 370 (1966)).  Notably, a court may initiate civil contempt proceedings, *sua sponte*, for failure to comply with an order of the court. *See Rylander*, 460 U.S. at 754.

For example, in *S.E.C. v. American Bd. of Trade, Inc.,* 830 F.2d 431 (2d Cir. 1987), *cert. denied,* 485 U.S. 938 (1988), the Second Circuit reviewed a case involving an unregistered commercial paper program that had been found unlawful. The Court noted that the district court's injunction "was designed to protect persons who were not parties to the action and [who] were too numerous and too ill-informed to protect their own interests." *Id.* at 441. Ruling that "the circumstances of th[e] case" justified the district court's *sua sponte* resort to civil contempt proceedings when faced with a violation of its injunction, the court said that "the district court had the obligation and resultant power to protect [the defendant's] noteholders, the principal beneficiaries of the underlying proceeding, whether or not the SEC specifically requested such relief." *Id.*  The same may very well be true here, where the TRO was designed to protect the "personal, confidential, sensitive, and private information that millions of Americans entrusted to their government." *AFSCME I*, 771 F. Supp. 3d at 808.

Discovery would enlighten and assist the Court in regard to such a matter.  Plaintiffs' requested discovery just happens to coincide and overlap with what the Court itself intended to explore at the appropriate time, out of concern that DOGE appears to have considered itself above the law.  For now, however, it seems appropriate to allow plaintiffs to proceed, thereby obviating the need for the Court to conduct its own inquiry.

Further, outside of the APA context, when determining whether good cause exists for expedited discovery, "courts frequently consider (1) whether a motion for preliminary injunction is pending; (2) the breadth of the requested expedited discovery; (3) the reasons the moving party is requesting expedited discovery; (4) the burden on the opponent to comply with the request for expedited discovery; (5) whether the information sought expeditiously could be obtained more efficiently from some other source; (6) the extent to which the discovery process would be expedited; and (7) whether a motion to dismiss for failure to state a claim is pending." *Does 4 v. Musk*, TDC-25-0462, 2025 WL 1505305, at *2 (D. Md. May 27, 2025) (citation omitted).

Of import, the requisite good cause may exist where "'[s]ignificant questions regarding noncompliance' with a court order" are present. *Abrego Garcia v. Noem*, 348 F.R.D. 589, 591 (D. Md. 2025) (quoting *Cal. Dep't of Social Servs. v. Leavitt*, 523 F.3d 1025, 1033–34 (9th Cir. 2008)); *see Blackberry Ltd. v. Typo Prods. LLC*, WHO-14-0023, 2014 WL 4136586, at *5 (N.D. Cal. Aug. 21, 2014) (granting discovery where plaintiff raised "serious questions . . . regarding [defendant's] possible violations of the preliminary injunction"); *Palmer v. Rice*, 231 F.R.D. 21, 25 (D.D.C. 2005) (allowing discovery where, "without [it], plaintiffs will not be able to determine whether the government has complied with the court's injunctions").

As noted, when evaluating good cause, courts in this district consider, among other factors, the breadth of the requested discovery, the reasons for the request, the burden on the opposing party, and whether a motion to dismiss is pending. *Does 4*, 2025 WL 1505305, at *2. Plaintiffs' requests are targeted at specific admissions defendants themselves made in ECF 197; the underlying facts are exclusively in defendants' possession and cannot readily be obtained from another source; and defendants have already represented that they conducted an internal review

and identified the relevant documents, which would seem to reduce the burden on them from the discovery process.

Moreover, the pendency of the Motion to Dismiss does not preclude discovery, particularly where discovery pertains to defendants' admitted misconduct and lack of compliance with a prior Court order. In particular, defendants have admitted that DOGE Team members ran PII searches on SSA systems on the morning of the very day compliance with the TRO was certified, and that DOGE personnel received PII access on at least two occasions after the TRO was issued. ECF 197 at 2–3. Those admissions present precisely the "significant questions regarding noncompliance with a court order" that establish good cause, independent of any other consideration. *Abrego Garcia*, 348 F.R.D. at 591.

## C.

Defendants assert that they have already produced the administrative record (ECF 100), and they argue that plaintiffs are not entitled to extra-record discovery. ECF 215 at 12–13. They also claim that plaintiffs "have not articulated a legitimate basis for extra-record discovery in this APA case." *Id.* at 12.

In my view, the discovery sought by plaintiffs is unrelated to the APA or SSA's decision to grant the DOGE Team access to SSA's systems. Rather, the discovery is aimed at defendants' conduct in regard to the TRO, including their lack of compliance with the TRO and the candor of defendants' representations to the Court. Defendants' insistence that the parties and the Court must consider only the APA record that defendants previously produced is a red herring.

It is, of course, well settled that the APA provides for judicial review of a final agency action. *See* 5 U.S.C. §§ 702, 704; *see also Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018); *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017).

Pursuant to the APA, a court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C). These provisions are "cumulative" in that "an agency action which is supported by the required substantial evidence may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.) (citation omitted).

Moreover, I am mindful that "courts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985). As a general matter, "claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record[.]" *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007); *see also  Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" (citation omitted)). This "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dep't of Commerce v. New York*, 588 U.S. 752, 780–81 (2019) (citation omitted) ("*New York*").

Further, judicial review of agency action is deferential, such that the agency's decision "is entitled to a presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977);

*see Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 577 (2025); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).  But, a court is not a "'rubber-stamp'" as to agency action.  *Ohio Valley Envtl. Coal.*, 556 F.3d at 192 (citation omitted); *see Judulang v. Holder*, 565 U.S. 42, 53 (2011) ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."); *Nat'l Audubon Soc'y v. United States Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021) ("Of course, a court should take care under any level of deference to not conduct judicial review with simply a 'rubber stamp.'") (citation omitted). Although a court "is not empowered to substitute its judgment for that of the agency," *Overton,* 401 U.S. at 416; *see Ohio Valley Envtl. Coal.*, 556 F.3d at 192, it must perform a "thorough, probing, [and] in-depth" review of an agency action, *Overton*, 401 U.S. at 415.

Under the APA, "the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706(2).  "The whole administrative record includes pertinent but unfavorable information, and an agency may not exclude information on the ground that it did not 'rely' on that information in its final decision."  *Tafas v. Dudas*, 530 F. Supp. 2d 786, 793 (E.D. Va. 2008) (collecting cases); *see, e.g., Bar MK Ranches v. Yuetter,* 994 F.2d 735, 739 (10th Cir. 1993) (stating that "the complete administrative record consists of all documents and materials directly or indirectly considered by the agency."); *Thompson v. United States Dep't of Labor,* 885 F.2d 551, 555 (9th Cir. 1989) ("The whole administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position") (citation and quotation marks omitted, emphasis in *Thompson*); *Ad Hoc Metals Coalition v. Whitman,* 227 F. Supp. 2d 134, 139 (D.D.C. 2002) (determining that a complete record must include any materials that were "referred to, considered by, or used by [the agency] before it

31

issued its final rule"); *Environmental Defense Fund, Inc. v. Blum,* 458 F. Supp. 650, 661 (D.D.C. 1978) ("The agency may not . . . skew the 'record' for review in its favor by excluding from that 'record' information in its own files which has great pertinence to the proceeding in question.[]")

Notably, judicial review "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Overton*, 401 U.S. at 420. This inquiry "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *New York*, 588 U.S. at 780 (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)); *see Overton*, 401 U.S. at 420. Hence, "the focal point for judicial review" under the APA "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

What the Court said in *Otsuka Pharm. Co. v. Burwell*, GJH-15-852, 2015 WL 1579127, at *2 (D. Md. Apr. 8, 2015) (alteration added), is apt:

> [A]n "agency may not skew the record by excluding unfavorable information but must produce the full record that was before the agency at the time the decision was made." *Blue Ocean Inst. v. Gutierrez,* 503 F. Supp. 2d 366, 369 (D.D.C. 2007). Nor may an agency exclude information simply because it did not rely on it for its final decision. *See Banner Health v. Sebelius,* 945 F. Supp. 2d 1, 16 (D.D.C. 2013). Rather, "a complete administrative record should include all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision." *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,* 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (internal quotations omitted).

However, a "complete administrative record" does not include "privileged materials, such as documents that fall within the deliberative process privilege, attorney-client privilege, and work product privilege." *Tafas*, 530 F. Supp. 2d at 794 (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs,* 968 F.2d 1438, 1457–58 (1st Cir. 1992)).

Although APA review is ordinarily confined to the administrative record, "there are cases that do not fit the mold." *Mayor & City Council of Baltimore v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019) (Hollander, J.). To accommodate those cases, courts have recognized several narrow exceptions to the APA's record rule. *Tafas*, 530 F. Supp. 2d at 795; James N. Saul, *Overly Restrictive Administrative Records and the Frustration of Judicial Review*, 38 ENVTL. L. 1301, 1308 (2008) (cataloguing exceptions). Discovery beyond the record may be appropriate where the record is incomplete; where additional information would provide helpful context; where supplemental information would assist the court in determining whether the agency failed to consider relevant factors; and, where the record's integrity has been impugned. *See* Saul, *supra*, ENVTL. L. at 1308–11.

If an agency fails to produce a complete administrative record, a party may request supplementation of the record. *Burwell*, 2015 WL 1579127, at * 3. Some courts refer to this form of supplementation as completion of the record. *See Am. Farm Bureau Fed'n v. U.S. E.P.A.*, SHR-11-0067, 2011 WL 6826539, at *4 (M.D. Pa. Dec. 28, 2011) ("[C]ompletion of the record implies the addition of only those relevant documents that were actually available to, and considered by the agency at the time the decision was made and, therefore, should have been part of the record but were improperly excluded.") (Emphasis in original). But, "[s]upplementation of the record as designated by the agency is . . . the exception, not the rule." *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 309 (S.D.N.Y. 2012). The Court said in *Burwell*, 2015 WL 1579127, at *3:

> "An administrative record may be 'supplemented' in one of two ways—either by (1) including evidence that should have been properly a part of the administrative record but was excluded by the agency, or (2) adding extra-judicial evidence that was not initially before the agency but the party believes should nonetheless be included in the administrative record." *WildEarth Guardians v. Salazar,* 670 F. Supp. 2d 1, 5 n.4 (D.D.C. 2009).

33

Courts have recognized that extra-record discovery is appropriate where, among other circumstances, a "'strong showing of bad faith or improper behavior'" has been made. *New York*, 588 U.S. at 781 (quoting *Overton*, 401 U.S. at 420); *see Food & Drug Admin.*, 604 U.S. at 577; *Mayor & City Council of Baltimore*, 429 F. Supp. 3d at 137. But, mere allegations of bad faith are inadequate to overcome the presumption of regularity accorded to agency action. *See Mullins v. U.S. Dep't of Energy*, 50 F.3d 990, 993 (Fed. Cir. 1995). Rather, a plaintiff must put forth a "strong showing" of impropriety to peer beyond the record. *New York*, 588 U.S. at 781; *see also Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 339 (D.C. Cir. 2011).

Defendants maintain that plaintiffs cannot "meet the 'high standard' for extra-record discovery because SSA demonstrably has acted in good faith." ECF 215 at 13 (quoting *Tafas*, 530 F. Supp. 2d at 797). They posit that because SSA itself "reported possible discrepancies in the record first to its counsel and then the Court", the bad faith exception does not apply. ECF 215 at 13. In my view, this argument is misguided.

For starters, as Judge King noted in *AFSCME VI*, 172 F.4th at 394 n.4, SSA and its two leaders are not the only defendants. The defendants also include the DOGE entities and two DOGE officials. Yet, the Notice was not filed on DOGE's behalf. As Judge King astutely observed, "it is beyond passing strange that only SSA filed 'the Notice . . . .'" *Id.*

Moreover, defendants downplay the significance of the content of the Notice. In the Notice, dated January 16, 2026 (ECF 197), defendants disclosed that several sworn declarations previously submitted to the Court were inaccurate, and they identified multiple instances in which members of the DOGE Team may have violated the TRO, which was then in effect. The declarations were, of course, made under oath. The Notice revealed, in sum, that DOGE Team members had accessed and transmitted SSA data in ways that defendants had previously denied or

34

failed to disclose. Further, the Notice established that the government's prior representations about the scope, purpose, and containment of DOGE's access to SSA data were inaccurate, and that sensitive personal information belonging to a large number of Americans may have traveled well beyond the walls of the Agency.

To illustrate, the Notice disclosed that in March 2025, a political advocacy group contacted SSA DOGE Team members requesting assistance in analyzing state voter rolls, with the stated aim of finding evidence of voter fraud and "to overturn election results in certain States." *Id.* at 5. Moreover, the Notice represents: "In connection with these communications, one of the DOGE team members signed a 'Voter Data Agreement,' in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025." *Id.* According to defendants, this agreement was executed without review or approval through the Agency's data exchange procedures, and without the knowledge of SSA leadership. *Id.* And, "SSA first learned about this agreement during a review unrelated to this case in November 2025." *Id.*

In addition, plaintiffs submitted with their Opposition to the Motion to Rescind several documents that were produced by defendants in the case of *Democracy Forward Found. v. Soc. Sec. Admin.*, ABA-26-1188 (D. Md.), filed in this District on March 23, 2026, in which Democracy Forward Foundation seeks to compel SSA to comply with the Freedom of Information Act with respect to the information provided in defendants' Notice. *See* ECF 216-1. Plaintiffs assert, ECF 216 at 10, that these heavily redacted documents include the Voter Data Transfer Agreement between SSA DOGE personnel and a third-party political organization and several emails surrounding the transmission and execution of the agreement (ECF 216-1 at 9–13); Hatch Act complaints (*id.* at 2–8, 14–22); and an email from a member of the SSA DOGE Team to DOGE

personnel at the Department of Homeland Security and the Department of Labor in which "the SSA DOGE Team attached a 'password protected [E]xcel workbook' with 'enriched data,' including personally identifiable information on 971 beneficiaries." ECF 216 at 10 (quoting ECF 216-1 at 61). According to plaintiffs, these documents "make clear that the DOGE Team's actions in connection with the Voter Data Transfer Agreement far exceeded Defendants' off-handed description of it in their 'Notice of Corrections.'" ECF 216 at 10.

Moreover, as discussed earlier, plaintiffs brought to the Court's attention news reports in the Washington Post that provided additional allegations as to DOGE's conduct at SSA. *See* ECF 208; ECF 233. In particular, on March 10, 2026, plaintiffs filed their First Factual Notice (ECF 208), alerting the Court to an article reporting whistleblower allegations with respect to a former DOGE employee who had taken restricted SSA databases to a private-sector employer, potentially on a thumb drive. Then, on June 5, 2026, plaintiffs filed the Second Factual Notice (ECF 233), bringing to the Court's attention a sworn Declaration by named SSA senior executive Schofield, who described DOGE's directions to falsify death records, its effort to have 2.7 million living people marked as deceased in SSA systems, and a DHS official's admission that the purpose was to cause mass deportations through the illegal manipulation of SSA data.

Plaintiffs' Discovery Motion seeks expedited discovery; it does not seek supplementation of the administrative record. *See* ECF 200. Plaintiffs' requested discovery does not ask the Court to look behind SSA's reasons for granting the DOGE Team access to its systems, or to probe the deliberations that produced that decision. Rather, the discovery is directed to the issues raised in defendants' Notice and in plaintiffs' reports: Whether defendants complied with the Court's TRO; whether defendants' representations to the Court were accurate; and what became of the SSA data once it left the Agency's control. Indeed, defendants acknowledge: "Nearly all of Plaintiffs'

proposed discovery requests . . . are directed at alleged misuse of data *after* access was granted [to DOGE]." ECF 215 at 11 (emphasis in original); *see* ECF 215-1.  Defendants also state: "Plaintiffs' case, as this Court has itself recognized, is about the alleged final agency action of granting access to the SSA DOGE Team in the first place."  ECF 215 at 11.

From its inception, this case concerned allegations of unjustified disclosure of highly personal information by SSA to DOGE, pertaining to millions of Americans.  The Notice (ECF 197) suggests that the conduct of the DOGE Team transformed a potential concern into reality by flagrant disregard of the TRO.  On the basis of defendants' own account, the Agency action under APA review is not one and the same as the matters for which limited discovery is now sought.  Discovery into conduct concerning the Notice and the reports is not governed by the APA's record rule.

Moreover, as discussed earlier, a court retains the inherent authority "to conduct an independent investigation in order to determine whether it has been the victim of fraud," and to ensure compliance with its own orders.  *Chambers*, 501 U.S. at 44.  This authority does not dissipate because the underlying suit arises under the APA.  Moreover, where "significant questions regarding noncompliance with a court order" are presented, good cause for discovery exists under ordinary principles, and the good cause factors are satisfied here.  *Abrego Garcia*, 348 F.R.D. at 591; *see Does 4*, 2025 WL 1505305, at *2.  Whether the APA's bad faith exception is *also* satisfied is beside the point.

The Court need not resolve here whether the allegations asserted in the Notice and in the Washington Post articles are true.  What matters for present purposes is that the information contained in the articles is facially inconsistent with representations made by defendants to this Court about the purpose and scope of DOGE's conduct and even its involvement at SSA.  The

incongruities in the articles and in defendants' Notice confirm the need to examine defendants' representations. In turn, that necessitates discovery. But, the inquiry does not implicate the Agency's decisionmaking. Therefore, the APA's record rule is not applicable.

But, even if the APA applied, extra-record discovery pursuant to the APA would be warranted. Extra-record discovery is generally appropriate where the integrity of the record is impugned. *See* Saul, *supra*, ENVTL. L. at 1308–11. Courts have also permitted extra-record discovery where bad faith or improper behavior has been shown. *New York,* 588 U.S. at 781; *Overton,* 401 U.S. at 420. Plaintiffs have certainly made the requisite showing, for the reasons already discussed.

In sum, plaintiffs are entitled to seek discovery regarding the issues surrounding defendants' alleged noncompliance with the TRO.

**D.**

Defendants maintain that plaintiffs' discovery requests are neither tethered to the Amended Complaint nor properly tailored. *See* ECF 215 at 11–12, 14–15. They assert: "Discovery about alleged misuse of agency data post-access decision is thus not relevant, unless and until Plaintiffs amend their complaint to include claims that would make it so." ECF 224 at 9.

But, it was defendants, not plaintiffs, who injected the issues that make this discovery necessary. By filing their Notice (ECF 197), defendants placed before the Court a variety of admissions, including incomplete disclosures by SSA; inaccurate sworn declarations; unauthorized data transmissions; and an undisclosed agreement by a DOGE member with a partisan political organization, which plaintiffs could not have anticipated when drafting their Complaint. Indeed, as plaintiffs put it in their Discovery Motion, "these revelations disclose new harms to Plaintiffs—both in the past and on an ongoing basis—that have not previously been

38

explored in this litigation." ECF 200 at 3. And, as discussed above, it appears to me that the Fourth Circuit generally contemplated discovery in regard to defendants' "conduct before the district court." *AFSCME VI*, 172 F.4th at 371 n.8 ("'On remand, however, the parties will be able to introduce further evidence on' these points, *Ashcroft*, 542 U.S. at 673, and the district court will be free to consider any future requests for appropriate relief or corrective action.").

Defendants ask the Court to impose on plaintiffs a limit of five requests for production, five interrogatories, five requests for admission, and zero depositions. ECF 215 at 15. The Court declines defendants' invitation to enact such rigid constraints on discovery, which is necessitated by defendants' own alleged misconduct. To be sure, even if some specific requests require modification, that concern does not justify rescinding the Order in its entirety. If defendants believe particular requests are not relevant, are disproportionate, or seek privileged material, *see* Fed. R. Civ. P. 26(b)(1), the proper mechanism is objections pursuant to the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 33(b)(4); Fed. R. Civ. P. 34(b)(2)(B)–(C); Fed. R. Civ. P. 36(a)(5), or a motion for a protective order addressing specific requests, *see* Fed. R. Civ. P. 26(c), not the elimination of discovery altogether.

### III. Conclusion

For the foregoing reasons, I shall deny the Motion to Rescind. An Order follows, consistent with this Memorandum Opinion.

Date: June 26, 2026

/s/  
Ellen Lipton Hollander  
United States District Judge